# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| TERRAN BIOSCIENCES, INC., UNIVERSITY OF MARYLAND, BALTIMORE, and SCOTT THOMPSON, | Civil Action No. 1:22-cv-01956-ELH |
| *Plaintiffs,* | **JURY TRIAL DEMANDED** |
| v. | |
| COMPASS PATHFINDER LIMITED (an England and Wales company), and DOES 1-10, | |
| *Defendants.* | |

## THIRD AMENDED COMPLAINT

Plaintiffs Terran Biosciences, Inc. ("Terran"), University of Maryland, Baltimore ("UMB"), and Professor Scott Thompson ("Professor Thompson") (collectively "Plaintiffs"), by and through their undersigned counsel, and for and in support of this Third Amended Complaint against Defendants Compass Pathfinder Limited and DOES 1-10 (collectively "Compass"), hereby aver as follows:

### Introduction

1.      This action arises out of Compass's malicious and intentional scheme to defraud the State of Maryland and misappropriate highly confidential and sensitive, proprietary information that Terran, UMB, and Professor Thompson spent years and substantial resources to develop.   In 2016, Professor Thompson, then-Chair of the Department of Physiology at the University of Maryland, Baltimore, School of Medicine, began working on the idea of the administration of psilocybin in the presence of a 5-HT2A antagonist

(including ketanserin) as a potential rapid, non-hallucinogenic antidepressant therapy.  At the time, it was known that 5-HT2A antagonists like ketanserin reduce or eliminate the negative hallucinogenic effects of psilocybin.  However, Professor Thompson recognized that psilocybin's antidepressant therapeutic effects are independent of significant 5-HT2A receptor activation that causes hallucinations, and discovered that, through the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, a patient could receive the antidepressant benefits of psilocybin, without being subject to the negative hallucinogenic effects.

2.     Professor Thompson spent the next several years at UMB researching and developing this discovery into a potential therapeutic product.  His inventions with respect to this potential breakthrough treatment and results of his work were and are the "Psilocybin Trade Secrets," including (i) his discovery that psilocybin's antidepressant therapeutic effects are independent of the 5-HT2A receptor activation that causes hallucinations, and (ii) his discovery that time-sequenced administration of a 5-HT2A receptor antagonist followed by psilocybin was necessary to achieve the anti-depressant therapeutic effects without hallucinations.  On August 13, 2019, Professor Thompson filed a provisional patent application, assigned to UMB, disclosing the co-administration of psilocybin and 5-HT2A antagonists. However, Professor Thompson maintained as trade secrets the importance of the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, as well as the time points, dosing, frequency and other details of such sequential administration, pending the development of further experimental data.  Both before and after he filed this patent application, Professor Thompson kept his research, development, and related information leading to the Psilocybin Trade Secrets confidential, and maintained a practice to never

disclose any such information outside the scope of a confidentiality/non-disclosure agreement.

3.    In May 2019, Dr. Ekaterina Malievskaia, the Co-Founder and Head of Research and Development of Compass, reached out to Professor Thompson, then-working in Baltimore, Maryland, purporting to seek a potential partnership with Professor Thompson in his capacity as a UMB researcher, ostensibly to further his psilocybin research and explore "possible business arrangements between them and/or their Affiliates."  Prior to any substantive discussions regarding Thompson's research or plans moving forward with the Psilocybin Trade Secrets, Jessica Rose Stuart, a Team Coordinator at Compass Pathfinder Limited (then known as Compass Pathways Limited), provided Professor Thompson with a Mutual Non-Disclosure Agreement ("NDA") at the direct of Dr. Malievskaia.  Under the terms of the NDA Compass provided, Compass would be precluded from distributing, disclosing, or otherwise disseminating any confidential information and prohibited from using this information for any purposes besides exploring a potential business relationship with Professor Thompson and UMB.  Professor Thompson executed the NDA in his capacity as a UMB researcher and as an agent of UMB, because UMB owned the confidential information protected by the NDA.  Compass confirmed receipt of the signed NDA.  However, even though it was Compass's own form NDA which it provided to Thompson, and even though Thompson signed Compass's NDA without making any changes to it, Compass for its part never executed the NDA.  On information and belief, Compass did not execute the NDA because Compass never intended to maintain the confidentiality of the Psilocybin Trade Secrets and other confidential information or to otherwise comply with the terms of the NDA. Instead, Compass provided the NDA to Professor Thompson to induce him to disclose his Psilocybin Trade Secrets and other confidential information to Compass under the belief that

all such communications and disclosures were subject to a binding NDA, when in fact Compass secretly intended to disclose and otherwise exploit the Psilocybin Trade Secrets and other confidential information for Compass's own unilateral benefit.    For seven months, in reliance on what he considered a binding NDA, Professor Thompson disclosed his Psilocybin Trade Secrets and other confidential information to Compass as he negotiated with Compass in good faith to reach a collaboration agreement, with the understanding that all information concerning Professor Thompson's inventions and the Psilocybin Trade Secrets exchanged between the parties was and would remain confidential.  Indeed, Professor Thompson and Compass engaged in numerous substantive discussions and negotiations regarding a potential partnership between Compass and UMB via e-mail, Zoom, and in-person meetings, during which communications Professor Thompson shared his Psilocybin Trade Secrets and other confidential information with Compass.

4.    During these negotiations, Compass repeatedly emphasized its excitement about the opportunity to work with Professor Thompson on his research ideas, which had been developed in Maryland.  In turn, Professor Thompson continued to disclose further proprietary information about the Psilocybin Trade Secrets to Compass in confidence, pursuant to the preemptive protections of what he believed to be a valid, governing NDA.  At the outset of those discussions, Compass did not know about the idea that administering psilocybin in the presence of a 5-HT2A antagonist might eliminate, attenuate, or shorten the duration of psilocybin-induced hallucinations while retaining its therapeutic benefits as an antidepressant.  However, upon discovering the "considerable clinical value" arising from Professor Thompson's research data—as "the first of its kind" and likely "the first direct evidence" of the functional requirements in the "antidepressant actions of psilocybin"—Compass mislead him into

disclosing all the information about his confidential research and Psilocybin Trade Secrets.

5.     Unbeknownst to Professor Thompson, Compass misappropriated the Psilocybin Trade Secrets for itself.  In August 2019, while Compass was maliciously stringing Professor Thompson along, it secretly filed its own patent application, claiming for the first time "[a] method of reducing the negative side effects associated with traumatic psychedelic experience in a patient undergoing treatment with psilocybin" through sequential administration of "one or more 5-HT2A specific antagonists" followed by psilocybin—in other words, claiming Professor Thompson's invention for itself.

6.     Even after it secretly began applying for patents related to certain of the Psilocybin Trade Secrets, Compass continued to encourage further disclosures until several months later—in November 2019—when Compass abruptly ended the parties' negotiations, stating that it would not enter into a collaboration agreement with Professor Thompson or UMB for psilocybin research.  Compass has misappropriated and continues to misappropriate the Psilocybin Trade Secrets for its own gain.

7.     In 2021, prior to discovering Compass's misappropriations and other tortious conduct as alleged herein, Terran entered into a licensing agreement with UMB, under which UMB granted Terran an exclusive license to the Psilocybin Trade Secrets.  Terran licensed the Psilocybin Trade Secrets so it could bring a groundbreaking rapid, non-hallucinogenic antidepressant therapy to market.  The Psilocybin Trade Secrets relate to this therapy, which Terran has taken significant steps towards developing and commercializing in the United States and throughout the world.  Terran has the "first and primary right" to prosecute and control any action for misappropriation of the Psilocybin Trade Secrets.

8.     Consequently, Terran, UMB, and Professor Thompson bring this action for

trade secret misappropriation and related common law causes of action, seeking injunctive relief, damages, and other relief necessary to remedy and punish Compass's blatant and fraudulent misconduct.

### The Parties

9.      Plaintiff Terran Biosciences, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business at 507 W 28th Street, PH 3A, New York, NY.

