# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TERRAN BIOSCIENCES, INC., *et al.*

    *Plaintiffs*,

    v.

COMPASS PATHFINDER
LIMITED, *et al.*

    *Defendants*.

Civil Action No. ELH-22-1956

**PUBLIC REDACTED VERSION**

## MEMORANDUM OPINION

In this trade secrets case, plaintiffs Terran Biosciences, Inc. ("Terran"), a Delaware corporation with its principal place of business in New York; the University of Maryland, Baltimore ("UMB"); and Scott Thompson, Ph.D., formerly Professor of Physiology and Chair of the Department of Physiology at UMB's School of Medicine, filed suit against defendant Compass Pathfinder Limited ("Compass" or "Defendant"), a company incorporated in England and Wales, and ten "John Doe" defendants ("Doe Defendants"). The Third Amended Complaint (ECF 81, "TAC") is the operative pleading.

In the TAC, plaintiffs allege that Compass engaged in a "malicious and intentional scheme to defraud the State of Maryland and misappropriate highly confidential and sensitive, proprietary information that Terran, UMB, and Professor Thompson spent years and substantial resources to develop." *Id.* ¶ 1. Further, plaintiffs allege, *inter alia*, that Compass fraudulently misappropriated the "Psilocybin Trade Secrets," which pertain to a mechanism to reduce or eliminate the hallucinatory effects of a chemical substance called psilocybin, while retaining its antidepressant benefits. *Id.* ¶¶ 1, 25, 26.

In the proverbial "kitchen sink" approach, the TAC contains eleven counts, supported by twenty-seven exhibits. *See* ECF 67-2 through ECF 67-28.[1] Count I, lodged by Terran and UMB, asserts misappropriation of trade secrets, in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.* Counts II and III are brought by Terran, UMB, and Thompson. Count II asserts misappropriation of trade secrets, in violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code (2013 Repl. Vol., 2022 Supp.), § 11-1201 *et seq.* of the Commercial Law Article ("C.L."), and Count III alleges unfair competition. Counts IV through X are brought by UMB and Thompson. Count IV asserts "Detrimental Reliance/Promissory Estoppel"; Count V asserts unjust enrichment; Count VI asserts "Quantum Meruit/Implied-In-Fact Contract"; Count VII alleges fraudulent misrepresentation; Count VIII alleges negligent misrepresentation; Count IX asserts fraudulent concealment; and Count X alleges constructive fraud. Count XI is brought solely by Thompson and alleges breach of contract.

Based on the DTSA claim, subject matter jurisdiction is founded on 28 U.S.C. § 1331. ECF 81, ¶ 14. With regard to plaintiffs' State law claims, the Court may exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367. In any event, the Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship and the amount in controversy exceeds $75,000. ECF 81, ¶ 16.

Compass has moved to dismiss the Third Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(6). ECF 93. The motion is supported by a memorandum (ECF 93-1) (collectively, the "Motion") as well as the Declaration of Anita M. C. Spieth, an attorney for

---

[1] These documents were included as exhibits to Terran's motion for leave to file a Third Amended Complaint (ECF 67), rather than as exhibits to the TAC. *See id.* Nonetheless, I understand the TAC to incorporate the exhibits by reference.

Compass (ECF 93-2), and three other exhibits. ECF 93-3 through ECF 93-5.[2] Under Rule 12(b)(2), Compass contends that the Court lacks personal jurisdiction, both specific and general. Pursuant to Rule 12(b)(6), Compass seeks dismissal of the DTSA claim, as well as the claims for fraudulent misrepresentation, negligent misrepresentation, constructive fraud, and fraudulent concealment. Compass contends that Terran and UMB have failed to plead adequately the interstate commerce requirement under the DTSA, and Thompson and UMB have failed adequately to allege that Compass owed them a duty of care. In addition, Compass urges dismissal of the Doe Defendants pursuant to Rule 12(b)(6), claiming the TAC fails to assert any factual allegations against them. Moreover, Compass contends that certain counts in the TAC are duplicative and, on this basis, Compass asks the Court to dismiss some of those claims to "preserve resources."

Plaintiffs oppose the Motion. ECF 102 ("Opposition"). The Opposition is supported by the Declaration of Dustin F. Guzior (ECF 99), an attorney for Terran and Dr. Thompson. Nine exhibits are appended to the Guzior Declaration. *See* ECF 99-1 through ECF 99-9.

Compass replied. ECF 105 ("Reply"). With leave of court (ECF 119, ECF 120), plaintiffs filed a surreply, docketed at ECF 121.

No hearing is necessary to decide the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall dismiss the Doe Defendants, but otherwise deny the Motion.

---

[2] As to the Rule 12(b)(6) challenge, I must assume the truth of the facts alleged in the TAC. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). As to the Rule 12(b)(2) challenge, I must "assume the credibility" of plaintiffs' "version of the facts," but I may also consider evidence presented by the parties. *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 560 (4th Cir. 2014).

## I. Factual and Procedural History

Pursuant to an "employment and invention assignment agreement" between Thompson and UMB, "the Psilocybin Trade Secrets are owned by UMB . . . ." ECF 81, ¶ 26. But, in accordance with "UMB's intellectual property policies and faculty agreements, Professor Thompson receives a portion of the revenues that UMB generates from his inventions, including a portion of the royalties UMB receives from licensing his patents and other inventions, including the Psilocybin Trade Secrets." *Id.* (citing ECF 67-15 at 4–5).

UMB, as owner of the Psilocybin Trade Secrets, entered into a Master License Agreement ("MLA") with Terran on May 7, 2021. ECF 81, ¶ 52. Pursuant to the MLA, UMB "exclusively licens[ed] to Terran certain of Professor Thompson's Inventions ('Licensed Inventions') and related Confidential Information, including the Psilocybin Trade Secrets." *Id.* Moreover, "the MLA grants Terran the right to institute any action for misappropriation of any Psilocybin Trade Secret that has existed at any period in time, including prior to the MLA." *Id.* ¶ 53.

Terran filed suit on August 5, 2022. ECF 1. The Complaint contained three counts: misappropriation of trade secrets, in violation of the DTSA (Count I); misappropriation of trade secrets, in violation of the MUTSA (Count II); and breach of contract (Count III). ECF 1, ¶¶ 31–65. Compass moved to dismiss the Complaint, arguing, *inter alia*, that this Court lacks personal jurisdiction over Compass. ECF 24 ("First Motion").

On April 6, 2023, before the Court decided the First Motion, Terran moved to amend the Complaint. ECF 32 ("First Motion to Amend"). The First Motion to Amend was granted by Order of April 7, 2023 (ECF 33), and the First Amended Complaint followed. ECF 34.

Then, on May 19, 2023, Terran moved to file a Second Amended Complaint. ECF 45 ("Second Motion to Amend"). It sought to join Professor Thompson as a plaintiff with respect to Count II, allegedly because he is "the inventor of the Psilocybin Trade Secrets at issue in this

action." *Id.* at 2. In addition, Terran sought to add Count III, asserted jointly by Terran and Professor Thompson, alleging unfair competition under Maryland law. *Id.* "Counts IV through XI" of the proposed Second Amended Complaint were lodged solely by Professor Thompson, "and include[d] claims for detrimental reliance, unjust enrichment, fraud, and breach of contract." *Id.* Compass did not oppose the motion. ECF 46. By Order of June 2, 2023, I granted the Second Motion to Amend. ECF 47. The Second Amended Complaint followed. ECF 48.

Terran and Thompson subsequently moved for leave to file a Third Amended Complaint, seeking to join UMB, a State entity, as a plaintiff, and to add factual allegations pertinent to the claims of fraud. ECF 67 ("Third Motion to Amend"). Compass opposed the proposed amendments as futile, untimely, and prejudicial. ECF 68. By Memorandum Opinion (ECF 79) and Order (ECF 80) of February 6, 2024, I granted the Third Motion to Amend. The TAC followed. ECF 81.

According to plaintiffs, in November 2016, while Professor Thompson worked at UMB, he "came up with the idea of administering psilocybin in the presence of ketanserin (a 5- HT2A antagonist) as a potential rapid, non-hallucinogenic antidepressant therapy." *Id.* ¶ 25.[3] In particular, "Professor Thompson recognized that th[is] combination would reduce or eliminate the hallucinatory effects of psilocybin, while retaining its antidepressant actions." *Id.* Therefore, "[o]ver the next few years, Professor Thompson engaged in extensive research . . . related to the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, in order to produce the optimal non-hallucinatory and anti-depressive effects." *Id.* "Further

---

[3] Dr. Thompson is now a Professor of Psychiatry at the University of Colorado Anschutz School of Medicine. ECF 81, ¶ 11.

research" conducted by Thompson "related to the optimal time points, frequency, and dosing for the sequential administration of the two drugs in combination." *Id.*

Plaintiffs assert, *id.* ¶ 26: "The inventions derived from, and the results of, this research constitute the Psilocybin Trade Secrets." Consistent with the TAC, I shall refer to the information outlined by plaintiffs in ECF 81, ¶¶ 25–27 as the "Psilocybin Trade Secrets." Thompson and UMB held the Psilocybin Trade Secrets in "strict confidence" and "did not disclose [them] to anyone except by non-disclosure agreements or other confidentiality obligations." *Id.* ¶ 27.

On August 13, 2019, Thompson and UMB "filed U.S. Provisional Patent Application No. 62/886,080 ('the '080 Application'), entitled 'Combination Therapy with Broad Spectrum Serotonergic Agonists and Anti-Hallucinogenic Serotonergic Antagonists.'" *Id.* ¶ 28 (quoting ECF 67-16).[4] Although the "'080 Application generally disclosed co-administering psilocybin and an antagonist," it "did not go into detail about the specifics of the sequential administration of a 5-HT2A antagonist followed by psilocybin, or the optimal order, time points, frequency, or dosing for the therapy, all of which Professor Thompson maintained as trade secrets pending further experimental data." ECF 81, ¶ 28.

In May 2019, Ekaterina Malievskaia, M.D., MScPH, "the Co-Founder and Head of Research and Development of Compass,"[5] contacted Carlos Zarate, Jr., M.D., of the National

---

[4] Plaintiffs cite Exhibit 15 to the Third Motion to Amend (ECF 67-16) in support of their assertion that "Professor Thompson and UMB filed U.S. Provisional Patent Application No. 62/886,0**8**0" on August 13, 2019. ECF 81, ¶ 28 (boldface added). However, that patent application is numbered "62/886,0**9**0." (Boldface added). The Court identified this inconsistency in its Memorandum Opinion of February 6, 2024 (ECF 79), resolving the Third Motion to Amend. *Id.* at 4 n.3. But, plaintiffs have continued to refer to this application as the "'080" application. Therefore, I will do the same.

[5] In her Declaration (ECF 93-3), Dr. Malievskaia states: "I am currently Chief Innovation Officer of Compass Pathways plc, the parent company of Compass Pathfinder Limited ('Compass'). I co-founded Compass in 2016." *Id.* ¶ 2.

Institute of Mental Health ("NIMH"), located in Bethesda, Maryland. *Id.* ¶ 29; *see* ECF 67-17. The initial communications between Dr. Malievskaia and Dr. Zarate are not before the Court. But, Dr. Zarate emailed Dr. Malievskaia on May 16, 2019, and copied Todd Gould, Professor of Psychiatry at UMB. *See* ECF 67-17 at 3–4. Dr. Zarate stated, *id.*:

> Hi Ekaterina—
>
> Thanks for exploring the possibility of conducting a PK/biomarker study at NIMH. As we discussed, I believe it would be important to do preclinical mechanistic work on psilocybin. I can't think of anyone better to do this work than Todd Gould at the University of Maryland. He has done elegant work deciphering the cellular and molecular mechanisms of ketamine, hydroxynorketamine, and other putative rapid acting antidepressant agents. He is cc'd on this email. Hope you can work something out and our lab would be delighted to collaborate on this project as well. Dr. Gould's lab of course would need support to do such a project.

Dr. Malievskaia responded that day, stating, in part, *id.* at 2–3 (emphasis added):

> Carlos, thank you for the introduction. Todd, pleasure to e-meet you. We are developing psilocybin for treatment-resistant depression and trying to understand molecular mechanisms of psilocybin. Could we set up a call to discuss in more details [sic]? *Our colleague Sarah Drummond will send you an CDA[6] and, once signed, will be in touch to schedule a call.*

Professor Gould replied six days later, on May 22, 2019. *Id.* at 2. He said, in part, *id.* (emphasis added):

> Dear Ekaterina,
>
> I work closely here with Scott Thompson, who is the chair of Physiology and an electrophysiologist, on many of our rapid acting antidepressant studies. e.g. [a link to the NIMH website was provided]
>
> In general Scott's expertise in electrophysiology complements my own expertise in neuropharmacology.

---

[6] "CDA" appears to be an abbreviation for "confidential disclosure agreement." The document that was eventually emailed to Dr. Thompson is titled "MUTUAL NONDISCLOSURE AGREEMENT," and is abbreviated as "NDA." *See* ECF 67-19. The abbreviations seem to refer to the same type of documents.

I just finished a conversation with Scott, and turns out he is interested in psilocybin MOA as well, and would take different but complementary experimental approaches to my own. I think having his input on any project we undertake in would be helpful. Would it make sense from your end to include Scott on our call scheduled next week (*with a NDA in place*)?

Dr. Malievskaia answered Gould via email on May 28, 2019. ECF 67-20 at 2. She stated, in relevant part, *id.*: "Yes, of course. Please invite Scott to the call if it's not too late." Dr. Gould copied Dr. Thompson on his email response and asked Dr. Malievskaia whether she wanted Thompson "to sign a NDA prior to the call?" *Id.* Dr. Malievskaia responded to Gould, with Thompson and two Compass employees copied on the email. *Id.* She also asked the Compass employees to "please send an NDA to Scott . . . ." *Id.*

The following day, May 29, 2019, Jess Rose Stuart, a "Team Coordinator" at Compass, sent Thompson "a Mutual Non-Disclosure Agreement ('NDA')" via email in anticipation of the scheduled telephone call with Dr. Malievskaia. ECF 81, ¶ 30; *see* ECF 67-18 at 3 (Stuart email to Thompson). A few hours later, another Compass employee, Manon Veraart, sent Thompson an email that stated, in part, ECF 67-18 at 3 (emphasis added): "Scott, could you please let us know if you have any comments on the NDA. If/when you're happy with this, *could you please return a signed version ahead of the call with [Dr. Malievskaia]*."

The TAC alleges: "By its terms, the NDA would prohibit Compass from using any information disclosed by Professor Thompson or his colleagues other than 'in connection with exploring possible business arrangements between [Compass and Professor Thompson] and/or their Affiliates.'" ECF 81, ¶ 30 (quoting ECF 67-19 (NDA), at 2) (alteration in TAC). On May 29, 2019, Thompson emailed Malievskaia, Veraart, and Stuart and attached a signed copy of the NDA. ECF 81, ¶ 30; ECF 67-18 at 2. The NDA was executed by Thompson "in his capacity as a UMB researcher and as an agent of UMB, because UMB owned the confidential information

8

protected by the NDA." ECF 81, ¶ 3. Thompson made no changes to the NDA provided to him by Compass. *Id.*

Veraart responded on May 30, 2019, ECF 67-20 at 2: "Thanks for signing the NDA Scott." Dr. Malievskaia was copied on the email. *Id.* In this same email, Veraart asked Dr. Gould to sign and return a nondisclosure agreement, stating, *id.*: "Todd, I don't believe we have an NDA in place with yourself (correct me if I'm wrong). Please find attached our NDA. Could you please have a look to see if you have any comments? If you're happy with this, could you please return a signed copy ahead of the call?" The TAC does not specify whether Gould ever returned a signed NDA.

According to the TAC, Compass "acknowledged receipt of [Thompson's] signed NDA on May 30, 2019", but Compass did not countersign the NDA. ECF 81, ¶ 30 (citing ECF 24-1 at 18); *see also* ECF 81, ¶ 3; ECF 67-19 at 4 (signature page of the NDA, which does not contain Compass's signature); ECF 67-20 at 2. The TAC alleges that Compass, acting "at least" through Dr. Malievskaia and Dr. Shaun Hurley, "a Research Scientist at Compass," fraudulently misrepresented that there was a signed NDA in place between Thompson and Compass. ECF 81, ¶¶ 33, 110.

Thompson, Gould, and "at least" Dr. Malievskaia held a telephone conference on May 31, 2019, "to discuss the molecular mechanisms of psilocybin." *Id.* ¶ 31. They discussed the "plans" of Dr. Thompson and Dr. Gould to investigate the effects of administering psilocybin with sequentially-administered ketanserin. *Id.* "On the call, Compass expressed significant interest in Professor Thompson's research results, in sponsoring further research, and in the possibility of including ketanserin as part of the treatment regimen in Compass's impending clinical study." *Id.*

Then, on June 12, 2019, Dr. Malievskaia "requested a research proposal from Professor Thompson." *Id.* ¶ 32 (citing ECF 67-21 at 4). "The next day, Professor Thompson and Professor

Gould sent Dr. Malievskaia a scientific proposal and a proposed budget to study the administration of psilocybin in the presence of ketanserin . . . ." ECF 81, ¶ 32; *see* ECF 67-21 at 3–4.[7] Thompson and Gould believed that this disclosure was protected by the NDA. ECF 81, ¶ 32 (citing ECF 67-21 at 3–4). Dr. Malievskaia "confirmed receipt of the proposal and indicated that Compass would like to schedule a follow-up call for the following week to continue discussion." ECF 81, ¶ 32 (citing ECF 67-21 at 3).

Dr. Hurley contacted Thompson and Gould via email on June 18, 2019. ECF 81, ¶ 33; ECF 67-21 at 2. He stated, in part: "Thank you for sharing your proposal with us—we were excited to read about the interesting questions you'd like to explore using psilocybin." ECF 67-21 at 2. He also advised, *id.*: "Ahead of our next call we would like to share some questions we have on your proposal (please see attached), which can serve as a basis for our next discussion." *Id.* Notably, he posed substantive, "pointed questions" to Gould and Thompson about their proposal. ECF 81, ¶ 33; *see* ECF 67-21 at 2; ECF 67-22.

At the outset of the questions, Dr. Hurley stated, ECF 67-22 at 2: "Overall, we believe that your proposal focuses on some very interesting and important questions. To our knowledge, these studies would provide the first direct evidence for the requirements (or not) of AMPAR and for 5-HT2R function in the antidepressant actions of psilocybin."

As noted, the questions were substantive. For example, Question 4 asked, *id.*: "What will the use of EEG to investigate cortical oscillations add to the proposed studies?" "Question 8 began with the following statement: "We are especially excited by the potential to evaluate the efficacy of psilocybin in the presence of ketanserin, as clearly this information also has considerable clinical value." *Id.* at 3; *see also* ECF 81, ¶ 33 (quoting ECF 67-21 at 2; ECF 67-22 at 3). And, Hurley

---

[7] The Court was not provided with a copy of the proposal.

asked whether a study on psilocybin administered with ketanserin could be "prioriti[z]ed." ECF 67-22 at 3.

In the months that followed, Thompson and Gould, "[b]elieving that they were protected by the NDA," responded to Compass's substantive questions. ECF 81, ¶ 34 (citing ECF 67-21 at 2; ECF 67-22). "During the course of these communications, Professor Thompson disclosed to Compass" certain details of the Psilocybin Trade Secrets. ECF 81, ¶ 34. Moreover, "[f]or the next several months," while "Compass and UMB worked on a draft collaboration agreement", Professor Thompson continued to disclose aspects of the Psilocybin Trade Secrets. *Id.* ¶ 35.[8] The TAC does not specify where Compass's employees were located during these communications.

During a telephone call on September 5, 2019, Dr. Hurley asked Dr. Thompson "whether any patent applications had been filed" with respect to his research. *Id.* ¶ 36. Thompson disclosed that "the '080 application had been filed." *Id.* Dr. Hurley responded with "a flurry of questions about Professor Thompson's work," and sent "follow-up emails [requesting] more information, including additional requests for initial research data and an explanation of Professor Thompson's past and future plans relating to any psilocybin research." *Id.* (citing ECF 67-23 at 3, 5–6).

"At this point, the parties still had not reached a collaboration agreement." ECF 81, ¶ 37. Thompson and Gould also recognized that "others in the scientific community were becoming interested in psilocybin's potential . . . ." *Id.* Therefore, they "informed Compass that they wanted to move forward as fast as they could." *Id.* (citing ECF 67-23 at 4). Hurley responded via email on September 24, 2019, "asking even more questions about the studies, specifically to confirm that they had not yet started." ECF 81, ¶ 37 (citing ECF 67-23 at 3). He also "represented that [Compass] was hopeful that this would be 'the start of an open and productive collaboration' with

---

[8] The Court has not been provided with any drafts of a collaboration agreement.

UMB, which [might] include the testing of 'new compounds in the future.'" ECF 81, ¶ 37 (quoting ECF 67-23 at 3).

On October 20, 2019, "Compass sent UMB a heavily marked-up revision of a collaboration agreement, with particularly heavy redlines to the intellectual property provisions of the draft agreement." ECF 81, ¶ 38. Thompson "had a lunch meeting with Dr. Hurley" the next day, while they were attending the annual meeting of the Society for Neuroscience ("SFN"). *Id.* ¶ 39.[9] Dr. Hurley represented "that Compass remained interested in working with UMB and Professor Thompson." *Id.* Nonetheless, "Compass would not agree to move forward" and kept Thompson and Gould "in limbo." *Id.* Then, on November 20, 2019, Hurley emailed Thompson, stating that "Compass was 'unable to proceed with the collaboration' and declined to fund Professor Thompson's experiments." *Id.* (quoting ECF 67-24).

Plaintiffs later discovered that on August 29, 2019, Compass filed U.S. Provisional Patent Application No. 62/893,611 ("the '611 Application"), "without telling Professor Thompson or UMB." ECF 81, ¶ 41. The application included disclosure of "the sequential administration of a 5-HT2A antagonist (expressly including ketanserin) followed by psilocybin to reduce [psilocybin's] negative side effects . . . ." *Id.* Yet, the '611 Application did "not include any data regarding this combination." *Id.* (citing ECF 67-7). Plaintiffs contend that Compass filed the '611 Application even though, when it "first began talking with Professor Thompson and Professor Gould, it had not been researching the combination of psilocybin with a 5-HT2A antagonist, and had no knowledge about that subject." ECF 81, ¶ 40.

---

[9] The location of the meeting is not specified in the TAC. However, Compass asserts that it was held in Chicago. *See* ECF 93-3, ¶ 6.

Plaintiffs assert that Compass "stole the ideas for the '611 Application from Professor Thompson and disclosed them in its own patent application." *Id.* ¶ 41. According to plaintiffs, the '611 Application contains "glaring" indicators of the theft, including the speed with which it was filed. *Id.* ¶ 44. They posit that it was a "hasty copy-and-paste job," so that Compass "could quickly file" before Thompson. *Id.* And, plaintiffs claim the application was "copied from an earlier, unrelated Compass application, U.S. Provisional Patent Application No. 62/893,110 ('the '110 Application')." *Id.* ¶ 42; *see also id.* ¶ 43 (stating that the '611 Application "is essentially copied and pasted from the '110 Application . . .").

The '110 Application, which Compass filed on August 28, 2019, "claims methods of reducing anxiety in a patient undergoing treatment with psilocybin by co-administering benzodiazepines." *Id.* ¶ 42 (citing ECF 67-8). The '611 Application contains references to co-administration with benzodiazepines, "changed to include certain of the Psilocybin Trade Secrets . . . ." ECF 81, ¶ 43. Yet, plaintiffs point out that the '611 Application "mistakenly" retains "references to the mechanism of action for benzodiazepines ('GABAergic manipulation')," which is not relevant to 5-HT2A antagonists. *Id.* ¶ 44 (citing ECF 67-7 at 308–309; ECF 67-8 at 58–59).

Moreover, the '110 Application "lists seven inventors: Drummond McCullogh, Derek Londesbrough, Christopher Brown, Julian Northen, Gillian Moore, Hemant Patil, and David Nichols." ECF 81, ¶ 42 (citing ECF 67-8 at 7–9). Curiously, the '611 Application lists the "same seven inventors, in the same order." ECF 81, ¶ 43 (citing ECF 67-7 at 7). And, in the '611 Application, the font and size of the text specific to the Psilocybin Trade Secrets differs from the rest of the font and size of the text, which was copied from the '110 Application. ECF 81, ¶ 44 (citing ECF 67-7 at 308–309; ECF 67-8 at 58–59).

In addition, the '611 Application contains specific "disclosures regarding the sequential administration of a 5-HT2A antagonist followed by psilocybin . . . including ranges for the sequential order, time points, frequency and dosing of such therapy . . . ." ECF 81, ¶ 45; *see id.* ¶ 46 (citing ECF 67-7 at 265). Notably, plaintiffs allege, ECF 81, ¶ 46: "As of August 29, 2019, Professor Thompson had not made any public disclosure of these aspects and details of his Psilocybin Trade Secrets, nor did he disclose them in his August 13, 2019 provisional patent application . . . ." According to plaintiffs, "the purpose" of these disclosures "in the '611 Application was to claim the Psilocybin Trade Secrets as Compass's own invention, and/or to preemptively block Professor Thompson and UMB from securing patent rights over the Psilocybin Trade Secrets . . . ." *Id.*

On September 5, 2019, Compass learned that Thompson "had filed his own patent application on the general co-administration of psilocybin and a 5-HT2A antagonist . . . two weeks before Compass's filing." *Id.* ¶ 47. Compass became "upset that Professor Thompson was the first to file . . . ." *Id.* "Since 2019, Compass has filed at least four additional United States patent applications with specification disclosures involving the sequential administration of a 5-HT2A antagonist followed by psilocybin." *Id.* ¶ 48.

In particular, on October 18, 2021, "Compass filed U.S. Patent Application No. 17/604,610" (the "'610 Application"). *Id.* It included claims to "aspects of the Psilocybin Trade Secrets, including the sequential administration of a 5-HT2A antagonist followed by psilocybin." *Id.* (citing ECF 67-25 at 4). However, on August 25, 2022, before the Patent Office took any action with respect to the '610 Application, Compass "cancelled" its claims to aspects of the Psilocybin Trade Secrets. ECF 81, ¶ 48 (citing ECF 67-26 at 4). Plaintiffs assert that Compass cancelled these claims "because Compass's patent prosecution attorneys at Cooley LLP became

aware of Compass's misconduct and the fact that no one at Compass actually invented the claimed subject matter . . . ."  ECF 81, ¶ 48.

