IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TERRAN BIOSCIENCES, INC., *et al.*

    *Plaintiffs*,

v.

COMPASS PATHFINDER
LIMITED,

    *Defendant*.

Civil Action No. ELH-22-1956

**MEMORANDUM OPINION**

This Memorandum Opinion resolves the motion of defendant Compass Pathfinder Limited ("Compass") to require disclosure of "Trade Secret Identification" prior to the commencement of discovery. ECF 149 ("Motion"). Compass is a biotechnology company incorporated in England and Wales. Plaintiffs Terran Biosciences, Inc. ("Terran"), a Delaware biotechnology corporation with its principal place of business in New York; the University of Maryland, Baltimore ("UMB"); and Scott Thompson, Ph.D., formerly Professor of Physiology and Chair of the Department of Physiology at the University of Maryland, Baltimore, School of Medicine, oppose the Motion. ECF 153 ("Opposition"). Defendant has replied. ECF 156 ("Reply"). Terran and Compass are both engaged in the development of a mental health therapy that involves psilocybin, a hallucinogenic compound.

Terran filed suit on August 5, 2022. ECF 1 ("Complaint"). On April 6, 2023, before the Court resolved Compass's Motion to Dismiss the Complaint (ECF 24), Terran moved to amend the Complaint. ECF 32 ("First Motion to Amend"). The First Motion to Amend was granted by Order of April 7, 2023 (ECF 33), and the First Amended Complaint followed. ECF 34. Then, on May 19, 2023, Terran moved to file a Second Amended Complaint. ECF 45 ("Second Motion to

Amend"). Among other things, Terran sought to join Professor Thompson as a plaintiff and add certain counts. *See id.* at 2. Compass did not oppose the motion. ECF 46. By Order of June 2, 2023, I granted the Second Motion to Amend. ECF 47. The Second Amended Complaint followed. ECF 48.

Terran and Thompson subsequently moved for leave to file a Third Amended Complaint, seeking, *inter alia*, to join UMB, a State entity, as a plaintiff. ECF 67 ("Third Motion to Amend"). Compass opposed the motion. ECF 68. By Memorandum Opinion (ECF 79) and Order (ECF 80) of February 6, 2024, I granted the Third Motion to Amend. The Third Amended Complaint (ECF 81, "TAC") is the operative pleading.[1]

In the TAC, plaintiffs allege that Compass engaged in a "malicious and intentional scheme to defraud the State of Maryland and misappropriate highly confidential and sensitive, proprietary information that Terran, UMB, and Professor Thompson spent years and substantial resources to develop." *Id.* ¶ 1. Further, plaintiffs allege, *inter alia*, that Compass fraudulently misappropriated the "Psilocybin Trade Secrets," which, in general, pertain to a mechanism to reduce or eliminate the hallucinatory effects of psilocybin while retaining its antidepressant benefits. *Id.* ¶¶ 1, 25, 26. Whether the alleged trade secrets are adequately identified in the TAC is central to the Motion.

In the proverbial "kitchen sink" approach, the TAC contains eleven counts, supported by twenty-seven exhibits. *See* ECF 67-2 through ECF 67-28.[2] Count I, lodged by Terran and UMB, asserts misappropriation of trade secrets, in violation of the Defend Trade Secrets Act ("DTSA"),

---

[1] On May 19, 2025, plaintiffs moved for leave to file a fourth amended complaint and to join two defendants to the suit. ECF 157. The matter is pending.

[2] These documents were included as exhibits to the Third Motion to Amend (ECF 67), rather than as exhibits to the TAC. *See id.* Nonetheless, I understand the TAC to incorporate the exhibits by reference.

18 U.S.C. § 1831 *et seq.* And, Count II, brought by all plaintiffs, asserts misappropriation of trade secrets, in violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code (2013 Repl. Vol., 2022 Supp.), § 11-1201 *et seq.* of the Commercial Law Article ("C.L.").[3] Count III, brought by all plaintiffs, alleges unfair competition. Counts IV through X are brought by UMB and Thompson. Count IV asserts "Detrimental Reliance/Promissory Estoppel"; Count V asserts unjust enrichment; Count VI asserts "Quantum Meruit/Implied-In-Fact Contract"; Count VII alleges fraudulent misrepresentation; Count VIII alleges negligent misrepresentation; Count IX asserts fraudulent concealment; and Count X alleges constructive fraud. Count XI is brought solely by Thompson and alleges breach of contract.

Defendants moved to dismiss the TAC, pursuant to Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(6). ECF 93; ECF 93-1. Under Rule 12(b)(2), Compass contended that the Court lacks personal jurisdiction, both specific and general. ECF 93-1 at 11. Pursuant to Rule 12(b)(6), Compass also sought dismissal of the DTSA claim, as well as the claims for fraudulent misrepresentation, negligent misrepresentation, constructive fraud, and fraudulent concealment. *Id.* at 11, 12. In addition, pursuant to Rule 12(b)(6), Compass urged dismissal of the other defendants named in the TAC, ten "John Does," claiming the TAC fails to assert any factual allegations against them. *Id.* at 12. Moreover, Compass contended that certain counts in the TAC are duplicative and, on this basis, Compass asked the Court to dismiss some of those claims to "preserve resources." *Id.*

---

[3] Based on the DTSA claim, subject matter jurisdiction is founded on 28 U.S.C. § 1331. ECF 81, ¶ 14. With regard to plaintiffs' State law claims, the Court may exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367. In any event, the Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship and the amount in controversy exceeds $75,000. ECF 81, ¶ 16.

By Memorandum Opinion (ECF 122) and Order (ECF 123) of March 11, 2025, the Court dismissed the Doe Defendants, but otherwise denied the motion. ECF 128 (public, redacted version of the Memorandum Opinion). Compass filed an answer to the Third Amended Complaint on March 27, 2025. ECF 124.

Thereafter, in a "Joint Conference Report" of April 16, 2025, the defense raised the issue of trade secret identification. *See* ECF 135 at 2–3. The matter was also raised during a telephone status conference held on April 21, 2025 (ECF 137). *See* ECF 138. By letter of April 21, 2025 (*id.*), I reiterated what I told the parties during the telephone conference: the Court would not resolve the dispute during a telephone conference. *Id.* at 1. Therefore, I directed Compass to file a written motion, and promulgated a briefing schedule. *Id.* at 1–2.

