## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TERRAN BIOSCIENCES, INC., UNIVERSITY OF MARYLAND, BALTIMORE, and SCOTT THOMPSON, | : : : : | Civil Action No. 1:22-cv-01956-ELH |
| *Plaintiffs,* | : : | **JURY TRIAL DEMANDED** |
| v. | : : | |
| COMPASS PATHFINDER LIMITED (an England and Wales company), EKATERINA MALIEVSKAIA, M.D., and GEORGE GOLDSMITH | : : : : : | |
| *Defendants.* | : : | |

## <u>FOURTH AMENDED COMPLAINT</u>

Plaintiffs Terran Biosciences, Inc. ("Terran"), University of Maryland, Baltimore ("UMB"), and Professor Scott Thompson ("Professor Thompson") (collectively "Plaintiffs"), by and through their undersigned counsel, and for and in support of this Fourth Amended Complaint against Defendants Compass Pathfinder Limited ("Compass"), Ekaterina Malievskaia, M.D. ("Dr. Malievskaia"), and George Goldsmith ("Goldsmith") (collectively "Defendants"), hereby aver as follows:

### <u>Introduction</u>

1.      This action arises out of Defendants' malicious and intentional scheme to defraud the State of Maryland and misappropriate highly confidential and sensitive, proprietary information that Terran, UMB, and Professor Thompson spent years and substantial resources to develop.   In 2016, Professor Thompson, then-Chair of the Department of Physiology at the University of Maryland, Baltimore, School of Medicine, began working on the idea of the

administration of psilocybin in the presence of a 5-HT2A antagonist (including ketanserin) as a potential rapid, non-hallucinogenic antidepressant therapy.  At the time, it was known that 5-HT2A antagonists like ketanserin reduce or eliminate the negative hallucinogenic effects of psilocybin.  However, Professor Thompson recognized that psilocybin's antidepressant therapeutic effects are independent of significant 5-HT2A receptor activation that causes hallucinations, and discovered that, through the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, a patient could receive the antidepressant benefits of psilocybin, without being subject to the negative hallucinogenic effects.

2.      Professor Thompson spent the next several years at UMB researching and developing this discovery into a potential therapeutic product.  His inventions with respect to this potential breakthrough treatment and results of his work were and are the "Psilocybin Trade Secrets," including (i) his discovery that psilocybin's antidepressant therapeutic effects are independent of the 5-HT2A receptor activation that causes hallucinations, and (ii) his discovery that time-sequenced administration of a 5-HT2A receptor antagonist followed by psilocybin was necessary to achieve the anti-depressant therapeutic effects without hallucinations.  On August 13, 2019, Professor Thompson filed a provisional patent application, assigned to UMB, disclosing the co-administration of psilocybin and 5-HT2A antagonists.  However, Professor Thompson maintained as trade secrets the importance of the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, as well as the time points, dosing, frequency and other details of such sequential administration, pending the development of further experimental data.  Both before and after he filed this patent application, Professor Thompson kept his research, development, and related information leading to the Psilocybin Trade Secrets confidential, and maintained a practice to never disclose any such information outside the scope

of a confidentiality/non-disclosure agreement.

3.    In May 2019, Dr. Malievskaia, then the Co-Founder and Head of Research and Development of Compass, reached out to Professor Thompson, then-working in Baltimore, Maryland, purporting to seek a potential partnership with Professor Thompson in his capacity as a UMB researcher, ostensibly to further his psilocybin research and explore "possible business arrangements between them and/or their Affiliates."  Prior to any substantive discussions regarding Thompson's research or plans moving forward with the Psilocybin Trade Secrets, Jessica Rose Stuart, a Team Coordinator at Compass Pathfinder Limited (then known as Compass Pathways Limited), provided Professor Thompson with a Mutual Non-Disclosure Agreement ("NDA") at the direction of Dr. Malievskaia.  Under the terms of the NDA Compass provided, Compass and its affiliates,[1] including Dr. Malievskaia and Goldsmith, would be precluded from distributing, disclosing, or otherwise disseminating any confidential information and prohibited from using this information for any purposes besides exploring a potential business relationship with Professor Thompson and UMB.  Professor Thompson executed the NDA in his capacity as a UMB researcher and as an agent of UMB, because UMB owned the confidential information protected by the NDA.  Compass confirmed receipt of the signed NDA.  However, even though it was Compass's own form NDA which it provided to Professor Thompson, and even though Professor Thompson signed Compass's NDA without making any changes to it, Compass, for its part, never executed the NDA, which listed Goldsmith as the signatory for Compass.  On information and belief, Compass did not execute the NDA because Defendants never intended to maintain the confidentiality of the Psilocybin Trade Secrets and other confidential information or to otherwise comply with the terms of the NDA.

---

[1] The NDA defines "affiliates" as "a person or entity that directly or indirectly controls or is controlled by or is under common control with a party to this Agreement."  Ex. 18 at 2.

Instead, Defendants provided the NDA to Professor Thompson to induce him to disclose his Psilocybin Trade Secrets and other confidential information to Defendants under the belief that all such communications and disclosures were subject to a binding NDA, when in fact Defendants secretly intended to disclose and otherwise exploit the Psilocybin Trade Secrets and other confidential information for Defendants' own unilateral benefits. For seven months, in reliance on what he considered a binding NDA, Professor Thompson disclosed his Psilocybin Trade Secrets and other confidential information to Defendants as he negotiated with Defendants in good faith to reach a collaboration agreement, with the understanding that all information concerning Professor Thompson's inventions and the Psilocybin Trade Secrets exchanged between the parties was and would remain confidential. Indeed, Professor Thompson and Defendants engaged in numerous substantive discussions and negotiations regarding a potential partnership between Defendants and UMB via e-mail, Zoom, and in-person meetings, during which communications Professor Thompson shared his Psilocybin Trade Secrets and other confidential information with Defendants.

4.     During these negotiations, Defendants repeatedly emphasized their excitement about the opportunity to work with Professor Thompson on his research ideas, which had been developed in Maryland. In turn, Professor Thompson continued to disclose further proprietary information about the Psilocybin Trade Secrets to Defendants in confidence, pursuant to the preemptive protections of what he believed to be a valid, governing NDA. At the outset of those discussions, Defendants did not know about the idea that administering psilocybin in the presence of a 5-HT2A antagonist might eliminate, attenuate, or shorten the duration of psilocybin-induced hallucinations while retaining its therapeutic benefits as an antidepressant. However, upon discovering the "considerable clinical value" arising from Professor Thompson's

research data—as "the first of its kind" and likely "the first direct evidence" of the functional requirements in the "antidepressant actions of psilocybin"—Defendants misled him into disclosing all the information about his confidential research and Psilocybin Trade Secrets.

5.    Unbeknownst to Professor Thompson, Defendants misappropriated the Psilocybin Trade Secrets for themselves. In August 2019, while Defendants were maliciously stringing Professor Thompson along, they secretly filed their own patent application, claiming for the first time "[a] method of reducing the negative side effects associated with traumatic psychedelic experience in a patient undergoing treatment with psilocybin" through sequential administration of "one or more 5-HT2A specific antagonists" followed by psilocybin—in other words, claiming Professor Thompson's invention for themselves.

6.    Even after they secretly began applying for patents related to certain of the Psilocybin Trade Secrets, Defendants continued to encourage further disclosures until several months later—in November 2019—when Defendants abruptly ended the parties' negotiations, stating that they would not enter into a collaboration agreement with Professor Thompson or UMB for psilocybin research. Defendants have misappropriated and continue to misappropriate the Psilocybin Trade Secrets for their own gain.

7.    In 2021, prior to discovering Defendants' misappropriations and other tortious conduct as alleged herein, Terran entered into a licensing agreement with UMB, under which UMB granted Terran an exclusive license to the Psilocybin Trade Secrets. Terran licensed the Psilocybin Trade Secrets so it could bring a groundbreaking rapid, non-hallucinogenic antidepressant therapy to market. The Psilocybin Trade Secrets relate to this therapy, which Terran has taken significant steps towards developing and commercializing in the United States and throughout the world. Terran has the "first and primary right" to prosecute and control any

action for misappropriation of the Psilocybin Trade Secrets.

8.    Consequently, Terran, UMB, and Professor Thompson bring this action for trade secret misappropriation and related common law causes of action, seeking injunctive relief, damages, and other relief necessary to remedy and punish Defendants' blatant and fraudulent misconduct.

### The Parties

9.    Plaintiff Terran Biosciences, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business at 507 W 28th Street, PH 3A, New York, NY.