10.     Plaintiff University of Maryland, Baltimore, is a public university in Baltimore, Maryland.  UMB is the parent institution of the University of Maryland School of Medicine, which was the first public medical school in the United States and a leading medical school in both research and primary care.

11.     Plaintiff Dr. Scott Thompson is currently a Professor of Psychiatry at the University of Colorado Anschutz School of Medicine.  From 1998 to 2022, he was a Professor of Physiology at the University of Maryland, Baltimore, School of Medicine.

12.     Upon information and belief, Defendant Compass Pathfinder Limited is a company incorporated in England and Wales, with company number 10229259, whose registered office is at 3rd Floor, 1 Ashley Road, Altrincham, Cheshire, United Kingdom, WA14 2DT.

13.     Defendants DOES 1-10 are presently unknown to Plaintiffs.  They include, for example, any Compass entities, executives, employees, agents, or other affiliates who were active participants in the scheme to defraud Professor Thompson and/or misappropriate the Psilocybin Trade Secrets.  Their exact identities and actions can be uncovered through discovery into Defendant Compass Pathfinder Limited's misappropriation of the Psilocybin

Trade Secrets and the other causes of action. Plaintiffs will amend its complaint to identify the DOE defendants at an appropriate time.

**Jurisdiction and Venue**

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), as it arises under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq*.

15.    This Court has supplemental jurisdiction over Plaintiffs' state law claims under the Maryland Uniform Trade Secret Act, Md. Code Ann., Comm. Law § 11-1201, *et seq*. pursuant to 28 U.S.C. § 1367(a) because Plaintiffs' state law claims are so closely related to the federal claim that they form part of the same case of controversy under Article III of the United States Constitution.

16.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C.§ 1332(a), because there is complete diversity and the amount in controversy is at least $75,000.

17.    This Court has personal jurisdiction over Compass under Fed. R. Civ. P. 4(k)(1)(A) and Md. Code Ann., Cts & Jud. Proc. § 6-103(1), (3), and (4). Compass reached out to multiple UMB professors, including Professor Thompson in Baltimore, Maryland, to discuss his research and proposal related to the Psilocybin Trade Secrets. Compass purported to enter into an NDA with Professor Thompson for the purposes of exploring a business relationship with UMB. Compass sought and received proprietary information developed and held at UMB constituting the Psilocybin Trade Secrets under the pretense of a potential partnership between Compass and UMB. By engaging in seven months of extensive negotiations with UMB professors, secretly filing patent applications in the midst of those

negotiations, and then continuing to induce UMB professors to disclose further proprietary information under the guise of the preemptive protections of an NDA, Compass purposefully availed itself of the benefits and privileges of the laws of Maryland, while simultaneously causing harm to Professor Thompson and UMB in Maryland, and defrauding the State of Maryland.

18.     Compass also purposefully availed itself of the benefits and privileges of the laws of Maryland by conducting clinical trials of its own therapeutic psilocybin product at the Sheppard Pratt Health System in Baltimore, Maryland during the time it began misappropriating the alleged trade secrets.   On information and belief, Compass misappropriated the Psilocybin Trade Secrets in part to block, preempt and otherwise interfere with UMB's patenting of the Psilocybin Trade Secrets to further Compass's efforts to commercialize its own therapeutic product.  As a result, Compass's own activities in Maryland directed to its own therapeutic psilocybin product relate directly to Compass's schemes, misappropriations and other torts and breaches as alleged herein.   Compass's related activities in Maryland were and are substantial.  For example, Compass conducted a clinical trial in part at the Sheppard Pratt Health System in Baltimore, Maryland titled "The Safety and Efficacy of Psilocybin in Participants With Treatment Resistant Depression (P- TRD)."  Ex. 1 at 2, 6; Ex. 2 at 4 (list of Compass clinical trials conducted in the U.S.) (Row 8).  Compass submitted this study to the FDA's database for clinical trials in December 2018, and reported that the first patient's first visit in the study occurred on March 1, 2019 and that the study completed on September 27, 2021. Ex. 1 at 2-3.[1]  Compass also established, funds, and operates a "Centre of Excellence" to "carry out new research in the use of psilocybin therapy" on Sheppard Pratt's Towson, Maryland campus.  Ex. 3 at 2.  The Centre was first announced publicly in

---

[1] All Exhibit pincites are to PDF pagination.

January 2021.  *Id.*  Since 2021, Compass has conducted at least six additional clinical trials at Sheppard Pratt in Maryland related to Psilocybin. Ex. 2 at 2-4 (Rows 1, 3, 4, 10, 12 & 13).  This includes two trials which were both posted on June 16, 2020 and began on March 1, 2021, *id.* at 4 (Rows 12 & 13), and another trial which was posted on February 2, 2022 and began on March 28, 2022, *id.* (Row 10).  Compass has also expanded in Maryland beyond Sheppard Pratt.  One 2023 clinical trial has study locations at CBH Health, LLC in Gaithersburg, Maryland and Pharmasite Research, Inc. in Pikesville, Maryland (in addition to Sheppard Pratt and other U.S. locations), *id.* at 2 (Row 3), while another is located entirely at Sunstone Therapies in Rockville, Maryland, *id.* (Row 1).

19.     To the extent specific jurisdiction is not proper in Maryland, then Compass is subject to personal jurisdiction under Fed. R. Civ. P. 4(k)(2), as a foreign defendant who is not subject to any state's court of general jurisdiction.  Before preparing the Third Amended Complaint, counsel for Plaintiffs reached out to counsel for Compass, requesting that Compass "identify which state(s) Compass Pathfinder would agree it is subject to personal jurisdiction in for purposes of this action." Ex. 4.  Compass did not identify any such location, instead attesting that Compass "is incorporated in the U.K. and does not have a principal place of business in the U.S. [and] cannot determine where jurisdiction may be proper (if anywhere)." Ex. 5.

20.     The exercise of jurisdiction under Fed. R. Civ. P. 4(k)(2) would be consistent with the United States Constitution and its laws, as Compass has purposefully established numerous contacts with the United States.

21.     Compass's contacts with the United States includes many activities beyond those listed above in the State of Maryland.  For example, Compass's 2019-2021 clinical trial

regarding "The Safety and Efficacy of Psilocybin in Participants With Treatment Resistant Depression (P- TRD)" had eight study locations within the United States. Along with Sheppard Pratt in Baltimore, Maryland, the trial had study locations in La Jolla, San Diego, and Stanford, California; Atlanta, Georgia; New Orleans, Louisiana; New York, New York; and Houston, Texas. Ex. 1 at 5-6; Ex. 2 at 4 (Row 8). In addition to the seven trials conducted at least partially in Maryland, Compass has conducted at least seven more clinical trials in the U.S. located entirely outside of Maryland. Ex. 2 at 2-5 (Rows 2, 5-7, 9, 11 & 14). This includes a study which began on July 20, 2020, with locations in La Jolla and San Diego, California; Atlanta, Georgia; and Houston, Texas. *Id*. at 3 (Row 7). Another study began on September 15, 2020, with La Jolla, California as the sole United States location, *id*. (Row 6), while another study located entirely in New York, New York (although co-sponsored by UCLA) began on February 26, 2021, *id*. at 5 (Row 14).

22.    As is particularly relevant to Compass's fraudulent scheme giving rise to this lawsuit, Compass has consistently sought and received the benefits of the United States patent system. For example, on August 29, 2019, Compass blatantly misappropriated the Psilocybin Trade Secrets by filing U.S. Provisional Patent Application No. 62/893,611, entitled "Methods of Co-Administering 5-HT2A Antagonists/Inverse Agonists And Psilocybin." Ex. 6. This was one day after Compass filed U.S. Provisional Patent Application No. 62/893,110, entitled "Methods Of Co-Administering Benzodiazepines And Psilocybin" and listing the same seven inventors. Ex. 7. These are only two of at least twenty provisional patent applications filed by Compass, including seventeen provisional patent applications filed April 17, 2019, and one filed December 10, 2019. *See* Ex. 8 at 2-3 (listing provisional applications). Compass has further filed at least fourteen non-provisional patent applications relating to psilocybin, with at

least nine so far having issued as granted United States patents (U.S. Patent Nos. 10,519,125; 10,947,257; 10,954,259; 11,149,044; 11,180,517; 11,447,510; 11,505,564; 11,564,935; 11,629,159). *See* Ex. 8; Ex. 9 at 2 (listing other granted patents in the family); *see also* Ex. 10 at 2 (Compass stating that "These patents are a critical milestone in our efforts to establish a new evidence-based option to help patients with depression in the US . . . Through these grants, the USPTO has recognised our innovations.").