Also on October 18, 2021, "Compass filed two additional non-provisional applications . . . U.S. Patent Application Nos. 17/604,606 and 17/604,619, which included, in their specifications, aspects and details of the Psilocybin Trade Secrets."  *Id.* ¶ 49.  And, on December 2, 2021, "Compass filed U.S. Patent Application No. 17/540,962, which likewise included aspects and details of the Psilocybin Trade Secrets in its specification."  *Id.*  "That application issued as U.S. Patent No. 11,564,935."  *Id.* (citing ECF 67-9 at 132-133, 149-151).  Compass has since "filed U.S. Patent Application No. 18/077,876, a continuation patent application with the same specification."  ECF 81, ¶ 49.  In addition, Compass has "filed multiple international patent applications" that "disclose aspects and details of the Psilocybin Trade Secrets in their specifications."  *Id.*  Plaintiffs allege, *id.*: "Many of the inventors listed on these patent applications are the same Compass employees who were involved in the communications with Professor Thompson and Professor Gould starting in May 2019" and "were included on email correspondence, attended meetings with Professor Thompson and Professor Gould, and had access to the Psilocybin Trade Secrets."

Plaintiffs allege that, during the relevant time period, Compass was engaged in substantial activity in Maryland related to psilocybin.  *Id.* ¶ 18.  For example, in 2018 Compass received "breakthrough therapy designation for psilocybin therapy for treatment-resistant depression" from the Food and Drug Administration ("FDA") for its psilocybin product, COMP360.  ECF 99-3 at 4; *see also* ECF 102 at 25 (citing ECF 67-4 at 2).  The FDA is a federal agency headquartered in

Maryland.[10]  Moreover, plaintiffs allege that between 2019 and 2021, Compass conducted a "clinical trial" of its psilocybin product at the Sheppard Pratt Health System ("Sheppard Pratt") in Baltimore.  ECF 81, ¶ 18.  And, since 2021, Compass has conducted "at least six" additional clinical trials at Sheppard Pratt related to Psilocybin, as well as psilocybin clinical trials at three other locations in Maryland.  *Id.*  In addition, Compass "established, funds, and operates a 'Centre of Excellence'" at Sheppard Pratt to conduct "'research in the use of psilocybin therapy' . . . ."  *Id.* (quoting ECF 67-4 at 2).  Compass has also provided "support, training and funding for" a study involving its COMP360 psilocybin therapy at the Aquilino Cancer Center ("ACC"), located at the Adventist Healthcare Shady Grove Medical Center in Rockville, Maryland.  ECF 99-2 at 2; ECF 99-3 at 4.  And, Compass collaborated with the ACC on its Bill Richards Center for Healing, which opened in September 2020.  ECF 99-2.

Compass disputes any basis for personal jurisdiction in Maryland.  It contends that Dr. Hurley met with Dr. Thompson in October 2019 at the annual meeting of the Society for Neuroscience held in Chicago, not Maryland.  *See* ECF 93-3 (Malievskaia Declaration), ¶ 6.  Dr. Malievskaia avers, *id.*: "To the best of my knowledge, the only in-person discussion between Compass and Professor Thompson took place in Chicago during the SFN conference.  Compass never met with Professor Todd Gould in person . . . ."  She adds, *id.* ¶ 7: "Compass never visited Maryland in connection with negotiations concerning a potential partnership with UMB researchers or the [NDA] . . . ."  Further, Dr. Malievskaia avers that Compass is incorporated in the United Kingdom; is headquartered in London; does not have an office in Maryland; and does

---

[10] The TAC does not specify where the FDA is headquartered.  But, the location of the headquarters of the FDA is an "adjudicative fact" of which the Court may take judicial notice.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also* Fed. R. Evid. 201.

not manufacture or sell products, or provide services, in Maryland. *Id.* ¶¶ 3, 4, 5. Although Dr. Malievskaia acknowledges that Compass "established" the Centre of Excellence at Sheppard Pratt "primarily for the research and clinical testing of psilocybin therapies," she asserts that the Centre was not "launched" until 2021. *Id.* ¶ 8.

Dr. Malievskaia also states, *id.* ¶¶ 9–10: "Compass has conducted clinical trials in the United States and Europe of its proprietary psilocybin formulation, COMP360. The U.S. clinical trials of COMP360 included sites in Maryland and other states. COMP360 does not include ketanserin or another 5-HT2A antagonist. Compass's clinical trials of COMP360 have never involved administration of ketanserin or other 5-HT2A antagonists." And, according to Dr. Malievskaia, "Compass does not currently have a psilocybin product approved for sale in any country." *Id.* ¶ 11.

Additional facts are included, *infra*.

### III. Personal Jurisdiction

#### A. Rule 12(b)(2)

Compass moves to dismiss for lack of personal jurisdiction, predicated on Fed. R. Civ. P. Rule 12(b)(2). ECF 93-1 at 17. "[A] Rule 12(b)(2) challenge raises an issue for the court to resolve, generally as a preliminary matter." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). Under Rule 12(b)(2), a defendant "must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Id.*; *see UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350 (4th Cir. 2020). And, "ultimately," the plaintiff must "prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *see Grayson*, 816 F.3d at 267.

When "the existence of jurisdiction turns on disputed factual questions the court may resolve the [jurisdictional] challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." *Combs*, 886 F.2d at 676. In its discretion, a court may also permit discovery as to the jurisdictional issue. *See Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993). However, neither discovery nor an evidentiary hearing is required in order for the court to resolve a motion under Rule 12(b)(2). *See generally* 5B Wright & A. Miller, Federal Practice & Procedure § 1351 (4d ed. 2024) ("Wright & Miller").

"The plaintiff's burden in establishing jurisdiction varies according to the posture of a case and the evidence that has been presented to the court." *Grayson*, 816 F.3d at 268. "When personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a *prima facie* case of jurisdiction." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019); *see Grayson*, 816 F.3d at 268. In that circumstance, "the district court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Hawkins*, 935 F.3d at 226; *accord Sneha Media & Entm't, LLC. v. Assoc. Broad. Co. P Ltd.*, 911 F.3d 192, 196 (4th Cir. 2018); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

However, "'[a] threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'" *Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 n.5 (4th Cir. 2005) (citation omitted).

Plaintiffs (ECF 99) and Compass (ECF 93-2) have submitted exhibits in regard to jurisdiction. In resolving the Motion, the court may "consider affidavits [and exhibits] submitted by both parties, although it must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction." *Hawkins*, 935 F.3d at 226; *see UMG Recordings, Inc.*, 963 F.3d at 350; *Grayson*, 816 F.3d at 268; *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009); *Mylan Labs.*, 2 F.3d at 62.

## B. Nonresident Defendants

Compass is a foreign corporation. Fed. R. Civ. P. 4(k)(1) authorizes a federal district court to exercise personal jurisdiction over a defendant in accordance with the law of the state where the district court is located. *Carefirst of Md.*, 334 F.3d at 396. Therefore, "to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Id.*; *see Clarke Veneers & Plywood, Inc. v. Mentakab Veneer & Plywood, SDN BHD*, 821 F. App'x 243, 244 (4th Cir. 2020).

Title 6 of the Courts and Judicial Proceedings Article ("C.J.") of the Maryland Code (2020 Repl. Vol., 2022 Supp.) is titled "Personal Jurisdiction, Venue, Process and Practice." C.J. § 6-103 is titled "Cause of action arising from conduct in State or tortious injury outside State." It codifies Maryland's long-arm statute. C.J. § 6-103 provides, in relevant part, *id*:

(a) *Condition.* — If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b) *In General.* — A court may exercise personal jurisdiction over a person, who directly or by an agent:
(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

As discussed, *infra*, plaintiffs contend that Compass is subject to specific personal jurisdiction under C.J. §§ 6-103(b)(1) and 6-103(b)(4) or, alternatively, to specific and general jurisdiction under Fed. R. Civ. P. 4(k)(2).[11]

Maryland's courts have "consistently held that the purview of [Maryland's] long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." *Beyond Systems, Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 15, 878 A.2d 567, 576 (2005) (citing *Mohamed v. Michael*, 279 Md. 653, 657, 370 A.2d 551, 553 (1977)); *see Pinner v. Pinner*, 467 Md. 463, 479, 225 A.3d 433, 442 (2020) (stating that "'the long arm statute represents an effort by the Legislature to expand the boundaries of permissible *in personam* jurisdiction to the limits permitted by the Federal Constitution.'") (citation omitted); *CSR, Ltd. v.*

---

[11] In the TAC, plaintiffs also allege that the Court has personal jurisdiction over Compass pursuant to C.J. § 6-103(b)(3). ECF 81, ¶ 17. In the Motion, Compass disputes that contention, arguing that the "only relevant jurisdictional contacts alleged by Plaintiffs—emails, phone calls, and Zoom meetings— . . . did not occur in Maryland." ECF 93-1 at 21. Notably, plaintiffs did not respond to this argument in the Opposition. Based on the failure to respond, plaintiffs have waived the contention. *See Haughie v. Wexford Health Sources, Inc.*, ELH-18-3963, 2020 WL 1158568, at *11 (D. Md. Mar. 9, 2020) (stating that plaintiff "did not respond to this argument in his opposition. Thus, he has waived opposition to" it); *Stenlund v. Marriot Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016) ("In failing to respond to [defendant's] argument, Plaintiff concedes the point."); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (same).

*Taylor*, 411 Md. 457, 472, 983 A.2d 492, 501 (2009) (stating that the long-arm statute authorizes the exercise of personal jurisdiction "'to the full extent allowable under the Due Process Clause'") (citation omitted); *Bond v. Messerman*, 391 Md. 706, 721, 895 A.2d 990, 999 (2006); *see also Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory",* 283 F.3d 208, 212–13 (4th Cir. 2002) (stating that "Maryland's long-arm statute expands the exercise of personal jurisdiction to the limits allowed by the Due Process Clause . . ."). Notably, "[b]ecause the limits of Maryland's statutory authorization for the exercise of personal jurisdiction are coterminous with the limits of the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996); *accord ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002).

The Maryland Court of Appeals, now known as the Supreme Court of Maryland,[12] has clarified, however, that the statutory analysis remains a requirement of the personal jurisdiction analysis. In *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 892 A.2d 479 (2006), the Maryland Court of Appeals said, *id.* at 141 n.6, 892 A.2d at 493 n.6. (citations omitted):

> We stated recently in *Beyond v. Realtime* . . . that "the purview of the long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." We did not, of course, mean by this that it is now permissible to simply dispense with analysis under the long-arm statute. . . . Rather, . . . we interpret the long-arm statute to the limits permitted by the Due Process Clause when we can do so consistently with the canons of statutory construction.

---

[12] In the general election held in Maryland in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. For accuracy, I shall refer to the courts by the names that were in effect when the cited decisions were issued.

Since *Mackey*, the Maryland high court has repeatedly affirmed that "determining whether a Maryland court may exercise personal jurisdiction over a foreign defendant requires a two-step analysis." *Bond*, 391 Md. at 721, 895 A.2d at 999; *see also Pinner*, 467 Md. at 479, 225 A.3d at 442 (noting that the inquiry involves "dual" considerations and that both "must be satisfied to find an exercise of personal jurisdiction proper"); *CSR*, 411 Md. at 472, 983 A.2d at 501 (stating that personal jurisdiction analysis "entails dual considerations").  First, the court must consider "whether the requirements of Maryland's long-arm statute[ ] are satisfied." *CSR*, 411 Md. at 472, 983 A.2d at 501.  Second, the court must consider "whether the exercise of personal jurisdiction comports with the requirements imposed by the Due Process Clause of the Fourteenth Amendment.[ ]"  *Id.* at 473, 983 A.2d at 501.  If the analysis of the second step demonstrates conclusively that personal jurisdiction over the defendant would violate due process, a court need not consider the first step.  *See, e.g.*, *Bond*, 391 Md. at 722, 895 A.2d at 1000.

As to due process considerations, the United States Supreme Court has long held that personal jurisdiction over a nonresident defendant is constitutionally permissible so long as the defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted).  The "constitutional touchstone" of personal jurisdiction is that "'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Due process jurisprudence "recognize[s] two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked')

jurisdiction." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017) ("*Bristol-Myers*") (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) ("*Goodyear*")).  "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers*, 582 U.S. at 262 (emphasis in original) (citing *Goodyear*, 564 U.S. at 919).

However, in *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014), the Supreme Court made clear that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there."  In particular, as to "'an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.'" *Id.* (quoting *Goodyear*, 564 U.S. at 924). In other words, for a corporation, "the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" *Daimler*, 571 U.S. at 137 (quoting *Goodyear*, 564 U.S. at 924) (alteration in *Daimler*).  Nevertheless, in an "exceptional case . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Daimler*, 571 U.S. at 139 n.19.

This case primarily concerns specific jurisdiction.  Specific jurisdiction exists where the "'the suit arise[s] out of or relate[s] to the defendant's contacts with the forum.'" *Daimler*, 571 U.S. at 127 (citation omitted) (alterations in original).  The Supreme Court has said: "The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.'" *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 359 (2021) (citation omitted); *see Burger King*, 471 U.S. at 472–73 (specific jurisdiction may be established over a defendant who "has

'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities.") (citation omitted).

For a defendant to be subject to specific jurisdiction, "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *Woodson*, 444 U.S. at 297. The purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random, fortuitous, or attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King*, 471 U.S. at 475 (citations omitted). In other words, the contacts must "show that the defendant deliberately 'reached out beyond' its home – by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." *Ford Motor Co.*, 592 U.S. at 359 (citations omitted; alterations in *Ford Motor Co.*); *see Walden v. Fiore*, 571 U.S. 277, 285 (2014).

"For this reason, 'specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Bristol-Myers*, 582 U.S. at 262 (quoting *Goodyear*, 564 U.S. at 919); *see Ford Motor Co.*, 592 U.S. at 359–60. However, the Supreme Court has rejected a "causation-only approach . . . ." *Ford Motor Co.*, 592 U.S. at 361. Specific personal jurisdiction may be established without "a causal showing," so long as there is a "strong 'relationship among the defendant, the forum, and the litigation' . . . ." *Id.* at 365.

Specific jurisdiction is assessed on a claim-by-claim basis. *See Finley Alexander Wealth Mgmt., LLC v. M&O Mktg., Inc.*, GJH-19-1312, 2020 WL 1322948, at *4 (D. Md. Mar. 20, 2020) (citing *Crussiah v. Inova Health Sys.*, TDC-14-4017, 2015 WL 7294368, at *4 (D. Md. Nov. 19, 2015) (stating that the plaintiff must establish personal jurisdiction "as to each claim")); *Pan-Am. Prod. & Holdings, LLC v. R.T.G. Furniture Corp.*, 825 F. Supp. 2d 664, 678 (M.D.N.C. 2011) ("When specific jurisdiction is asserted, jurisdiction must be established for each claim alleged.");

*Gatekeeper, Inc. v. Stratech Sys., Ltd.*, 718 F. Supp. 2d 664, 666–68 (E.D. Va. 2010) (discussing the doctrinal basis for this rule); WRIGHT & MILLER, § 1069.7 ("[A] plaintiff also must secure personal jurisdiction over a defendant with respect to each claim she asserts."); *see also Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006); *Remick v. Manfredy*, 238 F.3d 248, 255–56 (3d Cir. 2001).

The Fourth Circuit has formulated a three-part test for the due process requirements in connection with specific jurisdiction. The three criteria are: "'(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.'" *Consulting Eng'rs*, 561 F.3d at 278 (quoting *ALS Scan*, 293 F.3d at 712); *accord Sneha Media & Entm't*, 911 F.3d at 198; *Perdue Foods, LLC v. BRF, S.A.*, 814 F.3d 185, 188 (4th Cir. 2016); *Carefirst of Md.*, 334 F.3d at 397.

The first prong "articulates the minimum contacts requirement of constitutional due process that the defendant purposefully avail himself of the privilege of conducting business under the laws of the forum state." *Consulting Eng'rs*, 561 F.3d at 278. But, this prong "is not susceptible to a mechanical application." *UMG Recordings, Inc.,* 963 F.3d at 352. The Fourth Circuit has "set forth a list of various nonexclusive factors to consider," as follows:

> "(1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted."

*Id.* (quoting *Sneha Media & Entm't, LLC*, 911 F.3d at 198–99); *see also Consulting Eng'rs*, 561 F.3d at 278 (same).

As to the second prong, as explained, the plaintiff's claim(s) "must 'arise out of or relate to' the defendant's contacts with the forum." *Bristol-Myers*, 582 U.S. at 262 (alterations omitted) (quoting *Daimler*, 517 U.S. at 127). In other words, it is not just any contact that will give rise to specific personal jurisdiction. "In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State.'" *Bristol-Myers*, 582 U.S. at 264 (alterations omitted) (quoting *Goodyear*, 564 U.S. at 919). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers*, 582 U.S. at 264 (citation omitted).

Determining whether the plaintiff's claims share a nexus to the defendant's contacts with the forum "is generally not complicated." *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 303 (4th Cir. 2012) (citation omitted), *cert. denied*, 568 U.S. 1087 (2013). The Fourth Circuit has said: "Where activity in the forum state is 'the genesis of the dispute,' this prong is easily satisfied." *Id.* (quoting *CFA Inst. v. Inst. of Chartered Fin. Analysis of Ind.*, 551 F.3d 285, 295 (4th Cir. 2009)). Notably, a plaintiff's claim will "arise" out of the defendant's activities in the forum state where "substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim." *Tire Eng'g & Distrib.*, 682 F.3d at 303; *see CFA Inst.*, 551 F.3d at 295–96.

The third prong's constitutional reasonableness inquiry permits a defendant "who purposefully has directed his activities at forum residents" to defeat jurisdiction if the defendant can "present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. "This prong of the analysis 'ensures that litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent.'" *Tire Eng'g & Distrib.*, 682 F.3d at 301 (citation omitted).

"The factors relevant to such an analysis include 'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.'" *Bristol-Myers*, 582 U.S. at 272 (quoting *Burger King*, 471 U.S. at 477); *see also Consulting Eng'rs*, 561 F.3d at 279 (citations omitted); *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 113 (1987) ("*Asahi Metal*"); *CFA Inst.*, 551 F.3d at 296 (citing *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 217 (4th Cir. 2001)).

Fed. R. Civ. P. 4(k)(2) is also relevant. It is titled "*Federal Claim Outside State-Court Jurisdiction*." It states:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

"In order to obtain jurisdiction under Rule 4(k)(2), therefore, three requirements must be met. First, the suit must arise under federal law. Second, the defendant must not be subject to personal jurisdiction in any state.[13] Third, the defendant must have contacts with the United States

---

[13] The parties disagree as to which party has the burden to establish that Compass is not subject to personal jurisdiction in any state. Compass asserts that the burden is on plaintiffs. ECF

consistent with the Constitution and laws of the United States." *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 275 (4th Cir. 2005) (internal quotations omitted); *see also Grayson*, 816 F.3d at 271 ("[T]he plaintiff can invoke Rule 4(k)(2) if it demonstrates that *no State* can exercise personal jurisdiction over the defendant but that the defendant's contacts with the United States as a whole support the exercise of jurisdiction consistent with the Constitution and laws of the United States.") (emphasis in *Grayson*).

Rule 4(k)(2) "is in essence a federal long-arm statute" that is "designed to facilitate obtaining jurisdiction over foreign defendants . . . ." *Saudi*, 427 F.3d at 275. The Federal Circuit has explained: "The advisory committee was concerned with defendants escaping jurisdiction in U.S. federal courts while still having minimum contacts with the United States." *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1415 (Fed. Cir. 2009). Nonetheless, as Judge Chuang has succinctly explained, *Simone*, 2017 WL 658711, at *7: "The rubric for analyzing personal jurisdiction under Rule 4(k)(2) is no different than that under Rule 4(k)(1). All that differs is the scope—nationwide rather than statewide—of the contacts under consideration. Thus personal jurisdiction under Rule 4(k)(2) must be either general or specific, and specific jurisdiction continues to require that 'the cause of action arise[ ] out of the defendant's contacts with the forum.'" (Citations omitted; alteration in *Simone*).

With these principles in mind, I turn to the jurisdictional allegations.

---

105 at 18–19. Plaintiffs, on the other hand, cite several out-of-circuit cases to support the contention that the burden is on Compass to identify another state where it would be subject to personal jurisdiction. ECF 121 at 2 n.1. I agree with Compass that the Fourth Circuit has placed the burden on the plaintiff. *See Sneha Media & Entm't*, 911 F.3d at 198, 201; *Grayson*, 816 F.3d at 271; *Base Metal Trading, Ltd.*, 283 F.3d at 215; *see also Simone v. VSL Pharms., Inc.*, TDC-15-1356, 2017 WL 658711, at *5 (D. Md. Feb. 16, 2017). At least for now, a Rule 4(k)(2) analysis is unnecessary.

### C. Jurisdictional Allegations

As noted, plaintiffs contend that Compass is subject to specific personal jurisdiction under C.J. § 6-103(b)(1) and C.J. § 6-103(b)(4) or, alternatively, to specific and general jurisdiction under Fed. R. Civ. P. 4(k)(2). ECF 102 at 11. I have gleamed the following allegations from the TAC and exhibits, pertinent to jurisdiction:[14]

- The Psilocybin Trade Secrets were developed by Thompson in Maryland, partially with UMB funding, and are owned by UMB pursuant to an agreement with Thompson. ECF 81, ¶¶ 1, 4, 17; ECF 67-15. The information developed by Thompson was "kept on secured devices in UMB's custody and control." ECF 81, ¶ 27.

- In May 2019, Dr. Malievskaia contacted Dr. Zarate of the NIMH, located in Maryland, in regard to conducting a psilocybin-related study. *Id.* ¶ 29; ECF 67-17 at 3. Dr. Zarate copied Dr. Gould on his email response and suggested that Dr. Malievskaia contact Gould, a professor at UMB, "to do preclinical mechanistic work on psilocybin." ECF 67-17 at 3.

- On May 16, 2019, Dr. Malievskaia contacted Dr. Gould by email and asked to arrange a telephone call to discuss psilocybin. *Id.* at 2. She also stated that her colleague would send Gould a "CDA" for signature before the call. *Id.*

- On May 22, 2019, Dr. Gould told Dr. Malievskaia of Dr. Thompson's interest in psilocybin and asked about including Thompson on the telephone call, "with a NDA in place." *Id.*

---

[14] The TAC features a section titled "Jurisdiction and Venue." ECF 81 at 7. Paragraphs 17 through 23 of that section summarily discuss jurisdictional allegations. But, in my view, there are other allegations throughout the TAC that are also pertinent to the jurisdictional analysis, and I have referenced them here.

- In response, Dr. Malievskaia emailed Gould and stated, ECF 67-20 at 2: "Yes, of course. Please invite [Dr. Thompson] to the call if it's not too late." And, she directed two Compass employees to send a Mutual Non-Disclosure Agreement to Thompson. *Id.*

- On May 29, 2019, a Compass employee sent a NDA to Thompson, via email. ECF 81, ¶ 30; ECF 67-18 at 3. The stated "[p]urpose" of the NDA was to allow the parties to "discuss and disclose" certain confidential "information in connection with exploring possible business arrangements . . . ." ECF 67-19 at 2; *see also* ECF 81, ¶¶ 3, 17.

- Compass's Manon Veraart sent Thompson an email on May 29, 2019, asking Thompson if he had "any comments on the NDA" and requested that he "return a signed version ahead of the call" with Dr. Malievskaia. ECF 67-18 at 3.

- Thompson "executed the NDA in his capacity as a UMB researcher and as an agent of UMB, because UMB owned the confidential information protected by the NDA [*i.e.*, the Psilocybin Trade Secrets]." ECF 81, ¶ 3. Thompson made no changes to Compass's form NDA and emailed it to Compass on May 29, 2019. *Id.* ¶ 30; ECF 67-18 at 2.

- Compass acknowledged receipt of the signed NDA the next day. ECF 67-20 at 2. However, unknown to Thompson at the time, Compass never countersigned the NDA. ECF 81, ¶¶ 3, 30. But, Compass led Thompson to believe that it had done so. *Id.* ¶¶ 33, 110.

- On May 31, 2019, Thompson, Gould, and Malievskaia held a telephone conference, during which they discussed the plans of Gould and Thompson to research the effects of administering psilocybin with sequentially-administered ketanserin. *Id.* ¶ 31. On the call, Compass expressed "significant interest" in this research and in sponsoring further research. *Id.*

- On June 12, 2019, Malievskaia requested a research proposal from Thompson. *Id.* ¶ 32 (citing ECF 67-21 at 4). The next day, believing that they were protected by the NDA, Thompson and Gould sent Malievskaia a "scientific proposal and proposed budget to study the administration of psilocybin in the presence of ketanserin . . . ." ECF 81, ¶ 32; *see* ECF 67-21 at 3–4.

- Dr. Malievskaia confirmed receipt of the proposal and requested a follow-up call to discuss it. ECF 81, ¶ 32 (citing ECF 67-21 at 3). On June 18, 2019, before the scheduled follow-up call, Dr. Hurley emailed several substantive questions to Dr. Gould and Dr. Thompson about the proposal, which were allegedly intended to "serve as a basis for" the telephone discussion. ECF 81, ¶ 33; *see* ECF 67-21 at 2; ECF 67-22.

- In the months that followed, Gould and Thompson responded to these and other questions about Thompson's research. ECF 81, ¶ 34 (citing ECF 67-21 at 2; ECF 67-22); ECF 81, ¶ 36 (citing ECF 67-23 at 3, 5–6). During the course of these discussions, which occurred by email, telephone, and Zoom, Thompson disclosed to Compass certain aspects of the Psilocybin Trade Secrets, in anticipation of obtaining funding for his research. *Id.* ¶ 34 (citing ECF 67-21 at 2; ECF 67-22); *see also* ECF 81, ¶ 35.

- The parties worked on a collaboration agreement by which Compass was to fund Thompson's research in Maryland. ECF 81, ¶ 35. On October 20, 2019, Compass sent UMB a revised collaboration agreement. *Id.* ¶ 38. However, plaintiffs contend that Compass never intended to collaborate. *Id.* ¶¶ 3, 110. And, ultimately, Compass declined to fund Thompson's research. *Id.* ¶ 39 (citing ECF 67-24).

- Thompson and UMB later discovered that on August 29, 2019, in the midst of the parties' negotiations, Compass filed the '611 Application, which included disclosure of aspects of the Psilocybin Trade Secrets. ECF 81, ¶ 41.

- Compass engaged "in seven months of extensive negotiations with UMB professors, secretly fil[ed] patent applications in the midst of those negotiations, and then continu[ed] to induce UMB professors to disclose further proprietary information under the guise of the preemptive protections of an NDA . . . ." *Id. ¶* 17.

Further, the TAC asserts, *id.* ¶ 18: "Compass's related activities in Maryland were and are substantial." In particular, plaintiffs allege:

- Compass conducted "clinical trials of its own therapeutic psilocybin product" at Sheppard Pratt in Baltimore "during the time it began misappropriating the alleged trade secrets." *Id.*

- Compass conducted a clinical trial "in part" at Sheppard Pratt, "titled 'The Safety and Efficacy of Psilocybin in Participants With Treatment Resistant Depression (P- TRD).' Compass submitted this study to the FDA database for clinical trials in December 2018, and reported that the . . . patient's first visit in the study occurred on March 1, 2019 and that the study [was] completed on September 27, 2021." *Id.* (internal citations omitted).

- Compass "established, funds, and operates a 'Centre of Excellence' to 'carry out new research in the use of psilocybin therapy'" at Sheppard Pratt. *Id.* (citation omitted). "The Centre was first announced publicly in January 2021." *Id.* (citation omitted).