The Motion (ECF 149) is supported by four exhibits, ECF 149-1 through ECF 149-4, all of which are scientific articles concerning psilocybin. According to Compass, the TAC "does not provide Compass with any notice of the trade secrets at issue in this case." ECF 149 at 7. Defendant argues, *id.* at 6 (emphasis in ECF 149): "To have a full and fair opportunity to defend itself, Compass needs to understand what ***specifically*** it is accused of misappropriating." Compass contends that the TAC "merely describes the well-known combination of two drugs" and merely refers to "generic categories devoid of specifics." *Id.* at 7.

In plaintiffs' view, the Motion is "unnecessary because [the TAC] already identifies with particularity the claimed trade secrets." *Id.* at 4. Plaintiffs also contend that Compass's arguments are "about the merits of whether Plaintiffs' discoveries constitute trade secrets at all." *Id.* According to plaintiffs, such arguments are "not the proper subject of a motion for identification of trade secrets." *Id.*

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I. Factual Background

The parties are familiar with the facts, which have been summarized by the Court in several earlier opinions. *See*, *e.g.*, ECF 79; ECF 112; ECF 128.[4] I include here the facts pertinent to the Motion, drawn largely from the TAC.

According to plaintiffs, in November 2016, while Dr. Thompson worked at UMB, he "began working on the idea of the administration of psilocybin in the presence of a 5-HT2A antagonist (including ketanserin) as a potential rapid, non-hallucinogenic antidepressant therapy." ECF 81, ¶ 1.[5] Plaintiffs concede that, "[a]t the time, it was known that 5-HT2A antagonists like ketanserin reduce or eliminate the negative hallucinogenic effects of psilocybin." *Id.* However, "Professor Thompson recognized that psilocybin's antidepressant therapeutic effects are independent of significant 5-HT2A receptor activation that causes hallucinations, and discovered that, through the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, a patient could receive the antidepressant benefits of psilocybin, without being subject to the negative hallucinogenic effects." *Id.* Therefore, "[o]ver the next few years, Professor Thompson engaged in extensive research . . . related to the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, in order to produce the optimal non-hallucinatory and anti-depressive effects." *Id.* ¶ 25. "Further research" conducted by

---

[4] I incorporate the factual and procedural summary set forth in the Memorandum Opinion of April 1, 2025 (ECF 128), resolving Compass's motion to dismiss (ECF 93) the TAC (ECF 81).

[5] Dr. Thompson is now a Professor of Psychiatry at the University of Colorado Anschutz School of Medicine. ECF 81, ¶ 11.

Thompson "related to the optimal time points, frequency, and dosing for the sequential administration of the two drugs in combination." *Id.*

Plaintiffs assert, *id.* ¶ 26: "The inventions derived from, and the results of, this research constitute the Psilocybin Trade Secrets." Consistent with the TAC, I shall refer to the information outlined by plaintiffs in ECF 81, ¶¶ 25–27, as the "Psilocybin Trade Secrets."[6]

Based on UMB's employment contract with Dr. Thompson, UMB is the owner of the Psilocybin Trade Secrets. *Id.* ¶ 26. Dr. Thompson receives "a portion of the revenues that UMB generates from his inventions . . ., including the Psilocybin Trade Secrets." *Id.* (citing ECF 67-15 at 4–5). UMB, as owner of the Psilocybin Trade Secrets, entered into a Master License Agreement ("MLA") with Terran on May 7, 2021. ECF 81, ¶ 52. Pursuant to the MLA, UMB "exclusively licens[ed] to Terran" the Psilocybin Trade Secrets. *Id.* "Terran licensed the Psilocybin Trade Secrets so it could bring a groundbreaking rapid, non-hallucinogenic antidepressant therapy to market." *Id.* ¶ 7. Moreover, "the MLA grants Terran the right to institute any action for misappropriation of any Psilocybin Trade Secret that has existed at any period in time, including prior to the MLA." *Id.* ¶ 53.

On August 13, 2019, Thompson and UMB "filed U.S. Provisional Patent Application No. 62/886,080 ('the '080 Application'), entitled 'Combination Therapy with Broad Spectrum Serotonergic Agonists and Anti-Hallucinogenic Serotonergic Antagonists.'" *Id.* ¶ 28 (quoting ECF 67-16).[7] Although the "'080 Application generally disclosed co-administering psilocybin

---

[6] To be clear, I utilize the phrase "Psilocybin Trade Secrets" for convenience and consistency; the usage is not a ruling or suggestion that the information does, in fact, constitute a trade secret.

[7] Plaintiffs cite Exhibit 15 to the Third Motion to Amend (ECF 67-16) in support of their assertion that "Professor Thompson and UMB filed U.S. Provisional Patent Application No. 62/886,0**8**0" on August 13, 2019. ECF 81, ¶ 28 (boldface added). However, that patent application

and an antagonist," it "did not go into detail about the specifics of the sequential administration of a 5-HT2A antagonist followed by psilocybin, or the optimal order, time points, frequency, or dosing for the therapy, all of which Professor Thompson maintained as trade secrets pending further experimental data." ECF 81, ¶ 28. Indeed, Thompson and UMB held the Psilocybin Trade Secrets in "strict confidence" and "did not disclose [them] to anyone except by non-disclosure agreements or other confidentiality obligations." *Id.* ¶ 27.

In May 2019, Ekaterina Malievskaia, M.D., MScPH, "the Co-Founder and Head of Research and Development of Compass,"[8] emailed Todd Gould, Professor of Psychiatry at UMB. *See* ECF 67-17 at 3–4. Malievskaia stated that Compass was "developing psilocybin for treatment-resistant depression" and requested a telephone call with Gould to discuss the "molecular mechanisms of psilocybin." *Id.* Gould, in turn, suggested the involvement of Thompson. *Id.* at 2. Malievskaia encouraged Gould to invite Thompson to participate in the telephone call. ECF 67-20 at 2.

Prior to the telephone discussion, at the direction of Dr. Malievskaia, a Compass employee sent Dr. Thompson a nondisclosure agreement ("NDA") for his signature. *Id.*; *see also* ECF 67-19 (NDA). "By its terms, the NDA would prohibit Compass from using any information disclosed by Professor Thompson or his colleagues other than 'in connection with exploring possible business arrangements between [Compass and Professor Thompson] and/or their

---

is numbered "62/886,0**9**0." (Boldface added). The Court has identified this inconsistency twice. *See* ECF 79 at 4 n.3; ECF 128 at 6 n.4. But, plaintiffs continue to refer to the application as the "'080" application. Therefore, I have done the same.

[8] In Dr. Malievskaia's Declaration (ECF 93-3), filed as an exhibit to Compass's Motion to Dismiss the TAC (ECF 93), she states: "I am currently Chief Innovation Officer of Compass Pathways plc, the parent company of Compass Pathfinder Limited ('Compass'). I co-founded Compass in 2016." ECF 93-3, ¶ 2.