10.    Plaintiff University of Maryland, Baltimore, is a public university in Baltimore, Maryland.  UMB is the parent institution of the University of Maryland School of Medicine, which was the first public medical school in the United States and a leading medical school in both research and primary care.

11.    Plaintiff Dr. Scott Thompson is currently a Professor of Psychiatry at the University of Colorado Anschutz School of Medicine.  From 1998 to 2022, he was a Professor of Physiology at the University of Maryland, Baltimore, School of Medicine.

12.    Upon information and belief, Defendant Compass Pathfinder Limited is a company incorporated in England and Wales, with company number 10229259, whose registered office is at 3rd Floor, 1 Ashley Road, Altrincham, Cheshire, United Kingdom, WA14 2DT.

13.     Upon information and belief, Defendant Ekaterina Malievskaia, M.D. (defined above as "Dr. Malievskaia") is an individual who is a resident and citizen of London, England, United Kingdom.  In June 2016, Dr. Malievskaia and her husband, Defendant Goldsmith,

formed Compass Pathways Technologies Limited, a for-profit private limited company incorporated in England and Wales. In 2017, Dr. Malievskaia and Defendant Goldsmith renamed Compass Pathways Technologies Limited to Compass Pathways Limited and, at their direction Compass began to carry out clinical trials and funding activities. In August 2020, Compass Pathways Limited was renamed Compass Pathfinder Limited. Dr. Malievskaia served as a member of Compass's board of directors from 2017 through March 29, 2024. She served as Compass's Head of Research and Development from January 2019 to January 2020, as Compass's Chief Medical Officer from June 2017 to 2019, and as Compass's Chief Innovation Officer from January 2020 through June 2023.

14.     Upon information and belief, Defendant George Goldsmith (defined above as "Goldsmith") is an individual who is a resident and citizen of London, England, United Kingdom. In June 2016, Goldsmith and his wife, Dr. Malievskaia, formed Compass Pathways Technologies Limited, a for-profit private limited company incorporated in England and Wales. In 2017, Goldsmith and Dr. Malievskaia renamed Compass Pathways Technologies Limited to Compass Pathways Limited and at their direction, Compass began to carry out clinical trials and funding activities. In August 2020, Compass Pathways Limited was renamed Compass Pathfinder Limited. Goldsmith served as Compass's Chief Executive Officer from its founding through August 1, 2022. He served as chairman of Compass' board of directors from its founding through March 29, 2024.

15.     Compass publicly credits Dr. Malievskaia and Goldsmith for causing, leading, and overseeing, among other things, the following activities, all of which were conducted, at least in part, in Maryland: a) "the design, launch and completion" of "the largest psilocybin therapy clinical trial ever conducted" at various different sites and countries, including in

Maryland, United States, and b) the establishment of the "Centres of Excellence," including the first of which in collaboration with The Sheppard Pratt Institute for Advanced Diagnostics and Therapeutics in Baltimore, Maryland, United States.

## Jurisdiction and Venue

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), as it arises under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq*.

17.    This Court has supplemental jurisdiction over Plaintiffs' state law claims under the Maryland Uniform Trade Secret Act, Md. Code Ann., Comm. Law § 11-1201, *et seq*. pursuant to 28 U.S.C. § 1367(a) because Plaintiffs' state law claims are so closely related to the federal claim that they form part of the same case of controversy under Article III of the United States Constitution.

18.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C.§ 1332(a), because there is complete diversity and the amount in controversy is at least $75,000.

19.    This Court has personal jurisdiction over Compass under Fed. R. Civ. P. 4(k)(1)(A) and Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1), (3), and (4).  Defendants reached out to multiple UMB professors, including Professor Thompson in Baltimore, Maryland, to discuss his research and proposal related to the Psilocybin Trade Secrets.  Defendants purported to enter into an NDA with Professor Thompson for the purposes of exploring a business relationship with UMB.  Defendants sought and received proprietary information developed and held at UMB constituting the Psilocybin Trade Secrets under the pretense of a potential partnership between Defendants and UMB.  By engaging in seven months of extensive

negotiations with UMB professors, secretly filing patent applications in the midst of those negotiations, and then continuing to induce UMB professors to disclose further proprietary information under the guise of the preemptive protections of an NDA, Defendants purposefully availed themselves of the benefits and privileges of the laws of Maryland, while simultaneously causing harm to Professor Thompson and UMB in Maryland, and defrauding the State of Maryland.

20.    Defendants also purposefully availed themselves of the benefits and privileges of the laws of Maryland by conducting clinical trials of their own therapeutic psilocybin product at the Sheppard Pratt Health System in Baltimore, Maryland during the time they began misappropriating the alleged trade secrets.    On information and belief, Defendants misappropriated the Psilocybin Trade Secrets in part to block, preempt and otherwise interfere with UMB's patenting of the Psilocybin Trade Secrets to further Defendants' efforts to commercialize their own therapeutic product.  As a result, Defendants' activities in Maryland directed to their own therapeutic psilocybin product relate directly to Defendants' schemes, misappropriations and other torts and breaches as alleged herein.  Defendants' related activities in Maryland were and are substantial.  For example, Defendants conducted a clinical trial in part at the Sheppard Pratt Health System in Baltimore, Maryland titled "The Safety and Efficacy of Psilocybin in Participants With Treatment Resistant Depression (P- TRD)."  Ex. 1 at 2, 6; Ex. 2 at 4 (list of Defendants' clinical trials conducted in the U.S.) (Row 8).  Defendants submitted this study to the FDA's database for clinical trials in December 2018, and reported that the first patient's first visit in the study occurred on March 1, 2019 and that the study completed on September 27, 2021.  Ex. 1 at 2-3.[2]  Defendants also established, fund, and operate a "Centre of

---

[2] All Exhibit pincites are to PDF pagination.

Excellence" to "carry out new research in the use of psilocybin therapy" on Sheppard Pratt's Towson, Maryland campus. Ex. 3 at 2. The Centre was first announced publicly in January 2021. *Id*. Since 2021, Defendants have conducted at least six additional clinical trials at Sheppard Pratt in Maryland related to Psilocybin. Ex. 2 at 2-4 (Rows 1, 3, 4, 10, 12 & 13). This includes two trials which were both posted on June 16, 2020 and began on March 1, 2021, *id*. at 4 (Rows 12 & 13), and another trial which was posted on February 2, 2022 and began on March 28, 2022, *id*. (Row 10). Defendants have also expanded in Maryland beyond Sheppard Pratt. One 2023 clinical trial has study locations at CBH Health, LLC in Gaithersburg, Maryland and Pharmasite Research, Inc. in Pikesville, Maryland (in addition to Sheppard Pratt and other U.S. locations), *id*. at 2 (Row 3), while another is located entirely at Sunstone Therapies in Rockville, Maryland, *id*. (Row 1).

21.    Specific jurisdiction is proper in Maryland over all Defendants as a result of, among other things, Defendants' actions in and contacts with Maryland. In the alternative, to the extent specific jurisdiction was not proper in Maryland, then Defendants are subject to personal jurisdiction under Fed. R. Civ. P. 4(k)(2), as foreign defendants who are not subject to any state's court of general jurisdiction. Before preparing the Third Amended Complaint, counsel for Plaintiffs reached out to counsel for Compass, requesting that Compass "identify which state(s) Compass Pathfinder would agree it is subject to personal jurisdiction in for purposes of this action." Ex. 4. Compass did not identify any such location, instead attesting that Compass "is incorporated in the U.K. and does not have a principal place of business in the U.S. [and] cannot determine where jurisdiction may be proper (if anywhere)." Ex. 5.

22.    The exercise of jurisdiction under Fed. R. Civ. P. 4(k)(2) would be consistent with the United States Constitution and its laws, as Defendants have purposefully established

numerous contacts with the United States.

23.    Defendants' contacts with the United States include many activities beyond those listed above in the State of Maryland.  For example, Defendants' 2019-2021 clinical trial regarding "The Safety and Efficacy of Psilocybin in Participants With Treatment Resistant Depression (P- TRD)" had eight study locations within the United States.  Along with Sheppard Pratt in Baltimore, Maryland, the trial had study locations in La Jolla, San Diego, and Stanford, California; Atlanta, Georgia; New Orleans, Louisiana; New York, New York; and Houston, Texas. Ex. 1 at 5-6; Ex. 2 at 4 (Row 8).  In addition to the seven trials conducted at least partially in Maryland, Defendants have conducted at least seven more clinical trials in the U.S. located entirely outside of Maryland. Ex. 2 at 2-5 (Rows 2, 5-7, 9, 11 & 14).  This includes a study which began on July 20, 2020, with locations in La Jolla and San Diego, California; Atlanta, Georgia; and Houston, Texas.  *Id*. at 3 (Row 7).  Another study began on September 15, 2020, with La Jolla, California as the sole United States location, *id*. (Row 6), while another study located entirely in New York, New York (although co-sponsored by UCLA) began on February 26, 2021, *id*. at 5 (Row 14).