23.    Compass has also filed for at least eight trademarks in the United States, Ex. 11, including the filing of Word Mark Nos. 79302207 and 79301429 on September 17, 2020 for "Compass" and "Compass Pathways," expressly noting that they cover, *inter alia*, "Psychoactive and psychedelic medicinal preparations for the treatment of depression, anxiety, bipolar disorder, post-traumatic stress disorder, and eating disorders," Exs. 12 & 13.

24.    Venue is proper in the United States District Court for the District of Maryland pursuant to 28 U.S.C. § 1391(c)(3) because Compass is a foreign defendant and venue is proper in any judicial district.  Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims asserted occurred in this District.

## **Factual Background**

### *Psilocybin Trade Secrets and Confidential Information*

25.    Dr. Scott Thompson, a Professor of Physiology at the University of Maryland School of Medicine for nearly 24 years (from 1998 to 2022), and currently a Professor of Psychiatry at the University of Colorado Anschutz School of Medicine, is an expert in the potential use of psilocybin as an antidepressant and medication for other mental health disorders.  In November 2016, Professor Thompson came up with the idea of administering

psilocybin in the presence of ketanserin (a 5- HT2A antagonist) as a potential rapid, non-hallucinogenic antidepressant therapy.  Professor Thompson recognized that the combination would reduce or eliminate the hallucinatory effects of psilocybin, while retaining its antidepressant actions.  Over the next few years, Professor Thompson engaged in extensive research during the course of his employment with UMB to test the potential of this idea.  In particular, Professor Thompson's research related to the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, in order to produce the optimal non-hallucinatory and anti-depressive effects.  Further research related to the optimal time points, frequency, and dosing for the sequential administration of the two drugs in combination.

26.     The inventions derived from, and the results of, this research constitute the Psilocybin Trade Secrets.  By virtue of Professor Thompson's employment and invention assignment agreement with UMB, the Psilocybin Trade Secrets are owned by UMB, which in turn has exclusively licensed them to Terran.  However, pursuant to UMB's intellectual property policies and faculty agreements, Professor Thompson receives a portion of the revenues that UMB generates from his inventions, including a portion of the royalties UMB receives from licensing his patents and other inventions, including the Psilocybin Trade Secrets.  Ex. 14 at 4-5.

27.     At all relevant times, Professor Thompson and UMB held the Psilocybin Trade Secrets in strict confidence.  Information regarding the trade secrets was kept on secured devices in UMB's custody and control.   Professor Thompson and UMB did not disclose the Psilocybin Trade Secrets to anyone except those governed by non-disclosure agreements or other confidentiality obligations.

28.    On August 13, 2019, Professor Thompson and UMB filed U.S. Provisional Patent Application No. 62/886,080 ("the '080 Application"), entitled "Combination Therapy with Broad Spectrum Serotonergic Agonists and Anti-Hallucinogenic Serotonergic Antagonists." Ex. 15. The '080 Application generally disclosed co-administering psilocybin and an antagonist, but did not go into detail about the specifics of the sequential administration of a 5-HT2A antagonist followed by psilocybin, or the optimal order, time points, frequency, or dosing for the therapy, all of which Professor Thompson maintained as trade secrets pending further experimental data.

***Compass Reaches Out To UMB Regarding Thompson's Research***

29.    On May 16, 2019, in the course of considering whether to conduct a PK/biomarker study at the National Institute of Mental Health in North Bethesda, Maryland, Dr. Ekaterina Malievskaia, the Co-Founder and Head of Research and Development of Compass, reached out to Professor Todd Gould, a Psychiatry Professor at the University of Maryland School of Medicine, because Compass was "developing psilocybin for treatment-resistant depression and trying to understand molecular mechanisms of psilocybin." Ex. 16 at 2-3. Professor Gould directed Dr. Malievskaia to Professor Thompson. *Id*. Dr. Malievskaia solicited a call with Professor Thompson to discuss his research on the Psilocybin Trade Secrets.

30.    On May 29, 2019, at the direction of Dr. Malievskaia, Jessica Rose Stuart, a Team Coordinator at Compass Pathfinder Limited (then known as Compass Pathways Limited), sent Professor Thompson a Mutual Non-Disclosure Agreement ("NDA") to execute prior to the scheduled call. Ex. 17 at 3. By its terms, the NDA would prohibit Compass from using any information disclosed by Professor Thompson or his colleagues other than "in connection with

exploring possible business arrangements between [Compass and Professor Thompson] and/or their Affiliates." Ex. 18 at 2. Professor Thompson returned a signed copy of the NDA that same day. Ex. 17 at 2. Manon Veraart, a Compass employee, acknowledged receipt of Professor Thompson's signed NDA on May 30, 2019. Ex. 19 at 2. However, as Compass represented to this Court, Compass "did not sign" the NDA in return. ECF No. 24-1 at 18. The fact that Compass has disclaimed the existence of a binding NDA between itself and Professor Thompson, despite inducing Professor Thompson to believe all of his communications and disclosures were covered by the NDA that Compass itself sent him, further evidences Compass's intent to defraud Professor Thompson and UMB, and its desire and attempt to misappropriate trade secrets and other confidential information with impunity.

31.    On May 31, 2019, Professor Thompson and Professor Gould of UMB, and at least Dr. Malievskaia of Compass, held a call to discuss the molecular mechanisms of psilocybin. The parties discussed Professor Thompson's and Professor Gould's plans to test invention of the administering of psilocybin in the presence of ketanserin, whereby, through such sequential administration, ketanserin would reduce or eliminate psilocybin's unwanted hallucinatory side effects without disrupting its antidepressant effects. On the call, Compass expressed significant interest in Professor Thompson's research results, in sponsoring further research, and in the possibility of including ketanserin as part of the treatment regimen in Compass's impending clinical study.

32.    On June 12, 2019, Dr. Malievskaia of Compass requested a research proposal from Professor Thompson. Ex. 20 at 4. The next day, Professor Thompson and Professor Gould sent Dr. Malievskaia a scientific proposal and a proposed budget to study the administration of psilocybin in the presence of ketanserin, both of which they believed were

disclosed under the protection of the NDA.  *Id*. at 3-4.  Dr. Malievskaia confirmed receipt of the proposal and indicated that Compass would like to schedule a follow-up call for the following week to continue discussion.  *Id*. at 3.

33.    On June 18, 2019, Dr. Shaun Hurley, a Research Scientist at Compass, responded to Professor Thompson that they "were excited to read about the interesting questions you'd like to explore using psilocybin" and asked some additional pointed questions to elicit additional confidential information about Professor Thompson's research. *Id*. at 2.  Compass acknowledged that Professor Thompson's proposed studies "would provide the first direct evidence for the requirements (or not) of AMPAR and/or 5-HT2R function in the antidepressant actions of psilocybin."  Ex. 21 at 2.  Compass was "especially excited by the potential to evaluate the efficacy of psilocybin in the presence of ketanserin, as clearly this information also has considerable clinical value."  *Id*. at 3.  Compass even asked whether a study evaluating psilocybin and ketanserin could "be prioritised."  *Id*.

34.    Believing they were protected by the NDA, Professor Thompson and Professor Gould responded to Compass's questions on June 21, 2019, and throughout the months thereafter.  Ex. 20 at 2; Ex. 21.  During the course of these communications, Professor Thompson disclosed to Compass his ideas for the sequential administration of ketanserin followed by psilocybin, as well as other details of the Psilocybin Trade Secrets.