- "Since 2021, Compass has conducted at least six additional clinical trials at Sheppard Pratt in Maryland related to Psilocybin. This includes two trials which were both posted on June

16, 2020 and began on March 1, 2021 . . . and another trial which was posted on February 2, 2022 and began on March 28, 2022[.]" *Id.* (internal citations omitted).

- In 2023, Compass conducted a clinical trial with "study locations at CBH Health, LLC in Gaithersburg, Maryland and Pharmasite Research, Inc. in Pikesville, Maryland . . . while another" clinical trial that began in 2023 "is located entirely at Sunstone Therapies in Rockville, Maryland[.]" *Id.* (internal citations omitted).

- Compass has provided "support, training and funding for" a study involving its COMP360 psilocybin therapy at the ACC located at the Adventist Healthcare Shady Grove Medical Center in Rockville, Maryland. ECF 99-2 at 2; ECF 99-3 at 4. Compass's involvement first occurred prior to March 2021. *See* ECF 99-2 (Compass blog post, dated March 2, 2021, detailing its relationship with the ACC). Compass has also collaborated with the ACC's team on its Bill Richards Center for Healing, which opened in September 2020. *Id.*

- "In 2018, Compass received FDA breakthrough therapy designation for psilocybin therapy for treatment-resistant depression . . . ." ECF 99-3 at 4; *see also* ECF 102 at 25 (citing ECF 67-4 at 2) ("COMP360 has been designated a Breakthrough Therapy by the . . . [FDA], for treatment-resistant depression . . . .").

### D. Discussion

### 1. Timing of Contacts

As to Compass's contacts with Maryland, the parties disagree as to the relevant time period that the Court may consider with regard to the jurisdictional analysis.

Plaintiffs contend that jurisdiction "should be assessed based on contacts as of the filing of the complaint, which here is August 2022." ECF 102 at 20. They assert: "[T]he Court can consider Compass's additional contacts with Maryland from 2020 through the end of 2022 under [C.J. §]

33

6-103(b)(4) because Plaintiffs asserted misappropriation claims that arose when Compass filed additional patent applications in 2021 and 2022, the last of which was filed on December 8, 2022." *Id.* at 19 (citing ECF 81, ¶¶ 48–49; ECF 99-5 at 2–3). According to plaintiffs, each patent filing is "an independent act of misappropriation—not merely continuation of the initial act—and this is a sound basis to consider Compass's contacts with Maryland through 2022." ECF 102 at 20.

Compass argues that its contacts with Maryland must be assessed as of the time the causes of action arose. ECF 93-1 at 24 (citing cases). According to Compass, that date is August 29, 2019, *i.e.*, the date on which Compass filed the '611 Application. *See* ECF 105 at 11; *see also* ECF 81, ¶ 41. Compass asserts: (1) the "patent application[s] filed in the [United States Patent and Trademark Office ('USPTO')]—located in *Virginia*—are irrelevant in the Rule 4(k)(1) inquiry of whether a *Maryland* court may assert personal jurisdiction over Compass"; and (2) a misappropriation claim does not renew with each subsequent patent filing because the MUTSA and DTSA state that "'continuing misappropriation constitutes a single claim of misappropriation.'" ECF 105 at 11 (quoting 18 U.S.C. § 1836(d) and C.L. § 11-1206) (emphasis in original).

Plaintiffs counter that Compass mischaracterizes the statutory text of the MUTSA and the DTSA. ECF 121 at 4. They argue that the language quoted by Compass is expressly limited to the separate question of when a cause of action arises for the purpose of the statute of limitations. *Id.* The limitations subsection in the DTSA states, in part: "*For purposes of this subsection*, a continuing misappropriation constitutes a single claim of misappropriation." 18 U.S.C. § 1836(d) (emphasis added). Similarly, the limitations section of the MUTSA provides, in part: "*For purposes of this section*, a continuing misappropriation constitutes a single claim." C.L. § 11-1206(b) (emphasis added).

To my knowledge, the Supreme Court has never addressed the time period by which a defendant's contacts with the forum state must be measured. In *Stein v. Horwitz*, 191 F.3d 448 (Table), 1999 WL 710355 (4th Cir. Sept. 13, 1999) (per curiam), the Fourth Circuit considered the issue with respect to C.J. § 6-103(b)(4). As indicated, C.J. § 6-103(b)(4) concerns, in part, tortious injury in or outside the State by an act outside the State if the defendant "regularly . . . engages in [a] persistent course of conduct in the State . . . ."

In *Stein*, the plaintiff sued the defendant in Maryland for injuries sustained in a car accident that occurred outside of Maryland. *Id.* at *1, *2 n.5. At the time of the incident, the parties were college students in Baltimore. *Id.* at *1. After graduation, however, the defendant left Maryland and, at the time of suit, was a resident of either California or New York. *Id.* The issue on appeal was whether the district court erred in dismissing the suit for lack of personal jurisdiction. *Id.*

The Fourth Circuit explained that "federal courts must accept as binding the interpretation of Maryland's long-arm statute rendered by the Maryland Court of Appeals" and, under "Maryland law, either [the defendant's] activities in Maryland at the time of the accident, *or . . . at the time this suit was filed*, may satisfy the conditions of section (4) of Maryland's long-arm statute." *Id.* at *2 (emphasis added). However, the Court stated that, as "to the due process considerations," it assesses the defendant's "contacts with Maryland *at the time of the accident*." *Id.* (emphasis added) (citing *Steel v. United States,* 813 F.2d 1545, 1549 (9th Cir. 1987); *Rossman v. State Farm Mut. Auto. Ins. Co.*, 832 F.2d 282, 287 n.2 (4th Cir. 1987)[15]; *Connecticut Aircraft Corp. v. Smith,*

---

[15] The parties cite *Rossman*, 832 F.2d 282, in discussing the timing of contacts. *See* ECF 102 at 20–21; ECF 105 at 10–11. There, the Fourth Circuit concluded that a defendant insurance company was subject to personal jurisdiction in Virginia. *Rossman*, 832 F.2d at 286. In a footnote, the Court stated, in part, *id.* at 287 n.2: "We do not base our holding on the fact that [the defendant] expanded its connection with Virginia after the accident . . . . We do not think that a party's investigation of possible legal liability after an accident creates *in personam* jurisdiction that would not otherwise exist. If it did, insurers would be discouraged from legitimate investigation and

574 F. Supp. 626, 630 (D. Conn. 1983)). In other words, "the issue of the timing of the assessment of a defendant's contacts with the forum state is slightly different under Maryland's long-arm statute and the Due Process Clause . . . ." *Stein*, 1999 WL 710355, at *2 n.2.

However, *Stein* is an unreported opinion, decided some twenty-five years ago. More recently, the Fourth Circuit has suggested that courts may consider a defendant's contacts with the forum state up to and even after the date suit is filed. In *UMG Recordings, Inc.*, 963 F.3d at 347, the plaintiffs, twelve U.S. record companies, filed suit against the defendant on August 8, 2018, alleging copyright infringement. The defendant was a Russian citizen who operated two websites on which its visitors could extract audio tracks from various online platforms (e.g., YouTube) and convert them into a downloadable format. *Id.* at 348. The issue on appeal was whether the district court properly dismissed the action on the basis that it lacked personal jurisdiction over the defendant. *Id.* at 350.

In examining whether the defendant's contacts with Virginia supported the exercise of specific jurisdiction, the Fourth Circuit stated, *id.* at 353: "*In the relevant period, between October 2017 and September 2018*, more than half a million unique visitors went to the Websites, totaling nearly 1.5 million visits." (Emphasis added). Thus, the Fourth Circuit looked beyond the time the cause of action arose—and, indeed, beyond the time the suit was filed—and considered that period "relevant." *Id.* But, the timing of jurisdictional contacts was not an issue raised by the parties and the Fourth Circuit did not cite to any legal authority.

Other circuits are divided on the timing-of-contacts issue. The Third, Seventh, and Eighth Circuits have said that courts may look beyond the time that the cause of action arose. *See Clune*

insureds would be deprived of its benefits." Here, there is no policy concern about discouraging a legitimate investigation in order to avoid the prospect of personal jurisdiction.

*v. Alimak AB*, 233 F.3d 538, 544 n.8 (8th Cir. 2000) (agreeing with the defendant "that minimum contacts must occur at the time the cause of action arose, the time the suit is filed, or a reasonable period of time immediately prior to the filing of the lawsuit."); *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir. 1996) (citing cases and stating that contacts with the forum state after the cause of action arose are "relevant" in determining whether the defendant intended to serve the forum state's market); *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1224 (3d Cir. 1992) (considering contacts with the forum state after the at-issue contract was breached). On the other hand, the First and Ninth Circuits have limited contacts to those which existed at the time the cause of action arose. *See Harlow v. Children's Hosp.*, 432 F.3d 50, 61 (1st Cir. 2005) (stating "that in analyzing specific jurisdiction, contacts must generally be limited to those before and surrounding the accrual of the cause of action."); *Farmers Ins. Exch.*, 907 F.2d at 913 ("Only contacts occurring prior to the event causing the litigation may be considered."); *Steel*, 813 F.2d at 1549 (reasoning that contacts must be measured as of the time the events giving rise to the suit occurred); *see also* 16 James William Moore, MOORE'S FEDERAL PRACTICE § 108.42[2][a] (3d ed. 2024) ("The **proper focus** in the specific jurisdiction analysis is on those contacts leading up to and surrounding the accrual of the cause of action. Later events are not considered.") (boldface in original).

For the most part, judges in this District have said that a defendant's contacts with the forum state must be measured as of the time the cause of action arose. *See Hardnett v. Duquesne Univ.*, 897 F. Supp. 920, 923 (D. Md. 1995) ("Whether general or specific jurisdiction is sought, a defendant's 'contacts' with a forum state are measured as of the time the claim arose."); *see also Old Republic Nat'l Title Ins. Co. v. Georg*, RDB-21-842, 2023 WL 3763976, at *5 (D. Md. June 1, 2023) (quoting *Hardnett*, 897 F. Supp. at 923) (same); *Small Bus. Fin. Sols., LLC v. Corp. Client*

*Servs., LLC*, GLS-21-811, 2023 WL 1995414, at *7 (D. Md. Feb. 13, 2023) (stating that "the Court will not consider the in-state activities that took place after the injury occasioned.  Put another way, the Court will not consider Jurisdictional Facts Nos. 6 and 7 because they took place **after** the retention of fees and breach of contract.") (boldface in original); *Pandit v. Pandit*, PX-18-01136, 2018 WL 5026373, at *3 (D. Md. Oct. 17, 2018) (stating that the defendant's contacts "must have occurred at the time of the alleged wrongdoing"), *aff'd*, 808 F. App'x 179 (4th Cir. 2020) (per curiam); *Janjua v. Cooper Tire & Rubber Co*., WMN-12-2652, 2014 WL 2803741, at *4 (D. Md. June 19, 2014) (finding contacts that occurred after the accident were "irrelevant to the minimum contacts analysis"); *Glynn v. EDO Corp.*, 536 F. Supp. 2d 595, 606 n.15 (D. Md. 2008) (stating that "it is axiomatic that '[w]hether general or specific jurisdiction is sought, a defendant's "contacts" with a forum state are measured as of the time the claim arose.'") (citations omitted); *but see Carter v. Massey*, 436 F. Supp. 29, 35 (D. Md. 1977) (concluding that "the amenability of the defendants to suit may permissibly be judged on their current contacts with the forum state").

For purposes of the inquiry under the long-arm statute, I shall, consistent with *Stein*, consider Compass's contacts with Maryland up to the time "suit was filed."  *Stein*, 1999 WL 710355 at *2; *see Curtis Engine & Equip., Inc. v. Cummins Engine Co.*, WMN-97-26, 1997 WL 835051, at *3 (D. Md. Oct. 30, 1997) ("'To assert jurisdiction under [C.J.] § 6-103(b)(4) . . . the court must find that the defendant's activities in the State met the statutory requirements either when the suit was filed . . . . or when the cause of action arose.'") (citation and emphasis omitted). That date is August 5, 2022.  *See* Docket.  But, as to the due process inquiry, there is legal authority supporting both positions.  Therefore, I shall assume, *arguendo*, that for the purpose of the due process analysis, I may only consider Compass's contacts with Maryland as of the time the causes of action arose.  And, consistent with Compass's argument, ECF 105 at 11, I shall assume that the

causes of action arose on August 29, 2019, when Compass filed the '611 Application. ECF 81, ¶ 41.[16]

I turn to consider Compass's contacts with Maryland on or before August 29, 2019, for purposes of the Due Process Clause, and on or before August 5, 2022, for purposes of Maryland's long-arm statute.

## 2. Maryland Long-Arm Statute

### a. C.J. § 6-103(b)(1)

C.J. § 6-103(b)(1) states: "[A] court may exercise personal jurisdiction over a person, who directly or by an agent . . . Transacts any business or performs any character of work or service in the State . . . ." This "is not a demanding standard." *FrenchPorte IP, LLC v. Martin Door Mfg., Inc.*, TDC-14-0295, 2014 WL 4094265, at *11 (D. Md. Aug. 14, 2014). C.J. § 6-103(b)(1) "provides jurisdiction to the full extent permitted by due process." *Giannaris v. Cheng*, 219 F. Supp. 2d 687, 692 (D. Md. 2002) (citing *McGann v. Wilson,* 117 Md. App. 595, 601, 701 A.2d 873, 876 (1997)).

Compass argues that its contacts with Maryland are too attenuated to support a finding of specific jurisdiction under C.J. § 6-103(b)(1). ECF 93-1 at 19–20. Defendant asserts: "Exchanging phone calls and written communications with a party in Maryland—as Plaintiffs allege that Compass has done—does not meet the [C.J.] § 6-103(b)(1) standard." ECF 93-1 at 20 (citing *Gallman v. Sovereign Equity Grp., Inc.*, AW-11-2750, 2012 WL 983937 (D. Md. March 21, 2012)). Moreover, Compass points out, ECF 93-1 at 18–19 (internal citations omitted): "The

---

[16] If necessary, the Court will revisit the issue at a later date. *See Wellington Fin. Corp.*, 416 F.3d at 294 n.5 ("'A threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'") (citation omitted).

TAC alleges 'in-person meetings,' but the only in-person meeting between Compass and Thompson took place at the annual meeting of the [SFN] in October 2019," and the TAC omits that the SFN meeting was held in Chicago, not Maryland. *See* ECF 93-4 at 3 (screenshot of the SFN website which depicts that the 2019 annual meeting was held from October 19–23 in Chicago); ECF 93-3 (Malievskaia Declaration).

Defendant suggests that this case is governed by *Zavian v. Foudy*, 130 Md. App. 689, 699–702, 747 A.2d 764, 770–772 (2000). In that case, according to Compass, the Maryland Court of Special Appeals endorsed the proposition that "[m]erely contacting a plaintiff in Maryland is too attenuated an allegation to constitute transacting business for purposes of [§ 6-103(b)(1)] of the long-arm statute." ECF 93-1 at 20.

Plaintiffs contend that Compass is subject to personal jurisdiction under C.J. § 6-103(b)(1) "because it targeted UMB and a UMB professor in a months-long fraudulent scheme involving a series of communications into Maryland." ECF 102 at 12. They point out that Compass initiated the business relationship with UMB in Maryland, which is the "'strongest factor'" in "'determining whether prior business negations in the forum state give rise to specific jurisdiction . . . .'" *Id.* (quoting *Giannaris*, 219 F. Supp. 2d at 692). According to plaintiffs, this is "especially true when the claims arise from fraudulent statements made into the forum." ECF 102 at 12.

In summary, and as stated earlier, plaintiffs identify the following course of conduct, *id.* at 12–13: "Compass: (i) pursued contact with the [NIMH] in Maryland, who [sic] directed Compass to researchers at UMB, (ii) pursued contact with Profs. Gould and Thompson at UMB; (iii) fraudulently induced Prof. Thompson to share details of the Psilocybin Trade Secrets through communications purposefully directed into Maryland; [(iv)] extracted those trade secrets and other confidential information from him through a series of calls and other communications into

Maryland over a six month period; and [(v)] misappropriated those UMB-owned trade secrets by—among other things—disclosing them in U.S. patent applications as part of broader efforts by Compass to establish a permanent presence in Maryland and the United States."

The Maryland Court of Appeals has explained that the phrase "transacts any business" in C.J. § 6-103(b)(1) "must be read with a constitutional gloss, requiring some 'purposeful activity' by the defendant as a prerequisite to the exercise of jurisdiction." *CSR*, 411 Md. at 473, 983 A.2d at 501 (citation omitted). But, "the acts done within a State which will support in personam jurisdiction as transacting 'any business' are not necessarily limited to acts which are a part of commerce or of transactions for profit, but include acts which constitute a purposeful activity within the State." *Novack v. Nat'l Hot Rod Ass'n*, 247 Md. 350, 356, 231 A.2d 22, 26 (1967).

Notably, "even a single contact with the forum can satisfy the transaction of business standard in subsection (b)(1)." *Hausfeld v. Love Funding Corp.*, 16 F. Supp. 3d 591, 599 (D. Md. 2014). Of import here, under C.J. § 6-103(b)(1), "one who sends communications into Maryland can be found to have transacted business in the State, without ever entering the State . . . ." *Bond v. Messerman*, 162 Md. App. 93, 111, 873 A.2d 417, 427 (2005), *aff'd*, 391 Md. 706, 895 A.2d 990 (2006); *see Contiem v. Gullion*, MJM-23-2511, 2024 WL 4349689, at *4 (D. Md. Sept. 30, 2024) (stating that C.J. § 6-103(b)(1) "does not require the defendant's physical presence in the forum state.") (citation omitted); *Dynacorp Ltd. v. Aramtel Ltd.*, 208 Md. App. 403, 480–81, 56 A.3d 631, 677 (2012) (stating that, "in specific personal jurisdiction cases, transacting business within the State within the meaning of [C.J.] § 6–103(b)(1) can occur even if the defendant has never been 'physically present' in the State.") (citation omitted); *Bahn v. Chicago Motor Club Ins. Co.*, 98 Md. App. 559, 568, 634 A.2d 63, 67 (1993) (explaining that the "defendant need never have been physically present in" Maryland to satisfy the transaction of business standard in C.J. §

6-103(b)(1)); *Sleph v. Radtke*, 76 Md. App. 418, 429, 545 A.2d 111, 116 (1988) ("An absence of physical contacts will not defeat the exercise of personal jurisdiction where a commercial actor's efforts have been 'purposefully directed' toward residents of another state.").

"'An essential factor in determining whether business transactions give rise to specific jurisdiction is whether the defendant initiated the contact.'" (citation omitted). *Contiem*, 2024 WL 4349689, at *4. Contractual negotiations between an out-of-state defendant and an in-state plaintiff are also relevant in determining whether a defendant transacted business in the state. *Jason Pharmaceuticals, Inc. v. Jianas Bros. Packaging Co., Inc.*, 94 Md. App. 425, 433–34, 617 A.2d 1125, 1129 (1993) (telephone communications negotiating contract between out-of-state defendant and in-state plaintiff was a relevant contact for purposes of C.J. § 6-103(b)(1)).

Here, in May 2019, Compass initiated contact with Dr. Zarate at NIMH in Maryland and then with Dr. Gould, a UMB employee. ECF 81, ¶ 29. Gould, in turn, suggested the involvement of Thompson, who also worked at UMB. Also in May 2019, Compass sent both Thompson and Gould a NDA. *Id.* ¶¶ 3, 30; ECF 67-18 at 3; ECF 67-20 at 2. As indicated, the stated "[p]urpose" of the NDA was to allow the parties to "discuss and disclose" certain confidential "information in connection with exploring possible business arrangements . . . ." ECF 67-19 at 2. Thompson executed the NDA and sent it to Compass. ECF 81, ¶ 3. But, as stated, Compass never executed the NDA. *Id.*

In addition, on June 13, 2019, in response to Compass's request, Thompson and Gould sent a proposed budget and research proposal to Compass. *Id.* ¶ 32. Thereafter, for approximately six months, Compass, Gould, and Thompson engaged in communications in contemplation of a collaboration agreement. *Id.* ¶ 3. During this time, Gould and Thompson received and answered substantive questions that Dr. Hurley posed in regard to the research proposal. *Id.* ¶ 33; ECF 67-

21 at 2; ECF 67-22; ECF 67-23.  In October 2019, Compass sent UMB a revised collaboration agreement.  ECF 81, ¶ 38.

The TAC alleges, *inter alia*, that Thompson, UMB, and Compass entered into an implied-in-fact contract.  *Id.* ¶¶ 103–108.  An implied-in-fact contract is a contract.  *Alternatives Unlimited, Inc. v. New Baltimore City Board of School Comm'rs*, 155 Md. App. 415, 478, 843 A.2d 252, 289 (2004) ("A contract implied in fact is actually a contract.").  According to the TAC, ECF 81, ¶ 106: "Compass accepted the services and information provided by UMB and Professor Thompson, and understood that they expected compensation for such services and information, including at least a collaboration agreement which would provide funds for Professor Thompson's research activities."   In other words, plaintiffs allege that Compass incurred the obligation to fund Thompson and UMB for Thompson's research, which, at least by implication, was to occur in Maryland, where Thompson and UMB were or are located.  *See* ECF 67-22 at 3 (Gould and Thompson response to a question posed by Compass which indicates that the research would be performed at UMB).  This alleged contract is pertinent for purposes of C.J. § 6-103(b)(1) because it has a "'substantial connection'" to Maryland.  *Stisser*, 234 Md. App. at 637, 174 A.3d at 432 (citation omitted).  It creates "continuing obligations" on Compass's part to Maryland residents, which is relevant.  *CSR*, 411 Md. at 485, 983 A.2d at 508.

As indicated, Maryland's long-arm statute states: "If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action *arising from* any act enumerated in this section."  C.J. § 6-103(a) (emphasis added); *see Nat'l Fire & Marine Ins. Co. v. Advanced Lighting Techs. LLC*, JRR-22-02723, 2023 WL 6142988, at *3 (D. Md. Sept. 20, 2023) ("'The Maryland long-arm statute . . . limits specific jurisdiction to cases where the cause of 'action aris[es] from any act enumerated in the statute itself.'") (citation omitted; alteration in *Nat'l Fire*

& *Marine Ins. Co.*); *Toombs v. Lowe's Companies, Inc.*, DKC-21-1843, 2021 WL 4772926, at *3 (D. Md. Oct. 13, 2021) (noting that the "arising from" language in C.J. § 6-103(a) provides a "limiting condition" on the contacts that may be considered for purposes of satisfying Maryland's long-arm statute). Compass's pre-August 2022 clinical trials in Maryland, as well as its activity at the Centre of Excellence and the ACC, would likely satisfy the criteria in C.J. § 6-103(b)(1) that the person "performs any character of work or service in the State." Although plaintiffs' claims do not arise from those contacts,[17] plaintiffs' other allegations, if proved, would demonstrate that Compass transacted business in Maryland within the meaning of C.J. § 6-103(b)(1).

### b. C.J. § 6-103(b)(4)

C.J. § 6-103(b)(4) provides that a "court may exercise personal jurisdiction over a person, who directly or by an agent . . . Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other

---

[17] The "arising from" language of C.J. § 6-103(a) may be at odds with modern United States Supreme Court precedent. As noted, the Maryland appellate courts have long explained that "'the long arm statute represents an effort by the Legislature to expand the boundaries of permissible *in personam* jurisdiction to the limits permitted by the Federal Constitution.'" *Pinner*, 467 Md. at 479, 225 A.3d at 442 (citation omitted); *see CSR*, 411 Md. at 473, 983 A.2d at 501 (stating that Maryland has construed its long-arm statute to "'authorize the exercise of personal jurisdiction to the full extent allowable under the Due Process Clause.'") (citation omitted); *Mohamed*, 279 Md. at 657, 370 A.2d at 553 (explaining that "it was the intent of the Legislature in enacting the long-arm statute to expand the personal jurisdiction of the courts to the extent permitted by the Fourteenth Amendment."); *Cappel v. Riaso, LLC*, 197 Md. App. 347, 360, 13 A.3d 823, 831 (2011) (noting that C.J. § 6-103(b)(1) "has been interpreted as allowing the exercise of personal jurisdiction to the fullest extent permitted by the Due Process Clause."). However, in *Ford Motor Co.*, 592 U.S. at 362, the Supreme Court made clear that, for purposes of due process in the context of specific jurisdiction, the claim need not arise out of the defendant's contacts with the forum. Instead, to satisfy due process, the claim need only relate to the defendant's forum contacts. *Id.* Thus, Maryland's long-arm statute appears to impose a more stringent limitation on the exercise of personal jurisdiction than that imposed by the Due Process Clause.

persistent course of conduct in the State or derives substantial revenue from goods, foods, services, or manufactured products used or consumed in the State[.]"

Plaintiffs allege, ECF 102 at 15: "Here, tortious injury occurred in Maryland, and Plaintiffs have alleged sufficient facts to establish Compass's persistent course of conduct in Maryland." According to plaintiffs, Compass has engaged in a "persistent course of conduct" in Maryland by: (1) engaging in the months' long discussions with Professor Thompson and UMB regarding a potential collaboration; (2) conducting seven clinical trials in the State beginning in 2019; (3) establishing the Centre of Excellence in Baltimore; and (4) funding the ACC in Rockville. ECF 102 at 15–16, 20; *see also* ECF 67-3. Moreover, in plaintiffs' view, "it is reasonable to infer" that Compass had additional contacts in Maryland in 2019 in connection with its clinical trials, and its funding of the Centre of Excellence and the ACC. ECF 102 at 16.

Compass argues that, aside from its communications with plaintiffs regarding a potential collaboration and one clinical trial, each of the contacts with Maryland set forth above occurred after plaintiffs' claims arose, making them jurisdictionally irrelevant. ECF 93-1 at 23–24, 26; ECF 105 at 10–13. Further, Compass points out that it does not sell products in Maryland, is not registered to do business in Maryland, and has conducted clinical trials in many other states. ECF 93-1 at 26–27; ECF 105 at 12.

The issue is whether plaintiffs have sufficiently alleged that Compass engaged in a "persistent course of conduct" in Maryland. Before making that determination, I must first consider whether C.J. § 6-103(b)(4) authorizes general or specific jurisdiction.

Compass argues that C.J. § 6-103(b)(4) is a general jurisdiction statute. ECF 93-1 at 26. And, plaintiffs do not contend that Compass is subject to general jurisdiction in Maryland. However, plaintiffs assert, ECF 102 at 17: "Although the degree of contact for establishing

jurisdiction under Section 6-103(b)(4) is more demanding when the persistent conduct bears no relationship to the asserted claims, the standard is lower when, as here, the persistent conduct bears some relationship to the asserted claims."