Affiliates.'" ECF 81, ¶ 30 (quoting ECF 67-19 at 2) (alteration in TAC). Thompson executed the NDA and sent it to Compass. ECF 81, ¶ 3, 30; ECF 67-18 at 2.[9] Unknown to Dr. Thompson, Compass never countersigned the NDA. ECF 81, ¶ 30 (citing ECF 24-1 at 18); *see also* ECF 81, ¶ 3, 33, 110; ECF 67-19 at 4 (signature page of the NDA, which does not contain Compass's signature); ECF 67-20 at 2. According to the TAC, Dr. Malievskaia and Dr. Hurley, a research scientist at Compass, fraudulently misrepresented that Compass did so. ECF 81, ¶ 110.

On June 13, 2019, at Dr. Malievskaia's request, Dr. Thompson and Dr. Gould sent Compass a "scientific proposal and a proposed budget to study the administration of psilocybin in the presence of ketanserin . . . ." ECF 81, ¶ 32; *see* ECF 67-21 at 3–4.[10] In response, Dr. Hurley stated, ECF 67-22 at 2: "Overall, we believe that your proposal focuses on some very interesting and important questions. To our knowledge, these studies would provide the first direct evidence for the requirements (or not) of AMPAR and for 5-HT2R function in the antidepressant actions of psilocybin." Dr. Hurley also stated, *id.* at 3: "We are especially excited by the potential to evaluate the efficacy of psilocybin in the presence of ketanserin, as clearly this information also has considerable clinical value."

Thereafter, for approximately six months, Compass, Gould, and Thompson engaged in communications via email and telephone in contemplation of a collaboration agreement. ECF 81, ¶ 3. During this time, Gould and Thompson received and answered substantive questions that Dr. Hurley posed in regard to the research proposal. *Id.* ¶ 33; ECF 67-21 at 2; ECF 67-22; ECF 67-

---

[9] Compass also sent Gould a NDA. *See* ECF 67-20 at 2. But, the TAC does not specify whether Gould ever returned a signed NDA.

[10] The Court was not provided with a copy of the proposal.

23.  Moreover, "[d]uring the course of these communications, Professor Thompson disclosed to Compass" certain details of the Psilocybin Trade Secrets.  ECF 81, ¶ 34.

In October 2019, Compass sent UMB a revised collaboration agreement.  *Id.* ¶ 38.[11] However, on November 20, 2019, Hurley emailed Thompson, stating that "Compass was 'unable to proceed with the collaboration' and declined to fund Professor Thompson's experiments."  *Id.* ¶ 39 (quoting ECF 67-24).

Plaintiffs later discovered that on August 29, 2019, Compass filed U.S. Provisional Patent Application No. 62/893,611 ("the '611 Application"), "without telling Professor Thompson or UMB."  ECF 81, ¶ 41.  The application included disclosure of "the sequential administration of a 5-HT2A antagonist (expressly including ketanserin) followed by psilocybin to reduce [psilocybin's] negative side effects . . . ."  *Id.*  Yet, the '611 Application did "not include any data regarding this combination."  *Id.* (citing ECF 67-7).  Plaintiffs contend that Compass filed the '611 Application even though, when it "first began talking with Professor Thompson and Professor Gould, it had not been researching the combination of psilocybin with a 5-HT2A antagonist, and had no knowledge about that subject."  ECF 81, ¶ 40.

Plaintiffs assert that Compass "stole the ideas for the '611 Application from Professor Thompson and disclosed them in its own patent application."  *Id.* ¶ 41.  According to plaintiffs, the '611 Application contains "glaring" indicators of the theft, including the speed with which it was filed.  *Id.* ¶ 44.

In addition, the '611 Application contains specific "disclosures regarding the sequential administration of a 5-HT2A antagonist followed by psilocybin . . . including ranges for the sequential order, time points, frequency and dosing of such therapy . . . ."  ECF 81, ¶ 45; *see id.*

---

[11] The Court has not been provided with any drafts of a collaboration agreement.

¶ 46 (citing ECF 67-7 at 265).  Notably, plaintiffs allege, ECF 81, ¶ 46: "As of August 29, 2019, Professor Thompson had not made any public disclosure of these aspects and details of his Psilocybin Trade Secrets, nor did he disclose them in his August 13, 2019 provisional patent application . . . ."  According to plaintiffs, "the purpose" of these disclosures "in the '611 Application was to claim the Psilocybin Trade Secrets as Compass's own invention, and/or to preemptively block Professor Thompson and UMB from securing patent rights over the Psilocybin Trade Secrets . . . ."  *Id.*

Since 2019, Compass has filed at least four additional United States patent applications, "with specification disclosures involving the sequential administration of a 5-HT2A antagonist followed by psilocybin."  *Id.* ¶ 48.  In particular, on October 18, 2021, "Compass filed U.S. Patent Application No. 17/604,610" (the "'610 Application").  *Id.*  It included claims to "aspects of the Psilocybin Trade Secrets, including the sequential administration of a 5-HT2A antagonist followed by psilocybin."  *Id.* (citing ECF 67-25 at 4).  However, on August 25, 2022, before the Patent Office took any action with respect to the '610 Application, Compass "cancelled" its claims to aspects of the Psilocybin Trade Secrets.  ECF 81, ¶ 48 (citing ECF 67-26 at 4).  Plaintiffs assert that Compass cancelled these claims "because Compass's patent prosecution attorneys at Cooley LLP became aware of Compass's misconduct and the fact that no one at Compass actually invented the claimed subject matter . . . ."  ECF 81, ¶ 48.

Also on October 18, 2021, "Compass filed two additional non-provisional applications . . . U.S. Patent Application Nos. 17/604,606 and 17/604,619, which included, in their specifications, aspects and details of the Psilocybin Trade Secrets."  *Id.* ¶ 49.  And, on December 2, 2021, "Compass filed U.S. Patent Application No. 17/540,962, which likewise included aspects and details of the Psilocybin Trade Secrets in its specification."  *Id.*  "That application issued as

U.S. Patent No. 11,564,935." *Id.* (citing ECF 67-9 at 132–33, 149–151). Compass has since "filed U.S. Patent Application No. 18/077,876, a continuation patent application with the same specification." ECF 81, ¶ 49. In addition, Compass has "filed multiple international patent applications" that "disclose aspects and details of the Psilocybin Trade Secrets in their specifications." *Id.* Plaintiffs allege, *id.*: "Many of the inventors listed on these patent applications are the same Compass employees who were involved in the communications with Professor Thompson and Professor Gould starting in May 2019" and "were included on email correspondence, attended meetings with Professor Thompson and Professor Gould, and had access to the Psilocybin Trade Secrets."