24.    As is particularly relevant to Defendants' fraudulent scheme giving rise to this lawsuit, Defendants have consistently sought and received the benefits of the United States patent system.  For example, on August 29, 2019, Defendants blatantly misappropriated the Psilocybin Trade Secrets by filing U.S. Provisional Patent Application No. 62/893,611, entitled "Methods of Co-Administering 5-HT2A Antagonists/Inverse Agonists And Psilocybin."  Ex. 6.  This was one day after Defendants filed U.S. Provisional Patent Application No. 62/893,110, entitled "Methods Of Co-Administering Benzodiazepines And Psilocybin" and listing the same seven inventors. Ex. 7.  These are only two of at least twenty provisional patent applications filed by Defendants,

including seventeen provisional patent applications filed April 17, 2019, and one filed December 10, 2019. *See* Ex. 8 at 2-3 (listing provisional applications). Defendants have further filed at least fourteen non-provisional patent applications relating to psilocybin, with at least nine so far having issued as granted United States patents (U.S. Patent Nos. 10,519,125; 10,947,257; 10,954,259; 11,149,044; 11,180,517; 11,447,510; 11,505,564; 11,564,935; 11,629,159). *See* Ex. 8; Ex. 9 at 2 (listing other granted patents in the family); *see also* Ex. 10 at 2 (Defendants stating that "These patents are a critical milestone in our efforts to establish a new evidence-based option to help patients with depression in the US . . . Through these grants, the USPTO has recognised our innovations.").

26.    Defendants have also filed for at least eight trademarks in the United States, Ex. 11, including the filing of Word Mark Nos. 79302207 and 79301429 on September 17, 2020 for "Compass" and "Compass Pathways," expressly noting that they cover, *inter alia*, "Psychoactive and psychedelic medicinal preparations for the treatment of depression, anxiety, bipolar disorder, post-traumatic stress disorder, and eating disorders," Exs. 12 & 13.

26.    Venue is proper in the United States District Court for the District of Maryland pursuant to 28 U.S.C. § 1391(c)(3) because Defendants are foreign defendants and venue is proper in any judicial district. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims asserted occurred in this District.

## Factual Background

### *Psilocybin Trade Secrets and Confidential Information*

27.    Dr. Scott Thompson, a Professor of Physiology at the University of Maryland School of Medicine for nearly 24 years (from 1998 to 2022), and currently a Professor of

Psychiatry at the University of Colorado Anschutz School of Medicine, is an expert in the potential use of psilocybin as an antidepressant and medication for other mental health disorders.  In November 2016, Professor Thompson came up with the idea of administering psilocybin in the presence of ketanserin (a 5- HT2A antagonist) as a potential rapid, non-hallucinogenic antidepressant therapy.  Professor Thompson recognized that the combination would reduce or eliminate the hallucinatory effects of psilocybin, while retaining its antidepressant actions.  Over the next few years, Professor Thompson engaged in extensive research during the course of his employment with UMB to test the potential of this idea.  In particular, Professor Thompson's research related to the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, in order to produce the optimal non-hallucinatory and anti-depressive effects.  Further research related to the optimal time points, frequency, and dosing for the sequential administration of the two drugs in combination.

28.    The inventions derived from, and the results of, this research constitute the Psilocybin Trade Secrets.  By virtue of Professor Thompson's employment and invention assignment agreement with UMB, the Psilocybin Trade Secrets are owned by UMB, which in turn has exclusively licensed them to Terran.  However, pursuant to UMB's intellectual property policies and faculty agreements, Professor Thompson receives a portion of the revenues that UMB generates from his inventions, including a portion of the royalties UMB receives from licensing his patents and other inventions, including the Psilocybin Trade Secrets.  Ex. 14 at 4-5.

29.    At all relevant times, Professor Thompson and UMB held the Psilocybin Trade Secrets in strict confidence.  Information regarding the trade secrets was kept on secured devices in UMB's custody and control.   Professor Thompson and UMB did not disclose the Psilocybin

Trade Secrets to anyone except those governed by non-disclosure agreements or other confidentiality obligations.

30.     On August 13, 2019, Professor Thompson and UMB filed U.S. Provisional Patent Application No. 62/886,080 ("the '080 Application"), entitled "Combination Therapy with Broad Spectrum Serotonergic Agonists and Anti-Hallucinogenic Serotonergic Antagonists." Ex. 15. The '080 Application generally disclosed co-administering psilocybin and an antagonist, but did not go into detail about the specifics of the sequential administration of a 5-HT2A antagonist followed by psilocybin, or the optimal order, time points, frequency, or dosing for the therapy, all of which Professor Thompson maintained as trade secrets pending further experimental data.

***Defendants Reach Out To UMB Regarding Professor Thompson's Research***

31.     On May 16, 2019, in the course of considering whether to conduct a PK/biomarker study at the National Institute of Mental Health in North Bethesda, Maryland, Dr. Malievskaia, the Co-Founder and Head of Research and Development of Compass, reached out to Professor Todd Gould, a Psychiatry Professor at the University of Maryland School of Medicine, because Compass was "developing psilocybin for treatment-resistant depression and trying to understand molecular mechanisms of psilocybin." Ex. 16 at 2-3. Professor Gould directed Dr. Malievskaia to Professor Thompson. *Id*. Dr. Malievskaia solicited a call with Professor Thompson, in Maryland, to discuss his research on the Psilocybin Trade Secrets.

32.     On May 29, 2019, at the direction of Dr. Malievskaia, Jessica Rose Stuart, a Team Coordinator at Compass Pathfinder Limited (then known as Compass Pathways Limited), sent Professor Thompson a Mutual Non-Disclosure Agreement ("NDA") to execute prior to the scheduled call. Ex. 17 at 3. The NDA included a signature line for Goldsmith as "Executive

Chairman, Co-founder" of Compass.  By its terms, the NDA would prohibit Compass and its affiliates, including Dr. Malievskaia and Goldsmith, from using any information disclosed by Professor Thompson or his colleagues other than "in connection with exploring possible business arrangements between Compass and/or their Affiliates."  Ex. 18 at 2.  Professor Thompson returned a signed copy of the NDA that same day.  Ex. 17 at 2.  Manon Veraart, a Compass employee, acknowledged receipt of Professor Thompson's signed NDA on May 30, 2019.  Ex. 19 at 2.  However, as Compass represented to this Court, Compass "did not sign" the NDA in return.  ECF No. 24-1 at 18.  The fact that Compass has disclaimed the existence of a binding NDA between itself, its affiliates, including Dr. Malievskaia and Goldsmith, and Professor Thompson, despite inducing Professor Thompson to believe all of his communications and disclosures were covered by the NDA that Compass itself sent him, further evidences Defendants' intent to defraud Professor Thompson and UMB, and their desire and attempt to misappropriate trade secrets and other confidential information with impunity.

33.    On May 31, 2019, Professor Thompson and Professor Gould of UMB, and at least Dr. Malievskaia of Compass, held a call to discuss the molecular mechanisms of psilocybin.  The parties discussed Professor Thompson's and Professor Gould's plans to test invention of the administering of psilocybin in the presence of ketanserin, whereby, through such sequential administration, ketanserin would reduce or eliminate psilocybin's unwanted hallucinatory side effects without disrupting its antidepressant effects.  On the call, Compass, including through Dr. Malievskaia, expressed significant interest in Professor Thompson's research results, in sponsoring further research, and in the possibility of including ketanserin as part of the treatment regimen in Compass's impending clinical study.

34.    On June 12, 2019, Dr. Malievskaia of Compass requested a research proposal

from Professor Thompson. Ex. 20 at 4. The next day, Professor Thompson and Professor Gould sent Dr. Malievskaia a scientific proposal and a proposed budget to study the administration of psilocybin in the presence of ketanserin, both of which they believed were disclosed under the protection of the NDA. *Id*. at 3-4. Dr. Malievskaia confirmed receipt of the proposal and indicated that Compass would like to schedule a follow-up call for the following week to continue discussion. *Id*. at 3.

35.     On June 18, 2019, Dr. Shaun Hurley, a Research Scientist at Compass, responded to Professor Thompson that they "were excited to read about the interesting questions you'd like to explore using psilocybin" and asked some additional pointed questions to elicit additional confidential information about Professor Thompson's research. *Id*. at 2. Compass acknowledged that Professor Thompson's proposed studies "would provide the first direct evidence for the requirements (or not) of AMPAR and/or 5-HT2R function in the antidepressant actions of psilocybin." Ex. 21 at 2. Compass was "especially excited by the potential to evaluate the efficacy of psilocybin in the presence of ketanserin, as clearly this information also has considerable clinical value." *Id*. at 3. Compass even asked whether a study evaluating psilocybin and ketanserin could "be prioritised." *Id*.