35.    For the next several months, Compass and UMB worked on a draft collaboration agreement.  During this time, Compass continued to milk Professor Thompson and Professor Gould for trade secret information regarding their research and study plans.

36.    During a call on September 5, 2019, Dr. Hurley of Compass asked Professor Thompson whether any patent applications had been filed over his research, and Professor

Thompson confirmed that the '080 Application had been filed.  In response, Dr. Hurley of Compass asked a flurry of questions about Professor Thompson's work, as well as follow-up emails fishing for more information, including additional requests for initial research data and an explanation of Professor Thompson's past and future plans relating to any psilocybin research.  Ex. 22 at 3, 5-6.

37.     At this point, the parties still had not reached a collaboration agreement. Professor Thompson and Professor Gould were concerned about the delay.   At the time, others in the scientific community were becoming interested in psilocybin's potential, and Professor Thompson  and Professor Gould did not want to be left behind.  They therefore informed Compass that they wanted to move forward as fast as they could.  *Id*. at 4.  In response, on September 24, 2019, under the guise of being concerned about the use of psilocybin, which is a Schedule 1 drug, Dr. Hurley of Compass began asking even more questions about the studies, specifically to confirm that they had not yet started.  *Id*. at 3.  Dr. Hurley of Compass also represented that it was hopeful that this would be "the start of an open and productive collaboration" with UMB, which may include the testing of "new compounds in the future." *Id*.

38.     Still, Compass delayed sending a draft agreement.  Finally, on October 20, 2019, Compass sent UMB a heavily marked-up revision of a collaboration agreement, with particularly heavy redlines to the intellectual property provisions of the draft agreement.

39.     The next day, at the Society for Neuroscience annual meeting, Professor Thompson had a lunch meeting with Dr. Hurley of Compass to further discuss a potential collaboration, where Dr. Hurley of Compass stated that Compass remained interested in working with UMB and Professor Thompson.  Yet, Compass would not agree to move forward

with the deal and kept Professor Thompson and Professor Gould in limbo.  On November 20, 2019, Dr. Hurley of Compass e-mailed Professor Thompson saying that Compass was "unable to proceed with the collaboration" and declined to fund Professor Thompson's experiments.  Ex. 23.

***Compass Files For Patent Applications Related To The Psilocybin Trade Secrets***

40.    Meanwhile, Compass was busy executing its plan to misappropriate the Psilocybin Trade Secrets.  On information and belief, when Compass first began talking with Professor Thompson and Professor Gould, it had not been researching the combination of psilocybin with a 5-HT2A antagonist, and had no knowledge about that subject.  While Compass had previously filed patent applications related to use of psilocybin to treat various diseases, it had never identified or claimed the co-administration of psilocybin and a 5-HT2A antagonist in any of those applications, let alone the specifics of a sequential administration of a 5-HT2A antagonist followed by psilocybin.

41.    On August 29, 2019, without telling Professor Thompson or UMB, Compass secretly filed U.S. Provisional Patent Application No. 62/893,611 ("the '611 Application"), which included disclosure of, and draft claims covering, the sequential administration of a 5-HT2A antagonist (expressly including ketanserin) followed by psilocybin to reduce the negative side effects of psilocybin.  Tellingly, the '611 Application does not include any data regarding this combination.  *See, generally*, Ex. 6.  That is because Compass had none.  It stole the ideas for the '611 Application from Professor Thompson and disclosed them in its own patent application.

42.    Even more tellingly, on information and belief, the '611 Application was copied from an earlier, unrelated Compass application, U.S. Provisional Patent Application

No. 62/893,110 ("the '110 Application"). On August 28, 2019, Compass filed the '110 Application, which claims methods of reducing anxiety in a patient undergoing treatment with psilocybin by co-administering benzodiazepines. Ex. 7. That application includes backup materials suggesting that Compass had conducted some research into the co-administration of psilocybin and benzodiazepines, including a PowerPoint presentation regarding potential experiments to be conducted by Compass. *Id*. at 293-302. The '110 Application lists seven inventors: Drummond McCullogh, Derek Londesbrough, Christopher Brown, Julian Northen, Gillian Moore, Hemant Patil, and David Nichols. *Id*. at 7-9. Professor Thompson was not listed.

43. The '611 Application lists the exact same seven inventors, in the same order. Ex. 6 at 7. Its text is essentially copied and pasted from the '110 Application, with references to co-administration with benzodiazepines changed to include certain of the Psilocybin Trade Secrets, including references to sequential administration of a 5-HT2A antagonist followed by psilocybin. The following redline comparing the abstracts of the two applications is telling:

## ABSTRACT

The disclosure provides methods for treating a patient in need thereof comprising co-administering to the patient a therapeutically-effective dose of psilocybin and one or more benzodiazepines.5-HT$_{2A}$ specific antagonists and/or inverse agonists. The methods described herein may be used to reduce anxietythe negative side effects associated with a traumatic psychedelic experience in patients who are administered psilocybin during the treatment a variety of diseases, disorders, and conditions, such as, but not limited todepressiveto depressive disorders (including depressive disorders due to another medical condition), anxiety disorders, somatic symptom and related disorders, trauma and stressor related disorders, obsessive compulsive disorder and related disorders, substance-related and addictive disorders, headache disorders, feeding and eating disorders, or disruptive and impulse-control and conduct disorders.

*Compare* Ex. 6 at 319, *with* Ex. 7 at 69.

44.    Indeed, the hasty copy-and-paste job, necessary so Compass could quickly file its own application claiming the Psilocybin Trade Secrets before it thought Professor Thompson had the opportunity to do so, is so glaring that in certain instances, Compass forgot to normalize the font and size of the text of the '611 Application—the text font and size in certain of the replaced sections is different from the rest of the application (as shown clearly in the screenshots below)—and mistakenly left in references to the mechanism of action for benzodiazepines ("GABAergic manipulation"), which is not applicable for 5-HT2A antagonists:



'110 Application, Ex. 7 at 58-59

**Example 4: Co-administration of psilocybin and a benzodiazepine**

The following examples 4A and 4B provide details of studies that will be used to determine the effects of low and high dose benzodiazepine (e.g., alprazolam or diazepam) on the acute psilocybin experience in healthy volunteers. The purpose of these studies is to provide an evidence base for the use of benzodiazepines to control

213464130 v1                                42

Attorney Docket No: COPA-019/00US

psychedelic anxiety, which may be used to inform future dose and drug selection.  This study also seeks to show the dimension of the psychedelic experience affected by GABAergic manipulation, including subjective (11D-ASC) and neurological (fMRI), to help develop an understanding of which aspects are important therapeutically.



'611 Application, Ex. 6 at 308-309

**Example 4: Co-administration of psilocybin and a 5-HT₂ₐ inverse agonist**

The following example provides details of a study used to determine the effects of low and high dose of pimavanserin, a 5-HT₂ₐ inverse agonist on the acute psilocybin experience in healthy volunteers. The purpose of this study is to provide an evidence base for the use of 5-HT₂ₐ inverse agonists to control the negative side effects associated with

213539852 v1

45

Attorney Docket No: COPA-020/00US

a traumatic psychedelic experience, which may be used to inform future dose and drug selection. This study also seeks to show the dimension of the psychedelic experience affected by GABAergic manipulation, including subjective (11D-ASC) and neurological (fMRA), to help develop an understanding of which aspects are important therapeutically.

45.    Unlike the '110 Application filed the day prior, Compass did not include in the '611 Application any supporting data.  This is further evidence that Compass misappropriated Professor Thompson's ideas, including the Psilocybin Trade Secrets.  However, that did not stop Compass from making disclosures in the '611 Application that are simultaneously improperly broad and improperly specific, including disclosures regarding the sequential administration of a 5-HT2A antagonist followed by psilocybin, and further including ranges for the sequential order, time points, frequency and dosing of such therapy, based on Professor Thompson's communications with and disclosures to Compass, which Compass falsely induced Professor Thompson to believe were governed by the NDA that Professor Thompson signed.