In *Bristol-Myers*, 582 U.S. at 264, the Supreme Court rejected a so-called "sliding-scale approach", by which the quantum of contacts needed to establish jurisdiction varies with the connection of the contact to the cause of action. Thus, there is no "sliding scale" approach to personal jurisdiction; jurisdiction must be either general or specific. *See Stisser v. SP Bancorp, Inc.*, 234 Md. App. 593, 618 n.8, 174 A.3d 405, 421 n.8 (2017) (recognizing that *Bristol-Myers* "calls into question the conception the [Maryland] Court of Appeals articulated in *Camelback Ski Corp. v. Behning*[, 312 Md. 330, 339, 539 A.3d 1107, 1111 (1988)]—that where personal jurisdiction does not 'fit neatly' into the categories of specific and general jurisdiction 'the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases.'").

In *Cong. Bank v. Potomac Educ. Found., Inc.*, PWG-13-889, 2014 WL 347632, at *5 (D. Md. Jan. 30, 2014), the court observed: "Jurisdiction under [C.J. § 6-103(b)(4)] is, at a minimum, specific, but has been found by some judges to have the attributes of general jurisdiction." For example, in 1976, in *Geelhoed v. Jensen*, 277 Md. 220, 352 A.2d 818 (1976), the Maryland Court of Appeals impliedly concluded that C.J. § 6-103(b)(4) is a general jurisdiction statute. It rejected the argument that C.J. § 6-103(b)(4) "requires that the cause of action arise out of the defendant's contact with the forum." *Id.* at 231, 352 A.2d at 825. More recently, however, the Maryland high court indicated that C.J. § 6-103(b)(4) authorizes specific jurisdiction. In *Pinner*, 467 Md. at 496, 225 A.3d at 453, it stated: "Under the language of subsection (b)(4) of the long arm statute, CJ §

6-103, *specific jurisdiction* may arise where a defendant: '[c]auses tortious injury . . . outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any *other* persistent course of conduct in the State . . . .'" (First emphasis added; alteration in *Pinner*). And, the Fourth Circuit has reached the same conclusion. *Pandit v. Pandit*, 808 F. App'x 179, 186 (4th Cir. 2020) (per curiam) (stating that C.J. § 6-103(b)(4) provides an avenue to "confer specific personal jurisdiction").

When interpreting the reach of Maryland's long-arm statute, a federal district court is bound by the interpretations of the Maryland high court. *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 2 F.3d 56, 61 (4th Cir. 1993); *Coastal Lab'ys, Inc. v. Jolly*, 502 F. Supp. 3d 1003, 1017 (D. Md. 2020); *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 439 (D. Md. 2019); *Carbone v. Deutsche Bank Nat'l Tr. Co.*, RDB-15-1963, 2016 WL 4158354, at *5 (D. Md. Aug. 5, 2016); *Snyder v. Hampton Indus., Inc.*, 521 F. Supp. 130 (D. Md. 1981), *aff'd*, 758 F.2d 649 (4th Cir. 1985). Thus, C.J. § 6-103(b)(4) appears to authorize both general and specific jurisdiction, depending on the circumstances.[18]

---

[18] As to whether C.J. § 6-103(b)(4) is a general or specific jurisdictional provision, judges of this District have reached different conclusions. *See, e.g.*, *Phillips v. Brit. Airways*, DLB-23-3066, 2024 WL 3690786, at *6 (D. Md. Aug. 5, 2024) (stating that C.J. § 6-103(b)(4) "'has been construed as a general jurisdiction statute.'") (quoting *Orbita Telecom SAC v. Juvare LLC*, 606 F. Supp. 3d 240, 250 (D. Md. 2022)); *Mycosafe Diagnostics GMBH v. Life Techs. Corp.*, DKC-12-2842, 2013 WL 145893, at *4–5 (D. Md. Jan. 11, 2013) (same); *Tech. Patents, LLC v. Deutsche Telekom AG*, 573 F. Supp. 2d 903, 912 n.11 (D. Md. 2008) (same); *Bass v. Energy Transp. Corp.*, 787 F. Supp. 530, 534–35 (D. Md. 1992) (same); *Nichols v. G.D. Searle & Co.*, 783 F. Supp. 233, 236 (D. Md. 1992) ("[S]ubsection (b)(4) does not require that a defendant's contacts bear any relationship to the alleged acts giving rise to the suit"), *aff'd*, 991 F.2d 1195 (4th Cir. 1993); *but see Contiem*, 2024 WL 4349689, at *7 (analyzing C.J. § 6-103(b)(4) as a specific jurisdiction statute); *Brown Inv. Advisory & Tr. Co. v. Allen*, JKB-19-2332, 2020 WL 5833034, at *7 (D. Md. Sept. 29, 2020) (same); *Ryan v. TEV Corp.*, ELH-18-3852, 2019 WL 5683400, at *3–5 (D. Md. Nov. 1, 2019) (same); *Pandit*, 2018 WL 5026373, at *3 (same); *Metro. Reg'l Inf. Sys. v. Am. Home Realty Network, Inc.*, 888 F. Supp. 2d 691, 698 (D. Md. 2012) ("Establishing a 'persistent course of conduct' under section 6-103(b)(4) is 'not tantamount to establishing general jurisdiction . . . .'"); *Strong Pharm. Lab'ys, LLC v. Trademark Cosms., Inc.*, RDB 05-3427, 2006 WL 2033138, at

Regardless, the question is whether plaintiffs have sufficiently alleged that Compass engaged in a "persistent course of conduct" in Maryland. The Fourth Circuit has stated that "the contacts resulting from the conduct must be continuous over a long period of time." *Pandit*, 808 F. App'x at 187. In *Pinner*, 467 Md. at 497, 225 A.3d at 453, the Maryland Court of Appeals looked to the dictionary and noted that "persistent" is defined, *inter alia*, as "'existing for a long or longer than usual time or continuously . . . continuing or inclined to persist in a course.'" (Citation omitted). And, in *Geelhoed*, 277 Md. at 226–27, 352 A.2d at 822, the court described "persistent course of conduct" as having "a relatively flexible quality," and instructed that the term should be construed as "coextensive with the requirements of due process."

I conclude that plaintiffs have sufficiently alleged facts that, if proven, would establish that Compass engaged in a persistent course of conduct in Maryland between 2018 and August 2022, when suit was filed. For example, Compass received breakthrough therapy designation in 2018 from the FDA for its proprietary psilocybin formulation, COMP360; beginning in 2019, Compass engaged in a clinical trial in the State that continued for some two and a half years; Compass contacted the NIMH in Maryland in 2019 to conduct a psilocybin-related study; for a period of approximately six months, beginning in mid 2019, Compass communicated with Thompson and

---

*6 (D. Md. July 17, 2006) ("Although claims under § 6-103(b)(4) require greater contacts than those necessary for claims under §§ 6-103(b)(1)-(2), the level is distinct from that required for general jurisdiction.") (citing cases).

The disagreement appears to result from use of the statutory phrase "persistent course of conduct." On the one hand, merely engaging in a "persistent course of conduct" in the forum state is not sufficient to establish general jurisdiction. If the defendant is not incorporated in the forum state or does not have its principal place of business there, the defendant's contacts with the forum must be so continuous and systematic as to render it essentially at home there. *Daimler*, 571 U.S. at 139 n.19. On the other hand, there is no requirement that a defendant engage in a "persistent course of conduct" in the forum state to be subject to specific jurisdiction. *See Carefirst of Md.*, 334 F.3d at 397 ("Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact . . . ."); *Stisser*, 234 Md. App. at 630, 174 A.3d at 428 (stating that "a single tortious contact with the state may create specific jurisdiction").

48

Gould, who were located in Maryland, regarding a potential collaboration. ECF 81, ¶ 18; ECF 99-3 at 4; ECF 102 at 25. In addition, Compass conducted at least three other psilocybin clinical trials at Sheppard Pratt that began prior to August 2022. ECF 81, ¶ 18. And, Compass provided "support, training and funding" for a study involving its COMP360 psilocybin therapy at the ACC, which first occurred before March 2021. *See* ECF 99-2. Moreover, Compass "established, funds, and operates a 'Centre of Excellence' to 'carry out new research in the use of psilocybin therapy'" at Sheppard Pratt. ECF 81, ¶ 18 (citation omitted). "The Centre was first announced publicly in January 2021." *Id.* (citation omitted).[19]

I next consider the matter of due process.

### 3. Due Process

#### a. Minimum Contacts/Purposeful Availment

Compass argues that it does not have sufficient minimum contacts with Maryland to permit the exercise of in personam jurisdiction. ECF 93-1 at 21–23. It contends that it did not initiate contact with plaintiffs and never visited Maryland in connection with the negotiations with Thompson and UMB. *Id.* at 18; ECF 93-3, ¶ 6–7; ECF 105 at 9. Further, Compass asserts, ECF 93-1 at 21: The "types of contacts Plaintiffs allege—Compass and UMB researchers corresponding over email and telephone from their respective home countries—are insufficient to confer specific personal jurisdiction over a foreign defendant." It refers the Court to *Consulting Eng'rs*, 561 F.3d 273, in which, according to Compass, the Fourth Circuit held that various "email and phone 'contacts' were insufficient to establish personal jurisdiction over the defendants" in that case.

---

[19] To be sure, plaintiffs' claims do not arise from all of the contacts recounted above. The Maryland Court of Appeals has explained that, for purposes of C.J. § 6-103(b)(4), the requirement in the long-arm statute that the claims "aris[e] from any act enumerated in this section" "refers only to the act or omission which causes tortious injury." *Geelhoed*, 277 Md. at 232, 352 A.2d at 825.

ECF 93-1 at 21–22 (citing *Consulting Eng'rs*, 561 F.3d at 275, 279–82). In Compass's view, "the jurisdictional facts" in this case "are even fewer than in *Consulting Engineers*." ECF 93-1 at 22.

Moreover, Compass posits that it never reached a collaboration agreement with UMB and Thompson, and that the NDA provides no continuing obligations on its part to Thompson in Maryland. *Id.* at 22, 23. It also contends that, under the NDA, the law of England and Wales governs the contract, which is a factor that weighs against personal jurisdiction in Maryland. *Id.* at 23.

Plaintiffs maintain that Compass's lack of physical presence in Maryland is not dispositive. ECF 102 at 15. They point to Compass's initiation of contact with UMB in Maryland; Compass engaged in contractual negotiations with Maryland residents for approximately six months; and Compass sent fraudulent communications into Maryland in an effort to acquire trade secrets owned by the State of Maryland. *Id.* at 12–13.

The Supreme Court explained in *Kulko v. Superior Court of Cal.*, 436 U.S. 84, 92 (1978), that the determination of whether a defendant has maintained sufficient minimum contacts with the forum state is "one in which few answers will be written 'in black and white. The greys are dominant and even among them the shades are innumerable.'" (Citation omitted). Although there are some shades of grey here, I conclude, as discussed below, that the allegations amply satisfy due process.

To be sure, Compass does not maintain property in Maryland; Compass never made in-person contact with plaintiffs in the State; Compass does not sell products in Maryland or provide services here; and the parties never entered an express contract that required the performance of any duties by Compass in Maryland. These facts all weigh against a finding of specific personal jurisdiction. *UMG Recordings, Inc.*, 963 F.3d at 352. But, the analysis is a "'flexible'" one, and

is made on a case-by-case basis. *Universal Leather, LLC, v. Koro AR, S.A.*, 773 F.3d 553, 560 (4th Cir. 2014) (citation omitted). The Supreme Court has admonished that personal jurisdiction does not "turn on 'mechanical' tests." *Burger King*, 471 U.S. at 478; *see also International Shoe*, 326 U.S. at 319; *Perdue Foods, LLC*, 814 F.3d at 191. Numerous factors are pertinent, but no one factor is dispositive.

As discussed earlier, "physical presence in the forum state is not essential" to establish jurisdiction. *Perdue Foods, LLC*, 814 F.3d at 191. Even without a physical presence, a defendant may purposefully avail itself of the laws of the forum state. Indeed, "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Burger King*, 471 U.S. at 476.

The matter of whether the defendant initiated contact with the plaintiff in the forum state is an important consideration with regard to the question of personal jurisdiction. *UMG Recordings, Inc.*, 963 F.3d at 352. The Fourth Circuit has afforded "special weight" to this factor. *CFA Inst.*, 551 F.3d at 295 n.17; *see also CSS Antenna, Inc. v. Amphenol-Tuchel Elecs., GmbH*, 764 F. Supp. 2d 745, 749 (D. Md. 2011) ("An essential factor in determining whether business negotiations give rise to specific jurisdiction is 'whether the defendant initiated contact.'") (citation omitted); *Giannaris*, 219 F. Supp. 2d at 692 ("In determining whether prior business negotiations in the forum state give rise to specific jurisdiction, the 'strongest factor' is 'whether the defendant initiated the business relationship in some way.'") (citation omitted).

As indicated, Compass maintains that it did not "initiate contact" with Professor Thompson. ECF 105 at 9. According to Compass, Gould "was introduced to Compass through a

recommendation from a third party" and Gould "suggested that Thompson be included on an introductory call to discuss a research opportunity." *Id.* (citing ECF 67-17 at 2).

To support its position, Compass cites *Consulting Eng'rs*, 561 F.3d 273. There, the plaintiff, Consulting Engineers Corp. ("Consulting"), was a Virginia corporation with two branch offices in India. *Id.* at 275. Defendant Structure Works, LLC, a Colorado corporation, hired defendant Geometric Software Solutions ("Geometric"), an Indian corporation, to work on a software and structural design project. *Id.* Structure Works, believing that the plaintiff could assist Geometric in India with one aspect of the software project, "arranged a conference call" in which it "introduced" the plaintiff to Geometric. *Id.* Consulting and Geometric entered into a non-disclosure agreement, and Consulting entered a separate NDA with Structure Works. *Id.* at 275–76.

Eventually, Structure Works elected not to pursue the software project with the plaintiff. *Id.* at 276. Litigation ensued in a Virginia State court after Geometric hired an employee of the plaintiff in India, for work to be performed in India, allegedly in violation of the non-disclosure agreement. *Id.* After the case was removed to federal court, the district court dismissed the case for lack of personal jurisdiction. *Id.* On appeal, Consulting contended, *inter alia*, that Geometric initiated contact with it in Virginia. *Id.* at 281. The Fourth Circuit disagreed, concluding that "the two parties were first introduced on a joint conference call with Structure Works." *Id.* at 282–83.

Extrapolating from *Consulting Eng'rs*, Compass argues, in essence, that because Dr. Zarate suggested that Compass reach out to Dr. Gould and copied him on an email, Compass cannot be said to have initiated contact with Dr. Gould. Compass also makes much of the fact that it was Gould who suggested the involvement of Thompson. ECF 105 at 9. But, even if Compass did not initiate the contact, the factor is but one piece of a larger puzzle; the factor is not dispositive.

In any event, *Consulting Eng'rs* is factually distinguishable. Addressing now only the matter of initiation of contact, Compass overlooks the allegation in the TAC that Compass initially contacted Dr. Zarate at the NIMH in Maryland, and inquired about performing a psilocybin study in Maryland, *i.e.*, the forum State. ECF 67-17 at 3. In turn, via email, Zarate introduced Compass to Gould at UMB. *See id.* Compass then contacted Gould in Maryland. *Id.* at 2. Although it was Gould who then suggested the inclusion of Thompson, ECF 67-17 at 2, Compass reached out to Thompson at UMB and followed up by sending a NDA to him in Maryland. *See* ECF 67-20 at 2 (Malievskaia's request of May 28, 2019, to Compass employees to send a NDA to Thompson); ECF 67-18 at 3 (Compass sent NDA to Thompson).

Compass also points to the contractual choice-of-law clause in the NDA. ECF 93-1 at 23. It states, in part, ECF 67-19, ¶ 12: "This Agreement shall be governed and interpreted by the law of England and Wales without regard to conflict-of-law principles."

A choice-of-law clause that selects the law of a different state or country is a factor that weighs against a finding of personal jurisdiction. *See, e.g.*, *UMG Recordings, Inc*, 963 F.3d at 352 (a choice-of-law clause is a factor for consideration). But, it is not dispositive. *See Consulting Eng'rs*, 361 F.3d at 281 (stating that "a choice-of-law clause is one factor that a court may take into account in determining whether the exercise of personal jurisdiction is justified, but it is no more than that."). Of import, the NDA also states, ECF 67-19, ¶ 5 (emphasis added):

> Both parties acknowledge that unauthorised disclosure or use of Confidential Information could cause great or irreparable injury to Discloser and that pecuniary compensation may not afford adequate relief or that it would be extremely difficult to ascertain the amount of compensation that would afford adequate relief. Therefore, both parties agree that, in the event of such actual or alleged unauthorized disclosure or use of Confidential Information, Discloser will have the right to seek injunctive relief *in any court of competent jurisdiction*, without the necessity of posting a bond, in addition to any other rights and remedies it may have.

Notably, the TAC alleges that Compass "never executed the NDA." ECF 81, ¶ 3. Indeed, that is the basis for several of plaintiffs' claims. *See, e.g.*, *id.* ¶ 110 (alleging that Compass fraudulently misrepresented "that there was a signed NDA in place . . ."). In the Motion, Compass states that it "presumes, for purposes of this [M]otion, that a contract was entered." ECF 93-1 at 23 n.7. But, Compass seeks to "reserve[] the right to argue otherwise, given that the NDA was never signed." *Id.* Compass cannot shield itself from a claim of breach of contract by denying the existence of a contract while simultaneously seeking to benefit from a choice-of-law provision in that document.

For jurisdiction purposes, a court also considers whether a contract imposed "continuing obligations" on the defendant that had an effect on the "'extent, nature, and quality'" of the defendant's contacts with the forum state. *Perdue Foods, LLC*, 814 F.3d at 191 (citation omitted); *see also Burger King*, 471 U.S. at 476 (explaining that where a defendant creates "'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there . . .") (citation omitted). Compass points out that no collaboration agreement was reached, and the NDA does not impose any continuing obligations on its part to UMB or Thompson in Maryland. ECF 93-1 at 22, 23. But, Compass ignores that the TAC alleges that Compass, UMB, and Thompson entered into an implied-in-fact contract under which Compass was to fund Thompson's research and compensate UMB for the information Thompson provided to Compass. ECF 81, ¶¶ 106, 107.

Without question, the "nature, quality, and extent of the parties' communications about the business being transacted" are pertinent to the jurisdictional analysis. *UMG Recordings, Inc.*, 963 F.3d at 352. Phone calls, correspondence, and emails are, without more, generally insufficient to establish purposeful availment. *Ryan*, 2019 WL 5683400, at *9 (stating generally that

"'correspondence and phone calls from out-of-state defendants to in-state plaintiffs are insufficient as a matter of law to establish the minimum contacts that satisfy due process'") (citation omitted); *see Stover*, 84 F.3d at 137 (recognizing that "the use of a telephone to facilitate transactions between remote locations serves as an *alternative* to presence [and] [t]o conclude that such activity establishes presence in a state would upset generally held expectations"); *Doe v. Mast*, No. 3:22-CV-00049, 2024 WL 3524070, at *31 (W.D. Va. July 24, 2024) ("'[M]ere telephone conversations, telex messages and letters *negotiating* a transaction are insufficient to form a basis for in personam jurisdiction.'") (citation omitted) (alteration and emphasis in *Mast*); *Cricket Grp., Ltd. v. Highmark, Inc.,* 198 F. Supp. 3d 540, 544 (D. Md. 2016) ("And although many contacts between the two parties occurred via email, telephone, or instant messaging, such communications do not provide sufficient contacts to justify exercising personal jurisdiction over Highmark."); *Est. of Morris v. Goodwin*, DKC-13-3383, 2015 WL 132617, at *6 (D. Md. Jan. 8, 2015) ("A handful of emails, phone calls, and a 'friend request' on Facebook from an out-of-state defendant into Maryland, without more, do not rise to the level of purposeful availment for purposes of establishing specific jurisdiction under the Due Process Clause."); *Pharmabiodevice Consulting, LLC v. Evans*, GJH-14-00732, 2014 WL 3741692, at *8 (D. Md. July 28, 2014) (stating that "it is well-settled that periodic and isolated e-mails from an out-of-state defendant into Maryland, without more, will not rise to the level of purposeful availment for purposes of establishing specific jurisdiction under the Due Process Clause."); *Johansson Corp. v. Bowness Const. Co.*, 304 F. Supp. 2d 701, 706 (D. Md. 2004) (explaining that "the negotiations that occurred via mail or telephone contacts from North Carolina into Maryland cannot provide sufficient minimum contacts for the exercise of personal jurisdiction."); *Cape v. von Maur*, 932 F. Supp. 124, 128 (D. Md. 1996) ("Generally speaking, correspondence and phone calls from out-of-state defendants to

in-state plaintiffs are insufficient as a matter of law to establish the minimum contacts that satisfy due process."); *Leather Masters (PVT) Ltd. v. Giampier Ltd.,* 836 F. Supp. 328, 331 (D. Md. 1993) (stating that, "without more, communications made from outside the State to a Maryland resident are not enough to justify the exercise of personal jurisdiction over an out-of-state defendant").

However, the TAC does not merely allege periodic or isolated communications between the parties. Rather, it recounts a vigorous and persistent attempt by Compass to confer with Thompson and UMB under the guise of establishing a business collaboration. Among other things, Compass sent Thompson a NDA, in order to enable him to disclose confidential and proprietary information. Compass also solicited a research and budget proposal from Gould and Thompson. And, Compass sent numerous substantive questions to Thompson and Gould about their research and budget proposal, which they endeavored to answer over a period of time. Compass also sent a revised collaboration agreement with regard to creating a business relationship.

Even more important, the TAC alleges that Compass directed *fraudulent* communications into Maryland. *See* ECF 81, ¶¶ 3, 110.[20] The Fourth Circuit and other courts have recognized that, with regard to the purposeful availment requirement, sending fraudulent communications into the forum state is significant.

---

[20] Plaintiffs do not mention the so-called "effects test." In *Walden*, 571 U.S. at 287–88, the Supreme Court observed that the test is largely applicable to defamation actions. But, in considering specific jurisdiction, courts sometimes utilize it in other contexts. In particular, courts apply the test in cases where an out-of-state defendant acts outside the forum in a manner that purposely injures someone residing in the forum. The effects test "does not supplant the minimum contacts analysis, but rather informs it." *Consulting Eng'rs*, 561 F.3d at 280. Under the test, "the plaintiff must establish that specific jurisdiction is proper by showing that '(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.'" *Id.* (quoting *Carefirst of Md.*, 334 F.3d at 398 n.7).

In *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062 (4th Cir. 1982), the Fourth Circuit concluded that the exercise of specific personal jurisdiction was proper in North Carolina even though the defendant did not maintain a place of business in North Carolina, had never entered into a contract with a North Carolina entity, and "[a]t most," wrote three letters and initiated five telephone calls with the plaintiff in North Carolina. *Id.* at 1068. The Court reasoned that there can be no constitutional objection to asserting jurisdiction over an "'out-of-state sender of a fraudulent misrepresentation for such a sender has thereby purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Id.* (citation omitted) (alteration in *Vishay Intertechnology, Inc.*).

The case of *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166 (4th Cir. 2002), is also instructive. There, the defendant, Aboud, orchestrated a "bust-out scheme through her ownership and control of Micro Business Technology ('MBT'), a Canadian corporation ostensibly in the business of buying, assembling, and reselling computer components.[]" *Id.* at 171. The defendant and her coconspirators used MBT to establish credit lines with various wholesalers of computer equipment. *Id.* Just before MBT filed for bankruptcy in Canada, the defendant and her coconspirators "charged large orders of computer equipment, sold the equipment at artificially-discounted prices, and stole the proceeds from MBT, leaving MBT with neither assets nor records. By the time MBT filed for bankruptcy in March 2000, Aboud and her co-schemers had defrauded MBT's creditors out of millions of dollars." *Id.* Following a bench trial, the court concluded that the defendant was liable to ePlus, one of the wholesalers that extended credit to MBT, for fraud and for violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq. Id.* at 175.

On appeal, the defendant argued that the court lacked personal jurisdiction. *Id.* The Fourth Circuit disagreed, reasoning: "In order to obtain credit for MBT from Virginia corporations, Aboud submitted false information to Dun & Bradstreet, and *she faxed credit applications to ePlus and Intelligent Decisions, Inc. in Virginia. Because ePlus's claims involve credit fraud, these acts alone are sufficient to justify the court's exercise of jurisdiction over Aboud.*" *Id.* at 177 (citations omitted; emphasis added).

Many other courts have reached similar results. *See, e.g.*, *Fintech Fund, F.L.P. v. Horne*, 836 F. App'x 215, 220–21 (5th Cir. 2020) (defendant who made fraudulent statements during phone calls and sent emails to plaintiff in Texas with fraudulent content was subject to personal jurisdiction in Texas, despite lack of physical presence); *Schneider v. Hardesty*, 669 F.3d 693, 696, 702–03 (6th Cir. 2012) (personal jurisdiction proper over defendant who had no physical presence in forum state but who drafted two false letters with knowledge that the letters would likely be sent to forum state in furtherance of scheme to defraud plaintiff); *Felland v. Clifton*, 682 F.3d 665, 676 (7th Cir. 2012) (notwithstanding the lack of physical presence, personal jurisdiction proper in Wisconsin when defendant "engaged in an ongoing fraudulent scheme that included several letters, multiple phone calls, and almost two dozen emails, all to the [plaintiffs'] home in Wisconsin."); *Oriental Trading Co. v. Firetti*, 236 F.3d 938, 943 (8th Cir. 2001) (personal jurisdiction proper in Nebraska because defendants "made numerous phone calls and faxes and sent many invoices to [the plaintiff] in Nebraska to implement" their fraudulent scheme."); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) ("When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment."); *Schaefer Sys. Int'l, Inc. v. Aloft Media, LLC*, No. 322CV00513KDBDCK, 2023 WL 4055712, at *5 (W.D.N.C. June 16, 2023) (stating that a plaintiff "has made a prima facie showing" that a

defendant "purposely availed" himself of the benefits of the forum state when the plaintiff alleges "deliberate conduct and communications directed into [the forum state] in furtherance of a fraudulent scheme.") (citation omitted); *Renfinity, Inc. v. Jones*, No. 320CV00422KDBDSC, 2022 WL 332782, at *4 (W.D.N.C. Feb. 3, 2022) ("In the context of an allegation of fraud, if the defendant's conduct or the content of its communications directed into the forum state give rise to the claim then that is sufficient to establish purposeful availment."); *Finley Alexander Wealth Mgmt., LLC*, 2020 WL 1322948, at *6 (finding that "a series of" fraudulent telephonic and email communications made by the defendants to the plaintiff, while the plaintiff was in Maryland, was pertinent for purposes of specific personal jurisdiction); *A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 795 F. Supp. 2d 365, 371 (D. Md. 2011) (finding it jurisdictionally significant that a document containing allegedly fraudulent misrepresentations was mailed to Maryland); *Master Tech Prods., Inc. v. Smith*, 181 F. Supp. 2d 910, 912–13 (N.D. Ill. 2002) (jurisdiction proper in Illinois, despite defendant's lack of physical presence, because defendant and his agents made phone calls to Illinois plaintiff as part of a scheme to defraud the plaintiff by inducing it to disclose confidential information under the guise of negotiating an acquisition deal that the defendant did not intend to pursue).