## II. Legal Standard

As noted, in Count I Terran and UMB assert a claim under the DTSA. *See* 18 U.S.C. § 1836(b)(1) (addressing private civil actions). Under 18 U.S.C. § 1836(b)(1), "An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." The term "trade secret" is defined as follows, 18 U.S.C. § 1839(3):

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

To prevail on a DTSA claim, the plaintiff must establish: "(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 141 (4th Cir. 2023) (citing *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021)).

Count II asserts a MUTSA claim. Like the DTSA, the MUTSA requires a plaintiff to show that the information at issue "are trade secrets and that the defendant misappropriated those trade secrets." *Aarow Elec. Sols. v. Tricore Sys., LLC*, 693 F. Supp. 3d 525, 538 (D. Md. 2023); *see also* C.L. §§ 11-1201–03.[12] "The DTSA and the MUTSA define a trade secret in 'substantially the same manner.'" *Aarow Elec. Sols.*, 693 F. Supp. 3d at 538 (citation omitted).

Specifically, the MUTSA defines the term trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." C.L. § 11-1201(e).

"Cases involving trade secrets claims follow the normal procedures set by the Federal Rules; however, courts have universally recognized that defining the scope of discovery in trade secrets cases can be particularly difficult, because there is highly sensitive information and proprietary concerns on both sides." *Uni-Sys., LLC v. U.S. Tennis Ass'n*, No. 17CV147KAMCLP, 2017 WL 4081904, at *4 (E.D.N.Y. Sept. 13, 2017); *see also Bytemark, Inc. v. Xerox Corp.*, No. 17 CIV. 1803 (PGG), 2022 WL 120980, at *4 (S.D.N.Y. Jan. 11, 2022) (recognizing that trade

---

[12] Unlike the DTSA, there is no requirement in the MUTSA that the trade secret be used in or intended for use in interstate or foreign commerce.

secret cases present "proprietary concerns" and "difficulty in defining the scope of discovery");
*DeRubeis v. Witten Techs., Inc.*, 244 F.R.D. 676, 679 (N.D. Ga. 2007) ("Trade secret cases present unique and difficult problems with respect to the timing and scope of discovery.").

To combat these concerns, many courts require a plaintiff to identify the claimed trade secret with "reasonably particularity" before proceeding to discovery. *See, e.g.*, *Integrity Sols., Ltd v. MCS Consulting, Inc.*, No. 24-CV-02519-SKC-NRN, 2025 WL 1207597, at *2 (D. Colo. Apr. 25, 2025) (explaining that a plaintiff "'will normally be required first to identify with reasonable particularity the matter which it claims constitutes a trade secret, before it will be allowed . . . to compel discovery of its adversary's trade secrets.'"); *DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 F. App'x 844, 848 (11th Cir. 2016) (per curiam) (explaining that under Florida law, the "'plaintiff is required to identify with reasonable particularity the trade secrets at issue before proceeding with discovery.'") (citation omitted); *Structural Pres. Sys., LLC v. Andrews*, MJG-12-1850, 2013 WL 12244886, at *3 (D. Md. Dec. 17, 2013) (Gauvey, M.J.) (noting that "several district courts have held that a party bringing a trade secrets case must identify its alleged trade secrets with 'reasonable particularity' prior to discovery of its adversaries trade secrets"); *StoneEagle Servs., Inc. v. Valentine*, No. 3:12–CV–1687–P, 2013 WL 9554563, at *2 (N.D. Tex. June 5, 2013) ("The growing consensus seems to be in favor of requiring those plaintiffs bringing claims of trade secret misappropriation to identify, with reasonable particularity, the alleged trade secrets at issue.") (citing cases); *AAR Mfg., Inc. v. Matrix Composites, Inc.*, 98 So. 3d 186, 188 (Fla. Dist. Ct. App. 2012) ("In trade secret misappropriation cases, a plaintiff is required to identify with reasonable particularity the trade secrets at issue before proceeding with discovery."); *Engelhard Corp. v. Savin Corp.*, 505 A.2d 30, 33 (Del. Ch. 1986) ("Where, as here, a plaintiff in a trade secret case seeks to discover the trade secrets and confidential proprietary information of

its adversary, the plaintiff will normally be required first to identify with reasonable particularity the matter which it claims constitutes a trade secret, before it will be allowed (given a proper showing of need) to compel discovery of its adversary's trade secrets."); *see also* ECF 149 at 6 (citing cases).

At least two states, California and Massachusetts, have codified the pre-discovery reasonable particularity requirement. Cal. Civ. Proc. Code § 2019.210 ("In any action alleging the misappropriation of a trade secret . . ., before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity . . . ."); Mass. Gen. Laws ch. 93, § 42D(b) ("Before commencing discovery relating to an alleged trade secret, the party alleging misappropriation shall identify the trade secret with sufficient particularity under the circumstances of the case to allow the court to determine the appropriate parameters of discovery and to enable reasonably other parties to prepare their defense."); *see also* E.D. La. L.R. 26.3 (similar).

Neither the DTSA, the MUTSA, or the Federal or Maryland Rules of Civil Procedure, compel a trade secret claimant to disclose alleged trade secrets with particularity before discovery concerning the trade secrets may proceed. *Commure, Inc. v. Canopy Works, Inc.*, No. 24-CV-02592-NW (VKD), 2025 WL 1150695, at *3 (N.D. Cal. Apr. 18, 2025) (discussing DTSA); *Structural Pres. Sys., LLC*, 2013 WL 12244886, at *3 n.5 (discussing MUTSA). "Nevertheless, for reasons of efficiency and the orderly conduct of discovery, a court may choose to require that a DTSA trade secret claimant comply with" disclosure requirements "before obtaining discovery of an adversary relating to those trade secrets." *Commure, Inc*., 2025 WL 1150695, at *3; *see also Structural Pres. Sys., LLC*, 2013 WL 12244886, at *3 ("Defendants are correct that several district courts have held that a party bringing a trade secrets case must identify its alleged trade secrets

14

with 'reasonable particularity' prior to discovery of its adversaries trade secrets, even in the absence of a state-law requirement.").