36.     Believing they were protected by the NDA, Professor Thompson and Professor Gould responded to Compass's questions on June 21, 2019, and throughout the months thereafter. Ex. 20 at 2; Ex. 21. During the course of these communications, Professor Thompson disclosed to Defendants his ideas for the sequential administration of ketanserin followed by psilocybin, as well as other details of the Psilocybin Trade Secrets.

37.     For the next several months, Defendants and UMB worked on a draft collaboration agreement. During this time, Defendants continued to milk Professor Thompson

-16-

and Professor Gould for trade secret information regarding their research and study plans.

38.    During a call on September 5, 2019, Dr. Hurley of Compass asked Professor Thompson whether any patent applications had been filed over his research, and Professor Thompson confirmed that the '080 Application had been filed.  In response, Dr. Hurley of Compass asked a flurry of questions about Professor Thompson's work, as well as follow-up emails, that included Dr. Malievskaia and Goldsmith, fishing for more information, including additional requests for initial research data and an explanation of Professor Thompson's past and future plans relating to any psilocybin research.  Ex. 22 at 3, 5-6.

39.    At this point, the parties still had not reached a collaboration agreement. Professor Thompson and Professor Gould were concerned about the delay.  At the time, others in the scientific community were becoming interested in psilocybin's potential, and Professor Thompson  and Professor Gould did not want to be left behind.  They therefore informed Defendants that they wanted to move forward as fast as they could.  *Id*. at 4.  In response, on September 24, 2019, under the guise of being concerned about the use of psilocybin, which is a Schedule 1 drug, Dr. Hurley of Compass began asking even more questions about the studies, specifically to confirm that they had not yet started.  *Id*. at 3.  Dr. Hurley of Compass also represented that it was hopeful that this would be "the start of an open and productive collaboration" with UMB, which may include the testing of "new compounds in the future." *Id*.

40.    Still, Defendants delayed sending a draft agreement.  Finally, on October 20, 2019, Defendants sent UMB a heavily marked-up revision of a collaboration agreement, with particularly heavy redlines to the intellectual property provisions of the draft agreement.

41.    The next day, at the Society for Neuroscience annual meeting, Professor Thompson had a lunch meeting with Dr. Hurley of Compass to further discuss a potential

collaboration, where Dr. Hurley of Compass stated that Compass remained interested in working with UMB and Professor Thompson. Yet, Defendants would not agree to move forward with the deal and kept Professor Thompson and Professor Gould in limbo. On November 20, 2019, Dr. Hurley of Compass e-mailed Professor Thompson saying that Compass was "unable to proceed with the collaboration" and declined to fund Professor Thompson's experiments. Ex. 23.

***Defendants File For Patent Applications Related To The Psilocybin Trade Secrets***

42.     Meanwhile, Defendants were busy executing their plan to misappropriate the Psilocybin Trade Secrets. On information and belief, when Defendants first began talking with Professor Thompson and Professor Gould, they had not been researching the combination of psilocybin with a 5-HT2A antagonist, and had no knowledge about that subject. While Defendants had previously filed patent applications related to use of psilocybin to treat various diseases, they had never identified or claimed the co-administration of psilocybin and a 5-HT2A antagonist in any of those applications, let alone the specifics of a sequential administration of a 5-HT2A antagonist followed by psilocybin.

43.     On August 29, 2019, without telling Professor Thompson or UMB, Compass, at the direction of Dr. Malievskaia and Goldsmith, secretly filed U.S. Provisional Patent Application No. 62/893,611 ("the '611 Application"), with Goldsmith signing the applicant power of attorney that Compass filed with the USPTO, which included disclosure of, and draft claims covering, the sequential administration of a 5-HT2A antagonist (expressly including ketanserin) followed by psilocybin to reduce the negative side effects of psilocybin. Tellingly, the '611 Application does not include any data regarding this combination. *See, generally*, Ex. 6. That is because Defendants had none. They stole the ideas for the '611 Application from Professor Thompson and disclosed them in their own patent application.

44.     Even more tellingly, on information and belief, the '611 Application was copied from an earlier, unrelated Compass application, U.S. Provisional Patent Application No. 62/893,110 ("the '110 Application"). On August 28, 2019, Compass, at the direction of Dr. Malievskaia and Goldsmith, filed the '110 Application, with Goldsmith signing the applicant power of attorney that Compass filed with the USPTO, which claims methods of reducing anxiety in a patient undergoing treatment with psilocybin by co-administering benzodiazepines. Ex. 7. That application includes backup materials suggesting that Compass had conducted some research into the co-administration of psilocybin and benzodiazepines, including a PowerPoint presentation regarding potential experiments to be conducted by Compass. *Id*. at 293-302. The '110 Application lists seven inventors: Drummond McCullogh, Derek Londesbrough, Christopher Brown, Julian Northen, Gillian Moore, Hemant Patil, and David Nichols. *Id*. at 7-9. Professor Thompson was not listed.

45.     The '611 Application lists the exact same seven inventors, in the same order. Ex. 6 at 7. Its text is essentially copied and pasted from the '110 Application, with references to co-administration with benzodiazepines changed to include certain of the Psilocybin Trade Secrets, including references to sequential administration of a 5-HT2A antagonist followed by psilocybin. The following redline comparing the abstracts of the two applications is telling:

**ABSTRACT**

The disclosure provides methods for treating a patient in need thereof comprising co-administering to the patient a therapeutically-effective dose of psilocybin and one or more ~~benzodiazepines.~~5-HT$_{2A}$ specific antagonists and/or inverse agonists. The methods described herein may be used to reduce ~~anxiety~~the negative side effects associated with a traumatic psychedelic experience in patients who are administered psilocybin during the treatment a variety of diseases, disorders, and conditions, such as, but not limited ~~to~~depressiveto depressive disorders (including depressive disorders due to another medical condition), anxiety disorders, somatic symptom and related disorders, trauma and stressor related disorders, obsessive compulsive disorder and related disorders, substance-related and addictive disorders, headache disorders, feeding and eating disorders, or disruptive and impulse-control and conduct disorders.

*Compare* Ex. 6 at 319, *with* Ex. 7 at 69.

46.    Indeed, the hasty copy-and-paste job, necessary so Defendants could quickly file their own application claiming the Psilocybin Trade Secrets before they thought Professor Thompson had the opportunity to do so, is so glaring that in certain instances, Defendants forgot to normalize the font and size of the text of the '611 Application—the text font and size in certain of the replaced sections is different from the rest of the application (as shown clearly in the screenshots below)—and mistakenly left in references to the mechanism of action for benzodiazepines ("GABAergic manipulation"), which is not applicable for 5-HT2A antagonists:



'110 Application, Ex. 7 at 58-59

**Example 4: Co-administration of psilocybin and a benzodiazepine**

The following examples 4A and 4B provide details of studies that will be used to determine the effects of low and high dose benzodiazepine (e.g. alprazolam or diazepam) on the acute psilocybin experience in healthy volunteers. The purpose of these studies is to provide an evidence base for the use of benzodiazepines to control

213464130 v1                                                    42

Attorney Docket No: COPA-019/00US

psychedelic anxiety, which may be used to inform future dose and drug selection. This study also seeks to show the dimension of the psychedelic experience affected by GABAergic manipulation, including subjective (11D-ASC) and neurological (fMRI), to help develop an understanding of which aspects are important therapeutically.



'611 Application, Ex. 6 at 308-309

**Example 4: Co-administration of psilocybin and a 5-HT$_{2A}$ inverse agonist**

The following example provides details of a study used to determine the effects of low and high dose of pimavanserin, a 5-HT$_{2A}$ inverse agonist on the acute psilocybin experience in healthy volunteers. The purpose of this study is to provide an evidence base for the use of 5-HT$_{2A}$ inverse agonists to control the negative side effects associated with

213539852 v1                                                    45

Attorney Docket No: COPA-020/00US

a traumatic psychedelic experience, which may be used to inform future dose and drug selection. This study also seeks to show the dimension of the psychedelic experience affected by GABAergic manipulation, including subjective (11D-ASC) and neurological (fMRA), to help develop an understanding of which aspects are important therapeutically.