46.    For example, Paragraph 8 states that, "[i]n some embodiments, the one or more 5- HT2A specific antagonists and/or inverse agonists are administered to the patient prior to

administration of the psilocybin . . . such as about 10 minutes, about 15 minutes, about 20 minutes, about 30 minutes, about 45 minutes, about 60 minutes, about 75 minutes, about 90 minutes, about 105 minutes, about 120 minutes, about 150 minutes, or about 180 minutes" between two drugs. Ex. 6 at 265. Paragraphs 9 and 19 list broad ranges of dosing for the 5-HT2A antagonists and psilocybin, respectively, and paragraph 20 lists broad frequency ranges for the therapy. *Id.* at 266, 269. On information and belief, the purpose of this disclosure and others in the '611 Application was to claim the Psilocybin Trade Secrets as Compass's own invention, and/or to preemptively block Professor Thompson and UMB from securing patent rights over the Psilocybin Trade Secrets, through this premature disclosure without any accompanying data. As of August 29, 2019, Professor Thompson had not made any public disclosure of these aspects and details of his Psilocybin Trade Secrets, nor did he disclose them in his August 13, 2019 provisional patent application, because he intended to maintain, for example, details of the sequential administration of ketanserin or other 5-HT2A antagonist followed by psilocybin, along with the optimal order, time points, frequency and dosing for the therapy, as trade secrets pending his development of further experimental data.

47.     On a September 5, 2019 phone call, Dr. Hurley of Compass asked whether Professor Thompson had filed any patent applications, hoping that it had filed before Professor Thompson filed a patent application on any aspects of his Psilocybin Trade Secrets. Professor Thompson informed Compass that he had filed his own patent application on the general co-administration of psilocybin and a 5-HT2A antagonist on August 13, 2019, two weeks before Compass's filing. On information and belief, Compass was upset that Professor Thompson was the first to file, creating a hurdle in Compass's plan to claim the entirety of UMB's proprietary confidential and trade secret information as its own, and to block UMB from securing any

patent rights at all over Professor Thompson's inventions.

48.    Since 2019, Compass has filed at least four additional United States patent applications with specification disclosures involving the sequential administration of a 5-HT2A antagonist followed by psilocybin.  On October 18, 2021, Compass filed U.S. Patent Application No. 17/604,610.  Originally presented claims 22 and 23 claimed aspects of the Psilocybin Trade Secrets, including the sequential administration of a 5-HT2A antagonist followed by psilocybin.  Ex. 24 at 4.  On August 25, 2022, before any Office Action was issued by the Patent Office, Compass cancelled originally presented claims 22 and 23.  Ex. 25 at 4.  On information and belief, Compass canceled these claims because Compass's patent prosecution attorneys at Cooley LLP became aware of Compass's misconduct and the fact that no one at Compass actually invented the claimed subject matter, and could not in good faith continue prosecution of those claims.  Compass's initial attempt to claim the Psilocybin Trade Secrets as its own invention for patenting followed by its cancelation of such claims evidences Compass's scheme to misappropriate the Psilocybin Trade Secrets as well as its recognition of its own wrongdoing.

49.    Along with U.S. Patent Application No. 17/604,610, Compass filed two additional non-provisional applications on October 18, 2021, U.S. Patent Application Nos. 17/604,606 and 17/604,619, which included, in their specifications, aspects and details of the Psilocybin Trade Secrets.  On December 2, 2021, Compass filed U.S. Patent Application No. 17/540,962, which likewise included aspects and details of the Psilocybin Trade Secrets in its specification.  That application issued as U.S. Patent No. 11,564,935.  *See, e.g*., Ex. 8 at 132-133 (74:55-75:45), 149- 151 (108:54-112:47).  Compass later filed U.S. Patent Application No. 18/077,876, a continuation patent application with the same specification.  Compass has also

filed multiple international patent applications, including PCT/IB2020/053688, PCT/IB2020/053687, and PCT/IB2020/053684, which likewise disclose aspects and details of the Psilocybin Trade Secrets in their specifications.  These PCT applications first published on October 22, 2020.  Many of the inventors listed on these patent applications are the same Compass employees who were involved in the communications with Professor Thompson and Professor Gould starting in May 2019—they were included on email correspondence, attended meetings with Professor Thompson and Professor Gould, and had access to the Psilocybin Trade Secrets.  This group of Compass employees included at least Dr. Malievskaia, Dr. Hurley, Hans Eriksson, Nathan Poulsen, Lars Wilde, Anais Soula, George Goldsmith, and Manon Veraart.  *See* Exs. 8, 22, 23.

50.    Plaintiffs first suspected Compass's disclosure of, and misuse of, the Psilocybin Trade Secrets in approximately April 2022, in the course of reviewing Compass's published patent application filings.

***Compass Intentionally Developed and Executed its Fraudulent Scheme***

51.    Compass Co-Founder and Executive Dr. Ekaterina Malievskaia and her husband, Compass Co-Founder and Chairman George Goldsmith, have been publicly accused of deceptive schemes similar to the one they executed against UMB and Professor Thompson. In those prior instances, Compass is alleged to have seduced academics studying psilocybin by showering them with lavish gifts only to cut off contact after extracting the information they desired:

> These academics also described behavioral patterns that undermined their trust in the couple. They detailed how Goldsmith and Malievskaia lavished them with attention—invitations to their home, expensive dinners, and all-expenses-paid trips to the Isle of Man, a self-governing British Isles island in the Irish Sea—only to go abruptly quiet once they'd seemingly gathered the information they needed. Quartz has seen documents that

support these allegations. Compass, Goldsmith, and Malievskaia did not respond to requests for comment about these trips. …

"It felt seductive. It was very flattering, but there was something odd about it," says one of the psilocybin researchers, who requested anonymity out of concern for potential professional repercussions for speaking about Compass.

Ex. 26 at 8-9 (*Quartz*, "A millionaire couple is threatening to create a magic mushroom monopoly").  Goldsmith and Malievskaia are alleged to have engaged in similar behavior, towards other Maryland psilocybin researchers no less.  *See* Ex. 27 at 3 (former psilocybin investigator at Johns Hopkins University stating: "And after helping [Goldsmith and Malievskaia] craft their scientific proposal, using all the language from Roland [Griffin]'s hard work at Hopkins that he graciously let me share with them, all of a sudden it was like no communication.").  Goldsmith was the purported signatory of the NDA with Professor Thompson on behalf of Compass, although Compass now contends that he never actually signed the document.  Ex. 18 at 3.

### *Terran Licenses Technology and Intellectual Property from UMB*

52.    On May 7, 2021, UMB and Terran entered into a Master License Agreement ("MLA"), exclusively licensing to Terran certain of Professor Thompson's Inventions ("Licensed Inventions") and related Confidential Information, including the Psilocybin Trade Secrets.   Before this date, Terran had already entered into a confidentiality agreement with UMB and obtained an option to license the inventions from UMB.

53.    The MLA grants Terran an exclusive license to the Licensed Inventions and Confidential Information and provides that Terran has the first and primary right to institute an action concerning infringement, which covers both patent infringement and misappropriation of the Licensed Inventions and Confidential Information, whether or not the trade secrets were in existence before or after May 7, 2021.   In other words, the MLA grants Terran the right to

-24-

institute any action for misappropriation of any Psilocybin Trade Secret that has existed at any period in time, including prior to the MLA.

**Count I (By Terran and UMB)**
**Misappropriation of Trade Secrets**
**Defend Trade Secrets Act (18 U.S.C. § 1831 *et seq.*)**

54.    Terran and UMB re-allege and incorporate by reference each and every allegation contained in this Third Amended Complaint.

55.    As set forth above, Defendants misappropriated the Psilocybin Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*  UMB is the owner of these Psilocybin Trade Secrets.  Terran has the requisite standing to sue under the Master License Agreement with UMB.