Here, the TAC plainly alleges that Compass engaged in a fraudulent scheme to induce Thompson and Gould to disclose trade secrets, and effectuated the scheme by sending fraudulent communications into Maryland. *See* ECF 81, ¶¶ 1, 3, 110. Plaintiffs' allegations of such fraudulent communications render this case distinguishable from several cases cited by Compass. *See, e.g., Consulting Eng'rs*, 561 F.3d at 276 n.2 (no allegation of fraud); *Zavian*, 130 Md. App. at 699, 747 A.2d at 770 (declining to find personal jurisdiction in a breach of contract action involving a nonresident defendant because "attributing an agent's in-state activities to the

nonresident defendant would offend traditional notions of fair play and substantial justice.");

*Gilman & Bedigian, LLC v. Sackett*, CCB-19-3471, 2021 WL 4417250, at *6 (D. Md. Sept. 27, 2021) (no personal jurisdiction in trademark case because "[i]t would not comport with due process for this court to exercise personal jurisdiction over these defendants merely because they licensed their trademarks to a third party who in turn conducted business in the state, visited the state to conduct unspecified business, and solicited [the plaintiff]'s advertising business over the phone").

The cases cited by Compass that involve allegations of fraud are also distinguishable. For instance, Compass quotes *Aqua Acceptance, LLC v. Pelican Grp. Consulting, Inc.*, JRR-20-02802, 2022 WL 2275465, at *1 (D. Md. June 23, 2022), *reconsideration denied*, 2022 WL 16763730 (D. Md. Nov. 8, 2022), for the proposition that "merely '[s]ending correspondence in the form of letters and executed contracts to be delivered in the forum state does not qualify as transacting business . . . in the forum state.'" ECF 105 at 9 (alteration in ECF 105). The *Aqua Acceptance* Court recognized that special considerations may apply to fraudulent communications, but it concluded that the plaintiff's fraud count actually "sounds in breach of contract." *Aqua Acceptance, LLC*, 2022 WL 2275465, at *6. Here, plaintiff's fraud claims sound in fraud.

*Gallman*, 2012 WL 983937, is also distinguishable. There, the plaintiffs filed suit alleging fraudulent misrepresentation, among other things. In conducting the personal jurisdiction analysis, the court stated, *id.* at *4 (citation omitted): "In the case at bar, the Court must consider how specific jurisdiction applies where out-of-state defendants have acted outside of the forum in a manner that injures someone residing in the forum." The court found that specific jurisdiction was not proper in Maryland for several reasons that are inapplicable here. *Id.* at *5. For example, the court noted, *id.* at *4: "Plaintiffs provide no evidence or context as to the nature of any of Defendants' calls, e-mails, or money transfers and do not contend that any of these contacts form

the basis of Plaintiffs' claims." In contrast, the TAC provides ample context as to the nature of Compass's communications with Thompson, and these communications form the basis of the fraudulent misrepresentation claim.

Moreover, in *Gallman* the court explained that the specific representations of which the plaintiff complained occurred at a meeting in New York. *Id.* at *4. In this case, the specific representations of which UMB and Dr. Thompson complain were directed into Maryland. The *Gallman* Court also concluded that Stallworth, one of the defendants, did not purposefully conduct business activity in Maryland or avail herself of the protections of Maryland law because "Plaintiffs have not shown that Stallworth called, e-mailed, or wired money to Gallman with an intent to transact business in Maryland or even with knowledge that the recipient of her communications was located in Maryland." *Id.* at *5. By contrast, it is clear that Compass knew that it was negotiating with representatives of a Maryland State institution, located in Maryland. *See*, *e.g.*, ECF 67-17 at 3 (Dr. Zarate email introducing Dr. Malievskaia to "Todd Gould at the University of Maryland."); ECF 67-19 at 4 (NDA signed by Thompson indicating that Thompson was a "Professor and Chair" of the "Department of Physiology" at the "University of Maryland School of Medicine"); ECF 67-23 at 2 (Thompson email signature block indicating the same).

Even in intentional tort cases, the Supreme Court has made clear that the proper focus of the "minimum contacts" inquiry is "'the relationship among the defendant, the forum, and the litigation.'" *Walden*, 571 U.S. at 291 (quoting *Calder v. Jones*, 465 U.S. 783, 788 (1984)). In other words, "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285. Rather, the defendant's conduct must connect "him to the forum in a meaningful way." *Id.* at 290; *see also Ford Motor Co.*, 592 U.S. at 351 (explaining that the "essential

foundation" of specific jurisdiction is a "relationship among the defendant, the forum, and the litigation.") (citations and internal quotations omitted).

In my view, Compass's conduct connects it to Maryland in a meaningful way. In 2019, for example, Compass conducted a clinical trial in Maryland of its own psilocybin product. ECF 81, ¶ 18. While Compass's clinical trial was ongoing, Compass contacted Dr. Zarate at the NIMH about conducting a psilocybin study in Maryland. *Id.* ¶ 29; ECF 67-17 at 3. Zarate put Compass in touch with Dr. Gould at UMB. And, through Dr. Gould, Compass was introduced to Dr. Thompson, who also worked at UMB. *See* ECF 67-17 at 2, 3. Compass sent a NDA to both Gould and Thompson concerning disclosure of proprietary information. The TAC alleges that Compass induced Thompson to disclose confidential information under the guise of a NDA that Compass sent to Thompson but failed itself to execute. ECF 81, ¶ 17. And, for about six months, Compass sent documents and communications to Thompson and Gould in Maryland, some of which concerned the attempt to reach a collaboration agreement by which Compass was to fund Thompson's research in Maryland. *Id.* ¶¶ 3, 35; ECF 67-22 at 3.

Further, Compass's conduct connects it to Maryland in a meaningful way because the Psilocybin Trade Secrets were developed in Maryland, partially with State funding, and are owned by the State. ECF 81, ¶ 1 ("This action arises out of Compass's malicious and intentional scheme to defraud the State of Maryland . . . ."); *see also id.* ¶ 4; ECF 67-15 at 1. And, UMB and Thompson allegedly suffered tortious injury in Maryland, which is "'plainly relevant'" to the personal jurisdiction inquiry. *Consulting Eng'rs*, 561 F.3d at 280–81 (citation omitted).

That Compass's conduct meaningfully connects it to Maryland distinguishes this case from *Consulting Eng'rs*, 561 F.3d 273, on which Compass relies. *See* ECF 93-1 at 21–22. As discussed earlier, the plaintiff's jurisdictional allegations in *Consulting Eng'rs* revolved around emails and

phone calls between the out-of-state defendants and the Virginia plaintiff, to negotiate a software and structural design project that never came to fruition. *Consulting Eng'rs*, 561 F.3d at 275, 279, 281. Each defendant also negotiated and executed a NDA with the plaintiff. *Id.* at 275–76. The NDAs prohibited the parties from recruiting "certain named employees from the other." *Id.* at 275. But, there was an insufficient basis to connect the conduct of either defendant to Virginia.

As to defendant Structure Works, a Colorado company, the Fourth Circuit determined that its "contacts with the forum state were sufficiently attenuated that it would be a manifest injustice to hale it into [a] Virginia court." *Id.* at 281. In concluding that Structure Works did not purposefully avail itself of the privilege of doing business in Virginia, sufficient to create personal jurisdiction, the Court observed that Structure Works had no offices or employees in Virginia, did not own property in Virginia, and had no in-person contact with the plaintiff in Virginia. *Id.* at 279–80. Further, Structure Works "had no on-going business activity" in the forum state. *Id.* at 280. Moreover, "[a]ny work contemplated by the discussions" with the other parties would have been performed in India, not Virginia. *Id.* In addition, the alleged tortious activity occurred in India, the individuals named in the NDA worked in India, and Indian law would govern the claims in the suit. *Id.* With these facts, Structure Works' conduct in reaching out to the plaintiff in Virginia was "not enough to overcome" the other factors. *Id.*

As to defendant Geometric, similar considerations compelled the Court's conclusion that the defendant's contacts with Virginia "were too attenuated to support specific personal jurisdiction." *Id.* at 282 (footnote omitted). In particular, Geometric had no in-person contact with the plaintiff in Virginia; owned no property in Virginia; had no employees who worked in Virginia; and "engaged in no on-going business activities in Virginia." *Id.* at 281–82. Moreover, the Court observed that, "[i]f the parties had consummated their agreement to work together, the work would

have been performed in India," not Virginia. *Id.* at 282. Although the NDA between Geometric and the plaintiff invoked the law of Virginia, the Fourth Circuit concluded that it was not enough to overcome Geometric's lack of connection to the forum state. *Id.*

Here, defendant had no in-person contact with plaintiffs in Maryland; it does not sell products in Maryland or provide services in Maryland; and it has no office in Maryland. But, unlike in C*onsulting Eng'rs*, Compass was engaged in business activity in Maryland. In particular, in 2019, at the time of the alleged misappropriation of the Psilocybin Trade Secrets, Compass conducted a psilocybin clinical trial in Maryland. Moreover, the NDA concerned information that was developed in, owned by, and in the custody of the State of Maryland. The parties also spent months in an effort to reach a collaboration agreement, by which Compass was to fund Thompson's research in Maryland. During that time, Compass sent substantive questions to Gould and Thompson, which they endeavored to answer. Additionally, unlike in *Consulting Eng'rs*, plaintiffs allege that Compass sent fraudulent communications into the forum state. *See id.* at 276 n.2.

The Supreme Court has made clear that the "contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Ford Motor Co.*, 592 U.S. at 359 (citation omitted). Compass's contacts with Maryland, described earlier, were not "'random, isolated, or fortuitous.'" *Id.* Crediting the allegations in the TAC, it would be foreseeable to Compass that, by engaging in a months' long effort either to defraud a State university and its professors, or even to work with them, it would be haled into court in Maryland. *See Woodson*, 444 U.S. at 297 (explaining that "the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.").

At the time Compass allegedly began misappropriating the Psilocybin Trade Secrets, Compass purposefully availed itself of the opportunity to conduct activities in Maryland through a clinical trial of its own psilocybin product. ECF 81, ¶ 18. This clinical trial, conducted at Sheppard Pratt in Baltimore, was titled "The Safety of Efficacy of Psilocybin in Participants With Treatment Resistant Depression (P- TRD)." *Id.* (citing ECF 67-2 at 2, 6; ECF 67-3 at 4). "Compass submitted this study to the FDA's database for clinical trials in December 2018, and reported that the first patient's . . . visit in the study occurred on March 1, 2019 and that the study completed on September 27, 2021." ECF 81, ¶ 18 (citing ECF 67-2 at 2–3). By engaging in a clinical trial in Maryland over a period of two and a half years, beginning in March 2019, Compass again purposefully availed itself of the benefits and privileges of Maryland law.

For the foregoing reasons, I conclude that, at this stage of the litigation, plaintiffs have readily made a *prima facie* showing that Compass has sufficient minimum contacts with Maryland to satisfy due process.

### b. Arise Out of or Relate to

As explained, this case involves specific jurisdiction, which "'is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Bristol-Myers*, 582 U.S. at 262 (quoting *Goodyear*, 564 U.S. at 919). Therefore, in order to satisfy due process, plaintiffs' claims "must arise out of the activities directed at the forum . . . ." *Consulting Eng'rs*, 561 F.3d at 278; *see Ford Motor Co.*, 592 U.S. at 359; *see also Daimler*, 571 U.S. at 127 (specific jurisdiction exists where the "'the suit arise[s] out of or relate[s] to the defendant's contacts with the forum.'") (citation omitted) (alterations in original). In other words, "the defendant's contacts with the forum state [must] form the basis of the suit." *Consulting*

*Eng'rs*, 561 F.3d at 278–79; *see also Burger King*, 471 U.S. at 472; *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984).

In *Ford Motor Co.*, 592 U.S. at 362, the Supreme Court clarified that "a strict causal relationship" between a defendant's contacts with the forum and the claims is not required. But, the Court cautioned, *id.*: "[T]he phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum."[21]

Plaintiffs' tort claims arise out of or are related to Compass's alleged fraudulent conduct and communications directed into Maryland. For instance, all seven tort claims relate to or arise from Compass's conduct in failing to sign the NDA while inducing Thompson to do so. ECF 81, ¶ 63 (DTSA claim alleging "Defendants acquired the Psilocybin Trade Secrets under the guise of an NDA . . ."); *id.* ¶ 79 (same as to MUTSA claim); *id.* ¶ 87 (unfair competition claim alleging that Compass "sought to deceive and defraud" plaintiffs by "failing to sign a Mutual NDA and withholding the fact thereof . . ."); *id.* ¶ 110 (alleging fraudulent misrepresentation by Compass to the effect "that there was a signed NDA in place" between Compass and Thompson); *id.* ¶ 116 (negligent misrepresentation claim on the same basis); *id.* ¶ 124 (claim of fraudulent concealment because Compass "had not in fact entered into the NDA agreement that it had asked Professor Thompson to sign."); *id.* ¶ 128 (constructive fraud claim alleging that Thompson "believed" that there was a "valid Mutual NDA" between Compass and Thompson).

---

[21] To my knowledge, the Fourth Circuit has only cited *Ford Motor Co.* in a handful of cases. And, none have explored the "relates to" concept in a context similar to this case. *See In re Eli Lilly & Co.*, 37 F.4th 160, 167 (4th Cir. 2022) (citing the case in passing); *Wallace v. Yamaha Motors Corp, U.S.A.*, 2022 WL 61430, at *4 (4th Cir. Jan. 6, 2022) (products liability); *Witherspoon v. Stonebreaker*, 30 F.4th 381, 405 (4th Cir. 2022) (Rushing, J., dissenting) (ineffective assistance of counsel claim; mentioned for an unrelated reason).

There is also a sufficient relationship between the alleged fraudulent communications and conduct and the contract claims of Thompson and UMB. For example, as to the promissory estoppel claim, Compass's alleged fraudulent representations to Thompson that it would not misuse or disclose the Psilocybin Trade Secrets are pertinent. *Id.* ¶ 93–96. Additionally, as to the unjust enrichment claim, Compass's conduct in soliciting information pertaining to the Psilocybin Trade secrets is pertinent. *Id.* ¶ 100. Compass's act of sending a NDA to Thompson, to induce him to negotiate a potential collaboration agreement, relates to the breach of contract claim. *Id.* ¶ 133. And, the alleged implied-in-fact contract is relevant to the purposeful availment inquiry; the actions that give rise to the claim are also contacts that create jurisdiction.

The more difficult question is whether Compass's 2019 clinical trial is sufficiently related to plaintiffs' claims, given that plaintiffs' claims do not arise out of it. According to Compass, because the 2019 clinical trial did not involve the Psilocybin Trade Secrets, it does not relate to plaintiffs' claims. ECF 105 at 7, 13–14. In Dr. Malievskaia's Declaration, she avers that none of Compass's clinical trials, in Maryland or elsewhere, employed the Psilocybin Trade Secrets. ECF 93-3, ¶ 10. She also avers that Compass's proprietary psilocybin formulation, COMP360, does not feature any of the Psilocybin Trade Secrets. *Id.*

Plaintiffs have not contradicted these assertions, nor does the TAC allege otherwise. *See* ECF 102 at 18 n.6 (plaintiffs acknowledging that they "have not alleged that Compass is developing a therapy that incorporates the Psilocybin Trade Secrets . . . ."). The TAC alleges, ECF 81, ¶ 18: "Compass misappropriated the Psilocybin Trade Secrets in part to block, preempt and otherwise interfere with UMB's patenting of the Psilocybin Trade Secrets to further Compass's effort to commercialize its own therapeutic product." Further, the TAC asserts, *id.*: "Compass's own activities in Maryland directed to its own therapeutic psilocybin product relate directly to

Compass's schemes, misappropriations and other torts and breaches . . . ."  And, plaintiffs argue, ECF 102 at 17: "Compass improperly disclosed the Psilocybin Trade Secrets, which purposefully impaired Plaintiffs' ability to compete in the development of psilocybin therapies (*e.g.*, by hindering Plaintiffs' ability to obtain its own patent protection), and Compass's . . . clinical trials (involving the very same psychedelic compound that is at the heart of the Psilocybin Trade Secrets) . . . bear[] at least some relationship to the competitive harm that this case seeks to remedy."

As I see it, Compass's view of the significance of its own clinical trial in 2019 is unduly narrow.  Even if Compass did not employ the Psilocybin Trade Secrets in that trial, this does not mean that its trial was unrelated to the alleged scheme to defraud plaintiffs.

"Clinical trials are an essential precursor to approval of a new drug by the" FDA.  *Seagen Inc. v. Daiichi Sankyo Co.*, 546 F. Supp. 3d 515, 527 (E.D. Tex. 2021).  Defendant's clinical trial was integral to Compass's overarching effort to develop and commercialize a psilocybin product.  To that end, Compass was testing its own formula while also seeking to procure others.

According to the TAC, Compass fraudulently obtained the Psilocybin Trade Secrets and filed at least six patent applications allegedly containing aspects of them.  Plaintiffs allege that the patents were filed to prevent UMB and Thompson from commercializing its therapeutic product containing the Psilocybin Trade Secrets, and to make it more difficult for UMB and Thompson to compete with Compass.  ECF 81, ¶ 18 ("Compass misappropriated the Psilocybin Trade Secrets in part to block, preempt and otherwise interfere with UMB's patenting of the Psilocybin Trade Secrets to further Compass's effort to commercialize its own therapeutic product."); *id.* ¶ 90 (unfair competition claim alleging that Compass's conduct "substantially interferes with Professor Thompson's, UMB's, and Terran's ability to compete with Compass on the merits of their products/services or otherwise").

In other words, Compass's 2019 clinical trial and the alleged effort of Compass to fraudulently obtain the Psilocybin Trade Secrets were part of a broad swath of conduct by Compass, aimed at developing a commercial therapeutic psilocybin product. In effect, Compass was waging a war on several fronts—testing its own theory in the clinical trial while securing the theory of plaintiffs' (*i.e.*, the Psilocybin Trade Secrets). Compass's clinical trial, like the alleged attempt to obtain the Psilocybin Trade Secrets, relates directly to Compass's attempt to commercialize a successful therapeutic psilocybin product. In my view, there is a sufficient relationship between Compass's 2019 clinical trial and, at a minimum, the unfair competition claim.

### c. Constitutional Reasonableness

Having determined that plaintiffs have adequately alleged that Compass has sufficient minimum contacts with Maryland, and that plaintiffs' claims arise out of or relate to those contacts, I next consider whether the exercise of personal jurisdiction would be "constitutionally reasonable." *ALS Scan*, 293 F.3d at 712. Courts conduct a constitutional reasonableness inquiry in order to ensure that "jurisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent." *Burger King*, 471 U.S. at 478 (citation omitted).

"[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477. As noted, courts consider the following factors: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interests in obtaining relief; (4) "'the interstate judicial system's interest in obtaining the most efficient resolution of controversies'"; and (5) "'the shared interest of the several States in

furthering fundamental substantive social policies.'" *Bristol-Myers*, 582 U.S. at 272 (quoting *Burger King*, 471 U.S. at 477); *see also Asahi Metal,* 480 U.S. at 113; *Consulting Eng'rs*, 561 F.3d at 279; *CFA Inst.*, 551 F.3d at 296.

Compass insists that it is constitutionally unreasonable for it to be haled into court in Maryland. ECF 93-1 at 24–25. As discussed, Compass is a foreign company incorporated in the United Kingdom; it has no office in Maryland; and it has never sold a product to a Maryland consumer. *Id.* at 25 (citing ECF 93-3, ¶ 3). Compass also contends that its "unrelated clinical trial activities in Maryland, and later-in-time Centre of Excellence, have no connection to the claims— and cannot fairly be used to force Compass to litigate in a foreign legal system." ECF 93-1 at 25. Further, Compass asserts that merely filing "prior, unrelated patent and trademark applications in the USPTO" does not make litigating in Maryland any less burdensome for Compass. ECF 105 at 14.

Plaintiffs contend that Compass is "intimately familiar with the United States legal process" by virtue of its patent applications and trademark registrations and "should have expected to face a lawsuit in Maryland when it reached out to and defrauded" Thompson and UMB. *Id.* at 28 (citations omitted). Moreover, they assert, *id.*: "Maryland unquestionably has an interest in protecting its state university professors and its educational institutions from being taken advantage of by foreign corporations." Plaintiffs add, *id.* at 30: "Here, ten of the eleven claims undisputedly implicate Maryland or U.S. law, with the only possible exception being the breach of contract claim (in the alternative), regarding an NDA that Compass has consistently denied ever signing or being enforceable."

In *Asahi Metal*, 480 U.S. at 105, a case on which Compass relies, the plaintiff was injured in California when he crashed his motorcycle. The plaintiff filed a product liability action in a

state court in California, alleging that the accident was caused by defects in the motorcycle's rear tire. *Id.* at 105–06. The complaint named as defendants, among others, Cheng Shin Rubber Industrial Co., Ltd. ("Cheng Shin"), a Taiwanese company that manufactured the tire's tube, and Asahi Metal Industry Co., Ltd. ("Asahi"), a Japanese company that manufactured the tube's valve assembly. *Id.* at 106. Cheng Shin subsequently filed a cross-claim against Asahi, seeking indemnification. *Id.* The plaintiff's claims against each defendant were eventually settled and dismissed, leaving only Cheng Shin's indemnity claim against Asahi. *Id.* Asahi argued, *inter alia*, that California could not exercise personal jurisdiction over it consistent with the Due Process Clause. *Id.*

The Supreme Court issued a fractured opinion as to the "stream of commerce" theory of personal jurisdiction. But, applying the five constitutional reasonableness factors outlined above, eight justices agreed that, regardless of whether Asahi had purposefully availed itself of the benefits of doing business in California under the stream of commerce theory, it would "clearly" be constitutionally unreasonable for a California court to exercise personal jurisdiction over Asahi. *Id.* at 113, 114. The Court said, *id.* at 116: "Considering the international context, the heavy burden on the [foreign] defendant, and the slight interests of the plaintiff and the forum State, the exercise of personal jurisdiction by a California court over Asahi in this instance would be unreasonable and unfair."

In reaching that conclusion, the Court observed, *id.* at 114: "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." The Court regarded the burden on Asahi as severe, because it would have to travel from Japan to California and "submit its dispute with Cheng Shin to a foreign nation's judicial system."

*Id.* The Court recognized that, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Id.* But, the Court determined that "the interests of the plaintiff and the forum in California's assertion of jurisdiction over Asahi are slight." *Id.* Because Cheng Shin was not a California resident, the Supreme Court observed that "California's legitimate interests in the dispute have considerably diminished." *Id.* The Court reasoned, *id.*: "All that remains is a claim for indemnification asserted by Cheng Shin, a Taiwanese corporation, against Asahi. The transaction on which the indemnification claim is based took place in Taiwan; Asahi's components were shipped from Japan to Taiwan. Cheng Shin has not demonstrated that it is more convenient for it to litigate its indemnification claim against Asahi in California rather than in Taiwan or Japan."

The Court also rejected the argument that California had an interest in protecting its consumers by ensuring that foreign manufacturers complied with state safety standards. *Id.* at 114–15. It said, *id.*: "The dispute between Cheng Shin and Asahi is primarily about indemnification rather than safety standards." And, the Court indicated that it was unclear whether California law would govern the indemnification dispute between Cheng Shin and Asahi, which further diminished California's interest in the lawsuit. *Id.* at 115.

Although Compass is a foreign company, that circumstance is not controlling. *See, e.g.,* *CFA Inst.*, 551 F.3d at 296 (noting that the defendant was "not shielded from civil liability in Virginia because it is headquartered in India."). Compass chose to engage in several significant activities in Maryland, including multiple clinical trials, as well as ongoing collaborations with Sheppard Pratt and the ACC. ECF 81, ¶ 18; ECF 99-2 at 2; ECF 99-3 at 4. While most of these contacts occurred after plaintiffs' claims arose, Compass cites no legal authority that would

preclude consideration of these activities for purposes of making the practical determination of whether it would be unduly burdensome for Compass to defend this suit in Maryland, where it has engaged in several projects. Moreover, "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *Woodson,* 444 U.S. at 294 (internal quotation marks omitted).

Obviously, it is far more convenient for plaintiffs to litigate this case in Maryland than in the United Kingdom. UMB is located in Baltimore, approximately one mile from the courthouse. ECF 99-9 (depicting directions from UMB to the courthouse). In contrast, in *Asahi Metal*, Cheng Shin had "not demonstrated that it is more convenient for it to litigate in California." *Asahi Metal*, 480 U.S. at 114.

In addition, in *Asahi Metal* the Supreme Court determined that, because the only remaining claim was for indemnification between two foreign companies, the interests of the plaintiff and California in resolving the dispute in California were "slight." *Id.* That is not the case here. The TAC alleges that Compass reached into Maryland to effectuate a fraudulent scheme to acquire trade secrets that were owned by the State of Maryland. ECF 81, ¶ 1 ("This action arises out of Compass's malicious and intentional scheme to defraud the State of Maryland . . . ."). UMB is a Maryland State university, and Dr. Thompson was an employee of UMB, as well as a citizen of Maryland, at the time of the alleged wrongdoing. *Id.* ¶ 25; ECF 102 at 29; *see Base Metal Trading, Ltd.,* 283 F.3d at 215 ("The fact that the plaintiff in this case is not a Maryland corporation or resident 'considerably diminish[es]' Maryland's interest in the dispute.") (quoting *Asahi Metal*, 480 U.S. at 114) (alteration in *Base Metal Trading*). Indeed, the Governor of Maryland approved UMB "joining this case as a co-plaintiff . . . ." ECF 102 at 29 (citing ECF 67-32 at 2). Maryland clearly "has a valid interest in the resolution of the grievances of its citizens and businesses,

particularly when they potentially involve issues of [Maryland] law." *CFA Inst.*, 551 F.3d at 296; *see Fintech Fund*, *F.L.P.*, 836 F. App'x at 222 ("Texas has an interest in the case as the case involves the alleged misappropriation of trade secrets of a Texas business."); *Finley Alexander Wealth Mgmt.*, *LLC*, 2020 WL 1322948, at *7.

Further, in *Asahi Metal*, it was unclear whether California law would govern the single remaining claim, which also diminished California's interest in the lawsuit. *Asahi Metal*, 480 U.S. at 115. In contrast, as I discuss *infra*, several of plaintiffs' claims implicate Maryland law.