Some courts have grounded the authority to order pre-discovery identification in Fed. R. Civ. P. 16(c)(2)(L). *See, e.g.*, *United Servs. Auto. Ass'n v. Mitek Sys., Inc.*, 289 F.R.D. 244, 248–49 (W.D. Tex. 2013), *aff'd*, No. CIV.A. SA-12-CA-282, 2013 WL 1867417 (W.D. Tex. Apr. 24, 2013). Fed. R. Civ. P. 16(c)(2)(L) provides a district court with discretion to "adopt[] special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual problems of proof" at a pretrial conference. *See also* Fed. R. Civ. P. 16(c)(2)(F) (providing the district court with discretion to take action to control or schedule discovery during a pretrial conference). Other courts have grounded the authority in Fed. R. Civ. P. 26(c), which authorizes orders "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." *See, e.g.*, *Structural Pres. Sys., LLC*, 2013 WL 12244886, at *3.

"Courts and commentators have recognized several rationales for requiring pre-discovery disclosure of plaintiff's trade secrets under the Federal Rules, including: (1) discouraging frivolous pleadings, (2) allowing the Court and parties to better determine the scope of discovery, (3) allowing defendant the means to challenge the alleged secrecy of the information at issue; (4) preventing plaintiffs from making overbroad secrecy claims encompassing vast categories of information; (5) ensuring that plaintiff does not mold its cause of action around the discovery it receives; and (6) making discovery more efficient by ensuring that further rounds of depositions and document requests do not become necessary when defendant receives newly-provided information later in the discovery process." *Structural Pres. Sys., LLC*, 2013 WL 12244886, at *3 (citing authorities); *see also Integrity Sols., Ltd v. MCS Consulting, Inc.*, No. 24-CV-02519-SKC-

NRN, 2025 WL 1207597, at *3 (D. Colo. Apr. 25, 2025) (articulating some of the same reasons); *Dumbo Moving & Storage, Inc. v. Piece of Cake Moving & Storage LLC*, No. 22 CIV. 5138 (ER), 2025 WL 219063, at *6 (S.D.N.Y. Jan. 16, 2025) (articulating some of the same reasons).

On the other hand, several policies support "allowing the trade secret plaintiff to take discovery prior to identifying its claimed trade secrets." *DeRubeis*, 244 F.R.D. at 680. These include, *id.*: (1) "a plaintiff's broad right to discovery under the Federal Rules of Civil Procedure"; (2) "the trade secret plaintiff, particularly if it is a company that has hundreds or thousands of trade secrets, may have no way of knowing what trade secrets have been misappropriated until it receives discovery on how the defendant is operating"; and (3) the plaintiff may be placed in a "Catch-22": provide a general list, with the risk that it will encompass information the defendant can show cannot be a trade secret, or provide a specific list, with the risk that it may not account for the breadth of the misappropriated information. "These competing policies can make resolving this type of dispute difficult." *Id.* at 681.

What qualifies as "reasonable particularity" is fact and case dependent. *See Uni-Sys., LLC*, 2017 WL 4081904, at *4; *Structural Pres. Sys., LLC*, 2013 WL 12244886, at *4. There is no uniform standard that can be mechanically applied. *See, e.g.*, *Uni-Sys., LLC*, 2017 WL 4081904, at *4 (noting that definitions of reasonable particularity "vary"); *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, No. 10-CV-02868-MSK-KMT, 2011 WL 10858409, at *2 (D. Colo. Oct. 12, 2011) (noting that "the case law does not provide clear guidance as to how detailed a plaintiff's trade secret disclosures must be."). "It is generally recognized, however, that, at a minimum, 'reasonable particularity' requires that plaintiff disclose sufficient information to (1) put defendant on notice of the nature of the plaintiff's claims and (2) allow defendant to discern the relevancy of any requested discovery to its trade secrets." *Structural Pres. Sys., LLC*, 2013 WL 12244886, at

*4; *see also Plintron Techs. USA LLC v. Phillips*, No. 2:24-CV-00093, 2025 WL 890790, at *1 (W.D. Wash. Mar. 21, 2025) (same); *Uni-Sys., LLC*, 2017 WL 4081904, at *4 (same); *DeRubeis*, 244 F.R.D. at 681 (same).

The reasonable particularity "'standard is flexible and is driven by the Court's discretion.'" *Dumbo Moving & Storage, Inc.*, 2025 WL 219063, at *5 (citation omitted); *Uni-Sys., LLC*, 2017 WL 4081904, at *4 (noting that "the strength of the showing sufficient to identify trade secrets with sufficient particularity varies with the facts and stage of the case."). Thus, a "very general" showing "may be sufficient" to satisfy the standard in certain circumstances. *Uni-Sys., LLC*, 2017 WL 4081904, at *4 (citing *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 147 F. Supp. 3d 1147, 1154 (D. Or. 2015)).

However, "general allegations and generic references to products or information are insufficient to satisfy the reasonable particularity standard." *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, No. 10-CV-02868-MSK-KMT, 2011 WL 10858409, at *2 (D. Colo. Oct. 12, 2011); *see also, e.g.*, *US Thrillrides, LLC v. Intamin Amusement Rides Int. Corp. Est.*, No. 6:22-cv-2338-CEM-DCI, 2023 WL 11693750, at *2–3 (M.D. Fla. Dec. 12, 2023) (finding vague references to "all engineering and design details" or "engineering plans" for certain projects "too broad and too vague to identify trade secrets with any reasonable particularity"); *Uni-Sys., LLC*, 2017 WL 4081904, at *4 (noting that "generic descriptions of categories are insufficient to provide defendants with information sufficient to satisfy the 'reasonable particularity' standard."). Nevertheless, reasonable particularity "does not demand that a plaintiff 'define every minute detail of its claimed trade secret at the outset of litigation' . . . ." *Cisco Sys., Inc. v. Chung*, No. 19-CV-07562-PJH, 2020 WL 7495085, at *9 (N.D. Cal. Dec. 21, 2020) (citation omitted).

## III. Contentions

In defendant's view, the TAC does not "constitute a sufficient trade secret disclosure for at least two reasons." ECF 149 at 8. First, Compass repeatedly claims that the alleged trade secrets cannot be trade secrets, because the information was already available in the public domain. *See, e.g.*, *id.* at 6–7, 8–9. For example, Compass states, *id.* at 7 (quoting ECF 81, ¶¶ 25–26): "The Complaint merely describes the well-known combination of two drugs ('the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin')." "But that cannot be Plaintiffs' trade secret," Compass says, "because long before the first alleged contact between Plaintiffs and Compass,[] multiple researchers ***publicized*** that the administration of 5-HT2A antagonists, including ketanserin, prior to psilocybin administration prevents the latter's hallucinogenic effects." ECF 149 at 8 (emphasis in ECF 149). Second, Compass asserts, *id.* at 7: "The [TAC's] references to 'the optimal time points, frequency, and dosing' are simply generic categories devoid of specifics." Therefore, Compass contends, *id.*: "Plaintiffs must identify what time points, frequency, and dosing they claim to be a trade secret."