47.    Unlike the '110 Application filed the day prior, Defendants did not include in the '611 Application any supporting data. This is further evidence that Defendants misappropriated Professor Thompson's ideas, including the Psilocybin Trade Secrets. However, that did not stop

-21-

Defendants from making disclosures in the '611 Application that are simultaneously improperly broad and improperly specific, including disclosures regarding the sequential administration of a 5-HT2A antagonist followed by psilocybin, and further including ranges for the sequential order, time points, frequency and dosing of such therapy, based on Professor Thompson's communications with and disclosures to Defendants, which Defendants falsely induced Professor Thompson to believe were governed by the NDA that Professor Thompson signed.

48.    For example, Paragraph 8 states that, "[i]n some embodiments, the one or more 5-HT2A specific antagonists and/or inverse agonists are administered to the patient prior to administration of the psilocybin . . . such as about 10 minutes, about 15 minutes, about 20 minutes, about 30 minutes, about 45 minutes, about 60 minutes, about 75 minutes, about 90 minutes, about 105 minutes, about 120 minutes, about 150 minutes, or about 180 minutes" between two drugs. Ex. 6 at 265.  Paragraphs 9 and 19 list broad ranges of dosing for the 5-HT2A antagonists and psilocybin, respectively, and paragraph 20 lists broad frequency ranges for the therapy. *Id.* at 266, 269.  On information and belief, the purpose of this disclosure and others in the '611 Application was to claim the Psilocybin Trade Secrets as Compass's own invention, and/or to preemptively block Professor Thompson and UMB from securing patent rights over the Psilocybin Trade Secrets, through this premature disclosure without any accompanying data. As of August 29, 2019, Professor Thompson had not made any public disclosure of these aspects and details of his Psilocybin Trade Secrets, nor did he disclose them in his August 13, 2019 provisional patent application, because he intended to maintain, for example, details of the sequential administration of ketanserin or other 5-HT2A antagonist followed by psilocybin, along with the optimal order, time points, frequency and dosing for the therapy, as trade secrets pending his development of further experimental data.

49.     On a September 5, 2019 phone call, Dr. Hurley of Compass asked whether Professor Thompson had filed any patent applications, hoping that Defendants had filed before Professor Thompson filed a patent application on any aspects of his Psilocybin Trade Secrets. Professor Thompson informed Compass that he had filed his own patent application on the general co-administration of psilocybin and a 5-HT2A antagonist on August 13, 2019, two weeks before Compass's filing.  On information and belief, Defendants were upset that Professor Thompson was the first to file, creating a hurdle in Defendants' plan to claim the entirety of UMB's proprietary confidential and trade secret information as their own, and to block UMB from securing any patent rights at all over Professor Thompson's inventions.

50.     Since 2019, Compass, at the direction of Dr. Malievskaia and Goldsmith, have filed at least four additional United States patent applications with specification disclosures involving the sequential administration of a 5-HT2A antagonist followed by psilocybin.  On October 18, 2021, Compass, at the direction of Dr. Malievskaia and Goldsmith, filed U.S. Patent Application No. 17/604,610.  Originally presented claims 22 and 23 claimed aspects of the Psilocybin Trade Secrets, including the sequential administration of a 5-HT2A antagonist followed by psilocybin.  Ex. 24 at 4.  On August 25, 2022, before any Office Action was issued by the Patent Office, Compass cancelled originally presented claims 22 and 23.  Ex. 25 at 4.  On information and belief, Compass canceled these claims because Compass's patent prosecution attorneys at Cooley LLP became aware of Defendants' misconduct and the fact that no one at Compass actually invented the claimed subject matter, and could not in good faith continue prosecution of those claims.  Defendants' initial attempt to claim the Psilocybin Trade Secrets as Compass's own invention for patenting followed by their cancelation of such claims evidences Defendants' scheme to misappropriate the Psilocybin Trade Secrets as well as their recognition

of their own wrongdoing.

51.    Along with U.S. Patent Application No. 17/604,610, Compass, at the direction of Dr. Malievskaia and Goldsmith, filed two additional non-provisional applications on October 18, 2021, U.S. Patent Application Nos. 17/604,606 and 17/604,619, which included, in their specifications, aspects and details of the Psilocybin Trade Secrets.  On December 2, 2021, Compass, at the direction of Dr. Malievskaia and Goldsmith, filed U.S. Patent Application No. 17/540,962, which likewise included aspects and details of the Psilocybin Trade Secrets in its specification.  That application issued as U.S. Patent No. 11,564,935.  *See, e.g.*, Ex. 8 at 132-133 (74:55-75:45), 149- 151 (108:54-112:47).  Compass later filed U.S. Patent Application No. 18/077,876, a continuation patent application with the same specification.  Compass has also filed multiple international patent applications, including PCT/IB2020/053688, PCT/IB2020/053687, and PCT/IB2020/053684, which likewise disclose aspects and details of the Psilocybin Trade Secrets in their specifications.  These PCT applications were first published on October 22, 2020. Many of the inventors listed on these patent applications are the same Compass employees who were involved in the communications with Professor Thompson and Professor Gould starting in May 2019—they were included on email correspondence, attended meetings with Professor Thompson and Professor Gould, and had access to the Psilocybin Trade Secrets.  This group of Compass employees included at least Dr. Malievskaia, Goldsmith, Dr. Hurley, Hans Eriksson, Nathan Poulsen, Lars Wilde, Anais Soula, and Manon Veraart.  *See* Exs. 8, 22, 23.

52.    Plaintiffs first suspected Defendants' disclosure of, and misuse of, the Psilocybin Trade Secrets in approximately April 2022, in the course of reviewing Compass's published patent application filings.

***Defendants Intentionally Developed and Executed their Fraudulent Scheme***

53.     Compass Co-Founder and Executive Dr. Malievskaia and her husband, Compass

Co-Founder and Chairman Goldsmith, have been publicly accused of deceptive schemes similar

to the one they executed against UMB and Professor Thompson.  In those prior instances,

Defendants are alleged to have seduced academics studying psilocybin by showering them with

lavish gifts only to cut off contact after extracting the information they desired:

> These academics also described behavioral patterns that undermined their trust in the
> couple. They detailed how Goldsmith and Malievskaia lavished them with attention—
> invitations to their home, expensive dinners, and all-expenses-paid trips to the Isle of Man,
> a self-governing British Isles island in the Irish Sea—only to go abruptly quiet once they'd
> seemingly gathered the information they needed. Quartz has seen documents that support
> these allegations. Compass, Goldsmith, and Malievskaia did not respond to requests for
> comment about these trips. …
>
> "It felt seductive. It was very flattering, but there was something odd about it," says one of
> the psilocybin researchers, who requested anonymity out of concern for potential
> professional repercussions for speaking about Compass.

Ex. 26 at 8-9 (*Quartz*, "A millionaire couple is threatening to create a magic mushroom

monopoly").  Dr. Malievskaia and Goldsmith are alleged to have engaged in similar behavior

towards other Maryland psilocybin researchers.  *See* Ex. 27 at 3 (former psilocybin investigator at

Johns Hopkins University stating: "And after helping [Dr. Malievskaia and Goldsmith] craft their

scientific proposal, using all the language from Roland [Griffin]'s hard work at Hopkins that he

graciously let me share with them, all of a sudden it was like no communication.").  Goldsmith

was the purported signatory of the NDA with Professor Thompson on behalf of Compass, although

Compass now contends that he never actually signed the document.  Ex. 18 at 3.

***Terran Licenses Technology and Intellectual Property from UMB***

54.     On May 7, 2021, UMB and Terran entered into a Master License Agreement

("MLA"), exclusively licensing to Terran certain of Professor Thompson's Inventions

-25-

("Licensed Inventions") and related Confidential Information, including the Psilocybin Trade Secrets.    Before this date, Terran had already entered into a confidentiality agreement with UMB and obtained an option to license the inventions from UMB.

55.    The MLA grants Terran an exclusive license to the Licensed Inventions and Confidential Information and provides that Terran has the first and primary right to institute an action concerning infringement, which covers both patent infringement and misappropriation of the Licensed Inventions and Confidential Information, whether or not the trade secrets were in existence before or after May 7, 2021.  In other words, the MLA grants Terran the right to institute any action for misappropriation of any Psilocybin Trade Secret that has existed at any period in time, including prior to the MLA.

**Count I (By Terran and UMB; Against All Defendants)**
**Misappropriation of Trade Secrets**
**Defend Trade Secrets Act (18 U.S.C. § 1831 *et seq.*)**

56.    Terran and UMB re-allege and incorporate by reference each and every allegation contained in this Fourth Amended Complaint.

57.    As set forth above, Defendants misappropriated the Psilocybin Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*  UMB is the owner of these Psilocybin Trade Secrets.  Terran has the requisite standing to sue under the Master License Agreement with UMB.