56.    The Psilocybin Trade Secrets are directed towards methods of treating depression and other mental health issues with the sequential administration of a 5-HT2A antagonist followed by psilocybin, which implicate the development, manufacturing, and sale of products and services used in, and intended for use in, interstate and foreign commerce.

57.    The Psilocybin Trade Secrets are related to a potential treatment for neuropsychiatric disorders that has been continually under development by Professor Thompson, UMB, and Terran since 2016 and is intended for use throughout the United States and the world.

58.    The Psilocybin Trade Secrets derive(d) independent economic value from not being generally known to the public, to Terran's competitors, or to other persons who can obtain economic value from the disclosure or use of the information.

59.    At the time of the misappropriation, the Psilocybin Trade Secrets were not readily ascertainable through proper means or from generally available, public sources.

60.     At all relevant times, Terran, Professor Thompson, and UMB have made reasonable efforts to protect and preserve the secrecy of the Psilocybin Trade Secrets.

61.     Defendants misappropriated the Psilocybin Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by, *inter alia*, knowingly acquiring the Psilocybin Trade Secrets through improper means, and disclosing and/or using the Psilocybin Trade secrets without Professor Thompson's, UMB's, or Terran's express or implied consent.

62.     Defendants knew or had reason to know that, at the time Defendants acquired information about the Psilocybin Trade Secrets, this information was acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that they did not have Professor Thompson's, UMB's, or Terran's express or implied consent to do so.

63.     Defendants acquired the Psilocybin Trade Secrets under the guise of an NDA with Professor Thompson and UMB, not through their own independent research and efforts, in direct violation of their legal obligations to Professor Thompson and UMB.

64.     On information and belief, Defendants failed to fully delete or return the Psilocybin Trade Secrets that they misappropriated, and continue to use or disclose the Psilocybin Trade Secrets without Professor Thompson's, UMB's, or Terran's consent.

65.     On information and belief, Defendants have gained, or will gain, substantial benefit from their misappropriation of the Psilocybin Trade Secrets, to Terran's and UMB's substantial detriment.

66.     As a result of Defendants' unlawful conduct, the Psilocybin Trade Secrets have been compromised, and Terran and UMB are substantially threatened by Defendants' further use and/or dissemination of that information.

67.     As a direct, proximate, and foreseeable result of Defendants' misappropriation of the Psilocybin Trade Secrets, Terran and UMB have been damaged in an amount not yet ascertained.

68.     Defendants' unlawful actions were willful and malicious, and with the deliberate intent to injure Terran's and UMB's businesses, thereby entitling Terran and UMB to exemplary damages and/or attorneys' fees in an amount to be proven at trial pursuant to 18 U.S.C. § 1836(b)(3)(D).

69.     Terran and UMB are entitled to an order requiring Defendants, their agents, and all persons acting in concert with them, from using or disclosing, or threatening to use or disclose, the Psilocybin Trade Secrets, and restraining Defendants from obtaining any benefit from their wrongful possession and use of the Psilocybin Trade Secrets.  Unless enjoined by this Court, said misappropriation of the Psilocybin Trade Secrets, actual or threatened, will cause great and irreparable injury to Terran and UMB.   Terran and UMB have no adequate or other remedy at law for such acts and threatened acts.

**Count II (By Terran, UMB, and Professor Thompson)**
**Misappropriation of Trade Secrets**
**Maryland Uniform Trade Secrets Act (Md. Code Ann. Com. Law. § 11-1201 *et seq*.)**

70.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in this Third Amended Complaint.

71.     As set forth above, Defendants misappropriated information regarding the Psilocybin Trade Secrets under the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann. Com. Law. § 11-1201 *et seq.*   UMB has standing to sue as the owner of thePsilocybin Trade Secrets.  Terran has the requisite standing to sue under the Master License Agreement, and amendments thereto.

72.     Professor Thompson likewise has standing to sue as inventor of the Psilocybin Trade Secrets who shares in licensing revenues from those inventions, and who was thus directly, economically harmed by Compass's misappropriation.   For example, Compass misappropriated the Psilocybin Trade Secrets including through Compass's wrongful disclosure of aspects and details of the Psilocybin Trade Secrets in its own patent applications, so that Compass could claim the Psilocybin Trade Secrets as Compass's own invention, and/or so that Compass could preemptively block Professor Thompson and UMB from securing patent rights over the Psilocybin Trade Secrets, through this premature disclosure without any accompanying data.   Compass's misappropriation has thereby substantially damaged UMB's ability to patent the Psilocybin Trade Secrets, resulting in impaired future royalties to both UMB and Professor Thompson personally.

73.     The Psilocybin Trade Secrets are directed towards methods of treating depression and other mental health issues with the sequential administration of a 5-HT2A antagonist followed by psilocybin.

74.     The Psilocybin Trade Secrets derive(d) independent economic value from not being generally known to the public, to Professor Thompson's, UMB's, or Terran's competitors, or to other persons who can obtain economic value from the disclosure or use of the information.

75.     At the time of the misappropriation, the Psilocybin Trade Secrets were not readily ascertainable through proper means or from generally available, public sources.

76.     At all relevant times, Professor Thompson, Terran, and UMB have made reasonable efforts to protect and preserve the secrecy of the Psilocybin Trade Secrets.

77.     Defendants misappropriated the Psilocybin Trade Secrets within the meaning of

Md. Code Ann. Com. Law. § 11-1201 *et seq* by, *inter alia*, knowingly acquiring the Psilocybin Trade Secrets through improper means, and disclosing and/or using the Psilocybin Trade secrets without Professor Thompson's, UMB's, or Terran's express or implied consent.

78.    Defendants knew or had reason to know that, at the time they acquired information about the Psilocybin Trade Secrets, this information was acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that they did not have Professor Thompson's, UMB's, or Terran's express or implied consent to do so.

79.    Defendants acquired the Psilocybin Trade Secrets under the guise of an NDA with Professor Thompson and UMB, not through their own independent research and efforts, in direct violation of their legal obligations to Professor Thompson and UMB.

80.    On information and belief, Defendants failed to fully delete or return the Psilocybin Trade Secrets that they misappropriated, and continue to use or disclose the Psilocybin Trade Secrets without Professor Thompson's, UMB's, or Terran's consent.

81.    On information and belief, Defendants have gained, or will gain, substantial benefit from its misappropriation of the Psilocybin Trade Secrets, to Professor Thompson's, UMB's, and Terran's substantial detriment.

82.    As a result of Defendants' unlawful conduct, the Psilocybin Trade Secrets have been compromised, and Professor Thompson, UMB, and Terran are substantially threatened by Defendants' further use and/or dissemination of that information.

83.    As a direct, proximate, and foreseeable result of Defendants' misappropriation of the Psilocybin Trade Secrets, Professor Thompson, UMB, and Terran have been damaged in an amount not yet ascertained.

84.    Defendants' unlawful actions were willful and malicious, and with the deliberate intent to injure Professor Thompson's and UMB's research, and Terran's business, thereby entitling Professor Thompson, UMB, and Terran to exemplary damages and/or attorneys' fees in an amount to be proven at trial pursuant to Md. Code Ann. Com. Law. §§ 11-1203 and 11-1204.

85.    Plaintiffs are entitled to an order requiring Defendants, their agents, and all persons acting in concert with them, from using or disclosing, or threatening to use or disclose, the Psilocybin Trade Secrets, and restraining Defendants from obtaining any benefit from their wrongful possession and use of the Psilocybin Trade Secrets.  Unless enjoined by this Court, said misappropriation of the Psilocybin Trade Secrets, actual or threatened, will cause great and irreparable injury to Professor Thompson, UMB, and Terran.   Plaintiffs have no adequate or other remedy at law for such acts and threatened acts.

### Count III (By Terran, UMB, and Professor Thompson)
### Unfair Competition

86.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in this Third Amended Complaint.

87.    On information and belief, Compass did not conduct its interactions with Professor Thompson and others at UMB with honesty and fairness, and instead continually sought to deceive and defraud them.  This included initiating discussions with Professor Thompson and UMB in bad faith, failing to sign a Mutual NDA and withholding the fact thereof, continuing to extract confidential information from Professor Thompson with no desire to collaborate with UMB, and secretly filing patent applications using confidential information obtained from Professor Thompson and others at UMB.