Compass contends: "This Court has already held that, where the Compass-Thompson [NDA] is implicated by Plaintiffs' claims, an analysis of the 'substance of the applicable law of England and Wales' is required. ECF No. 31. The NDA is central to most, if not all, of Plaintiffs' claims. The foreign choice of law clause in the NDA 'raises the negative implication that personal jurisdiction in the forum state was not contemplated.'" ECF 105 at 15 n.3 (quoting *Cricket Grp.*, *Ltd.*, 198 F. Supp. 3d at 544–45).[22]

I disagree with Compass that I previously "held" that "where the Compass-Thompson [NDA] is implicated by Plaintiffs' claims, an analysis of the 'substance of the applicable law of England and Wales' is required." ECF 105 at 15 n.3. In a Memorandum to Counsel on March 23, 2023 (ECF 31), the Court quoted the choice-of-law provision in the NDA, ECF 67-19, ¶ 12, and said: "In the memorandum in support of the motion to dismiss (ECF 24-1), defendant asserts that 'the law of England and Wales governs any dispute arising out of the NDA.' In response, plaintiff does not dispute that the law of England and Wales applies to the contract claim." ECF 31 at 1 (some internal citations omitted). Thus, I noted "the parties' apparent agreement as to the

---

[22] Curiously, although intimating that foreign law applies to several of plaintiffs' claims, Compass relies exclusively on Maryland law in the Motion in urging the dismissal of plaintiffs' contract and tort claims.

governing law of the contract . . . ." *Id.* But, I also stated, *id.*: "Despite the parties' apparent agreement as to the governing law of the contract (ECF 16), neither party has addressed the law of England and Wales."

My statements were limited to the breach of contract claim. They did not pertain to other "claims," as Compass now contends. ECF 105 at 15 n.3.

As stated, the choice-of-law clause in the NDA states, ECF 67-19, ¶ 12 (emphasis added): "*This Agreement* shall be governed and interpreted by the law of England and Wales without regard to conflict-of-law principles." The plain language of the contract limits the choice-of-law clause to the NDA, not to any and all causes of action plaintiffs may assert that relate to interactions between Compass, UMB, and Thompson. So, even assuming that the NDA is a validly executed contract, there is nothing in it that requires the law of England or Wales to apply to the claims of plaintiffs that do not directly pertain to the NDA.

The NDA, which was drafted by Compass, also states, *id.* ¶ 5 (emphasis added): "[B]oth parties agree that, in the event of [an] actual or alleged unauthorized disclosure or use of Confidential Information, Discloser will have the right to seek injunctive relief *in any court of competent jurisdiction* . . . ." This suggests that Compass anticipated that the kinds of claims lodged here would be filed in a Maryland court.

In my view, the exercise of personal jurisdiction over Compass appears constitutionally reasonable. In sum, the State of Maryland has a strong interest in having this dispute resolved in Maryland. And, there is "'nothing unreasonable about subjecting [Defendant] to jurisdiction [when it allegedly] . . . submitted false information'" to plaintiffs with the intention that they "'rely on this information.'" *A Love of Food I, LLC*, 795 F. Supp. 2d at 371 (citation omitted).

### d. Conclusion

I conclude that plaintiffs have made a *prima facie* showing that Compass is subject to specific personal jurisdiction in Maryland. Of course, this ruling "does not finally settle the issue; plaintiff[s] must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'" *Wellington Fin. Corp.*, 416 F.3d at 294 n.5 (citation omitted).[23]

## IV. Fed. R. Civ. P. 12(b)(6)

As noted, Compass has moved to dismiss Counts I, VII, VIII, IX, and X under Fed. R. Civ. P. 12(b)(6). In addition, under Rule 12(b)(6), Compass moves to dismiss the Doe Defendants, claiming that the TAC does not assert any factual allegations against them.

### A. Legal Standard

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts

---

[23] Given my ruling, it is unnecessary to consider plaintiffs' request to conduct limited discovery on the issue of personal jurisdiction. ECF 102 at 30–31 (requesting limited jurisdictional discovery if the Court finds that a *prima facie* showing of personal jurisdiction has not been made). Nor must I undertake a Rule 4(k)(2) analysis at this time. *CFA Inst.*, 551 F.3d at 292 ("If the state's long-arm statute fails to authorize the court's exercise of personal jurisdiction, we must then—and only then—decide whether Rule 4(k)(2) is satisfied.").

alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

The "court's role under Rule 12(b)(6) is to evaluate the sufficiency of a complaint . . . ." *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024). Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . "); *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at 317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

A plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint

for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). However, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Instead, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In considering a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

When ruling on a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023); *Bing v. Brio Sys.*, LLC, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies ... if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250); *see L.N.P. v. Kijakazi*, 64 F.4th 577, 585–86 (4th Cir. 2023).

It is well settled that a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See, e.g.*, *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-

established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448); *see Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits"); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). But, under limited circumstances, a court may consider documents beyond the complaint, without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Doriety*, 2024 WL 3558754, at *6; *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied sub nom.*, *City of Greensboro v. BNT Ad Agency, LLC*, 583 U.S. 1044 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in original) (citation omitted); *see also Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam).

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc.*, 551 U.S. at 322; *Katyle*, 637 F.3d at 466; *Philips*, 572 F.3d at 180. However, under Fed. R. Evid. 201, a court may only take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

With these principles in mind, I am entitled to consider the materials submitted by plaintiffs at ECF 67-2 through ECF 67-28. Although these documents are docketed as exhibits to plaintiffs' Third Motion to Amend (ECF 67), the TAC references them. *See generally* ECF 81.

Compass and plaintiffs urge the Court to consider the MLA in deciding the Motion, and they cite to certain portions of it to support their respective positions.  ECF 93-1 at 16, 30; ECF 102 at 31 n.18, 32; ECF 105 at 19.  The MLA is not attached to the TAC or the Motion.  Rather, it is an exhibit to Compass's motion to dismiss the Second Amended Complaint (ECF 51-3) and to Compass's opposition to the Third Motion to Amend.  ECF 68-2.[24]  Because the parties agree that the MLA is integral to the TAC, and because there is no dispute as to its authenticity, I will consider it, without converting the Motion to one for summary judgment.

## B.  Count I - DTSA

In Count I, Terran and UMB assert a claim under the DTSA.  To prevail on a DTSA claim, the plaintiff must establish: "(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce."  *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 141 (4th Cir. 2023) (citing *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021)).

Compass has moved to dismiss the DTSA claim.  ECF 93.  It claims that Terran and UMB "fail to adequately plead the interstate commerce element . . . ."  ECF 93-1 at 29–30.  That element requires the trade secret to "relate[] to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).

In particular, Compass asserts, ECF 93-1 at 30 (citing ECF 81, ¶ 56): "Plaintiffs recite the statutory 'interstate commerce' requirement in conclusory fashion, with no further explanation of how the asserted trade secrets have been (or will be) commercialized across state lines."  Further, Compass argues that the TAC "contains no facts about Terran's business" and "no allegations that

---

[24] The MLA is filed under seal.  *See* ECF 113 (Order of May 2, 2024, directing the clerk to maintain under seal ECF 51-3, ECF 68-2, and ECF 84).

UMB—an academic institution—would be involved in any business venture related to a product embodying the Psilocybin Trade Secrets, let alone the commercialization of any product used in interstate commerce." ECF 93-1 at 30.

Defendant points out that in the MLA, "UMB specifically reserved for itself the right to use the alleged Inventions for 'Non-Commercial Uses' and to license the alleged Inventions to 'Non-Commercial Organizations.'" *Id.* (quoting ECF 68-2, §§ 3.2.1, 3.2.2). Moreover, Compass argues, ECF 105 at 19: "A licensing agreement with counterparties in two locales is not a product or service crossing state lines." In addition, Compass contends that Terran and UMB have failed to allege how the Psilocybin Trade Secrets "relate to" the product or service that Terran allegedly intends to bring to market. *Id.* at 18–19.

Terran and UMB counter that the TAC "clearly pleads that Terran is developing and planning to commercialize throughout the United States—and the world—an antidepressant therapy relating to the Psilocybin Trade Secrets . . . ." ECF 102 at 31 (citing ECF 81, ¶¶ 7, 56–57). They add: "The MLA includes a development plan setting forth in extensive detail Terran's intention to commercialize the Psilocybin Trade Secrets, and ███████████████████████ ████████████████████████████████████████████████████████████ ████████████ " ECF 102 at 32 (citing ECF 51-3, §§ 4.1, 5.4; *id.* at 46–57).

Plaintiffs also assert, ECF 102 at 32 (citing ECF 81, ¶¶ 7, 9–10, 26, 52, 56–57): "The TAC pleads that (i) UMB licensed the Psilocybin Trade Secrets to Terran (a Delaware company with its principal place of business in New York) via the [MLA]; (ii) the licensed Psilocybin Trade Secrets are related to a potential treatment for neuropsychiatric disorders; and (iii) Terran is using the licensed Psilocybin Trade Secrets in developing such an antidepressant therapy for commercialization." According to plaintiffs, these allegations are sufficient to establish that UMB

is involved in the commercialization of a product intended for use in interstate commerce.  ECF 102 at 32.

The DTSA contains the phrase "used *in*, or intended for use *in*, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1) (emphasis added).  In *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 277 (1975), the Supreme Court said: "The phrase 'in commerce' does not . . . necessarily have a uniform meaning whenever used by Congress."  In the context of other statutes, the Supreme Court has drawn a distinction between the phrase "used in" interstate commerce and the familiar "affecting" or "involving" interstate commerce language.  *See, e.g.*, *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (stating that the term "involving commerce" "encompasses a wider range of transactions than those actually 'in commerce' — that is, within the flow of interstate commerce"); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001) ("The plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce'"); *Jones v. United States*, 529 U.S. 848, 854, 859 (2000) (noting that the term "'affecting . . . commerce,'" "when unqualified, signal[s] Congress' intent to invoke its full authority under the Commerce Clause," but declining in a criminal case to interpret the statute in a way to "make virtually every arson in the country a federal offense"; explaining that the qualifying words "used in" interstate commerce in a criminal statute for arson is a more limiting reading of the "commerce clause"); *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273 (1995) (The words "in commerce" are not as broad as the words "involving commerce" or "affecting commerce" and cover "only persons or activities within the flow of interstate commerce.") (emphasis omitted); *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 195 (1974) (interpreting the "in commerce" language to "denote only persons or activities within the flow of interstate commerce — the practical, economic

continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer").

Based on the cases cited above, among others, several federal district courts have concluded that the "used in" commerce language of the DTSA is intended to limit the application of the statute to circumstances narrower than those "affecting" commerce. *See, e.g.*, *Exec. Trim Constr., Inc. v. Gross*, 525 F. Supp. 3d 357, 380–81 (N.D.N.Y. 2021); *Islands Hospice, Inc. v. Duick*, No. CV 19-00202-JMS-WRP, 2019 WL 4620369, at *3 (D. Haw. Sept. 23, 2019). Even if Congress intended the "in commerce" language in the DTSA to serve a limiting function, the allegations of UMB and Terran meet that requirement.

The TAC states, ECF 81, ¶ 7: "Terran entered into a licensing agreement with UMB [in 2021], under which UMB granted Terran an exclusive license to the Psilocybin Trade Secrets. Terran licensed the Psilocybin Trade Secrets so it could bring a groundbreaking rapid, non-hallucinogenic antidepressant therapy *to market*. The Psilocybin Trade Secrets relate to this therapy, which Terran has taken significant steps towards *developing and commercializing in the United States and throughout the world*." (Emphasis added). Further, the TAC alleges, *id.* ¶ 56: "The Psilocybin Trade Secrets are directed towards methods of treating depression and other mental health issues with the sequential administration of a 5-HT2A antagonist followed by psilocybin, which implicate the development, manufacturing, and sale of products and services used in, and intended for use in, interstate and foreign commerce." Moreover, according to the TAC, *id.* ¶ 57 (emphasis added): "The Psilocybin Trade Secrets are related to a potential treatment for neuropsychiatric disorders that has been continually under development by Professor Thompson, UMB, and Terran since 2016 and *is intended for use throughout the United States and the world*."

The MLA is also pertinent.[25]  It states, ECF 68-2, § 1.5 (emphasis added): "As a public research and education institution, [UMB] is interested in licensing Invention #1 and its joint undivided interest in Invention #2 to [Terran] to benefit the public *by the development and marketing of new and useful products and methods*."  Invention #1 is defined as "*Methods of Treating Psychological and Brain Disorders*," made by Dr. Thompson.  *Id.* § 1.1 (italics in original).  Invention #2 is defined as "*Methods and Composition Relating to Psychedelics and Serotonin Receptor Modulators*," made jointly by Thompson and a Terran employee.  *Id.* § 1.2 (italics in original).

Section 4.3 of the MLA states: "[Terran] shall use Commercially Reasonable Efforts to bring one or more Licensed Products to market as soon as reasonably practicable in accordance with the Commercialization Plan . . . ."  The "Commercialization Plan" is attached to the MLA as Schedule B.  *Id.* at 46–57; *see id.* § 4.1 (discussing the Commercialization Plan).  Schedule B contains a detailed description of the steps Terran intends to take to █████████████████ █████████████████████████████████████████████████████████████████████████████ █████████████████████████████████  *Id.* at 47.

As consideration for the contract, Terran agreed to ███████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ██████████████████████

───────────────

[25] As noted, the MLA is filed under seal.  *See* ECF 113 (Order of May 2, 2024, directing the clerk to maintain under seal ECF 51-3, ECF 68-2, and ECF 84).

Schedule C of the MLA is entitled "**DILIGENCE MILESTONES**." ECF 68-2 at 58 (boldface in original). One of the specified milestones is , for which the deadline is ███████. *Id.* Similarly, Schedule C contemplates ███████████. *Id.* Schedule C also contemplates ███████████ *Id.*

Compass's challenges are without merit. The allegations in the TAC, along with the MLA, are more than sufficient to plausibly allege that the Psilocybin Trade Secrets "relate[] to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

First, the TAC sufficiently alleges the "in commerce" component. As noted, it alleges, *inter alia*, ECF 81, ¶ 7: "Terran licensed the Psilocybin Trade Secrets so it could bring a groundbreaking rapid, non-hallucinogenic antidepressant therapy *to market*." (Emphasis added). And, the MLA obligates Terran to bring a licensed product █████████████ █████ and features a commercialization plan which lays out in detail the steps Terran intends to take to do so. ECF 68-2, § 43; *id.* at 46–57.

---

[26] The MLA defines "IND" as follows: "An investigational New Drug Application submitted to [the] FDA under §505 of the Food, Drug, and Cosmetic Act, which satisfies the requirements of 21 C.F.R. §312; or a similar application to [the] FDA's foreign equivalents." ECF 68-2, § 2.23.

[27] The MLA defines "NDA" as follows: "A New Drug Application submitted to the FDA to market a new drug under §505 of the Food, Drug, and Cosmetic Act, which satisfies the requirements of 21 C.F.R. §313; or a similar application to FDA's foreign equivalents." ECF 68-2, § 2.32.

Compass argues that there are insufficient allegations that UMB "would be involved in any business venture related to a product embodying the Psilocybin Trade Secrets, let alone the commercialization of any product . . . ." ECF 93-1 at 30. But, based on the MLA, plaintiffs clearly allege that UMB *is* involved in a business venture with Terran to commercialize a product or service. For example, per the terms of the MLA, ███████████████████████████ ████████████████████████████████████████████████████ ECF 68-2, §§ 5.4.1, 5.5.

Compass correctly points out that, pursuant to the MLA, UMB reserved for itself the right to use the "Inventions"[28] for "Non-Commercial Uses" and to license the Inventions to "Non-Commercial Organizations." ECF 68-2, §§ 3.2.1, 3.2.2. However, the MLA does not foreclose Terran from commercializing a product or service if UMB chooses to exercise its rights to use "Inventions" for a non-commercial purpose. And, by its plain terms, the DTSA does not require a trade secret to be used *solely* for commercial purposes in order to qualify for protection. Indeed, Compass has not identified any case that holds that a DTSA claim fails as a matter of law if a trade secret implicates both commercial and non-commercial purposes.

Second, the TAC adequately alleges that Terran intends to commercialize a product/service interstate or abroad. *See, e.g.*, ECF 81, ¶ 3 ("Terran has taken significant steps towards developing and commercializing [a therapy involving the Psilocybin Trade Secrets] in the United States and throughout the world."); *id.* ¶ 57 (alleging that Terran's product/service "is intended for use throughout the United States and the world").

---

[28] The "Inventions" are defined as "Invention #1" and "Invention #2," collectively. *See* ECF 68-2, §§ 1.1–1.2, 2.25.

As noted, Compass argues that these allegations are merely "conclusory." ECF 93-1 at 30. But, the MLA contemplates the sale of a ██████████████████████████████████████████ ECF 68-2 at 58. It also contemplates the submission of ████████████████████████████ ████████████████████████████████████ *Id.* Thus, it may reasonably be inferred from the MLA that the product Terran intends to bring to the market is not solely intended for intrastate sale. *See Mighty Deer Lick, Inc. v. Morton Salt, Inc.*, No. 17-CV-05875, 2020 WL 635904, at *6 (N.D. Ill. Feb. 11, 2020) (inferring that the plaintiff sold or intended to sell its products outside of the United States because a licensing agreement provided for the sale of its products in Canada).

Third, I disagree with Compass that UMB and Terran have failed adequately to plead that the Psilocybin Trade Secrets "relate to" the antidepressant therapy that Terran allegedly intends to commercialize. ECF 105 at 18–19. According to Compass, a "liberal reading of [the] 'related to' [sub-element] under the DTSA 'would result in virtually unlimited expansion of the court's jurisdiction . . . .'" ECF 105 at 19 (quoting *Islands Hospice, Inc.*, 2019 WL 4620369, at *13–14).

In *Islands Hospice, Inc.*, 2019 WL 4620369, the court explained, *id.* at *6: "[W]hat must 'relate to' the product or service in interstate commerce is [the] 'secret' information." The TAC adequately pleads just that. It alleges that the Psilocybin Trade Secrets include, *inter alia*: "(i) [Dr. Thompson's] discovery that psilocybin's antidepressant therapeutic effects are independent of the 5-HT2A receptor activation that causes hallucinations, and (ii) [Dr. Thompson's] discovery that time-sequenced administration of a 5-HT2A receptor antagonist followed by psilocybin was necessary to achieve the anti-depressant therapeutic effects without hallucinations." ECF 81, ¶ 2. And, as noted, the TAC also alleges, *id.* ¶ 7: "Terran licensed the Psilocybin Trade Secrets so it could bring a groundbreaking rapid, non-hallucinogenic antidepressant therapy to market." Moreover, the commercialization plan attached to the MLA provides, ECF 68-2 at 47: ████

for its therapeutic psilocybin product. Thus, there is a direct relationship between the Psilocybin Trade Secrets and the product or service that Terran intends to commercialize, which is all that is required. *See R.J. Heating Co. v. Rust*, No. 1:22-CV-00710, 2024 WL 1307114, at *5 (N.D. Ohio Mar. 27, 2024) (dismissing DTSA claim because, *inter alia*, the relationship between the trade secrets and the product at issue was "too attenuated").[29]

I shall deny Compass's Motion as to Count I.

### C. Counts VII–X

As noted, UMB and Thompson assert tort claims for fraudulent misrepresentation (Count VII), negligent misrepresentation (Count VIII), fraudulent concealment (Count IX), and constructive fraud (Count X).

Compass urges dismissal of these claims, contending that Thompson and UMB "fail to plead sufficient facts showing that Compass owed either Thompson or UMB a duty of care." ECF

---

[29] Most of the cases cited by Compass are easily distinguishable, because the complaints either recited the statutory interstate commerce element verbatim or failed to allege any nexus between the product/service and interstate or foreign commerce. *See NJ Coed Sports LLC v. ISP Sports, LLC*, No. CV 22-06969, 2023 WL 3993772, at *2, *3 (D.N.J. June 14, 2023). (dismissing DTSA claim because the complaint "only alleges that Plaintiff operated at the [indoor sports facility] in Randolph, New Jersey" and thus "indicates that Plaintiff's product/service—adult recreational sports leagues—are entirely *intrastate*.") (emphasis in original); *W. Chester Design Build, LLC v. Moses*, No. CV 22-1911, 2022 WL 15524950, *2, *4 (E.D. Pa. Oct. 27, 2022) (dismissing DTSA claim because the complaint merely recited, verbatim, the statutory interstate commerce element); *Mid-Atl. Field Servs. LLC v. Barfield*, No. 3:23-CV-177-HEH, 2023 WL 4494175, at *4 (E.D. Va. July 12, 2023) ("Plaintiff's Complaint fails to assert that its Trade Secrets are related to products that are used in, or intended for use in, interstate or foreign commerce. *Rather, its Complaint is silent as to this element.*") (footnote omitted, emphasis added); *Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 338 (D. Del. 2017) ("The complaint fails to allege any nexus between interstate or foreign commerce and the Confidential Recordings, Hydrogen Technology, Purchase Agreement, or Mutual Cooperation Agreement.").

93-1 at 34.  It posits, ECF 105 at 20: "[A] duty of care is not established when parties merely engage in arms-length commercial bargaining."[30]

When considering a state law claim, a court applies the law of the forum state (including as to choice of law), whether proceeding under supplemental or diversity jurisdiction.  *See, e.g.*, *Colgan Air, Inc. v. Raytheon Aircraft Co.,* 507 F.3d 270, 275 (4th Cir. 2007); *Doe v. Cmty. Coll. of Balt. Cnty.*, 595 F. Supp. 3d 392, 418 (D. Md. 2022); *Nash v. Montgomery County*, GJH-20-1138, 2021 WL 1222874, at *7 n.7 (D. Md. Mar. 31, 2021); *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008).  The parties have presented their arguments under Maryland law, albeit without addressing the issue of choice of law.

In tort cases, Maryland applies the *lex loci delicti* principle, meaning "'the law of the place of the wrong.'"  *Doctor's Weight Loss Centers, Inc. v. Blackston*, 487 Md. 476, 492–93, 319 A.3d 1102, 1111 (2024) (quoting *Colgan Air, Inc.*, 507 F.3d at 275).  "When a case's facts concern a single state, *lex loci delicti* is easy to apply."  *Blackston*, 487 Md. at 493, 319 A.3d at 1111–12.  "But, when the facts concern multiple states, Maryland 'appl[ies] the [substantive] law of the [s]tate where the injury—the last event required to constitute the tort—occurred.'"  *Id.* (alterations in *Blackston*; citation omitted).

---

[30] In the Reply, Compass argues for the first time, in a footnote, that Thompson "cannot plausibly allege justifiable reliance, as required for Counts VII, VIII, and IX."  ECF 105 at 21 n.5.  Because this argument was raised for the first time in the Reply, I decline to consider it.  *See SEC v. Pirate Investor*, 580 F.3d 233, 255 n.23 (4th Cir. 2009) ("Ordinarily we do not consider arguments raised for the first time in a reply brief . . . ."); *Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*, 708 F. Supp. 2d 527, 535 (D. Md. 2010) ("Ordinarily, arguments raised for the first time in a reply brief . . . will not be considered."); *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (same).

In opposing the Third Motion to Amend, Compass argued that the proposed amendments to the fraud claims were "futile" because the proposed TAC did not plausibly allege justifiable reliance.  ECF 70 at 13–14.  Yet, Compass failed to include this argument in its Motion.

UMB is a citizen of Maryland and Thompson was a citizen of Maryland until July 2022. ECF 102 at 29; ECF 81, ¶ 25. The alleged tortious injury occurred in Maryland. Therefore, the Court will apply Maryland law to the claims of fraudulent misrepresentation (Count VII), negligent misrepresentation (Count VIII), fraudulent concealment (Count IX), and constructive fraud (Count X).

Compass seeks dismissal of these claims, claiming that Compass owed no duty of care to Dr. Thompson or UMB. Maryland courts generally characterize a "duty" as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward one another." *Blondell v. Littlepage,* 413 Md. 96, 120, 991 A.2d 80, 94 (2010) (quoting W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 53 (5th ed.1984)). Thus, the question of whether "an actionable duty exists represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant." *Blondell,* 413 Md. at 120, 991 A.2d at 94; *see also Pendleton v. State,* 398 Md. 447, 461, 921 A.2d 196, 204–05 (2007).

There "is no precise formula for determining the existence of a duty of care" in Maryland. *Griesi v. Atl. Gen. Hosp. Corp.,* 360 Md. 1, 12, 756 A.2d 548, 554 (2000). But, courts in Maryland "have endorsed an analytical approach that encompasses at least two major assessments: examining the nature of the legal relationship between the parties and the likely harm that results from a party's failure to exercise reasonable care within that relationship." *Id.* (citing *Jacques v. First National Bank*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986)).

### 1. Count VII – Fraudulent Misrepresentation

Compass has moved to dismiss Count VII, seemingly as an afterthought. In the Motion (ECF 93-1), Compass initially omits fraudulent misrepresentation as a claim for which it seeks dismissal. *See id.* at 34. It mentions fraudulent misrepresentation only as follows, *id.* at 35: "For

the above reasons, Thompson's and UMB's fraud claims (Claims VII, VIII, IX, and X) must fail."

Moreover, Compass sets forth no argument in the Motion on the merits of the fraudulent

misrepresentation claim, apart from the generic assertion that plaintiffs failed to plead facts

showing that Compass owed a duty of care.

Defendant's "'passing shot at the issue' . . . would likely constitute waiver." *Garey v.*

*James S. Farrin, P.C.*, 35 F.4th 917, 928 n.10 (4th Cir. 2022) (citation omitted). In any event,

there is no merit to defendant's motion as to Count VII, because the elements for fraudulent

misrepresentation do not include a duty of care. *See Frozen Wheels, LLC v. Potomac Valley Home*

*Med., Inc.*, CCB-20-2479, 2021 WL 2226175, at *4 (D. Md. June 2, 2021) (outlining fraudulent

misrepresentation elements, which do not include a duty of care); *Thomas v. Nadel*, 427 Md. 441,

451 n.18, 48 A.3d 276, 282 n.18 (2012) (same); *Hoffman v. Stamper*, 385 Md. 1, 28, 867 A.2d

276, 292 (2005) (same).

### 2. Count VIII – Negligent Misrepresentation

According to the TAC, Compass negligently misrepresented, *inter alia*, "that there was a

signed NDA in place between Compass and Professor Thompson." ECF 81, ¶ 116.

The elements of negligent misrepresentation under Maryland law are as follows: "(1) the

defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the

defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has

knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause

loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the

plaintiff suffers damage proximately caused by the defendant's negligence." *Griesi*, 360 Md. at

11, 756 A.2d at 553; *see also Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 136 (2007) (same); *Gross*

*v. Sussex Inc.*, 332 Md. 247, 259, 630 A.2d 1156, 1162 (1993) (same); *J.G. Wentworth*

*Originations, LLC v. Mobley*, ELH-11-1406, 2012 WL 4922862, at *8 (D. Md. Oct. 12, 2012). As noted, Compass maintains that it owed no duty of care to plaintiffs.

In negligence cases involving purely economic loss, as in this case, Maryland courts "have refrained from finding a tort duty absent privity [of contract] or its equivalent – i.e., an 'intimate nexus.'" *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 620–21, 155 A.3d 445, 457 (2017) (citations and footnote omitted) ("*Balfour*"); *see Griesi*, 360 Md. at 12–13, 256 A.2d at 554; *Jacques*, 307 Md. at 534, 515 A.2d 756; *Chassels v. Krepps*, 235 Md. App. 1, 14, 174 A.3d 896, 903 (2017). The Maryland Court of Appeals has said: "[T]he intimate nexus test requires the relationship between the parties to be sufficiently close—or intimate—to support finding a tort duty." *Balfour*, 451 Md. at 615, 155 A.3d at 543.