Compass complains that it will be "significantly prejudiced" if plaintiffs are not required to "immediately identify" (*id.* at 10) the asserted trade secrets with sufficient particularity. Defendant contends: (1) "[W]ithout an early particularized trade secret disclosure, Plaintiffs can obtain Compass's confidential information via discovery and point to ***absolutely any*** timing, frequency, or dosage in Compass's records as Plaintiffs' trade secrets", *id.* at 10 (emphasis in original); and (2) "Without further particularization of the parameters of Plaintiffs' purported trade secrets, Compass is unable to investigate whether any particular timing, frequency, or dosage was publicly known and, therefore, ineligible to qualify as Plaintiffs' trade secret." *Id.* at 11.

18

Plaintiffs acknowledge the authority permitting courts to require a plaintiff to identify a claimed trade secret with reasonable particularity before discovery is taken. *See* ECF 153 at 5–6. But, citing paragraphs 2, 4, 25–26, 28, 34, 43, 45–46, 48, and 49 of the TAC, plaintiffs argue that the Motion "is unnecessary because [the TAC] already identifies with particularity the claimed trade secrets." *Id.* at 4, 5. Plaintiffs add, *id.*: "If, as discovery progresses, Compass identifies a specific need for additional information, Compass can seek that information through ordinary discovery tools."

Further, plaintiffs argue, *id.* at 4: "Compass's arguments have nothing to do with the particularity with which Plaintiffs allege their trade secrets[]" and "instead are about the merits of whether Plaintiffs' discoveries constitute trade secrets at all." Plaintiffs posit, *id.*: "Courts have routinely held that such merits testing is not the proper subject of a motion for identification of trade secrets." Regardless, plaintiffs argue that Compass's argument is misplaced, because it focuses on information that plaintiffs do not claim as a trade secret. *Id.* at 7. Plaintiffs observe that in paragraph one of the TAC, they "expressly acknowledge that it was 'known that 5-HT2A antagonists like ketanserin reduce or eliminate the negative hallucinogenic effects of psilocybin.'" *Id.* at 4 (quoting ECF 81, ¶ 1). Plaintiffs add, ECF 153 at 4 (quoting ECF 81, ¶ 1): "Paragraph 1 [of the TAC] goes on to explain how Plaintiffs' trade secrets are distinct from that public information—they relate to the discovery that 'through the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, a patient could receive the antidepressant benefits of psilocybin, without being subject to the negative hallucinogenic effects.'"

In response to Compass's argument that plaintiffs should be required to specifically identify the optimal order, time points, frequency and dosing of the psilocybin therapy that Dr. Thompson was developing, plaintiffs assert that "reasonable particularity 'does not demand that a

plaintiff define every minute detail of its claimed trade secret at the outset of litigation.'"  *Id.* at 8 (citation omitted).  Plaintiffs also distinguish a number of the cases cited by Compass, on the basis that those cases involved "generic" or "broad" concepts "that could encompass a wide range of information without guiding limitation." *Id.* at 9.  Plaintiffs maintain that they "have not claimed time points, dosing, frequency, or other parameters as general categories of information[,]" but have instead "tethered" those "parameters . . . to the sequential administration of a 5-HT2A antagonist followed by psilocybin."  *Id.* at 9–10.

Regardless, plaintiffs posit: "Compass is wrong about the facts."  *Id.* at 9.  They assert, *id.*: "The [TAC] does point to specific disclosures in Compass's '611 Patent Application regarding 'ranges for the sequential order, time points, frequency and dosing of such therapy, [that are] based on Professor Thompson's communications with and disclosures to Compass . . . .'" (Quoting ECF 81, ¶¶ 45–46); *see also* ECF 67-7, ¶¶ 8, 9, 19, 20.  Plaintiffs also argue, ECF 153 at 9: "This disclosure goes well beyond a 'generic reference' and the general requirements of reasonable particularity."

In addition, plaintiffs disagree with Compass's argument that, "without an early particularized trade secret disclosure, Plaintiffs can obtain Compass's confidential information via discovery and point to ***absolutely any*** timing, frequency, or dosage in Compass's records as Plaintiffs' trade secrets."  ECF 149 at 10 (emphasis in ECF 149).  They contend, ECF 153 at 11: "That is not a serious concern here where the Complaint *already* puts Compass on pre-discovery notice that these parameters are within the scope of the trade secrets."  (Emphasis in ECF 153).

In sum, plaintiffs argue, *id.* at 10: "Compass elected to bring this motion before any discovery responses had been exchanged and before Plaintiffs have had the opportunity to fairly discover the full extent of Compass's misappropriation.  Accounting for the facts and stage of this

case, the existing disclosure in the Complaint is more than sufficient to balance Plaintiffs' right to discovery with Compass's need for notice."  Plaintiffs add that, if the Court grants the Motion, it should "permit reasonable supplementation by Plaintiffs as discovery progresses."  *Id.* at 11.

In the Reply, defendant characterizes plaintiffs' alleged trade secrets as: "(1) the idea that 'a patient could receive the antidepressant benefits of psilocybin without being subject to the negative hallucinogenic effects' using the sequential administration; and (2) the 'optimal time points, frequency, and dosing' of the two drugs."  ECF 156 at 4 (quoting ECF 153 at 3–4). Compass maintains that this "characterization remains insufficient."  ECF 156 at 4.

According to Compass, because it is does not utilize the sequential administration of ketanserin and psilocybin in "any" manner, the "only live allegation of misappropriation relates to Compass's purported disclosure of Plaintiffs' trade secrets in the '611 Patent Application."  ECF 156 at 4.  But, Compass argues that plaintiffs' attempt to point to the '611 Application "does not salvage" plaintiffs' trade secret disclosure.  *Id.*  This is so, according to defendant, because plaintiffs have criticized the disclosures made in the '611 Application as "'***improperly broad***.'" *Id.* (quoting ECF 81, ¶¶ 45–46) (emphasis in ECF 156).

Defendant explains, ECF 156 at 4 (emphasis in ECF 156): "If, as Plaintiffs claim, their trade secrets are the ***optimal*** time points, frequency, and dosing of the two drugs—*i.e.*, not just broad categories of information—Plaintiffs need to identify those with the requisite specificity." If plaintiffs are "excused from that requirement," argues Compass, plaintiffs "would be free to 'mold its cause of action around the discovery it receives,' which would, in turn, significantly prejudice Compass's ability to defend itself in this case."  *Id.* at 4 (citation omitted).