58.    The Psilocybin Trade Secrets are directed towards methods of treating depression and other mental health issues with the sequential administration of a 5-HT2A antagonist followed by psilocybin, which implicate the development, manufacturing, and sale of products and services used in, and intended for use in, interstate and foreign commerce.

59.    The Psilocybin Trade Secrets are related to a potential treatment for

-26-

neuropsychiatric disorders that has been continually under development by Professor Thompson, UMB, and Terran since 2016 and is intended for use throughout the United States and the world.

60.    The Psilocybin Trade Secrets derive(d) independent economic value from not being generally known to the public, to Terran's competitors, or to other persons who can obtain economic value from the disclosure or use of the information.

61.    At the time of the misappropriation, the Psilocybin Trade Secrets were not readily ascertainable through proper means or from generally available, public sources.

62.    At all relevant times, Terran, Professor Thompson, and UMB have made reasonable efforts to protect and preserve the secrecy of the Psilocybin Trade Secrets.

63.    Defendants misappropriated the Psilocybin Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by, *inter alia*, knowingly acquiring the Psilocybin Trade Secrets through improper means, and disclosing and/or using the Psilocybin Trade secrets without Professor Thompson's, UMB's, or Terran's express or implied consent.

64.    Defendants knew or had reason to know that, at the time Defendants acquired information about the Psilocybin Trade Secrets, this information was acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that they did not have Professor Thompson's, UMB's, or Terran's express or implied consent to do so.

65.    Defendants acquired the Psilocybin Trade Secrets under the guise of an NDA with Professor Thompson and UMB, not through their own independent research and efforts, in direct violation of their legal obligations to Professor Thompson and UMB.

66.    On information and belief, Defendants failed to fully delete or return the

Psilocybin Trade Secrets that they misappropriated, and continue to use or disclose the Psilocybin Trade Secrets without Professor Thompson's, UMB's, or Terran's consent.

67.    On information and belief, Defendants have gained, or will gain, substantial benefit from their misappropriation of the Psilocybin Trade Secrets, to Terran's and UMB's substantial detriment.

68.    As a result of Defendants' unlawful conduct, the Psilocybin Trade Secrets have been compromised, and Terran and UMB are substantially threatened by Defendants' further use and/or dissemination of that information.

69.    As a direct, proximate, and foreseeable result of Defendants' misappropriation of the Psilocybin Trade Secrets, Terran and UMB have been damaged in an amount not yet ascertained.

70.    Defendants' unlawful actions were willful and malicious, and with the deliberate intent to injure Terran's and UMB's businesses, thereby entitling Terran and UMB to exemplary damages and/or attorneys' fees in an amount to be proven at trial pursuant to 18 U.S.C. § 1836(b)(3)(D).

71.    Terran and UMB are entitled to an order requiring Defendants, their agents, and all persons acting in concert with them, from using or disclosing, or threatening to use or disclose, the Psilocybin Trade Secrets, and restraining Defendants from obtaining any benefit from their wrongful possession and use of the Psilocybin Trade Secrets.  Unless enjoined by this Court, said misappropriation of the Psilocybin Trade Secrets, actual or threatened, will cause great and irreparable injury to Terran and UMB.   Terran and UMB have no adequate or other remedy at law for such acts and threatened acts.

**Count II (By Terran, UMB, and Professor Thompson; Against All Defendants)**
**Misappropriation of Trade Secrets**
**Maryland Uniform Trade Secrets Act (Md. Code Ann. Com. Law § 11-1201 *et seq.*)**

72.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in this Fourth Amended Complaint.

73.    As set forth above, Defendants misappropriated information regarding the Psilocybin Trade Secrets under the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann. Com. Law. § 11-1201 *et seq.*  UMB has standing to sue as the owner of the Psilocybin Trade Secrets.  Terran has the requisite standing to sue under the Master License Agreement, and amendments thereto.

74.    Professor Thompson likewise has standing to sue as inventor of the Psilocybin Trade Secrets who shares in licensing revenues from those inventions, and who was thus directly, economically harmed by Defendants' misappropriation.    For example, Defendants misappropriated the Psilocybin Trade Secrets including through Defendants' wrongful disclosure of aspects and details of the Psilocybin Trade Secrets in their own patent applications, so that Defendants could claim the Psilocybin Trade Secrets as Defendants' own invention, and/or so that Defendants could preemptively block Professor Thompson and UMB from securing patent rights over the Psilocybin Trade Secrets, through this premature disclosure without any accompanying data.    Defendants' misappropriation has thereby substantially damaged UMB's ability to patent the Psilocybin Trade Secrets, resulting in impaired future royalties to both UMB and Professor Thompson personally.

75.    The Psilocybin Trade Secrets are directed towards methods of treating depression and other mental health issues with the sequential administration of a 5-HT2A antagonist followed by psilocybin.

76.     The Psilocybin Trade Secrets derive(d) independent economic value from not being generally known to the public, to Professor Thompson's, UMB's, or Terran's competitors, or to other persons who can obtain economic value from the disclosure or use of the information.

77.     At the time of the misappropriation, the Psilocybin Trade Secrets were not readily ascertainable through proper means or from generally available, public sources.

78.     At all relevant times, Professor Thompson, Terran, and UMB have made reasonable efforts to protect and preserve the secrecy of the Psilocybin Trade Secrets.

79.     Defendants misappropriated the Psilocybin Trade Secrets within the meaning of Md. Code Ann. Com. Law. § 11-1201 *et seq* by, *inter alia*, knowingly acquiring the Psilocybin Trade Secrets through improper means, and disclosing and/or using the Psilocybin Trade secrets without Professor Thompson's, UMB's, or Terran's express or implied consent.

80.     Defendants knew or had reason to know that, at the time they acquired information about the Psilocybin Trade Secrets, this information was acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that they did not have Professor Thompson's, UMB's, or Terran's express or implied consent to do so.

81.     Defendants acquired the Psilocybin Trade Secrets under the guise of an NDA with Professor Thompson and UMB, not through their own independent research and efforts, in direct violation of their legal obligations to Professor Thompson and UMB.

82.     On information and belief, Defendants failed to fully delete or return the Psilocybin Trade Secrets that they misappropriated, and continue to use or disclose the Psilocybin Trade Secrets without Professor Thompson's, UMB's, or Terran's consent.

83.     On information and belief, Defendants have gained, or will gain, substantial

benefit from their misappropriation of the Psilocybin Trade Secrets, to Professor Thompson's, UMB's, and Terran's substantial detriment.

84.      As a result of Defendants' unlawful conduct, the Psilocybin Trade Secrets have been compromised, and Professor Thompson, UMB, and Terran are substantially threatened by Defendants' further use and/or dissemination of that information.

85.      As a direct, proximate, and foreseeable result of Defendants' misappropriation of the Psilocybin Trade Secrets, Professor Thompson, UMB, and Terran have been damaged in an amount not yet ascertained.

86.      Defendants' unlawful actions were willful and malicious, and with the deliberate intent to injure Professor Thompson's and UMB's research, and Terran's business, thereby entitling Professor Thompson, UMB, and Terran to exemplary damages and/or attorneys' fees in an amount to be proven at trial pursuant to Md. Code Ann. Com. Law. §§ 11-1203 and 11-1204.

87.      Plaintiffs are entitled to an order requiring Defendants, their agents, and all persons acting in concert with them, from using or disclosing, or threatening to use or disclose, the Psilocybin Trade Secrets, and restraining Defendants from obtaining any benefit from their wrongful possession and use of the Psilocybin Trade Secrets.  Unless enjoined by this Court, said misappropriation of the Psilocybin Trade Secrets, actual or threatened, will cause great and irreparable injury to Professor Thompson, UMB, and Terran.   Plaintiffs have no adequate or other remedy at law for such acts and threatened acts.

### Count III (By Terran, UMB, and Professor Thompson; Against All Defendants) Unfair Competition

88.      Plaintiffs re-allege and incorporate by reference each and every allegation contained in this Fourth Amended Complaint.

89.    On information and belief, Defendants did not conduct their interactions with Professor Thompson and others at UMB with honesty and fairness, and instead continually sought to deceive and defraud them.  This included initiating discussions with Professor Thompson and UMB in bad faith, failing to sign a Mutual NDA and withholding the fact thereof, continuing to extract confidential information from Professor Thompson with no desire to collaborate with UMB, and secretly filing patent applications using confidential information obtained from Professor Thompson and others at UMB.

90.    Defendants have leveraged their access to confidential information, provided by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) and licensed by Terran, to unlawfully compete with Professor Thompson, UMB, and Terran.  For example, Defendants secretly filed patent applications in an attempt to block Professor Thompson, UMB, and later Terran, from obtaining patent protection over Professor Thompson's inventions.