88.    Compass has leveraged its access to confidential information, provided by

Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) and licensed by Terran, to unlawfully compete with Professor Thompson, UMB, and Terran. For example, Compass secretly filed patent applications in an attempt to block Professor Thompson, UMB, and later Terran, from obtaining patent protection over Professor Thompson's inventions.

89.    Furthermore, on information and belief, Compass has misused the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) by furthering the research and development of their own products and services.

90.    Compass's actionable conduct substantially interferes with Professor Thompson's, UMB's, and Terran's ability to compete with Compass on the merits of their products/services or otherwise. Under Maryland law, Compass is prohibited from damaging or jeopardizing another's business by fraud, deceit, trickery, or unfair methods of any sort, yet Compass did exactly that. Compass's behavior conflicts with accepted principles of public policy, and should not be condoned.

91.    As a direct, proximate, and foreseeable result of Defendants' unfair business practices, Professor Thompson, UMB, and Terran have been damaged in an amount not yet ascertained. Furthermore, Compass has impermissibly received a benefit as a result of such deception, and is not entitled to benefit from such deception.

### Count IV (By UMB and Professor Thompson)
### Detrimental Reliance/Promissory Estoppel

92.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Third Amended Complaint.

93.    Compass made a clear and definite promise to Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) by attesting that it would not misuse or

disclose the Psilocybin Trade Secrets or any other confidential information received from Professor Thompson in the course of their extended discussions.

94.     Compass reasonably expected that making such a promise to Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB), which included providing Professor Thompson with a Mutual NDA to sign, would induce Professor Thompson to disclose the Psilocybin Trade Secrets and other confidential information, under the mistaken belief that Compass would hold such information in confidence and not misuse it for unilateral gain.

95.     As a result of Compass's promises and representations, Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB)did disclose the Psilocybin Trade Secrets and other confidential information to Compass.

96.     UMB's and Professor Thompson's detriment can only be avoided by enforcement of Compass's promise not to misuse or disclose the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson.

97.     Furthermore, as a direct, proximate, and foreseeable result of their reliance on Compass's promises, UMB and Professor Thompson have been damaged in an amount not yet ascertained.

### Count V (By UMB and Professor Thompson)
### Unjust Enrichment

98.     UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Third Amended Complaint.

99.     Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) conferred a benefit upon Compass by sharing the Psilocybin Trade Secrets and other confidential information with Compass.    Compass was able to benefit from Professor

Thompson's disclosure, including by filing patent applications directed towards the subject matter of the confidential information, and, on information and belief, using such information in the development of products and/or services relating to the confidential information.

100.    Compass appreciated and knowingly accepted the information shared by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB), and regularly solicited such information from them during the course of their discussions.

101.    Compass's acceptance, retention, use, and disclosure of the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) has resulted in Compass being unjustly enriched, and it would be inequitable under Maryland law for Compass to be permitted to retain the benefits conferred by the misuse of such information.

102.    As a result, equity compels that any enrichment unjustly conferred on Compass be awarded to UMB and Professor Thompson as restitution, in an amount to be determined.

**Count VI (By UMB and Professor Thompson)**
**Quantum Meruit/Implied-In-Fact Contract**

103.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Third Amended Complaint.

104.    As noted above, Compass has represented that it did not sign any NDA with UMB and Professor Thompson.  However, as evidenced by the circumstances, the ordinary course of dealing, and the common understandings of UMB, Professor Thompson, and Compass, an implied-in-law contract can be inferred by the intention of the parties.

105.    Compass reached out to UMB with the stated intention of funding university studies relating to psilocybin in the hopes of extracting information from UMB professors. Compass then requested specific services from Professor Thompson, namely the disclosure of

information relating to his research, including of the Psilocybin Trade Secrets and other confidential information.

106. Compass accepted the services and information provided by UMB and Professor Thompson, and understood that they expected compensation for such services and information, including at least a collaboration agreement which would provide funds for Professor Thompson's research activities.

107. Furthermore, UMB and Professor Thompson expected that, should Compass desire to use the Psilocybin Trade Secrets and other confidential information provided by them, Compass would compensate UMB for such services in the form of a license agreement, from which Professor Thompson would receive compensation as part of UMB's intellectual property policies and faculty agreements. Similarly, Compass should have expected that, by using the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) to file its own patent applications and further Compass's products and services in development, it would be required to compensate UMB, a share of which would go to Professor Thompson.

108. However, Compass extracted confidential and trade secret information from Professor Thompson and UMB, without ever providing compensation. UMB and Professor Thompson are entitled to recover the reasonable value of their services and information provided to Compass, in an amount to be determined.

### Count VII (By UMB and Professor Thompson) Fraudulent Misrepresentation

109. UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Third Amended Complaint.

110. Compass, acting at least through Dr. Ekaterina Malievskaia and Dr. Shaun

Hurley, knowingly made numerous fraudulent misrepresentations to Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) throughout 2019, under the guise of seeking to collaborate with UMB.  False statements made by Compass include at least a) representations that it would not use or disclose the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson; b) the representation that there was a signed NDA in place between Compass and Professor Thompson; and c) representations that it was seeking additional information regarding Professor Thompson's research for the purposes of evaluating a collaboration with UMB, when Compass did not intend to collaborate with UMB, such as continued requests for information even after secretly filing a patent application covering the Psilocybin Trade Secrets and other confidential information.

111.    Compass, acting at least through Dr. Ekaterina Malievskaia and Dr. Shaun Hurley, knew that the statements above were false, or at the very least the statements were made with such a reckless indifference to the truth as to be equivalent to actual knowledge.

112.    The purpose of the misrepresentations were to defraud UMB and Professor Thompson, including by fraudulently acquiring the Psilocybin Trade Secrets and other confidential information in order to misappropriate such information.

113.    Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) relied upon Compass's statements.  Professor Thompson believed that Compass reached out to discuss a collaboration effort in good faith, that there was a signed NDA governing the parties' communications, and that the continued requests for information were in furtherance of a collaboration agreement.  Had Professor Thompson known that Compass was defrauding him and UMB, or that there was not a signed NDA in place, he would not have shared any of the Psilocybin Trade Secrets or other confidential information with Compass,

nor continued communications with Compass throughout 2019.

114.    As a direct, proximate, and foreseeable result of Compass's fraudulent misrepresentations leading to the misuse and disclosure of the Psilocybin Trade Secrets and other confidential information, UMB and Professor Thompson have been damaged in an amount not yet ascertained.

### Count VIII (By UMB and Professor Thompson)
### Negligent Misrepresentation

115.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Third Amended Complaint.

116.    Compass, acting at least through Dr. Ekaterina Malievskaia and Dr. Shaun Hurley, made numerous fraudulent misrepresentations to Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) throughout 2019, under the guise of seeking to collaborate with UMB.  False statements made by Compass include at least a) representations that it would not use or disclose the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson; b) the representation that there was a signed NDA in place between Compass and Professor Thompson; and c) representations that it was seeking additional information regarding Professor Thompson's research for the purposes of evaluating a collaboration with UMB, when Compass did not intend to collaborate with UMB, such as continued requests for information even after secretly filing a patent application covering the Psilocybin Trade Secrets and other confidential information.  At a bare minimum, these statements were negligently made.

117.    Compass had a duty of care to UMB and Professor Thompson, namely the duty to furnish correct information.  This duty arose based on the prospective business relationship between Professor Thompson, UMB, and Compass.  Compass knew that the statements it

would make would be relied upon and acted upon by UMB and Professor Thompson, and that they would be injured by any misrepresentations. Morals and good conscious compelled Compass to furnish correct statements to UMB and Professor Thompson.

118.    Compass intended that Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) would act upon the statements it made. For example, Compass knew that Professor Thompson would not disclose confidential information without an NDA in place, or if he knew that Compass was merely fishing for information without intending to collaborate.