Finding an intimate nexus "requires consideration of numerous factors." *Griesi*, 360 Md. at 13, 256 A.2d at 554. The Maryland Court of Appeals explained in *Weisman v. Connors*, 312 Md. 428, 447, 540 A.2d 783, 792 (1988) (citation omitted):

> "Liability [for negligent misrepresentation] arises only where there is a duty, if one speaks at all, to give the correct information. And that involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care. An inquiry made of a stranger is one thing; of a person with whom the inquirer has entered, or is about to enter, into a contract concerning the goods which are, or are to be, its subject, is another."

In determining whether there is an intimate nexus, Maryland courts "consider the closeness of the relationship between the parties—especially one party's reliance on the other party's exercise of due care . . . ." *Balfour*, 451 Md. at 619–20, 155 A.3d at 456. And, "context is critical." *Id.* at 620–21, 155 A.3d at 457. The "privity-equivalent analysis in economic loss cases looks for

linking conduct—enough to show the defendant knew or should have known of the plaintiff's reliance." *Id.* at 620, 155 A.3d at 457; *see Village of Cross Keys, Inc. v. United States Gypsum Co.,* 315 Md. 741, 758, 556 A.2d 1126, 1133 (1989) (stating that there is a "close interrelationship of the concepts of duty and reliance"); *Chassels*, 235 Md. App. at 14, 174 A.3d at 903 (noting that the "key element" is linking conduct); *Simmons v. Lennon*, 139 Md. App. 15, 40–41, 773 A.2d 1064, 1079 (2001) ("The common denominator of the Maryland cases, where no contractual privity existed but nevertheless a tort was found, is that in each case the relationship of the litigants was close enough that the defendant knew that the plaintiff was likely to take some action based on what the defendant said or did."); *Lubore v. RPM, Assoc., Inc.*, 109 Md. App. 312, 338, 674 A.2d 547, 560 (1996) (concluding that an employer could be liable to an employee who resigned from former job in reliance on employer's negligent misrepresentation); *Giant Food, Inc. v. Ice King, Inc.*, 74 Md. App. 183, 189, 536 A.2d 1182, 1185 (1988) ("Patently, the duty to furnish the correct information arises when the relationship is of the nature that one party has the right to rely upon the other for information.").

"Maryland has found the equivalent of contractual privity in special relationships consummated during the course of pre-contract negotiations." *Griesi*, 360 Md. at 13, 756 A.2d at 554 (citing cases); *see, e.g.*, *id.* at 16, 17, 756 A.2d at 556 (finding an intimate nexus existed during extensive but arms-length pre-contractual employment negotiations); *Weisman,* 312 Md. at 448–451, 540 A.2d at 793–94 (concluding that there was sufficient evidence for jury to find an intimate nexus between two executives engaged in pre-contractual negotiations); *Giant Food, Inc.,* 74 Md. App. at 190–92, 536 A.2d at 1185–86 (concluding that a special relationship existed between Giant and seller of ice because of extensive pre-contractual communications that occurred over several months).

Compass contends that because Dr. Thompson and Compass were engaged in "arms-length commercial bargaining" and the alleged loss to plaintiffs is solely pecuniary, no duty or intimate nexus can exist. ECF 105 at 20; *see also* ECF 93-1 at 34–35. But, there is no such categorical exclusion. *Griesi*, 360 Md. at 12, 756 A.2d at 554 ("There is no precise formula for determining the existence of a duty of care between two parties."); *Giant Food, Inc.*, 74 Md. App. at 189, 536 A.2d at 1185 ("The precise degree of the relationship that must exist before recovery will be allowed is a question that defies generalization."). Indeed, Maryland courts have expressly stated the opposite. *See, e.g.*, *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 338, 439 A.2d 534, 539 (1982) ("Appellees have also argued that even if negligent misrepresentation is a viable tort action in this State, it can never be applied to statements made in connection with consummation of an arm's length transaction. . . . We find nothing . . . to support such a sweeping assertion and we reject it."); *see also Griesi*, 360 Md. at 16, 756 A.2d at 556 (concluding that negligent misrepresentation allegations were sufficient to establish a legal duty formed through pre-employment negotiations even though the negotiations were "at arm's length"); *Weisman*, 312 Md. at 448, 540 A.2d at 792 ("That there may be the requisite . . . intimate nexus in an arm's length commercial transaction involving pecuniary loss only was clearly established in *Martens Chevrolet v. Seney*"); *id.* at 450–51, 540 A.2d at 793–94 (considering cases from other jurisdictions and rejecting the argument that there is no duty if the parties are merely engaged in an arms-length transaction).

Cases in this District, and at least one Fourth Circuit case, "have attempted to limit remedies to contract law where the loss is purely economic and the parties engaged in arms-length commercial bargaining . . . ." *Gruppo Essenziero Italiano, S.p.A. v. Aromi D'Italia, Inc.*, CCB-

08-65, 2011 WL 3207555, at *8 (D. Md. July 27, 2011) (citing cases). However, as Judge Blake

pointed out, this applies "particularly with contracts for the sale of goods." *Id.*

Compass cites several of these cases. For example, in *Chubb & Son v. C & C Complete

Servs., LLC*, 919 F. Supp. 2d 666, 674–75 (D. Md. 2013), the court dismissed the plaintiff's

negligent misrepresentation claim, concluding that the defendant did not owe the plaintiffs a duty

of care. The court reasoned that the loss was purely economic and the parties engaged in arms-

length bargaining. *Id.* at 675.

In *CapitalSource Fin. LLC v. Pittsfield Weaving Co.*, 571 F. Supp. 2d 668 (D. Md. 2006),

the court dismissed the defendants' negligent misrepresentation counterclaim for the same reason.

*Id.* at 674. The court stated: "Under Maryland law, 'a claim for negligent misrepresentation is

improper when . . . the only relationship between the parties is contractual, both parties are

sophisticated, and the contract does not create an express duty of due care in making

representations.'" *Id.* (quoting *Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d

94, 98 (4th Cir. 1992)). The court explained: "'Courts have been exceedingly reluctant to find

special circumstances sufficient to transform an ordinary contractual relationship between a bank

and its customer into a fiduciary relationship or to impose any duties on the bank not found in the

loan agreement.'" *CapitalSource Fin. LLC*, 571 F. Supp. 2d at 674 (quoting *Parker v. Columbia

Bank,* 91 Md. App. 346, 604 A.2d 521, 532, *cert. denied,* 327 Md. 524, 610 A.2d 796 (1992)).

However, as Thompson and UMB point out, several of the cases cited by Compass involve

"financial institutions, such as banks and insurance agencies." ECF 102 at 36 (citing ECF 93-1 at

26–27); *see also Van Leer*, 479 F. App'x at 481 (stating that the plaintiff "simply alleges no facts

that would convert his relationship with Deutsche Bank from the standard bank-customer variety

into something so unique as to compel a court to impose a noncontractual duty on the bank.");

*CapitalSource Fin. LLC*, 571 F. Supp. 2d at 670, 674 (finding that the counter-defendant, a "specialized commercial finance company," did not owe the counter-plaintiff a duty). Compass brushes this distinction aside. But, unlike in the contractual negotiation context, there is Maryland case law that expressly limits the imposition of a duty of care on a bank in a negligent misrepresentation claim. *See, e.g.*, *Parker*, 91 Md. App. at 369, 604 A.2d at 532.

Moreover, there are cases in this District and in the Fourth Circuit that have reached conclusions at odds with Compass's position. *See*, *e.g.*, *Baltimore Cnty. v. Cigna Healthcare*, 238 F. App'x 914, 922–23 (4th Cir. 2007); *Finley Alexander Wealth Mgmt., LLC v. M & O Mktg., Inc.*, GJH-19-1312, 2023 WL 2163176, at *11 (D. Md. Feb. 21, 2023); *Dwoskin v. Bank of Am., N.A.*, 850 F. Supp. 2d 557, 571–72 (D. Md. 2012); *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 626–28 (D. Md. 2003); *see also Dierker v. Eagle Nat. Bank*, 888 F. Supp. 2d 645, 655 (D. Md. 2012) ("Arms-length negotiations between representatives of commercial entities do not establish an intimate nexus *unless they invoke considerations of personal trust and reliance*.") (emphasis added). And, as explained, under Maryland law, which applies here, the Maryland appellate courts have rejected the contention that there is no duty to make representations with reasonable care merely because the parties are engaged in arms-length commercial bargaining.

Notably, in *Martin Marietta Corp.*, 991 F.2d at 98, the Fourth Circuit said, *id.*: "Under Maryland law, 'a claim for negligent misrepresentation is improper when . . . the only relationship between the parties is contractual, both parties are sophisticated, and the contract does not create an express duty of due care in making representations.'" But, the Court distinguished the decision in *Martens Chevrolet,* 292 Md. at 338, 439 A.2d at 539. As explained, in that case the Maryland Court of Appeals rejected the argument that a negligent misrepresentation claim fails as a matter of law if a statement is made in connection with an arm's length transaction. *Id.* The Fourth

Circuit noted that *Martens Chevrolet* referred to a representation made before a contract was entered. *Martin Marietta Corp.*, 991 F.2d at 99. In contrast, the counter-plaintiff in *Martin Marietta Corp.* relied "on negligent misrepresentations made after the parties signed a contract." *Id.*; *see also Cooper v. Berkshire Life Ins. Co.*, 148 Md. App. 41, 86 n.8, 810 A.2d 1045, 1071 n.8 (2002) (distinguishing *Martin Marietta Corp.* on the ground that it involved alleged post-contractual misrepresentations). Here, Thompson and UMB have alleged reliance on representations made before a contract was entered.

In particular, and as noted, Thompson and UMB allege that Compass negligently misrepresented, *inter alia*, "that there was a signed NDA in place between Compass and Professor Thompson." ECF 81, ¶ 116. The TAC alleges that Professor Thompson never discussed the Psilocybin Trade Secrets without a NDA. *Id.* ¶ 2 ("Both before and after he filed this patent application, Professor Thompson kept his research, development, and related information leading to the Psilocybin Trade Secrets confidential, and maintained a practice to never disclose any such information outside the scope of a confidentiality/non-disclosure agreement."). Moreover, the TAC alleges, *id.* ¶ 118: "Compass knew that Professor Thompson would not disclose confidential information without an NDA in place . . . ." And, "based on the prospective business relationship between Professor Thompson, UMB, and Compass . . . [m]orals and good conscious [sic] compelled Compass to furnish correct statements to UMB and Professor Thompson." *Id.* ¶ 117. Yet, Compass never signed the NDA. *Id.* ¶ 3. The TAC asserts, *id.* ¶ 119: "Compass knew that [Professor Thompson's] reliance would result in Professor Thompson disclosing Psilocybin Trade Secrets and other confidential information, and that UMB and Professor Thompson would be injured as a result of Compass's negligent misrepresentations."

The TAC asserts that Compass knew that Professor Thompson would not disclose confidential information without a NDA in place. Dr. Malievskaia emailed Professor Gould, stating, ECF 67-17 at 2: "Our colleague . . . will send you an CDA and, once signed, will be in touch to schedule a call." Dr. Gould confirmed that the NDA was required before discussions could take place. In an email of May 22, 2019, he suggested including Dr. Thompson on the call, and said, *id.*: "Would it make sense on your end to include [Thompson] on our call scheduled next week (*with a NDA in place*)?" (Emphasis added).

Indeed, Compass promptly sent the NDA to Professor Thompson. ECF 81, ¶¶ 3, 119. That same day, a Compass employee emailed Thompson, stating, in relevant part, ECF 67-18 at 3: "Scott, could you please let us know if you have any comments on the NDA. If/when you're happy with this, could you please return a signed version ahead of the call with [Dr. Malievskaia]." Thompson signed the NDA, and Compass acknowledged its receipt. ECF 81, ¶¶ 3, 118, 119. But, "even though it was Compass's own form NDA which it provided to Thompson, and even though Thompson signed Compass's NDA without making any changes to it, Compass for its part never executed the NDA." *Id.* ¶ 3.

Thompson and UMB have plausibly alleged the pertinent "linking conduct"—that Compass "knew or should have known" that Thompson and UMB relied on a confidentiality agreement before disclosing proprietary information to Compass. *Balfour*, 451 Md. at 620, 155 A.3d at 457; *see also Weisman*, 312 Md. at 447, 540 A.2d at 792 ("There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property.") (citation and internal quotations omitted); *Giant Food, Inc.*, 74 Md. App. at 188,

536 A.2d at 1184 (stating that "a defendant's knowledge of the plaintiff's reliance on the statements made create[s] a duty of care on the part of the utterer of the statements.").

With respect to the issue of intimate nexus, it is also relevant that the TAC alleges "more than 'unilateral attempts'" on the part of Dr. Thompson and UMB to establish a business relationship with Compass. *Giant Food, Inc.*, 74 Md. App. at 190, 536 A.2d at 1185. Simply put, Compass's conduct in providing the NDA to Thompson induced him to disclose confidential information. *See Cooper*, 148 Md. App. at 71, 810 A.2d at 1062 ("In determining whether the duty exists to support negligent misrepresentation, a significant factor is whether the promises were an inducement to the plaintiff and provided the defendant with a business advantage when the plaintiff acted in conformance with them."). And, Compass "knew that the plaintiff was likely to take some action based on what [Compass] said or did." *Simmons*, 139 Md. App. at 40–41, 773 A.2d at 1079. The relationship was also one such that, "'in morals and good conscience'", Thompson and UMB had a right to rely upon Compass's representations. *Weisman*, 312 Md. at 447, 540 A.2d at 792 (citation omitted); *see also Griesi*, 360 Md. at 17, 756 A.2d at 556 ("We weigh heavily in our analysis that [the defendant] had exclusive control of vital and material information necessary for [the plaintiff] fully to understand the situation, and that it never disclosed such information to [the plaintiff]."); *Giant Food, Inc.*, 74 Md. App. at 189, 536 A.2d at 1185 ("Patently, the duty to furnish the correct information arises when the relationship is of the nature that one party has the right to rely upon the other for information.").

Beyond the contentions already addressed, Compass also argues: "Maryland courts regularly dismiss negligent misrepresentation claims that sound in fraud." ECF 93-1 at 33 (citing cases). But, the cases cited by Compass dismissed negligent misrepresentation claims that were based solely on promises of *future* conduct. In such a case, a negligent misrepresentation claim

converts to a fraudulent misrepresentation claim. *See 200 N. Gilmor, LLC v. Cap. One, Nat. Ass'n*, 863 F. Supp. 2d 480, 493 (D. Md. 2012) (citing cases and explaining that, in "order for a negligent misrepresentation claim based upon a promise of future conduct to be actionable, the party making the representation regarding its future conduct must know, at the time it makes the representation, that it does not intend to carry out the promise . . . . But, if the party knows the representation to be false at the time it is made, then the claim is one for *fraudulent* misrepresentation and the negligent misrepresentation claim [is converted] into a claim for fraudulent misrepresentation.") (emphasis and alterations in *200 N. Gilmor, LLC*; internal citations omitted); *see also Frozen Wheels, LLC*, 2021 WL 2226175, at *4 (stating that a "promise of future conduct is actionable only where the party making the representation regarding the future conduct knows, at the time the statement was made, that it did not intend to carry out the promise—if that is so, then the claim is one for *fraudulent* misrepresentation.") (emphasis in *Frozen Wheels, LLC*); *Heritage Oldsmobile-Imports v. Volkswagen of America, Inc.*, 264 F. Supp. 2d 282, 291 (D. Md. 2003).

Here, the TAC alleges that Compass negligently made "the representation that there was a signed NDA in place between Compass and Professor Thompson . . . ." ECF 81, ¶ 116. That does not concern future conduct.[31] In sum, in the light most favorable to Thompson and UMB, the allegations of the TAC, if proven, are sufficient to support a finding of intimate nexus.

---

[31] Compass asserts (ECF 93-1 at 33) that two other alleged "negligent" misrepresentations in the TAC actually sound in fraud: (1) Compass "would not use or disclose the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson"; and (2) Compass "was seeking additional information regarding Professor Thompson's research for the purposes of evaluating a collaboration with UMB, when Compass did not intend to collaborate with UMB . . . ." ECF 81, ¶ 116.

### 3. Counts IX and X - Fraudulent Concealment and Constructive Fraud

In Count IX, Thompson and UMB contend that Compass engaged in fraudulent concealment when it failed to disclose the following two material facts, ECF 81, ¶¶ 124, 125: (1) Compass "had not in fact entered into the NDA agreement that it had asked Professor Thompson to sign"; and (2) Compass "had secretly filed the '611 Application, in direct violation of the NDA and/or the promise it had induced Professor Thompson . . . to believe Compass had made that it would not disclose or use the Psilocybin Trade Secrets . . . ."

In Count X, the constructive fraud claim, the TAC asserts, *id.* ¶ 129: "UMB and Professor Thompson placed their trust in Compass, yet, they were defrauded as a result of Compass continually deceiving them and violating their confidences. This includes, but is not limited to, Compass's misuse and disclosure of the Psilocybin Trade Secrets and other confidential information, Compass's failure to disclose the filing of the '611 Application, and Compass leading Professor Thompson along in an effort to extract confidential information from him knowing it was not going to collaborate with UMB or him."

As to Count IX, the TAC states, *id.* ¶ 123: "Compass had a duty of care to UMB and Professor Thompson, namely the duty to disclose material facts while negotiating a collaboration with UMB. This duty arose based on the prospective business relationship between Professor Thompson, UMB, and Compass. Compass knew that the statements it would make would be relied upon and acted upon by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB), and that he and UMB would be injured by omitting material facts. Morals and good conscious compelled Compass to not suppress the truth in a way that would defraud Professor Thompson or UMB."

With respect to Count X, the TAC alleges, *id.* ¶ 128: "Compass had a duty of care to UMB and Professor Thompson, namely the duty not to deceive them, to violate their confidence, or to injure the public interests by defrauding a public university and its employees. This duty arose based on the confidential relationship between Professor Thompson, UMB, and Compass." Further, plaintiffs allege that Compass, acting "at least" though Dr. Malievskaia and Dr. Hurley, "gained Professor Thompson's trust by reaching out to UMB under the guise of seeking to collaborate with, and fund, UMB research. Compass's actions and statements resulted in a confidential relationship with Professor Thompson . . . . exemplified by what Professor Thompson believed to be a valid Mutual NDA." *Id.*

I begin with a review of the contours of each tort.

In Maryland, constructive fraud is defined as a "'breach of a legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.'" *Canaj, Inc. v. Baker & Div. Phase III, LLC*, 391 Md. 374, 421–22, 893 A.2d 1067, 1095 (2006) (quoting *Md. Envtl. Trust v. Gaynor,* 370 Md. 89, 97, 803 A.2d 512, 516–17 (2002)) (emphasis omitted); *see Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 69, 115 A.3d 125, 138 (2015) (same). Broken into elements, constructive fraud requires a plaintiff to prove: "1) The existence of a legal or equitable duty, usually arising out of a relationship where trust and confidence exist, i.e., a fiduciary relationship or a confidential relationship; 2) A breach of that duty; by 3) Conduct which deceives or violates a confidence or injures the public interest." *Pleading Causes of Action in Md.*, MD. STATE BAR ASS'C (7th ed. 2022) (chapter 3); *see also Gazmen v. Shimoura*, No. 2072, Sept. term, 2019, 2021 WL 911757, at *7, *8 (Md. Ct. Spec. App. Mar. 10, 2021) (concluding that a

trial court's constructive fraud jury instruction, which contained similar elements to those articulated above, "comported with Maryland law.").

"For constructive fraud's purposes, a defendant owes an equitable duty to a plaintiff where the parties are in a confidential relationship." *Thompson*, 443 Md. at 69, 115 A.3d at 138 (citation omitted). On the other hand, a defendant owes a "legal duty" to a plaintiff "where a statute or Maryland Rule requires the defendant to meet an obligation for the plaintiff." *Id.* at 69 n.13, 115 A.3d at 138 n.13. The TAC alleges that Compass owed Thompson and UMB an equitable duty. ECF 81, ¶ 128.

Constructive fraud is a tort that often arises in tax and lending cases where a "confidential relationship" exists. *See Ellerin v. Fairfax Sav. F.S.B.,* 337 Md. 216, 652 A.2d 1117 (1995); *Scheve v. McPherson,* 44 Md. App. 398, 408 A.2d 1071 (1979). Unlike fraudulent misrepresentation or fraudulent concealment, constructive fraud "is not an intentional tort." *D'Aoust v. Diamond*, 424 Md. 549, 571, 36 A.3d 941, 954 (2012); *see also Ellerin*, 337 Md. at 236 n.11, 652 A.2d at 1126 n.11 ("Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.") (citation and internal quotations omitted).

Fraud based on active suppression or concealment of material facts or an intentional failure to disclose facts that the defendant is legally obligated to disclose is the variety of fraud referred to as "fraudulent concealment." Under Maryland law, a mere failure to disclose a material fact is not actionable in the absence of a legal duty to disclose. *Brass Metal Prods. v. E–J Enters.,* 189 Md. App. 310, 354, 984 A.2d 361, 387 (2009) ("Ordinarily, non-disclosure of information does not create a cause of action unless a duty to disclose exists."). This is because "Maryland

recognizes no general duty upon a party to a transaction to disclose facts to the other party." *Md. Env't Tr. v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).[32]

A "claim of failure to disclose . . . requires only that the defendant remain silent about, or omit, facts," and is not actionable unless "the defendant had a duty to disclose." *Lloyd,* 397 Md. at 138 n.11, 916 A.2d at 274 n.11; *see Frederick Rd. Ltd. P'ship,* 360 Md. at 100 n.14, 756 A.2d at 976 n.14 ("Ordinarily, non-disclosure does not constitute fraud unless there exists a duty of disclosure."). "A duty to disclose is typically predicated on a confidential or fiduciary relationship between two parties." *Latty v. St. Joseph's Soc. of Sacred Heart, Inc.*, 198 Md. App. 254, 271–72, 17 A.3d 155, 165 (2011), *abrogated on other grounds by Plank v. Cherneski*, 469 Md. 548, 231 A.3d 436 (2020); *see Brass Metal Prods.*, 189 Md. App. at 354, 984 A.2d at 387 (a duty to disclose "may arise from certain relationships, such as a confidential relationship."); *Hogan v. Md. State Dental Ass'n,* 155 Md. App. 556, 566, 843 A.2d 902, 908 (2004) ("A duty to disclose arises in certain relationships such as a confidential or fiduciary relationship.").

Where a fraudulent concealment claim is based on a duty to disclose, Maryland courts have formulated the elements of the cause of action as follows:

> (1) the defendant owed a duty to the plaintiff to disclose a material fact;
> (2) the defendant failed to disclose that fact;
> (3) the defendant intended to defraud or deceive the plaintiff;
> (4) the plaintiff took action in justifiable reliance on the concealment; and
> (5) the plaintiff suffered damages as a result of the defendant's concealment.

---

[32] There are instances when a plaintiff may have an actionable fraudulent concealment claim based on actual concealment (as opposed to mere non-disclosure), even in the absence of a duty to disclose. *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 100 n.14, 756 A.2d 963, 976 n.14 (2000). But, Thompson and UMB do not allege that Compass took affirmative steps to conceal the fact that it had not signed the NDA or that it had filed the '611 Application. There is also no allegation that Compass "conceal[ed] facts that materially quailif[ied] affirmative representations," so that is not a basis on which Compass had an obligation to disclose. *Lubore*, 109 Md. App. at 330, 674 A.2d at 556. Nor does the TAC allege that any statement made by Compass amounted to a "'partial and fragmentary'" disclosure, which misled Professor Thompson and UMB because of its incompleteness. *Id.* at 330–31, 674 A.2d at 556 (citation omitted).

*Blondell*, 413 Md. at 119, 991 A.2d at 94; *Lloyd*, 397 Md. at 138, 916 A.2d at 274; *Green v. H & R Block, Inc.*, 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999).

Both fraudulent concealment by non-disclosure and constructive fraud include, as elements, that the defendant owed a duty to the plaintiff. For purposes of fraudulent concealment, the duty is the obligation to disclose information. The duty for purposes of constructive fraud is not easily definable. But, it can generally be explained as one requiring the defendant not to engage in conduct that violates a confidence. As to both torts, these duties generally arise when the plaintiff and defendant are in a fiduciary or confidential relationship. *Hogan*, 155 Md. App. at 566–67, 843 A.2d at 908; *Thompson*, 443 Md. at 69, 115 A.3d at 138.

The constructive fraud claim (Count X) expressly alleges a "confidential relationship" between Professor Thompson, UMB, and Compass. ECF 81, ¶ 128. The fraudulent concealment claim (Count IX) pleads facts necessary to establish an intimate nexus. *See id.* ¶ 123. But, the fraudulent concealment claim also incorporates "by reference each and every allegation contained in" the TAC. *Id.* ¶ 122. Compass urges dismissal of both claims, arguing that the TAC fails plausibly to allege that Compass owed "a duty of care" to UMB and Thompson. ECF 93-1 at 35.

Under Maryland law, "a confidential relationship exists where one party has dominion over the other person, and the relationship is such that the person with greater influence is expected to act in the best interest of the other person." *Brass Metal Prods.,* 189 Md. App. at 356, 984 A.2d at 388; *see Chassels*, 235 Md. App. at 16, 174 A.3d at 905 (stating that a confidential relationship is one in which "dominion or influence [is] exercised by one person over the other.") (alteration in original). A plaintiff and a defendant are in a confidential relationship where the defendant "has gained the [plaintiff's] confidence . . . and purports to act or advise with the [plaintiff's] interest in mind." *Buxton v. Buxton*, 363 Md. 634, 654, 770 A.2d 152, 164 (2001) (citation omitted).

Classic examples of confidential relationships are "attorney-client relationships, trustee-beneficiary relationships, and . . . some family relationships." *Brass Metal Prods.*, 189 Md. App. at 356, 984 A.2d at 388; *see also Chassels*, 235 Md. App at 16, 174 A.3d at 905 ("Relationships such as those between an attorney and client or a trustee and beneficiary are presumed to be confidential. . . . [L]ikewise, a familial relationship may also give rise to a confidential relationship, but its 'mere existence . . . is not indicative of a confidential relationship.'") (citation omitted).

Ordinarily, "'business relationships are not confidential relationships.'" *Brass Metal Prods.*, 189 Md. App. at 357, 984 A.2d at 388 (quoting *Williams v. Dresser Indus., Inc.,* 120 F.3d 1163, 1168 (11th Cir. 1997)). "Where businesses are engaged in an 'arm's length' transaction, a confidential relationship does not exist." *Brass Metal Prods.*, 189 Md. App. at 357, 984 A.2d at 388 (citing cases); *see TECx Glob. Educ. Found. v. W. Nottingham Acad. in Cecil Cnty.*, LKG-22-175, 2023 WL 4764596, at *11 (D. Md. July 26, 2023) (dismissing constructive fraud claim because, *inter alia*, "the allegations in the complaint establish that the parties entered into an arm's length business relationship . . . ."). However, when there are factors "above and beyond a typical business relationship", then "a confidential relationship may exist in a business relationship." *Brass Metal Prods.*, 189 Md. App. at 357, 984 A.2d at 388.