Compass also acknowledges that some courts have allowed trade secret plaintiffs to take discovery prior to identifying the complete scope of a trade secret, out of concern that the plaintiff

may not know the extent of the misappropriation. *Id.* at 6. But, Compass argues that "there are no such concerns here" because, "as Plaintiffs admit, their allegations are based on a discreet number of disclosures allegedly ***made by Professor Thompson***—a plaintiff in this case." *Id.* (emphasis in ECF 156). Therefore, Compass contends: "Plaintiffs do not need discovery to determine what they themselves allegedly disclosed." *Id.*

## IV. Discussion

Compass contends that the TAC fails to identify the alleged trade secrets with the requisite reasonable particularity. Reasonable particularity does not require absolute particularity. As discussed below, I am amply satisfied that the TAC describes, with reasonable particularity, the alleged trade secrets.

Plaintiffs expressly identify the Psilocybin Trade Secrets as "(i) [Dr. Thompson's] discovery that psilocybin's antidepressant therapeutic effects are independent of the 5-HT2A receptor activation that causes hallucinations, and (ii) his discovery that time-sequenced administration of a 5-HT2A receptor antagonist followed by psilocybin was necessary to achieve the anti-depressant therapeutic effects without hallucinations." ECF 81, ¶ 2. Plaintiffs also expressly identify the "optimal order, time points, frequency, [and] dosing for the therapy" as trade secrets. *Id.* ¶ 28.

The alleged trade secrets referenced in the paragraph above appear consistent with Compass's understanding of the alleged trade secrets. *See* ECF 156 at 4 (defendant articulating its understanding of plaintiffs' alleged trade secrets as: "(1) the idea that 'a patient could receive the antidepressant benefits of psilocybin without being subject to the negative hallucinogenic effects' using the sequential administration; and (2) the 'optimal time points, frequency, and dosing' of the two drugs.") (quoting ECF 153 at 3–4).

Compass's argument in the Motion that the TAC "does not provide Compass with any notice of the trade secrets at issue" is clearly overstated.  ECF 149 at 7.  Indeed, Compass appears to retreat from that argument in the Reply, arguing only that the TAC's reference to the optimal order, time points, frequency, and dosing ("OTFD") for the therapy is insufficiently particularized.  *See* ECF 156.

Defendant posits that plaintiffs "must identify what time points, frequency, and dosing they claim to be their trade secrets."  ECF 149 at 7.  In Compass's view, "'generic references to [] information' do not rise to the level of reasonable particularity.'"  *Id.* at 10 (citation omitted; alteration in ECF 149).  Therefore, the crux of this dispute boils down to whether the OTFD information is sufficiently identified in the TAC.

The TAC appears specifically to identify the optimal order of the therapy.  It repeatedly references the sequential administration of ketanserin, "followed by psilocybin."  *See, e.g.*, ECF 81, ¶ 1 ("Professor Thompson . . . discovered that, through the sequential administration of ketanserin (or other 5-HT2A antagonists) *followed by* psilocybin, a patient could receive the antidepressant benefits of psilocybin, without being subject to the negative hallucinogenic effects.") (emphasis added); *id.* ¶ 73 ("The Psilocybin Trade Secrets are directed towards methods of treating depression and other mental health issues with the sequential administration of a 5-HT2A antagonist *followed by* psilocybin.") (emphasis added); *see also* ECF 153 at 10 (referencing the "sequential administration of a 5-HT2A antagonist *followed by* psilocybin.") (emphasis added).

To my knowledge, the only explicit reference in the TAC to the specifics of the optimal timing, frequency, and dosage for the therapy is in paragraph 46.  It states, ECF 81, ¶ 46 (second alteration in ECF 81): "Paragraph 8 [of the '611 Application] states that, '[i]n some embodiments, the one or more 5- HT2A specific antagonists and/or inverse agonists are administered to the

patient prior to administration of the psilocybin . . . such as about 10 minutes, about 15 minutes, about 20 minutes, about 30 minutes, about 45 minutes, about 60 minutes, about 75 minutes, about 90 minutes, about 105 minutes, about 120 minutes, about 150 minutes, or about 180 minutes' between two drugs. Ex. 6 at 265. Paragraphs 9 and 19 [of the '611 Application] list broad ranges of dosing for the 5- HT2A antagonists and psilocybin, respectively, and paragraph 20 [of the '611 Application] lists broad frequency ranges for the therapy. *Id*. at 266, 269."

Plaintiffs maintain that the '611 Application, incorporated by reference into the TAC, "goes well beyond a 'generic reference' and the general requirements of reasonable particularity." ECF 153 at 9. According to Compass, ECF 156 at 4, the disclosures in the '611 Application are not as important as they may otherwise be, because plaintiffs criticize Compass in the TAC for making "disclosures in the '611 Application that are simultaneously improperly broad and improperly specific . . . ." ECF 81, ¶ 45. Therefore, Compass contends that it cannot merely look at the '611 Application to ascertain all of the specific OTFD information. ECF 156 at 4.

In my view, the TAC's reference to the optimal OTFD information, even without considering the information in the '611 Application, is sufficiently particularized for this stage of the litigation.

As explained, the most common formulation of the reasonable particularity standard requires that a plaintiff "disclose sufficient information to (1) put defendant on notice of the nature of the plaintiff's claims and (2) allow defendant to discern the relevancy of any requested discovery to its trade secrets." *Structural Pres. Sys., LLC*, 2013 WL 12244886, at *4. Compass does not even attempt to argue that the OTFD disclosure is inadequate to meet this standard. Indeed, Compass attached several scientific articles to the Motion that specifically discuss time points and dosing for studies involving psilocybin administered in the presence of ketanserin. *See* ECF

149-1 at 3–4; ECF 149-2 at 10; ECF 149-3 at 4.  It is readily apparent that the TAC places Compass "on notice of the nature of the plaintiff's claims . . . ."  *Structural Pres. Sys., LLC*, 2013 WL 12244886, at *4.