91.    Furthermore, on information and belief, Defendants have misused the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) by furthering the research and development of their own products and services.

92.    Defendants' actionable conduct substantially interferes with Professor Thompson's, UMB's, and Terran's ability to compete with Defendants on the merits of their products/services or otherwise.  Under Maryland law, Defendants are prohibited from damaging or jeopardizing another's business by fraud, deceit, trickery, or unfair methods of any sort, yet Defendants did exactly that.  Defendants' behavior conflicts with accepted principles of public policy, and should not be condoned.

93.    As a direct, proximate, and foreseeable result of Defendants' unfair business

practices, Professor Thompson, UMB, and Terran have been damaged in an amount not yet ascertained. Furthermore, Defendants have impermissibly received a benefit as a result of such deception, and is not entitled to benefit from such deception.

**Count IV (By UMB and Professor Thompson; Against All Defendants)**
**Detrimental Reliance/Promissory Estoppel**

94.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Fourth Amended Complaint.

95.    Defendants made a clear and definite promise to Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) by attesting that they would not misuse or disclose the Psilocybin Trade Secrets or any other confidential information received from Professor Thompson in the course of their extended discussions.

96.    Defendants reasonably expected that making such a promise to Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB), which included providing Professor Thompson with a Mutual NDA to sign, would induce Professor Thompson to disclose the Psilocybin Trade Secrets and other confidential information, under the mistaken belief that Defendants would hold such information in confidence and not misuse it for unilateral gain.

97.    As a result of Defendants' promises and representations, Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) did disclose the Psilocybin Trade Secrets and other confidential information to Defendants.

98.    UMB's and Professor Thompson's detriment can only be avoided by enforcement of Defendants' promises not to misuse or disclose the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson.

99.    Furthermore, as a direct, proximate, and foreseeable result of their reliance on

Defendants' promises, UMB and Professor Thompson have been damaged in an amount not yet ascertained.

**Count V (By UMB and Professor Thompson; Against All Defendants)**
**Unjust Enrichment**

100.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Fourth Amended Complaint.

101.    Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) conferred a benefit upon Defendants by sharing the Psilocybin Trade Secrets and other confidential information with Defendants.  Defendants were able to benefit from Professor Thompson's disclosure, including by filing patent applications directed towards the subject matter of the confidential information, and, on information and belief, using such information in the development of products and/or services relating to the confidential information.

102.    Defendants appreciated and knowingly accepted the information shared by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB), and regularly solicited such information from him during the course of their discussions.

103.    Defendants' acceptance, retention, use, and disclosure of the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) has resulted in Defendants being unjustly enriched, and it would be inequitable under Maryland law for Defendants to be permitted to retain the benefits conferred by the misuse of such information.

104.    As a result, equity compels that any enrichment unjustly conferred on Defendants be awarded to UMB and Professor Thompson as restitution, in an amount to be determined.

**Count VI (By UMB and Professor Thompson; Against All Defendants)**
**Quantum Meruit/Implied-In-Fact Contract**

-34-

105.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Fourth Amended Complaint.

106.    As noted above, Compass has represented that it did not sign any NDA with UMB and Professor Thompson.  However, as evidenced by the circumstances, the ordinary course of dealing, and the common understandings of UMB, Professor Thompson, and Defendants, an implied-in-law contract can be inferred by the intention of the parties.

107.    Defendants reached out to UMB with the stated intention of funding university studies relating to psilocybin in the hopes of extracting information from UMB professors. Defendants then requested specific services from Professor Thompson, namely the disclosure of information relating to his research, including of the Psilocybin Trade Secrets and other confidential information.

108.    Defendants accepted the services and information provided by UMB and Professor Thompson, and understood that they expected compensation for such services and information, including at least a collaboration agreement which would provide funds for Professor Thompson's research activities.

109.    Furthermore, UMB and Professor Thompson expected that, should Defendants desire to use the Psilocybin Trade Secrets and other confidential information provided by them, Defendants would compensate UMB for such services in the form of a license agreement, from which Professor Thompson would receive compensation as part of UMB's intellectual property policies and faculty agreements.  Similarly, Defendants should have expected that, by using the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) to file their own patent applications and further Defendants' products and services in development, they would be required to

compensate UMB, a share of which would go to Professor Thompson.

110.    However, Defendants extracted confidential and trade secret information from Professor Thompson and UMB, without ever providing compensation.  UMB and Professor Thompson are entitled to recover the reasonable value of their services and information provided to Defendants, in an amount to be determined.

### Count VII (By UMB and Professor Thompson; Against All Defendants)
### Fraudulent Misrepresentation

111.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Fourth Amended Complaint.

112.    Compass, acting at least through Dr. Malievskaia, Goldsmith, and Dr. Shaun Hurley, knowingly made numerous fraudulent misrepresentations to Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) throughout 2019, under the guise of seeking to collaborate with UMB.  False statements made by Defendants include at least a) representations that they would not use or disclose the Psilocybin Trade Secrets and other confidential information provided by Professor Thompson; b) the representation that there was a signed NDA in place between Compass and its affiliates and Professor Thompson; and c) representations that they were seeking additional information regarding Professor Thompson's research for the purposes of evaluating a collaboration with UMB, when Defendants did not intend to collaborate with UMB, such as continued requests for information even after secretly filing a patent application covering the Psilocybin Trade Secrets and other confidential information.

113.    Compass, acting at least through Dr. Malievskaia, Goldsmith, and Dr. Shaun Hurley, knew that the statements above were false, or at the very least the statements were made with such a reckless indifference to the truth as to be equivalent to actual knowledge.

-36-

114.    The purpose of the misrepresentations were to defraud UMB and Professor Thompson, including by fraudulently acquiring the Psilocybin Trade Secrets and other confidential information in order to misappropriate such information.

115.    Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) relied upon Defendants' statements.  Professor Thompson believed that Defendants reached out to discuss a collaboration effort in good faith, that there was a signed NDA governing the parties' communications, and that the continued requests for information were in furtherance of a collaboration agreement.  Had Professor Thompson known that Defendants were defrauding him and UMB, or that there was not a signed NDA in place, he would not have shared any of the Psilocybin Trade Secrets or other confidential information with Defendants, nor continued communications with Defendants throughout 2019.

116.    As a direct, proximate, and foreseeable result of Defendants' fraudulent misrepresentations leading to the misuse and disclosure of the Psilocybin Trade Secrets and other confidential information, UMB and Professor Thompson have been damaged in an amount not yet ascertained.

**Count VIII (By UMB and Professor Thompson; Against All Defendants)**
**Negligent Misrepresentation**

117.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Fourth Amended Complaint.

118.    Compass, acting at least through Dr. Malievskaia, Goldsmith, and Dr. Shaun Hurley, made numerous fraudulent misrepresentations to Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) throughout 2019, under the guise of seeking to collaborate with UMB.  False statements made by Defendants include at least a) representations that they would not use or disclose the Psilocybin Trade Secrets and other confidential

information provided by Professor Thompson; b) the representation that there was a signed NDA in place between Compass and its affiliates and Professor Thompson; and c) representations that they were seeking additional information regarding Professor Thompson's research for the purposes of evaluating a collaboration with UMB, when Defendants did not intend to collaborate with UMB, such as continued requests for information even after secretly filing a patent application covering the Psilocybin Trade Secrets and other confidential information. At a bare minimum, these statements were negligently made.

119.    Defendants had a duty of care to UMB and Professor Thompson, namely the duty to furnish correct information. This duty arose based on the prospective business relationship between Professor Thompson, UMB, and Defendants. Defendants knew that the statements they would make would be relied upon and acted upon by UMB and Professor Thompson, and that they would be injured by any misrepresentations. Morals and good conscious compelled Defendants to furnish correct statements to UMB and Professor Thompson.

120.    Defendants intended that Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) would act upon the statements they made. For example, Defendants knew that Professor Thompson would not disclose confidential information without an NDA in place, or if he knew that Defendants were merely fishing for information without intending to collaborate.

121.    Compass, acting at least through Dr. Malievskaia, Goldsmith, and Dr. Shaun Hurley, knew that Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) would trust that Defendants were acting in good faith and would not expect that he was being defrauded by Defendants' representations. Defendants knew that this reliance would result in Professor Thompson disclosing the Psilocybin Trade Secrets and other confidential

information, and that UMB and Professor Thompson would be injured as a result of Defendants' negligent misrepresentations.

122.    Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) justifiably relied on Defendants' misrepresentations, and disclosed the Psilocybin Trade Secrets and other confidential information, believing that Defendants would not misuse or disclose such information.