119.    Compass, acting at least through Dr. Ekaterina Malievskaia and Dr. Shaun Hurley, knew that Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) would trust that Compass was acting in good faith and would not expect that he was being defrauded by Compass's representations. Compass knew that this reliance would result in Professor Thompson disclosing the Psilocybin Trade Secrets and other confidential information, and that UMB and Professor Thompson would be injured as a result of Compass's negligent misrepresentations.

120.    Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) justifiably relied on Compass's misrepresentations, and disclosed the Psilocybin Trade Secrets and other confidential information, believing that Compass would not misuse or disclose such information.

121.    As a direct, proximate, and foreseeable result of Compass's negligent misrepresentations, leading to the misuse and disclosure of the Psilocybin Trade Secrets and other confidential information, UMB and Professor Thompson have been damaged in an amount not yet ascertained.

## Count IX (By UMB and Professor Thompson)
### Fraudulent Concealment

122.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Third Amended Complaint.

123.    Compass had a duty of care to UMB and Professor Thompson, namely the duty to disclose material facts while negotiating a collaboration with UMB.  This duty arose based on the prospective business relationship between Professor Thompson, UMB, and Compass. Compass knew that the statements it would make would be relied upon and acted upon by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB), and that he and UMB would be injured by omitting material facts.  Morals and good conscious compelled Compass to not suppress the truth in a way that would defraud Professor Thompson or UMB.

124.    Here, there were at least two instances where Compass, acting at least through Dr. Ekaterina Malievskaia and Dr. Shaun Hurley, failed to disclose a material fact to Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB).  The first is failing to disclose that it had not in fact entered into the NDA agreement that it had asked Professor Thompson to sign.  Compass failed to disclose the fact that it believed there was no NDA in place in order to deceive Professor Thompson so that he would disclose the Psilocybin Trade Secrets and other confidential information. Professor Thompson justifiably relied on the fact that he believed an NDA was in place, and did disclose such confidential information to Compass in response.

125.    Second, Compass failed to disclose that it had secretly filed the '611 Application, in direct violation of the NDA and/or the promise it had induced Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) to believe Compass had made that it would not disclose or use the Psilocybin Trade Secrets and other confidential

information, and the expectations of Professor Thompson.  Even when discussing the '080 Application filed by Professor Thompson, Compass concealed the fact that it too had filed a provisional patent application covering Professor Thompson's inventions.  Compass wanted to extract additional information from Professor Thompson, but knew that Professor Thompson would cut off communications if he knew how Compass was using UMB's confidential information.  Because provisional patent applications are not publicly available until the non-provisional child application is published, UMB and Professor Thompson could not have discovered that Compass was secretly attempting to secure patent rights over his Psilocybin Trade Secrets.  As a result of the concealment, Professor Thompson continued to supply Compass with confidential information when asked.

126.    As a direct, proximate, and foreseeable result of Compass's fraudulent concealment, leading to the misuse and disclosure of the Psilocybin Trade Secrets and other confidential information, UMB and Professor Thompson have been damaged in an amount not yet ascertained.

**Count X (By UMB and Professor Thompson)**
**Constructive Fraud**

127.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Third Amended Complaint.

128.    Compass had a duty of care to UMB and Professor Thompson, namely the duty not to deceive them, to violate their confidence, or to injure the public interests by defrauding a public university and its employees.  This duty arose based on the confidential relationship between Professor Thompson, UMB, and Compass.  Compass, acting at least through Dr. Ekaterina Malievskaia and Dr. Shaun Hurley, gained Professor Thompson's trust by reaching out to UMB under the guise of seeking to collaborate with, and fund, UMB research.

Compass's actions and statements resulted in a confidential relationship with Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB), exemplified by what Professor Thompson believed to be a valid Mutual NDA.

129.    UMB and Professor Thompson placed their trust in Compass, yet, they were defrauded as a result of Compass continually deceiving them and violating their confidences. This includes, but is not limited to, Compass's misuse and disclosure of the Psilocybin Trade Secrets and other confidential information, Compass's failure to disclose the filing of the '611 Application, and Compass leading Professor Thompson along in an effort to extract confidential information from him knowing it was not going to collaborate with UMB or him.

130.    As a direct, proximate, and foreseeable result of Compass's constructive fraud, leading to the misuse and disclosure of the Psilocybin Trade Secrets and other confidential information, UMB and Professor Thompson have been damaged in an amount not yet ascertained.

### Count XI (By Professor Thompson)
### Breach of Contract

131.    Professor Thompson re-alleges and incorporates by reference each and every allegation contained in this Third Amended Complaint.

132.    As stated above, Compass has represented to this Court that it did not sign the NDA.  However, to the extent that Compass contends that there was a valid contract between itself and Professor Thompson, Professor Thompson pleads this claim for breach of contract, in the alternative.

133.    As a condition of the disclosure of the Psilocybin Trade Secrets and other confidential information, Professor Thompson signed, without any changes, Compass's proffered NDA, which prohibited Compass from, *inter alia*, using or disclosing the Psilocybin

Trade Secrets and other confidential information received from Professor Thompson.

134.    Professor Thompson fully complied with and fulfilled his obligations under the NDA.

135.    Compass breached the NDA by, without authorization or any legitimate business purpose, using and disseminating the confidential information it received under the NDA, including by filing patent applications using that information.

136.    Professor Thompson has sustained and will continue to sustain damages as a direct, proximate, and foreseeable result of Compass's breach of contract.

### **Prayer For Relief**

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants, inclusive as follows:

1.    Granting permanent injunctive relief against Defendants, and any persons in active concert or participation with them: (i) enjoining Defendants from obtaining, retaining, using, transmitting, disseminating, or disclosing the Psilocybin Trade Secrets; (ii) ordering Defendants to identify, and turn over, any property in their possession, custody, or control containing or reflecting the Psilocybin Trade Secrets, including hard copy documents or any form of electronic storage media; (iv) ordering Defendants to identify any other persons, entities, or locations not within their possession, custody, or control, to which Defendant has transmitted, disseminated, disclosed, or stored any Psilocybin Trade Secrets; (v) requiring Defendants to assign to Terran any rights to patents, patent applications, or other intellectual property that incorporates the Psilocybin Trade Secrets or to correct inventorship on any patents or patent applications that incorporate the Psilocybin Trade Secrets; and (vi) any other appropriate injunctive relief;

2.     Awarding compensatory damages in an amount to be determined at trial;

3.     Awarding exemplary damages in an amount to be determined at trial;

4.     Awarding interest at the maximum legal rate on all sums awarded;

5.     Awarding reasonable attorneys' fees as permitted by law;

6.     Awarding all costs of suit herein; and

7.     Awarding such other and further relief as the Court deems just and proper.

**<u>Jury Demand</u>**

Plaintiffs demand a jury trial on all triable issues.

Dated: January [*], 2024              Respectfully submitted,

/s/ DRAFT
Ramsay M. Whitworth (Fed. Bar #26251)
Email: rwhitworth@silvermanthompson.com
Andrew M. Harvey (Fed. Bar # 21925)
Email: aharvey@silvermanthompson.com
Silverman, Thompson, Slutkin & White
400 East Pratt Street, Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Fax: (410) 547-2432

-and-

/s/ DRAFT
Andrei Iancu (admitted *pro hac vice*)
Email: iancua@sullcrom.com
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067
Telephone: (310) 712-6600
Facsimile: (310) 712-8800

Dustin F. Guzior (admitted *pro hac vice*)
Email: guziord@sullcrom.com
Kirandeep K. Mahal (admitted *pro hac vice*)
Email: mahalk@sullcrom.com
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Attorneys for Plaintiffs Terran Biosciences Inc. and Professor Scott Thompson*

/s/ DRAFT
Steven E. Tiller
Email: stiller@whitefordlaw.com
Whiteford, Taylor & Preston LLP
7 Saint Paul Street
Baltimore, MD 21202
Telephone: (410) 347-9425
Facsimile: (410) 223-4325

*Attorney for Plaintiff University of Maryland, Baltimore*