In their briefing, the parties focus exclusively on the intimate nexus needed for a negligent misrepresentation claim, rather than the confidential or fiduciary relationship ordinarily needed for a constructive fraud or fraudulent concealment claim. Neither side cited any Maryland case law addressing when a confidential relationship arises between two business entities. The parties also appear to assume that an intimate nexus creates a duty to disclose for purposes of fraudulent concealment and a legal or equitable duty for purposes of constructive fraud. But, neither side cites any case law to support those assumptions.

In *Lubore*, 109 Md. App. at 330 n.3, 674 A.2d at 556 n.3, the appellant urged the Maryland Court of Special Appeals to find that the "intimate nexus" needed for an actionable negligent misrepresentation claim could create a "duty to disclose" for purposes of fraudulent concealment. But, the Court did not decide the issue because it concluded that the appellees' partial and fragmentary disclosures triggered a duty to disclose. *Id.*

Since *Lubore*, "Maryland's appellate courts have demonstrated a tendency . . . to consider the duty owed in negligence, and that for the tort of fraud, together." *Al-Sabah v. World Bus. Lenders, LLC*, SAG-18-2958, 2020 WL 3868989, at *22 (D. Md. July 9, 2020); *see Blondell*, 413 Md. at 119–124, 991 A.2d at 93–97 (analyzing the duty owed for fraudulent concealment and negligence together); *Parker*, 91 Md. App. at 367–74, 604 A.2d at 531–535 (reviewing the duty owed for fraudulent concealment, negligent misrepresentation, negligence, and breach of fiduciary duty together); *see also Chubb & Son*, 919 F. Supp. 2d at 674–75 (analyzing the duty owed for negligent misrepresentation and fraudulent concealment in tandem). But, to my knowledge, Maryland's appellate courts have not expressly ruled that an intimate nexus creates a duty to disclose for purposes of fraudulent concealment.[33] And, contrary authority exists. *See, e.g.*, *Odyssey Travel Ctr., Inc.*, 262 F. Supp. 2d at 629 n.8 ("[T]he duty to disclose in a fraudulent concealment case differs from the duty of care in a negligent misrepresentation case.").

The constructive fraud claim raises a similar issue. As noted, constructive fraud requires the defendant to owe a legal or equitable duty to the plaintiff. *Thompson*, 443 Md. at 69, 115 A.3d at 138; *Canaj, Inc.*, 391 Md. at 421–22, 893 A.2d at 1095. At least two judges of this court have concluded that an intimate nexus qualifies as a "legal duty" for purposes of the tort of constructive

---

[33] In both *Blondell* and *Parker*, the courts found that no duty existed. *Blondell*, 413 Md. at 124, 991 A.2d at 97; *Parker*, 91 Md. App. at 374, 604 A.2d at 535.

fraud. *See Al-Sabah,* 2020 WL 3868989, at *22 (D. Md. July 9, 2020) (concluding that, because each defendant "plausibly owed the plaintiff a tort duty" (*i.e.*, an intimate nexus), the plaintiff "alleged a duty sufficient to maintain a constructive fraud claim"); *Dierker*, 888 F. Supp. 2d at 656 ("Although [constructive fraud] often involves the breach of a fiduciary duty, no authority bars a constructive fraud claim on the basis of a legal duty of care under negligence principles.") (footnotes omitted). But, this conclusion is seemingly at odds with *Thompson*, 443 Md. at 69 n.13, 115 A.3d at 138 n.13, in which the court said: A defendant owes a "legal duty" to a plaintiff "where a statute or Maryland Rule requires the defendant to meet an obligation for the plaintiff." It also appears to conflict with *Chassels*, 235 Md. App. at 16, 174 A.3d at 905, because there the court stated that a confidential relationship is a "prerequisite" to a constructive fraud claim.

These nuanced issues require input from the parties. To the extent that an intimate nexus is sufficient to create a duty to disclose for purposes of fraudulent concealment and a "legal duty" for purposes of constructive fraud, then my conclusion above that the TAC plausibly alleges an intimate nexus between Thompson, UMB, and Compass would preclude dismissal of these claims. On the other hand, if a confidential relationship is necessary to maintain an action for fraudulent concealment by nondisclosure or a constructive fraud claim, then I will consider that issue at the summary judgment stage, with the benefit of argument from the parties on the subject. In any event, Compass was at least arguably in a confidential relationship with Thompson and UMB.

At this juncture, I decline to dismiss the fraudulent concealment (Count IX) and constructive fraud (Count X) claims.

### D. The DOE Defendants

The TAC states: "Defendants DOES 1-10 are presently unknown to Plaintiffs. They include, for example, any Compass entities, executives, employees, agents, or other affiliates who

were active participants in the scheme to defraud Professor Thompson and/or misappropriate the Psilocybin Trade Secrets. Their exact identities and actions can be uncovered through discovery into [Compass's] misappropriation of the Psilocybin Trade Secrets and the other causes of action. Plaintiffs will amend its complaint to identify the DOE defendants at an appropriate time." ECF 81 at 6–7.

Compass argues that the "unnamed Doe defendants are not proper parties, pursuant to Fed. R. Civ. P. 12(b)(6), because Plaintiffs fail to state a plausible claim (or any claim whatsoever) against them." ECF 93-1 at 35. According to Compass, because the TAC "is devoid of factual allegations about these individuals or identities" and plaintiffs "do not explain how the conduct of any 'Compass entities, executives, or employees' would be separate from the alleged wrongdoing by Compass", the Doe Defendants "must be dismissed." *Id.* at 35–36.

Unlike the rules in some states, the Federal Rules of Civil Procedure do not contain a mechanism for naming a John Doe defendant. As Judge Chuang has explained: "Rule 10(a) requires plaintiffs in their pleadings to 'name all the parties' to the action. Rule 4(a)(1) requires that a summons 'name . . . the parties' and "be directed to the defendant.'" *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Cont'l Food Prod., Inc.*, TDC-14-0380, 2014 WL 7240264, at *2 (D. Md. Dec. 16, 2014) ("*Bakery*").

Although "[t]he designation of a John Doe defendant is generally not favored in the federal courts," such a designation "is appropriate . . . when the identity of the alleged defendant is not known at the time the complaint is filed and the plaintiff is likely to be able to identify the defendant after further discovery." *Chidi Njoku v. Unknown Special Unit Staff*, No. 99-7644, 2000 WL 903896, *1 (4th Cir. July 7, 2000) (per curiam) (citing *Roper v. Grayson,* 81 F.3d 124, 126 (10th Cir. 1996); *Gillespie v. Civiletti,* 629 F.2d 637, 642 (9th Cir. 1980)); *see Schiff v. Kennedy*, 691

F.2d 196, 197–98 (4th Cir. 1982). And, plaintiffs argue that discovery will allow them "to uncover the full extent of Compass's malfeasance and, if appropriate, bring suit against all individuals and/or entities who orchestrated Compass's misconduct." ECF 102 at 38.

District courts are vested with discretion to determine whether a doe defendant should be dismissed. *See, e.g.*, *Attkisson v. Holder*, 925 F.3d 606, 628 (4th Cir. 2019) ("We . . . defer to the wisdom of the district judge in dismissing the John Doe defendants."); *Schiff*, 691 F.2d at 198 (stating that the "district court is in a better position than we now are . . . to ascertain whether the case against Doe should be now permitted to proceed or whether the case at this stage should be terminated.").

Plaintiffs highlight that "'John Doe pleading is appropriate when a plaintiff knows a defendant exists, but cannot identify that defendant by name.'" ECF 102 at 38 (quoting *Bakery*, 2014 WL 7240264, at *2). But, plaintiffs have made no such allegation here, nor is there any basis for the Court to make such a finding. Moreover, plaintiffs have not asserted any factual allegations against the Doe Defendants. *See Hollandsworth v. City & Cnty. of Honolulu*, 440 F. Supp. 3d 1163, 1185 (D. Haw. 2020) ("While a plaintiff may refer to unknown defendants as Defendant John Doe 1, John Doe 2, John Doe 3 . . . he must go further and allege facts to support how each particular doe defendant violated the law.") (citation and internal quotations omitted); *Pair v. Alexander*, GLR-16-1492, 2018 WL 1583472, at *1 n.2 (D. Md. Apr. 2, 2018) (dismissing claims against John Doe defendants on the ground that the plaintiff "d[id] not raise specific allegations against" them); *Bakery*, 2014 WL 7240264, at *3 (dismissing John Doe defendants because plaintiffs provided no factual allegations tending to establish their existence and stating that, although plaintiffs "may suspect" that such defendants exist, "that suspicion, without more, is not enough to make the generally disfavored device of a John Doe pleading appropriate."); *Williams*

*v. Burgess*, 3:09-CV-115, 2010 WL 1957105, at *3 (E.D. Va. May 13, 2010) (the "complaint must provide each John Doe defendant with fair notice of the specific facts upon which his individual liability rests."); *but see Johnson v. Md. Dep't of Transp.*, ELH-18-1059, 2018 WL 6111779, at *10 (D. Md. Nov. 21, 2018) (declining to dismiss John Doe defendants because "plaintiff has raised specific allegations against each" of them).

The TAC and its exhibits have identified the names of individuals accused of wrongdoing. Yet, plaintiffs have not named those individuals as defendants. For example, Dr. Hurley and Dr. Malievskaia are expressly mentioned throughout the TAC.[34] Count VII, alleging fraudulent misrepresentation, states, ECF 81, ¶ 100: "Compass, acting at least through Dr. Ekaterina Malievskaia and Dr. Shaun Hurley, knowingly made numerous fraudulent misrepresentations to Professor Thompson . . . throughout 2019, under the guise of seeking to collaborate with UMB." Further, Count VII alleges, *id.* ¶¶ 111–112: "Compass, acting at least through Dr. Ekaterina Malievskaia and Dr. Shaun Hurley, knew that the statements above were false, or at the very least the statements were made with such a reckless indifference to the truth as to be equivalent to actual knowledge. The purpose of the misrepresentations were to defraud UMB and Professor Thompson, including by fraudulently acquiring the Psilocybin Trade Secrets and other confidential

---

[34] In the Opposition, plaintiffs state that Nathan Poulsen, "General Counsel and Chief Legal Officer of Compass's wholly-owned U.S. subsidiary at the relevant time," "was named as an inventor on Compass's '611 Application, in which Compass improperly disclosed trade secrets, as well as Compass's '610 patent application, in which Compass improperly tried to claim the Psilocybin Trade Secrets as its own." ECF 102 at 24 (citations omitted). The TAC appears to attribute wrongdoing to a number of other individuals. ECF 81, ¶ 49 (citing ECF 67-9; ECF 67-23; ECF 67-24) ("Many of the inventors listed on these patent applications are the same Compass employees who were involved in the communications with Professor Thompson and Professor Gould starting in May 2019—they were included on email correspondence, attended meetings with Professor Thompson and Professor Gould, and had access to the Psilocybin Trade Secrets. This group of Compass employees included at least Dr. Malievskaia, Dr. Hurley, Hans Eriksson, Nathan Poulsen, Lars Wilde, Anais Soula, George Goldsmith, and Manon Veraart.")

information in order to misappropriate such information." The TAC asserts similar allegations against Dr. Hurley and Dr. Malievskaia in Count VIII, alleging negligent misrepresentation, *see id.* ¶¶ 116, 119; in Count IX, alleging fraudulent concealment, *see id.* ¶ 124; and in Count X, alleging constructive fraud, *see id.* ¶ 128.

The TAC also alleges that Dr. Malievskaia and her husband, Compass Co-Founder and Chairman George Goldsmith, "have been publicly accused of deceptive schemes similar to the one they executed against UMB and Professor Thompson." ECF 81, ¶ 51.[35] The TAC alleges: "Goldsmith was the purported signatory of the NDA with Professor Thompson on behalf of Compass, although Compass now contends that he never actually signed the document." ECF 81, ¶ 51 (citing ECF 67-19 at 4). The signature page of the NDA identifies Goldsmith's name below the signature line, but it does not contain his signature. ECF 67-19 at 4.

By virtue of the allegations in the TAC, it is evident that plaintiffs know the identities of Dr. Hurley, Dr. Malievskaia, and Goldsmith, among others. Plaintiffs chose not to name them as defendants. But, there is no basis to permit the suit as to the Doe Defendants. Those defendants shall be dismissed.

## V. Duplicative Claims: Counts IV through X

Compass asks the Court to "dismiss some or all of Counts IV through X (respectively, detrimental reliance/promissory estoppel, unjust enrichment, quantum meruit, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, and constructive fraud) as duplicative and wasteful." ECF 93-1 at 33. In its view, the Court should "exercise its authority

---

[35] In opposing plaintiffs' Third Motion to Amend, Compass, in essence, asked the Court to strike these allegations pursuant to Fed. R. Civ. P. 12(f). *See* ECF 68 at 19–20; ECF 79 at 23 (Memorandum Opinion). I denied that request, ruling that the allegations were pertinent to "'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" ECF 79 at 34 (quoting Fed. R. Evid. 404(b)(2)).

'to dismiss duplicative claims where they allege the same facts and the same injury,' in order 'to avoid confusion and duplicated effort.'" *Id.* at 31 (quoting *Cmty. Coll. of Balt. Cnty.*, 595 F. Supp. 3d at 417–18).

Plaintiffs counter that "the law is clear" that they "'may plead alternative theories of liability, indeed as many theories as the facts will fit.'" ECF 102 at 33 (quoting *Polar Commc'ns Corp. v. Oncor Commc'ns, Inc.*, 927 F. Supp. 894, 896 (D. Md. 1996) (citing Fed. R. Civ. P. 8(e) (2)). They insist that is exactly what they have done here. ECF 102 at 33.

Claims are duplicative if they "stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010) (citing *McGee v. District of Columbia*, 646 F. Supp. 2d 115, 121-22 (D.D.C. 2009)). But, a district court "has discretion to dismiss duplicative claims where they allege the same facts and the same injury." *C&K NuCo, LLC v. Expedited Freightways, LLC*, 13 C 4006, 2014 WL 4913446, at *12 (N.D. Ill. Sept. 30, 2014); *see W. Veg-Produce, Inc. v. The Lexy Group*, 2:18-cv-00180-ODW, 2018 WL 1804689, at *5 (C.D. Cal. Apr. 16, 2018) ("'A court may dismiss duplicative claims in its discretion.'") (quoting *DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 18 (D.D.C. 2014)); *Wultz*, 755 F. Supp. 2d at 81 ("As a matter of judicial economy, courts should dismiss a claim if it is duplicative of another claim in the same suit.").

## A. Contract Claims

Dr. Thompson and UMB assert a "Quantum Meruit/Implied-In-Fact Contract" claim (Count VI) and two quasi contract claims: "Detrimental Reliance/Promissory Estoppel" (Count IV) and unjust enrichment (Count V). In the alternative, Thompson asserts a breach of contract claim (Count XI).

Both parties have relied upon Maryland case law in their briefing but have not expressly addressed the issue of choice of law. And, unlike the choice of law issue with respect to the tort claims, this issue does not appear to be straightforward.[36] For these reasons, at this juncture, I will apply Maryland law. *See, e.g.*, *Timilon Corp. v. Empowerment Just. Ctr. Corp.*, DKC 23-1134, 2024 WL 3276319, at *8 (D. Md. July 2, 2024) ("Because it is unclear where the contract was formed, neither party discusses choice of law, and courts need not address choice of law sua sponte, the court will assume that Maryland law governs."); *Al-Sabah*, 2020 WL 3868989, at *15 (presuming that Maryland law applied because the parties relied on it and did not identify "any relevant legal principles that might differ in other jurisdictions").

Under Maryland law, a contract may be express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (citation omitted). A contract implied-in-fact, or an "'implied contract,'" is "'an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men.'" *Cty. Comm'rs of Caroline Cty. v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000) ("*Dashiell*")

---

[36] With respect to contract claims, Maryland generally applies the doctrine of *lex loci contractus*, meaning the law of the place where the contract is made. *Oliveira v. Sugarman*, 451 Md. 208, 233 n.17, 152 A.2d 728, 743 n.17 (2017); *see Konover Prop. Tr., Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490–92, 790 A.2d 720, 728–29 (2002) ("*Konover*") (*lex loci contractus* applies to claims for unjust enrichment); *Macsherry v. Sparrows Point, LLC*, ELH-15-22, 2017 WL 3315262, at *11 (D. Md. Aug. 3, 2017) ("Because an action for promissory estoppel is tantamount to an action to enforce a contract, it is likely that a Maryland court would apply the doctrine of *lex loci contractus*."). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover*, 142 Md. App. at 490, 790 A.2d at 728. Based on the allegations in the TAC, it is not readily apparent where the last act necessary to form an express contract (Count XI) or implied-in-fact contract (Count VI) took place.

(citation omitted). An implied-in-fact contract is "actually a contract." *Alternatives Unlimited, Inc.*, 155 Md. App. at 478, 843 A.2d at 289. Maryland courts have said that an implied-in-fact contract arises when "specific services are requested by the defendant." *Mogavero v. Silverstein*, 142 Md. App. 259, 281, 790 A.2d 43, 55 (2002). But, an implied-in-fact contract also "is 'inferred from conduct of parties and arises where plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefore, and defendant, knowing such circumstances, avails himself of [the] benefit of those services.'" *Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 (citation omitted).[37]

A contract implied in law, known as a "quasi-contract," is a "[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *Maryland Cas. Co.*, 442 Md. at 707, 114 A.3d 676 at 689 (emphasis omitted). "'[U]nlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. *They are obligations created by law for reasons of justice.*'" *Mohiuddin v. Doctors Billing & Management Solutions, Inc.*, 196 Md. App. 439, 449, 9 A.3d 859, 865 (2010) (citation omitted) (emphasis in *Mohiuddin*).

In Maryland, a quasi-contract claim of unjust enrichment is established when: "(1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit;

---

[37] In Count VI, Professor Thompson and UMB assert a claim titled: "Quantum Meruit/Implied-In-Fact Contract." ECF 81 at 33 (bolding omitted). Although one of the allegations in that count states that an "implied-*in-law* contract can be inferred by the intention of the parties", *id.* ¶ 104 (emphasis added), Thompson and UMB have clarified that the statement was a "mistake." ECF 102 at 36 n.21. Given that the count is titled "Quantum Meruit/Implied-*In-Fact* Contract," and pleads the elements of an implied-in-fact contract, it appears that the isolated reference to an "implied-in-law" contract was a typographical error. ECF 81 at 33 (bolding omitted, emphasis added).

and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson v. State*, 389 Md. 615, 651-52, 887 A.2d 525, 546 (2005) (citation omitted). Detrimental reliance or promissory estoppel, another type of quasi-contract claim, is "a device for contractual recovery, when an element of a traditional bilateral contract is lacking." *Maryland Transp. Auth. Police Lodge No. 34 of Fraternal Ord. of Police, Inc. v. Maryland Transp. Auth.*, 195 Md. App. 124, 218, 5 A.3d 1174, 1229 (2010). The detrimental reliance of the promisee serves as a substitute for the missing contractual element, such as acceptance or consideration. *See id.* at 213–15, 5 A.3d at 1226–27 (reviewing cases). "An action for detrimental reliance or promissory estoppel requires the plaintiff to show (1) a clear and definite promise by the defendant; (2) the defendant had a reasonable expectation that the offer will induce action or forbearance on the part of the plaintiff; (3) the plaintiff actually and reasonably relied on the promise; and (4) the promise caused a detriment which can only be avoided by the enforcement of the promise." *Frozen Wheels, LLC*, 2021 WL 2226175, at *4.

In the suit, there are two distinct "true" contracts at issue. The implied-in-fact contract claim alleges the breach of a contract grounded in a mutual understanding that Compass would compensate Thompson and UMB for the information that Thompson provided to Compass. ECF 81, ¶¶ 106–108. The breach of contract claim alleges the breach of the NDA between Compass and Thompson. *Id.* ¶¶ 132–135. As to the quasi-contract claims, Count IV, which alleges promissory estoppel, is based on the allegation that Compass promised to keep the information that Thompson conveyed to it confidential, but then breached the promise by disclosing the information. *See id.* at 92–97. The unjust enrichment claim (Count V) is founded on the contention that Thompson and UMB provided Compass with information, for which they were never

compensated. *See id.* ¶¶ 98–102. Thus, contrary to Compass's argument, the contract claims are not "[e]ach . . . based on the allegation that Compass promised to keep Thompson's research confidential . . . and then broke that promise by putting the Psilocybin Trade Secrets in Compass's patent application(s)." ECF 93-1 at 32.

Under Maryland law, claims for breach of an implied-in-fact contract, promissory estoppel, and unjust enrichment are not decided under "identical legal standards." *Wultz*, 755 F. Supp. 2d. at 81.[38] Nor are plaintiffs entitled to "identical relief" for each claim if they prevail. *Id.* Compass does not contend otherwise. Thus, the contract claims in the TAC are not duplicative.

To be sure, the Court is mindful that, in general, "no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests." *Dashiell*, 358 Md. at 96, 747 A.2d at 607. However, a plaintiff may plead both contract and quasi-contract "theories in the alternative where the existence of a contract . . . is in dispute." *Swedish Civ. Aviation Admin. v. Project Mgmt. Enterprises, Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002); *see Botts v. Johns Hopkins Univ.*, ELH-20-1335, 2021 WL 1561520, at *18 (D. Md. Apr. 21, 2021); *Whiting-Turner Contracting Co. v. Liberty Mut. Ins. Co.*, 912 F. Supp. 2d 321, 344 (2012); *Alternatives Unlimited, Inc.*, 155 Md. App. at 482, 843 A.2d at 291.

Here, Compass has continuously denied that it signed the NDA. *See, e.g.*, ECF 93-1 at 23 n.7 (". . . the NDA was never signed."); ECF 24-1 at 13 n.2 (In its first motion to dismiss, Compass stated: "The NDA is not signed by Compass."); *id.* at 26 ("If this case were to proceed, Compass would be forced to . . . travel to Maryland to defend itself against claims arising from an NDA it did not sign . . . ."); ECF 51-1 at 14 n.3 (Compass's second motion to dismiss stating that "[t]he

---

[38] I note that an implied-in-fact contract claim and an express contract claim essentially have the same legal standards. But, the breach of contract claim, Count XI, is pled in the alternative. ECF 81, ¶ 132. And, the TAC alleges distinct contracts.

NDA was only signed by Thompson, not by Compass").[39] Thus, the general rule that bars pleading both contract and quasi contract claims concerning the same subject matter is inapplicable. And, Fed. R. Civ. P. 8(d)(2) states: "A party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones." That is precisely what plaintiffs have done.

In sum, the contract claims are not duplicative. But, even if they are, I would decline to exercise my discretion to dismiss them at this juncture.

## B. Tort Claims

As explained, Professor Thompson and UMB assert claims of negligent misrepresentation (Count VIII), and three related fraud claims: fraudulent misrepresentation (Count VII), fraudulent concealment (Count IX), and constructive fraud (Count X).

Compass urges the Court to dismiss "some or all" of these claims because they are "duplicative and wasteful." ECF 93-1 at 33. According to Compass, *id.*: "Each of these claims is based on the allegation that Compass tricked Thompson into disclosing the Psilocybin Trade Secrets by misrepresenting or hiding its 'true' intent, to steal the asserted trade secrets."

Compass's argument primarily focuses on the negligent and fraudulent misrepresentation claims. According to Compass, these claims "contain "nearly identical [allegations], word for word." ECF 105 at 19 (citing ECF 81, ¶¶ 109–121). Compass is correct. But, the Maryland Court

---

[39] Understandably, Compass has not challenged the alleged implied-in-fact contract with Thompson and UMB on the merits. The only claim that concerns the same subject matter as the implied-in-fact contract claim is the unjust enrichment claim (Count V). And, in the context of unjust enrichment, some courts permit an exception to the general rule barring recovery on both contract and quasi-contract claims that involve the same subject matter "when there is evidence of fraud or bad faith." *Dashiell*, 358 Md. at 100, 747 A.2d at 609. Plaintiffs have alleged both fraud and bad faith. Thus, if proven, plaintiffs may be entitled to recover under both their implied-in-fact contract claim and their unjust enrichment claim.

of Appeals has said: "Nothing prohibits a plaintiff from pleading both [fraudulent] and negligent misrepresentation in one declaration and then relying on the same nucleus of facts in an attempt to satisfy the differing burdens of proof on these alternative claims." *Martens Chevrolet, Inc.*, 292 Md. at 337, 439 A.2d at 539. I see no reason to dismiss either of these claims on the ground that they are duplicative.

The claims advanced in Counts VII through X are also not decided under "identical legal standards . . . ." *Wultz*, 755 F. Supp. 2d at 81. For example, negligent misrepresentation and constructive fraud are not intentional torts. *D'Aoust*, 424 Md. at 571, 36 A.3d at 954 (stating that "constructive fraud is not an intentional tort"); *Ellerin*, 337 Md. at 236 n.11, 652 A.2d at 1126 n.11 ("'Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.'") (citation omitted). But, fraudulent misrepresentation and fraudulent concealment are. Moreover, fraudulent misrepresentation and negligent misrepresentation require the defendant to make an affirmative misstatement of fact, while fraudulent concealment does not require the defendant to make any statement at all.

Moreover, as explained above, the claims arguably implicate different legal duties. For negligent misrepresentation, absent privity of contract, the parties must share an "intimate nexus." *Balfour*, 451 Md. at 620–21, 155 A.3d at 457. For fraudulent misrepresentation, no legal duty of care is required. *See Thomas*, 427 Md. at 451 n.18, 48 A.3d at 282 n.18. And, for constructive fraud and fraudulent concealment by non-disclosure, the plaintiff and defendant must generally be in a confidential or fiduciary relationship. *Hogan,* 155 Md. App. at 566, 843 A.2d at 908; *Thompson*, 443 Md. at 69, 115 A.3d at 138.

In sum, although negligent misrepresentation and fraudulent misrepresentation require a plaintiff to prove very similar elements, and the allegations in the TAC with respect to each claim

are virtually identical, the Court declines to dismiss either claim on the basis that these claims are duplicative. As to the remaining claims, to the extent that they are duplicative, I decline to exercise my discretion to dismiss them at this juncture.

## VI. Conclusion

For the foregoing reasons, Compass's Motion to Dismiss the Third Amended Complaint (ECF 93) is granted in part and denied in part. Specifically, I shall dismiss the suit as to Doe Defendants 1–10. The Motion is otherwise denied. Compass shall file an answer to the Third Amended Complaint by March 27, 2025.

An Order follows, consistent with this Memorandum Opinion.[40]


Date:   March 11, 2025                      _____/s/_____
                                           Ellen Lipton Hollander
                                           United States District Judge

---

[40] I shall file this Memorandum Opinion under seal because it contains business information that was filed under seal (*i.e.*, the MLA). The parties shall advise the Court as to whether they object to the lifting of the seal so that the Court may publicly docket this Memorandum Opinion or, alternatively, whether the Court should file a redacted version, omitting the quotations from the MLA contained in Section IV(B).