I am also satisfied that the OTFD disclosures in the TAC "allow defendant to discern the relevancy of any requested discovery to its trade secrets."  *Id.*  As Magistrate Judge Gauvey has explained, *id.* at *6: "Pre-discovery identification should define the contours of the dispute by providing identifiable limits to discovery."  The allegations of the TAC sufficiently do just that. Plaintiffs have specifically identified as their trade secrets the order, time points, frequency, and dosing of a therapy involving the sequential administration of a 5-HT2A antagonist in the presence of psilocybin, as a mechanism for a patient to receive the antidepressant benefits of psilocybin, without being subject to its negative hallucinogenic effects.  *See, e.g.*, ECF 81, ¶¶ 1, 2, 28, 46.  The claimed trade secrets are relatively narrow, in that they are tied to a specific sequential therapy involving specific chemical compounds.  Defendant should have no trouble discerning "the relevancy of any requested discovery to *its trade secret*[,]" *Structural Pres. Sys., LLC*, 2013 WL 12244886, at *6 (emphasis added), because Compass maintains that it does not utilize such a treatment in "any" manner.  ECF 156 at 4; *see also* ECF 93-3 (Malievskaia Declaration submitted in support of Compass's Motion to Dismiss), ¶ 10 ("Compass's clinical trials of [its therapeutic psilocybin product] have never involved administration of ketanserin or other 5-HT2A antagonists.").

Significantly, Compass has cited no similar case where, at this stage of the litigation, a court required the plaintiff to amplify a claimed trade secret.  Yet, other cases support plaintiffs' argument.  For example, in *Del Monte Fresh Produce Co. v. Dole Food Co. Inc.*, 148 F. Supp. 2d 1322 (S.D. Fla. 2001), the court said, *id.* at 1325: "If Del Monte is claiming that Dr. Funk has

misappropriated the percentage of concentration of certain chemicals, *it need not specify the percentages*, but it must tell Dr. Funk that Del Monte believes he has misappropriated the percentage of concentration of chemical 'X' or that he has misappropriated the process for combining chemicals 'X, Y, and Z.'" (Emphasis added); *see also Cisco Sys., Inc.*, 2020 WL 7495085, at *9 (reasonable particularity "does not demand that a plaintiff define every minute detail of its claimed trade secret at the outset of litigation."). More generally, some commentators have criticized the reasonable particularity standard in cases, such as this one, involving so-called "combination trade secrets," which concern "'a new arrangement of previously known information,'" because combination trade secrets "'are so difficult to identify that broad descriptions should suffice.'" Alex Harrell, *Getting Down to the Particulars Applying the Reasonable Particularity Standard to Trade Secret Disclosures*, 82 TEX. B.J. 582, 582 (2019) (citation omitted).

Moreover, Compass's claims of prejudice (ECF 149 at 10–11), outlined earlier, do not compel further identification at this time. Compass argues that, without further identification, plaintiffs could claim as their trade secret any information they receive in discovery that pertains to the optimal OTFD. ECF 149 at 10. But, Compass specifically argues in the Reply: "Compass does not offer a treatment involving the sequential administration of ketanserin and psilocybin, is not involved in any clinical trials of any such treatment, and does not use any such treatment in any other manner." ECF 156 at 4; *see also* ECF 93-3, ¶ 10 (Dr. Malievskaia, averring: "Compass's clinical trials of [its therapeutic psilocybin product] have never involved administration of ketanserin or other 5-HT2A antagonists.").

Therefore, it appears unlikely that Compass would possess information pertaining to the optimal OTFD for a therapy involving psilocybin and a 5-HT2A antagonist (such as ketanserin),

aside from what was provided to Compass by plaintiffs. This undercuts defendant's argument that plaintiffs could mold their cause of action based on the discovery that they receive. *See* ECF 156 at 4.

Moreover, the scope of the information to which plaintiffs could attempt to mold their cause of action is temporally limited. The information was provided to Compass over a period of approximately six-months, beginning in May 2019. Records obtained in discovery predating May 2019 clearly cannot qualify as plaintiffs' trade secret. This establishes a safeguard that further undermines Compass's speculative claim of prejudice.

In addition, Compass insists that it will be "significantly prejudiced" if plaintiffs are not required to "immediately identify" the optimal OTFD for the therapy with greater particularity because, without further identification, Compass cannot determine, with precision, whether the information was already available in the public domain. ECF 149 at 10–11; *see also Dow Chem. Can. v. HRD Corp.*, 909 F. Supp. 2d 340, 346 (D. Del. 2012) (To narrow the scope of discovery, plaintiffs must make their identification "particular enough as to separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade."). But, at this juncture, plaintiffs have provided sufficient information. Defendant may seek more specific information during discovery.

Finally, at this stage of the case, I decline to engage with Compass's argument that the alleged trade secrets cannot be trade secrets because the information was already publicly known or available. ECF 149 at 8–9. This is a merits argument. Compass cites no case in which a court dismissed a trade secret claim at this stage because the purported trade secret was not, as a legal matter, a trade secret. And, several courts have expressly rejected the argument that a plaintiff must prove the existence of a trade secret before proceeding to discovery or even during discovery.

*See, e.g.*, *National Staffing Solutions, Inc., v. Ascendo Resources, LLC, et al.*, No. 6:23-CV-1542-CEM-LHP, 2025 WL 1434377, at *5 (M.D. Fla. May 19, 2025) ("Whether any of Plaintiff's alleged trade secrets actually constitute valid and existing trade secrets is an issue for another day."); *Dumbo Moving & Storage, Inc.*, 2025 WL 219063, at *7 ("While [the plaintiff] ultimately bears the burden to prove that its trade secrets are distinguishable from generally known matters, and that [the plaintiff] derives specific economic value from them, [the plaintiff] need not do so before proceeding to document discovery."); *Cisco Sys., Inc.*, 2020 WL 7495085, at *9 (the reasonable particularity requirement in California's statute "does not demand . . . that a trial court 'conduct a miniature trial on the merits of a misappropriation claim before discovery commences.'") (citation omitted); *Commure, Inc.*, 2025 WL 1150695, at *2, *3 (similar); *Uni-Sys., LLC*, 2017 WL 4081904, at *4 ("[T]he requirement of reasonable particularity 'does not create a procedural device to litigate the ultimate merits of the case—that is, to determine as a matter of law on the basis of evidence presented whether the trade secret actually exists.'") (citation omitted); *AAR Mfg., Inc.*, 98 So. 3d at 188 ("[W]e reject [the defendant's] argument that the trial court departed from the essential requirements of the law by failing to make a threshold finding that [the plaintiff's] allegedly misappropriated trade secrets actually existed before ordering [the defendant] to disclose its own trade secrets.").

## V. Conclusion

For the foregoing reasons, I shall deny the Motion (ECF 149).  An Order follows.


Date:    June 3, 2025                                  /s/
                                           Ellen Lipton Hollander
                                           United States District Judge