123.    As a direct, proximate, and foreseeable result of Defendants' negligent misrepresentations, leading to the misuse and disclosure of the Psilocybin Trade Secrets and other confidential information, UMB and Professor Thompson have been damaged in an amount not yet ascertained.

### Count IX (By UMB and Professor Thompson; Against All Defendants)
### Fraudulent Concealment

124.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Fourth Amended Complaint.

125.    Defendants had a duty of care to UMB and Professor Thompson, namely the duty to disclose material facts while negotiating a collaboration with UMB.  This duty arose based on the prospective business relationship between Professor Thompson, UMB, and Defendants. Defendants knew that the statements they would make would be relied upon and acted upon by Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB), and that he and UMB would be injured by omitting material facts.  Morals and good conscious compelled Defendants to not suppress the truth in a way that would defraud Professor Thompson or UMB.

126.    Here, there were at least two instances where Compass, acting at least through Dr. Malievskaia, Goldsmith, and Dr. Shaun Hurley, failed to disclose a material fact to Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB).  The first is failing to

disclose that they had not in fact entered into the NDA agreement that they had asked Professor Thompson to sign.  Defendants failed to disclose the fact that they believed there was no NDA in place in order to deceive Professor Thompson so that he would disclose the Psilocybin Trade Secrets and other confidential information. Professor Thompson justifiably relied on the fact that he believed an NDA was in place, and did disclose such confidential information to Defendants in response.

127.    Second, Defendants failed to disclose that they had secretly filed the '611 Application, in direct violation of the NDA and/or the promise they had induced Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB) to believe Defendants had made that they would not disclose or use the Psilocybin Trade Secrets and other confidential information, and the expectations of Professor Thompson.  Even when discussing the '080 Application filed by Professor Thompson, Defendants concealed the fact that they too had filed a provisional patent application covering Professor Thompson's inventions.  Defendants wanted to extract additional information from Professor Thompson, but knew that Professor Thompson would cut off communications if he knew how Defendants were using UMB's confidential information.  Because provisional patent applications are not publicly available until the non-provisional child application is published, UMB and Professor Thompson could not have discovered that Defendants were secretly attempting to secure patent rights over his Psilocybin Trade Secrets.  As a result of the concealment, Professor Thompson continued to supply Defendants with confidential information when asked.

128.    As a direct, proximate, and foreseeable result of Defendants' fraudulent concealment, leading to the misuse and disclosure of the Psilocybin Trade Secrets and other confidential information, UMB and Professor Thompson have been damaged in an amount not yet

ascertained.

**Count X (By UMB and Professor Thompson; Against All Defendants)**
**Constructive Fraud**

129.    UMB and Professor Thompson re-allege and incorporate by reference each and every allegation contained in this Fourth Amended Complaint.

130.    Defendants had a duty of care to UMB and Professor Thompson, namely the duty not to deceive them, to violate their confidence, or to injure the public interests by defrauding a public university and its employees.  This duty arose based on the confidential relationship between Professor Thompson, UMB, Compass, and its affiliates, including, *inter alia*, Dr. Malievskaia and Goldsmith.  Compass, acting at least through Dr. Malievskaia, Goldsmith, and Dr. Shaun Hurley, gained Professor Thompson's trust by reaching out to UMB under the guise of seeking to collaborate with, and fund, UMB research.  Defendants' actions and statements resulted in a confidential relationship with Professor Thompson (in his capacity as a UMB researcher and as an agent of UMB), exemplified by what Professor Thompson believed to be a valid Mutual NDA.

131.    UMB and Professor Thompson placed their trust in Defendants yet, they were defrauded as a result of Defendants' continually deceiving them and violating their confidences.  This includes, but is not limited to, Defendant' misuse and disclosure of the Psilocybin Trade Secrets and other confidential information, Defendants' failure to disclose the filing of the '611 Application, and Defendants leading Professor Thompson along in an effort to extract confidential information from him knowing they were not going to collaborate with UMB or him.

132.    As a direct, proximate, and foreseeable result of Defendants' constructive fraud, leading to the misuse and disclosure of the Psilocybin Trade Secrets and other confidential

information, UMB and Professor Thompson have been damaged in an amount not yet ascertained.

**Count XI (By Professor Thompson; Against Compass)**
**Breach of Contract**

133.    Professor Thompson re-alleges and incorporates by reference each and every allegation contained in this Fourth Amended Complaint.

134.    As stated above, Compass has represented to this Court that it did not sign the NDA. However, to the extent that Compass contends that there was a valid contract between itself and Professor Thompson, Professor Thompson pleads this claim for breach of contract, in the alternative.

135.    As a condition of the disclosure of the Psilocybin Trade Secrets and other confidential information, Professor Thompson signed, without any changes, Compass's proffered NDA, which prohibited Compass and its affiliates, including, among others, Dr. Malievskaia and Goldsmith, from, *inter alia*, using or disclosing the Psilocybin Trade Secrets and other confidential information received from Professor Thompson.

136.    Professor Thompson fully complied with and fulfilled his obligations under the NDA.

137.    Compass breached the NDA by, without authorization or any legitimate business purpose, using and disseminating the confidential information it received under the NDA, including by filing patent applications using that information.

138.    Professor Thompson has sustained and will continue to sustain damages as a direct, proximate, and foreseeable result of Compass's breach of contract.

**Prayer For Relief**

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants,

inclusive as follows:

1.      Granting permanent injunctive relief against Defendants, and any persons in active concert or participation with them: (i) enjoining Defendants from obtaining, retaining, using, transmitting, disseminating, or disclosing the Psilocybin Trade Secrets; (ii) ordering Defendants to identify, and turn over, any property in their possession, custody, or control containing or reflecting the Psilocybin Trade Secrets, including hard copy documents or any form of electronic storage media; (iv) ordering Defendants to identify any other persons, entities, or locations not within their possession, custody, or control, to which Defendant has transmitted, disseminated, disclosed, or stored any Psilocybin Trade Secrets; (v) requiring Defendants to assign to Terran any rights to patents, patent applications, or other intellectual property that incorporates the Psilocybin Trade Secrets or to correct inventorship on any patents or patent applications that incorporate the Psilocybin Trade Secrets; and (vi) any other appropriate injunctive relief;

2.      Awarding compensatory damages, jointly and severally, in an amount to be determined at trial;

3.      Awarding exemplary damages, jointly and severally, in an amount to be determined at trial;

4.      Awarding interest, jointly and severally, at the maximum legal rate on all sums awarded;

5.      Awarding reasonable attorneys' fees, jointly and severally, as permitted by law;

6.      Awarding all costs of suit herein, jointly and severally; and

7.      Awarding such other and further relief as the Court deems just and proper.

## **Jury Demand**

Plaintiffs demand a jury trial on all triable issues.

Dated: May 19, 2025                    Respectfully submitted,

                                       /s/ DRAFT
                                       Ramsay M. Whitworth (Fed. Bar #26251)
                                       Email: rwhitworth@silvermanthompson.com
                                       Andrew M. Harvey (Fed. Bar # 21925)
                                       Email: aharvey@silvermanthompson.com
                                       Silverman, Thompson, Slutkin & White
                                       400 East Pratt Street, Suite 900
                                       Baltimore, MD 21202
                                       Telephone: (410) 385-2225
                                       Fax: (410) 547-2432

                                       -and-

                                       /s/ DRAFT
                                       Andrei Iancu (admitted *pro hac vice*)
                                       Email: iancua@sullcrom.com
                                       SULLIVAN & CROMWELL LLP
                                       1888 Century Park East
                                       Los Angeles, CA 90067
                                       Telephone: (310) 712-6600
                                       Facsimile: (310) 712-8800

                                       Dustin F. Guzior (admitted *pro hac vice*)
                                       Email: guziord@sullcrom.com
                                       Kirandeep K. Mahal (admitted *pro hac vice*)
                                       Email: mahalk@sullcrom.com
                                       SULLIVAN & CROMWELL LLP
                                       125 Broad Street
                                       New York, NY 10004
                                       Telephone: (212) 558-4000
                                       Facsimile: (212) 558-3588

                                       *Attorneys for Plaintiffs Terran Biosciences Inc. and Professor*
                                       *Scott Thompson*

                                       /s/ DRAFT
                                       Steven E. Tiller
                                       Email: stiller@whitefordlaw.com
                                       Whiteford, Taylor & Preston LLP
                                       7 Saint Paul Street
                                       Baltimore, MD 21202
                                       Telephone: (410) 347-9425
                                       Facsimile: (410) 223-4325

                                       *Attorney for Plaintiff University of Maryland, Baltimore*