IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TERRAN BIOSCIENCES, INC., *et al.*

   *Plaintiffs*,

v.

COMPASS PATHFINDER
LIMITED, EKATERINA
MALIEVSKAIA, M.D., and
GEORGE GOLDSMITH

   *Defendants*.

Civil Action No. ELH-22-1956

**MEMORANDUM OPINION**

In this contentious trade secret case, filed in August 2022, plaintiffs Terran Biosciences,

Inc. ("Terran"), a biotechnology company with its principal place of business in New York; the

University of Maryland, Baltimore ("UMB"); and Scott Thompson, Ph.D., formerly Chair of the

Department of Physiology at UMB's School of Medicine, have filed suit against defendant

Compass Pathfinder Limited ("Compass"), a biotechnology company incorporated in England and

Wales. In general, plaintiffs claim that in 2019 Compass fraudulently misappropriated their

"Psilocybin Trade Secrets," which pertain to a mechanism to reduce or eliminate the hallucinatory

effects of psilocybin while retaining its antidepressant benefits.

Almost three years after suit was filed, on May 19, 2025, plaintiffs filed "Motion For

Joinder Of Additional Parties And For Leave To File Fourth Amended Complaint," pursuant to

Fed. R. Civ. P. 20(a)(2). ECF 157 ("Fourth Motion"). In the Fourth Motion, plaintiffs sought to

add as defendants two individuals who were co-founders of Compass (ECF 157 at 5) and

executives of the company when suit was filed, but who had "since left their roles" with Compass.

*Id.* They are Ekaterina Malievskaia, M.D., MScPH and her husband, George Goldsmith ("New Defendants"). *Id.*

Compass opposed the Fourth Motion as untimely, lodged in bad faith, and prejudicial. ECF 160. Plaintiffs replied. ECF 181. For the reasons stated in my Memorandum Opinion (ECF 197) and Order (ECF 198) of July 11, 2025, I granted the Fourth Motion.

The Fourth Amended Complaint (ECF 199, "FAC") is the operative complaint. Critically, as to Compass, the FAC realleges the same facts and claims that were previously asserted. *Compare* ECF 81 (Third Amended Complaint) with ECF 199. Moreover, earlier versions of the suit, filed when Malievskaia and Goldsmith were associated with Compass, were replete with allegations concerning their alleged misconduct. But, they had not been named as defendants, presumably because of their affiliation with Compass, arguably rendering it unnecessary to sue them individually. Plaintiffs sought to add Malievskaia and Goldsmith as defendants only after their affiliation with Compass came to an end.

In Compass's response to the FAC, filed on July 25, 2025 (ECF 208), Compass asserted counterclaims for the first time (*id.* at 17-29), and did so beyond the deadline of May 19, 2025, as established in the Scheduling Order of April 24, 2025. *See* ECF 146. The New Defendants answered the FAC. ECF 212; ECF 213. Although the New Defendants have the same counsel as Compass, they did not lodge any counterclaims. *Id.*

Compass refers to each counterclaim as a count. But, I shall refer to each count as a counterclaim. Counterclaim I asserts fraudulent misrepresentation against UMB and Thompson; Counterclaim II asserts unfair competition against UMB and Thompson; Counterclaim III asserts unfair competition against all plaintiffs; and Counterclaim IV asserts tortious interference with

business relations, lodged against all plaintiffs.  ECF 208 at 25-29, ¶ 1-48.  Compass seeks compensatory and exemplary damages.  *Id.* at 28, ¶ 50.

Now pending is plaintiff's motion to strike and dismiss Compass's counterclaims, pursuant to Rule 12(f) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  ECF 229.  The motion is supported by a memorandum (ECF 229-1) (collectively, the "Motion").  Plaintiffs argue that Compass "was required to seek leave to assert these claims but did not do so, and the Court can strike the Counterclaims for that reason." ECF 229-1 at 6.[1]  Moreover, plaintiffs contend that Compass lacks "good cause, under either Rule 16(b) or under Rule 15(a)(2), for its long delay in asserting these claims." *Id.* at 7.  To the contrary, plaintiffs maintain that the counterclaims are "based on information Compass had in hand since this dispute began, and certainly had in hand when Compass filed its Answer on March 27, 2025." *Id.* at 6.  And, according to plaintiffs, Compass's filing of the counterclaims "**after the deadline for amending pleadings**, after the deadline for substantial completion of discovery, and shortly before expert reports were due — threatens to disrupt the case schedule and delay resolution . . . ." *Id.* (boldface in original).  Therefore, they urge the Court to strike the counterclaims as procedurally deficient and unduly prejudicial. ECF 229-1 at 6–7.

As to counterclaims I and II, plaintiffs also contend that the claims are barred by Maryland's statute of limitations, because they are based on events that occurred in 2019. *Id.* at 7, 18–20; *see* Md. Code (2020 Repl. Vol., 2024 Supp.), § 5-101 of the Courts and Judicial Proceedings Article.  With respect to counterclaims III and IV, plaintiffs assert that they are barred by the so called *Noerr-Pennington* doctrine.  *Id.* at 7, 21–23; *see Pro. Real Est. Invs., Inc. v.*

---

[1] Throughout this Memorandum Opinion, I cite to the electronic pagination.  The electronic pagination does not always correspond to page numbers imprinted on a particular submission.

*Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993); *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303 (4th Cir. 2003).

Compass opposes the Motion. ECF 232 (the "Opposition").  It is supported by eleven exhibits.  ECF 232-2 to ECF 232-13; ECF 234-1 to ECF 234-9.[2]  Compass argues that it "was not required to seek leave to file the Counterclaims in response to Plaintiff's Fourth Amended Complaint."  ECF 234-1 at 8.  Alternatively, Compass seeks leave, claiming that it has good cause under Rule 16(b) and Rule 15(a)(2).  ECF 234-1 at 8.  In particular, Compass contends that it exercised due diligence in filing its counterclaims because they "did not accrue until ***this July [of 2025]*** when it uncovered incriminating information ***through discovery in this case***."  *Id.* (boldface in original).

Moreover, Compass claims that plaintiffs put them in the position of filing belated counterclaims.  ECF 234-1 at 12. Compass explains that plaintiffs "waited until the last minute to file an amended complaint" and thus ensured that any counterclaims would be filed beyond the deadline.  *Id.*  Additionally, Compass claims that statute of limitations and the *Noerr-Pennington* doctrine are affirmative defenses that should not be resolved at the pleading stage.  *Id.*

Plaintiffs replied.  ECF 239.  They also submitted exhibits. ECF 237-1 to ECF 237-6; ECF 239.   No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion.

---

[2] ECF 234-1 is the sealed version of ECF 232.  I cite primarily to ECF 234-1.

## I. Factual and Procedural Background[3]

### A.

Terran filed suit on August 5, 2022, against Compass and ten "John Doe" defendants. ECF 1. The Complaint contained three counts: misappropriation of trade secrets, in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.* (Count I); misappropriation of trade secrets, in violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code (2013 Repl. Vol., 2022 Supp.), § 11-1201 *et seq.* of the Commercial Law Article (Count II); and breach of contract (Count III). ECF 1, ¶¶ 31–65. Compass moved to dismiss the Complaint, arguing, *inter alia*, that this Court lacks personal jurisdiction over Compass. ECF 24.

On April 6, 2023, before the Court decided the first motion to dismiss, Terran moved to amend the Complaint. ECF 32 ("First Motion"). In the First Motion, Terran sought to remove its breach of contract claim (Count III) and to add factual allegations pertaining to personal jurisdiction and in support of its trade secrets claims. *Id.* at 1. I granted the First Motion by Order of April 7, 2023. ECF 33. The First Amended Complaint followed. *See* ECF 34.

Then, on May 19, 2023, Terran moved to file a Second Amended Complaint. ECF 45 ("Second Motion"). In particular, Terran sought to join Professor Thompson as a plaintiff with respect to Count II, claiming he is "the inventor of the Psilocybin Trade Secrets at issue in this action." *Id.* at 2. In addition, Terran sought to add Count III, asserted jointly by Terran and Professor Thompson, alleging unfair competition under Maryland law. *Id.* Counts IV through XI of the proposed Second Amended Complaint were lodged solely by Professor Thompson, and

---

[3] The parties are familiar with the facts, which have been summarized by the Court in several prior opinions and incorporated by reference here. *See*, *e.g.*, ECF 79; ECF 112; ECF 128; ECF 161; ECF 197. The facts pertinent to the Motion are drawn largely from the FAC and Compass's response to the FAC. ECF 199; ECF 208.

included claims for detrimental reliance, unjust enrichment, fraud, and breach of contract. *Id.* Compass did not oppose the motion. ECF 46. By Order of June 2, 2023, I granted the Second Motion. ECF 47. The Second Amended Complaint is docketed at ECF 48.

On January 4, 2024, Terran and Thompson moved to file a Third Amended Complaint ("TAC"), seeking to join UMB as a plaintiff, and to add factual allegations pertinent to the claims of fraud. ECF 67 ("Third Motion"). The Third Motion was supported by numerous exhibits. Compass opposed the proposed amendments as futile, untimely, and prejudicial. ECF 68. By Memorandum Opinion (ECF 79) and Order (ECF 80) of February 6, 2024, I granted the Third Motion. The TAC is docketed at ECF 81.

Thereafter, Compass moved to dismiss the Third Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(6). ECF 93; ECF 93-1; ECF 95. Under Rule 12(b)(2), Compass contended that the Court lacks personal jurisdiction, both specific and general. ECF 93-1 at 11. Pursuant to Rule 12(b)(6), Compass also sought dismissal of the DTSA claim, as well as the claims for fraudulent misrepresentation, negligent misrepresentation, constructive fraud, and fraudulent concealment. *Id.* at 11, 12. In addition, pursuant to Rule 12(b)(6), Compass urged dismissal of the ten "John Does" named in the Third Amended Complaint, claiming the Third Amended Complaint failed to assert any factual allegations against them. *Id.* at 12. Moreover, Compass contended that certain counts in the Third Amended Complaint were duplicative and, on this basis, Compass asked the Court to dismiss some of those claims to "preserve resources." *Id.*

By Memorandum Opinion (ECF 122) and Order (ECF 123) of March 11, 2025, I dismissed the suit as to all Doe Defendants, but otherwise denied the motion to dismiss. *See also* ECF 128 (redacted Memorandum Opinion). Compass answered the TAC on March 27, 2025. ECF 124.

In April 2025, several new lawyers entered the case for Compass. *See*, *e.g.*, ECF 132, ECF 133, ECF 134, ECF 141, ECF 142, ECF 155. At about the same time, other counsel for Compass withdrew from the case. *See*, *e.g.*, ECF 147, ECF 148, ECF 163. Then, in June 2025, eight attorneys sought pro hac vice status as counsel for Terran. *See* ECF 163 to ECF 171.

In the meantime, the Court held a telephone conference with counsel on April 21, 2025. *See* Docket. Thereafter, on April 24, 2025, I issued a Scheduling Order. ECF 146. The Scheduling Order set a deadline of May 19, 2025, for joinder of parties and amendments of pleadings. *Id.* at 1. Further, the Court set a discovery deadline of October 10, 2025, and a dispositive pretrial motion deadline of November 7, 2025. *Id.* at 2.[4]

On April 24, 2025, consistent with the deadline in the Scheduling Order, plaintiffs filed the Fourth Motion. ECF 157. Pursuant to Rules 15(a) and 20(a)(2), plaintiffs sought to add Malievskaia and Goldsmith as defendants, as noted. And, they submitted the proposed FAC. ECF 157-1. By Memorandum Opinion (ECF 197) and Order (ECF 198) of July 11, 2025, I granted the Fourth Motion.

The FAC, docketed at ECF 199, contains the same eleven counts that were previously asserted in the TAC (ECF 81). And, it appears to incorporate the same twenty-seven exhibits appended to the TAC. *See* ECF 67-2 to ECF 67-28.[5] Count I, lodged by Terran and UMB against all defendants, asserts misappropriation of trade secrets, in violation of the DTSA.[6] Count II,

---

[4] This deadline was subsequently revised by Order of October 17, 2025. ECF 270. A new discovery deadline was set for November 20, 2025, and the dispositive pretrial motion deadline was set for November 26, 2025. *Id.*

[5] These documents, included with the TAC, are cited throughout the FAC. But, they were not resubmitted. *See* ECF 197 at 4 n. 2.

[6] Based on the DTSA claim, subject matter jurisdiction is founded on 28 U.S.C. § 1331. ECF 199, ¶ 16. With regard to plaintiffs' State law claims, the Court may exercise supplemental

brought by all plaintiffs against all defendants, asserts misappropriation of trade secrets, in violation of the MUTSA.  Count III, brought by all plaintiffs against all defendants, alleges unfair competition.  Counts IV through X are brought by UMB and Thompson against all defendants. Count IV asserts "Detrimental Reliance/Promissory Estoppel"; Count V asserts unjust enrichment; Count VI asserts "Quantum Meruit/Implied-In-Fact Contract"; Count VII alleges fraudulent misrepresentation; Count VIII alleges negligent misrepresentation; Count IX asserts fraudulent concealment; and Count X alleges constructive fraud.  Count XI is brought solely by Thompson and lodged only against Compass.  It alleges breach of contract.

Critically, as to Compass, the FAC is substantively unchanged from the Third Amended Complaint (ECF 81).  But, for the reasons stated, the FAC added as defendants two individuals who held executive positions at Compass when suit was filed, but who had since left the Company. Of significance, no new claims were added to the suit.  Rather, the New Defendants were added to existing claims that had already been lodged against Compass.  The counterclaims followed on July 25, 2025.  ECF 208.

## B.

Malievskaia and Goldsmith are citizens of the United Kingdom.  ECF 199, ¶¶ 13, 14.  They co-founded Compass in 2016 and held various roles in the company.  *See id.*  For example, Goldsmith served as Compass's Chief Executive Officer from June 2016 through August 2022, and as chairman of Compass's board of directors from June 2016 to March 2024.  *Id.* ¶ 14.  Dr. Malievskaia served as (1) a member of Compass's board of directors from 2017 to March 2024; (2) Compass's Head of Research and Development from January 2019 to January 2020; (3)

---

jurisdiction. *See* 28 U.S.C. § 1367.  In any event, the Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), based on diversity of citizenship.  ECF 199, ¶ 18.

Compass's Chief Medical Officer from June 2017 to 2019; and (4) Compass's Chief Innovation Officer from January 2020 through June 2023. *Id.* ¶ 13.[7]

On "March 28, 2024, Compass announced that Dr. Malievskaia and Mr. Goldsmith had resigned from the board of directors, effective the next day." ECF 181 at 6 n.5. Moreover, both have "left Compass." *Id.* at 12; *see* ECF 157 at 5.

According to the FAC, in November 2016, while Dr. Thompson worked at UMB, he "began working on the idea of the administration of psilocybin in the presence of a 5-HT2A antagonist (including ketanserin) as a potential rapid, non-hallucinogenic antidepressant therapy." ECF 199, ¶ 1.[8] Plaintiffs concede that, "[a]t the time, it was known that 5-HT2A antagonists like ketanserin reduce or eliminate the negative hallucinogenic effects of psilocybin." *Id.* However, "Professor Thompson recognized that psilocybin's antidepressant therapeutic effects are independent of significant 5-HT2A receptor activation that causes hallucinations, and discovered that, through the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, a patient could receive the antidepressant benefits of psilocybin, without being subject to the negative hallucinogenic effects." *Id.* Therefore, "[o]ver the next few years, Professor Thompson engaged in extensive research . . . related to the sequential administration of ketanserin (or other 5-HT2A antagonists) followed by psilocybin, in order to produce the optimal non-hallucinatory and anti-depressive effects." *Id.* ¶ 27. "Further research" conducted by

---

[7] In Dr. Malievskaia's Declaration of June 26, 2023 (ECF 93-3), filed as an exhibit to Compass's motion to dismiss the TAC (ECF 93), she stated: "I am currently Chief Innovation Officer of Compass Pathways plc, the parent company of Compass Pathfinder Limited ('Compass')." ECF 93-3, ¶ 2.

[8] Dr. Thompson is now a Professor of Psychiatry at the University of Colorado Anschutz School of Medicine. ECF 199, ¶ 11.

Thompson "related to the optimal time points, frequency, and dosing for the sequential administration of the two drugs in combination." *Id.*

The FAC asserts, *id.* ¶ 28: "The inventions derived from, and the results of, this research constitute the Psilocybin Trade Secrets." Consistent with the FAC, I shall refer to the information outlined by plaintiffs in ECF 199, ¶¶ 27–29, as the "Psilocybin Trade Secrets."[9]

Based on UMB's employment contract with Dr. Thompson, UMB is the owner of the Psilocybin Trade Secrets. *Id.* ¶ 28. Dr. Thompson receives "a portion of the revenues that UMB generates from his inventions . . ., including the Psilocybin Trade Secrets." *Id.* (citing ECF 67-15 at 4–5). UMB, as owner of the Psilocybin Trade Secrets, entered into a Master License Agreement ("MLA") with Terran on May 7, 2021. ECF 199, ¶ 54. Pursuant to the MLA, UMB "exclusively licens[ed] to Terran" the Psilocybin Trade Secrets, *id.*, in order to "bring a groundbreaking rapid, non-hallucinogenic antidepressant therapy to market." *Id.* ¶ 7. Moreover, "the MLA grants Terran the right to institute any action for misappropriation of any Psilocybin Trade Secret that has existed at any period in time, including prior to the MLA." *Id.* ¶ 55.

On August 13, 2019, Thompson and UMB "filed U.S. Provisional Patent Application No. 62/886,080 ('the '080 Application'), entitled 'Combination Therapy with Broad Spectrum Serotonergic Agonists and Anti-Hallucinogenic Serotonergic Antagonists.'" *Id.* ¶ 30 (quoting ECF 67-16).[10] Although the "'080 Application generally disclosed co-administering psilocybin

---

[9] To be clear, I utilize the phrase "Psilocybin Trade Secrets" for convenience and consistency; the usage is not a ruling that the information does, in fact, constitute a trade secret.

[10] Plaintiffs cited Exhibit 15 to the Third Motion (ECF 67-16) to support their assertion that "Professor Thompson and UMB filed U.S. Provisional Patent Application No. 62/886,0**8**0" on August 13, 2019. ECF 199, ¶ 30 (boldface added). However, that patent application is numbered "62/886,0**9**0." (Boldface added). The Court has identified this inconsistency on other occasions. *See* ECF 197 at 8 n.7; ECF 161 at 6, n.7; ECF 128 at 6 n.4; ECF 79 at 4 n.3. Because plaintiffs continue to refer to the application as the "'080" application, I have done the same.

and an antagonist," it "did not go into detail about the specifics of the sequential administration of a 5-HT2A antagonist followed by psilocybin, or the optimal order, time points, frequency, or dosing for the therapy, all of which Professor Thompson maintained as trade secrets pending further experimental data."  ECF 199, ¶ 30.  Indeed, Thompson and UMB held the Psilocybin Trade Secrets in "strict confidence" and "did not disclose [them] to anyone except by non-disclosure agreements or other confidentiality obligations."  *Id.* ¶ 29.

In May 2019, Dr. Malievskaia, then "Head of Research and Development of Compass," emailed Todd Gould, Professor of Psychiatry at UMB.  *See* ECF 67-17 at 3–4.  Malievskaia stated that Compass was "developing psilocybin for treatment-resistant depression" and requested a telephone call with Gould to discuss the "molecular mechanisms of psilocybin."  *Id.*  Gould, in turn, suggested the involvement of Thompson.  *Id.* at 2.  Malievskaia encouraged Gould to invite Thompson to participate in the telephone call.  ECF 67-20 at 2.

Prior to the telephone discussion, and at the direction of Dr. Malievskaia, a Compass employee sent a nondisclosure agreement ("NDA") to Dr. Thompson for his signature.  *Id.*; ECF 124 (Compass's Answer to the Third Amended Complaint), ¶ 3 ("Compass admits that Jessica Rose Stuart provided Thompson with a document titled Mutual Non-Disclosure Agreement at the Direction of Dr. Ekaterina Malievskaia . . . ."); *see also* ECF 67-19 (NDA).  "By its terms, the NDA would prohibit Compass from using any information disclosed by Professor Thompson or his colleagues other than 'in connection with exploring possible business arrangements between Compass and/or their Affiliates.'"  ECF 199, ¶ 32 (quoting ECF 67-19 at 2).

Notably, the NDA was prepared by Compass.  And, as depicted below, the NDA reflects that Goldsmith was to sign it on behalf of Compass.

11

COMPASS Pathways Limited

By:

Name:  George Goldsmith

Title: Executive Chairman, Co-Founder

Address:

120 New Cavendish Street

Office 301

London W1W 6XX, UK

Scott Thompson

By:

Name: Scott Thompson

Title: Professor and Chair

Address:

Department of Physiology

University of Maryland School of Medicine

655 W. Baltimore St.

Baltimore, MD 21201 USA

Thompson executed the NDA and sent it to Compass.  ECF 199, ¶ 3, 32; ECF 67-18 at 2.[11]

However, unknown to Dr. Thompson, Compass never countersigned the NDA.  ECF 199, ¶ 3, 30,

33, 110; *see also* ECF 24-1 at 13 n.2 (In its first motion to dismiss, Compass stated: "The NDA is

not signed by Compass."); *id.* at 26 ("If this case were to proceed, Compass would be forced

to . . . travel to Maryland to defend itself against claims arising from an NDA it did not sign . . . ");

ECF 51-1 at 14 n.3 (Compass's second motion to dismiss, stating: "The NDA was only signed by

Thompson, not by Compass"); ECF 93-1 at 23 n.7 (Compass's third motion to dismiss, stating that

"the NDA was never signed.").  Indeed, as depicted above, the signature page of the NDA, which

features the typed name of George Goldsmith, is blank as to his signature.  *See* ECF 67-19 at 4.

And, according to the FAC, Dr. Malievskaia and Dr. Hurley, a research scientist at Compass,

fraudulently misrepresented to Dr. Thompson that Compass had signed the NDA.  ECF 199, ¶ 110.

On June 13, 2019, at Dr. Malievskaia's request, Dr. Thompson and Dr. Gould sent

Compass a "scientific proposal and a proposed budget to study the administration of psilocybin in

---

[11] Compass also sent Gould a NDA.  *See* ECF 67-20 at 2.  But, the FAC does not specify
whether Gould ever executed it.

the presence of ketanserin . . . ." ECF 199, ¶ 34; *see* ECF 67-21 at 3–4.[12]  In response, Dr. Hurley stated, ECF 67-22 at 2: "Overall, we believe that your proposal focuses on some very interesting and important questions.  To our knowledge, these studies would provide the first direct evidence for the requirements (or not) of AMPAR and for 5-HT2R function in the antidepressant actions of psilocybin."  Dr. Hurley also stated, *id.* at 3: "We are especially excited by the potential to evaluate the efficacy of psilocybin in the presence of ketanserin, as clearly this information also has considerable clinical value."

Thereafter, for approximately six months, Compass, Gould, and Thompson engaged in communications via email and telephone in supposed contemplation of a collaboration agreement.  ECF 199, ¶ 3.  During this time, Gould and Thompson received and answered substantive questions posed by Dr. Hurley in regard to the research proposal.  *Id.* ¶ 37; ECF 67-21 at 2; ECF 67-22; ECF 67-23.  Notably, Dr. Malievskaia and Goldsmith were copied on at least some of these email communications.  *See, e.g.*, ECF 67-23.  Moreover, "[d]uring the course of these communications, Professor Thompson disclosed to Compass" certain details of the Psilocybin Trade Secrets.  ECF 199, ¶ 36.

In October 2019, Compass sent UMB a revised collaboration agreement.  *Id.* ¶ 40.[13]  That same month, Compass attended a presentation by Thompson at the national Society for Neuroscience conference in Chicago. ECF 93 at 14 n. 3. There, Compass claims it learned that Thompson had already performed the studies he was proposing to Compass.  *Id*.

On November 20, 2019, Hurley emailed Thompson, stating that the "results that your group presented sound promising, but we understand from your presentation at SFN that the experiments

---

[12] The Court was not provided with a copy of the proposal.

[13] The Court has not been provided with any drafts of a collaboration agreement.

outlined in your proposal to us are already in progress." ECF 67-24 at 2. He continued, *id.*: "As discussed previously, we are not comfortable with supplying our product, a scheduled substance, for studies that are in-progress/completed." Therefore, "Compass was 'unable to proceed with the collaboration' and declined to fund Professor Thompson's experiments." ECF 199, ¶ 41 (quoting ECF 67-24). Dr. Malievskaia, among other Compass employees, was copied on the email. ECF 67-24 at 2.

Later, plaintiffs discovered that on August 29, 2019, Compass filed U.S. Provisional Patent Application No. 62/893,611 ("the '611 Application"), "without telling Professor Thompson or UMB." ECF 199, ¶ 43. Of import, the '611 Application is signed by Goldsmith, in his capacity as "Co-Founder" and "Chairman" of Compass. ECF 67-7 ('611 Application), at 5. The application included disclosure of "the sequential administration of a 5-HT2A antagonist (expressly including ketanserin) followed by psilocybin to reduce [psilocybin's] negative side effects . . . ." ECF 199, ¶ 43. In addition, the '611 Application contains specific "ranges for the sequential order, time points, frequency and dosing of such therapy . . . ." *Id.* ¶ 47; *see id.* ¶ 48 (citing ECF 67-7 at 265).

Plaintiffs allege, ECF 199, ¶ 48: "As of August 29, 2019, Professor Thompson had not made any public disclosure of these aspects and details of his Psilocybin Trade Secrets, nor did he disclose them in his August 13, 2019 provisional patent application . . . ." Plaintiffs posit that "the purpose" of these disclosures "in the '611 Application was to claim the Psilocybin Trade Secrets as Compass's own invention, and/or to preemptively block Professor Thompson and UMB from securing patent rights over the Psilocybin Trade Secrets . . . ." *Id.*

According to plaintiffs, Compass and the New Defendants "stole the ideas for the '611 Application from Professor Thompson and disclosed them in their own patent application." *Id.* ¶ 43. In this regard, plaintiffs observe that Compass filed the '611 Application even though, when

14

the defendants "first began talking with Professor Thompson and Professor Gould, they had not been researching the combination of psilocybin with a 5-HT2A antagonist, and had no knowledge about that subject." *Id.* ¶ 42. Moreover, plaintiffs maintain that the '611 Application contains "glaring" indicators of the theft, including the speed with which it was filed. *Id.* ¶ 46.

Since 2019, Compass has filed at least four additional United States patent applications, "with specification disclosures involving the sequential administration of a 5-HT2A antagonist followed by psilocybin." *Id.* ¶ 50. In particular, on October 18, 2021, "Compass, at the direction of Dr. Malievskaia and Goldsmith, filed U.S. Patent Application No. 17/604,610" (the "'610 Application"). *Id.* It included claims to "aspects of the Psilocybin Trade Secrets, including the sequential administration of a 5-HT2A antagonist followed by psilocybin." *Id.* (citing ECF 67-25 at 4). However, on August 25, 2022, before the Patent Office took any action with respect to the '610 Application, Compass "cancelled" its claims to aspects of the Psilocybin Trade Secrets. ECF 199, ¶ 50 (citing ECF 67-26 at 4). According to plaintiffs, Compass cancelled these claims "because Compass's patent prosecution attorneys at Cooley LLP became aware of Defendants' misconduct and the fact that no one at Compass actually invented the claimed subject matter . . . ." ECF 199, ¶ 50.

Also on October 18, 2021, "Compass, at the direction of Dr. Malievskaia and Goldsmith, filed two additional non-provisional applications . . . U.S. Patent Application Nos. 17/604,606 and 17/604,619, which included, in their specifications, aspects and details of the Psilocybin Trade Secrets." *Id.* ¶ 51. And, on December 2, 2021, "Compass, at the direction of Dr. Malievskaia and Goldsmith, filed U.S. Patent Application No. 17/540,962, which likewise included aspects and details of the Psilocybin Trade Secrets in its specification." *Id.* "That application issued as U.S. Patent No. 11,564,935." *Id.* (citing ECF 67-9 at 132–33, 149–151). Compass has since "filed U.S.

Patent Application No. 18/077,876, a continuation patent application with the same specification."
ECF 199, ¶ 51.

In addition, Compass has "filed multiple international patent applications" that "disclose aspects and details of the Psilocybin Trade Secrets in their specifications."  *Id.*  Plaintiffs allege, *id.*: "Many of the inventors listed on these patent applications are the same Compass employees who were involved in the communications with Professor Thompson and Professor Gould starting in May 2019" and "were included on email correspondence, attended meetings with Professor Thompson and Professor Gould, and had access to the Psilocybin Trade Secrets."  Notably, this includes Dr. Malievskaia and Goldsmith.  *Id.*; *see also, e.g.*, ECF 67-9 (U.S. Patent No. 11,564,935), at 1 (listing Dr. Malievskaia and Goldsmith, among other people, as inventors).

## II.    Fed. R. Civ. P. 12(b)(6) and 12(f)

Plaintiffs' Motion is predicated on Fed. R. Civ. P. 12(b)(6) and 12(f).

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024); *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  In considering a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw

all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Hebb v. City of Asheville, N. Carolina*, 145 F.4th 421, 432 (4th Cir. 2025).

Fed. R. Civ. P. 12(f) governs motions to strike.  It provides, in part: "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  *See, e.g.*, *Haley Paint Co. v. E.I. du Pont de Nemours & Co*., 279 F.R.D. 331, 335 (D. Md. 2012).  In determining whether to grant a motion to strike, the court "enjoys wide discretion . . . in order to minimize delay, prejudice and confusion by narrowing the issues for discovery and trial."  *Id*. at 336.

Courts have used Rule 12(f) to strike and dismiss untimely claims added by a party without leave of court. *See*, *e.g., Patterson v. Louisiana State Bd. of Elementary & Secondary Educ*., No. CV 21-30-JWD-RLB, 2023 WL 5251843, at *4 (M.D. La. Aug. 15, 2023) (granting Rule 12(f) motion to strike newly added claims because plaintiff could not show good cause for untimely assertion); *Ten Bridges, LLC v. Midas Mulligan, LLC*, 522 F. Supp. 3d 856, 867 (W.D. Wash. 2021) (granting motion to strike untimely claims filed without leave of court); *Concordia Pharms. Inc. SARL.*, No. 618CV01658HMHJDA, 2019 WL 2502212, at *5 (D.S.C. May 17, 2019) (granting Rule 12(f) motion as to untimely claims added without leave of court), *report and recommendation adopted sub nom*., 2019 WL 2502189 (D.S.C. June 17, 2019); *see Hendrix v. Coffey,* 305 Fed. Appx. 495, 497 (10th Cir. 2008) (granting motion to strike reply brief as untimely); *Doe A.F. v. Lyft, Inc.,* No. CV 23-3990-KSM, 2024 WL 4479912, at *1 (E.D. Pa. Oct. 10, 2024) (Because "Plaintiff did not have Lyft's consent or leave of court to add Count II, the Court will strike it under Federal Rule of Civil Procedure 12(f)."); *Boyack v. Salon Mgmt. Corp.,*

No. SACV1801233AGDFMX, 2019 WL 1744855, at *3 (C.D. Cal. Feb. 11, 2019) ) ("The Court instead opts to strike the newly added claims for relief under Rule 12(f)."), *aff'd sub nom.,* 812 F. App'x 428 (9th Cir. 2020); *Baca v. Patriot Nat'l, Inc.*, No. 17-CV-03508-SK, 2018 WL 10435168, at *2 (N.D. Cal. Feb. 12, 2018) (granting Rule 12(f) motion to strike claims that were added beyond the scope of court's leave to amend.); *Romero v. Barnett,* DKC-09-2371, 2011 WL 1938147, at *1 (D. Md. May 20, 2011) (recognizing that some courts have stricken untimely answers under Rule 12(f).).

To be sure, "Rule 12(f) motions are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (internal quotation marks omitted); *see also Renaissance Greeting Cards, Inc. v. Dollar Tree Stores*, 227 Fed. Appx. 239, 247 (4th Cir. 2007). Therefore, "[w]hen reviewing a motion to strike, 'the court must view the pleading under attack in a light most favorable to the pleader.'" *Piontek v. Serv. Ctrs. Corp.*, PJM 10–1202, 2010 WL 4449419, at *8–9 (D. Md. Nov. 5, 2010) (citation omitted).

Ordinarily, a Rule 12(f) motion "will be denied unless the matter under challenge has 'no possible relation to the controversy and may prejudice the other party.'" *U.S. ex rel. Ackley v. Int'l Bus. Machines Corp*., 110 F. Supp. 2d 395, 406 (D. Md. 2000) (quoting *Steuart Inv. Co. v. Bauer Dredging Constr. Co*., 323 F. Supp. 907, 909 (D. Md. 1971)); *accord Williams v. Kettler Mgmt. Inc*., CCB–12–1226, 2014 WL 509474 (D. Md. Feb. 5, 2014); *E.E.O.C. v. Spoa, LLC*, CCB–13–1615, 2014 WL 47337 (D. Md. Jan. 3, 2014). In contrast, "'the disfavored character of Rule 12(f) is relaxed in the context of scandalous allegations, *i.e.*, those that improperly cast a derogatory light on someone.'" *Asher & Simons, P.A. v. J2 Global Canada, Inc*., 965 F. Supp. 2d 701, 702

18

(D. Md. 2013) (citation omitted), *partial reconsideration on other grounds*, 977 F. Supp. 2d 544 (D. Md. 2013).

A motion to strike a defense "should not be granted when the sufficiency of the defense depends upon disputed issues of fact or unclear questions of law." *NCUA v. First Union Capital Mtks. Corp.*, 189 F.R.D. 158, 163 (D. Md. 1999); *see Federal Ins. Co. v. Edenbaum*, JKS–12–410, 2012 WL 2803739, at *2 (D. Md. July 9, 2012). Moreover, "Rule 12(f) motions often are not granted in the absence of a showing of prejudice to the moving party.[]" Wright and Miller, Federal Practice and Procedure: Civil 3d § 1381 at 422. Of relevance here, "prejudice may be considered and, in some cases, may be determinative, where a defense is presented beyond the normal time limits of the Rules, especially at a late stage in the litigation . . . ." *GEOMC Co., Ltd. v. Calmore Therapeutics Inc.*, 918 F.3d 92, 99 (2nd Cir. 2019). The Second Circuit has cautioned that, when a new counterclaim raises issues "late in the litigation" and "beyond the scope of the most recent amended complaint," so as to prejudice the counterdefendant or "unduly expand the litigation," a challenge should be made, *inter alia*, under Rule 12(b)(6), but not Rule 12(f). *Id.* at 101.

### III. The Filing of the Counterclaims

Plaintiffs argue that Compass was required to seek leave of court to file its counterclaims in July 2025. ECF 229-1 at 12. And, they argue that "Compass's Counterclaims should be struck because Compass did not request and obtain leave to amend to add its new Counterclaims." *Id*. Compass maintains that the counterclaims were filed by right. ECF 234-1 at 8, 12. In the alternative, Compass asks the Court to "retroactively grant leave for Compass to file its Counterclaims." *Id*. at 16.

"The . . . question is whether a new counterclaim may respond as broadly as one included in an answer to an original complaint or whether it must respond only to the new allegations of an

amended complaint.  This is an issue that remains unresolved . . . .”  *GEOMC Co., Ltd.*, 918 F.3d at 100.  The Second Circuit has stated, *id.*:  “We think resolution of this issue depends on how far into the litigation the new counterclaim is asserted.”  Notably, the court added, *id.*:  “At a late stage of the litigation . . . a new counterclaim that raises issues beyond the scope of the new claims made in the most recent amended complaint will usually cause escalating prejudice to the counterdefendant and undue expansion of litigation that the court is charged with managing[.]”  The Second Circuit has opined that “a new counterclaim should normally not be permitted if it exceeds the scope of the plaintiff's new claims.”  *Id.*

The Second Circuit outlined the principal approaches to the analysis, as follows, *id.* at 100, n.12:

> Four approaches to the issue have been identified for new counterclaims asserted in an amended answer that responds to an amended complaint. A so-called “narrow approach” 3 Moore's Federal Practice § 15.17[6], suggests that a new counterclaim “had to be tailored specifically to address the amendments in the complaint,” *id.* A so-called “permissive approach,” *id.* suggests that new counterclaims may be included in an amended answer “without leave of court, regardless of the nature of the amended complaint,” *id.* A so-called “moderate approach,” *id.*, suggests that new counterclaims may be filed “without seeking permission if the amended complaint changes the theory or scope of the case,” *id.*, but such counterclaims “must be those that respond to new allegations in the amended complaint,” *id.* Finally, a so-called “Bern approach,” *id.*, suggests that courts considering whether new counterclaims may be filed should “simply apply normal Rule 15(a) standards, in all their flexibility,” *id.*; *see Bern Unlimited, Inc. v. Burton Corp.*, 25 F.Supp.3d 170, 178-79 (D. Mass. 2014).

According to plaintiffs, courts in the Fourth Circuit use the “common-sense ‘moderate approach’ . . . .” ECF 229-1 at 12.  Plaintiffs emphasize that the FAC did not change the theory or the scope of the case.  *Id.* at 13.  Yet, they argue that the counterclaims “advance four new theories of liability that would change the scope and theory of the case.”  *Id.*  In their view, “the amendments in the Counterclaims are not proportional to the amendments in Plaintiffs’ FAC.”  *Id.*

Compass posits: "*No appellate court* has squarely addressed whether counterclaims filed in response to an amended complaint . . . must be permitted as of right or only with leave of court." ECF 234-1 at 11 (citing *Elite Ent. Inc. v. Khela Bros Ent.*, 227 F.R.D. 444, 446 (E.D. Va. 2005)) (emphasis in ECF 234-1).  Compass insists that it "had a right to file its Counterclaims in response to Plaintiffs' Fourth Amended Complaint," and it advocates for the permissive approach adopted by several courts.  ECF 234-1 at 12.  It points out that plaintiffs "waited until the last minute to file an amended complaint" and, as such, opened the door for the counterclaims.  *Id.*

Further, Compass maintains that, even under the "moderate approach," Compass was not required to seek leave. ECF 234-1 at 13. Arguing that its "Counterclaims meet that proportionality requirement . . .", Compass contends that while the FAC "added two entirely new parties . . . and asserted **ten** counts against **each** . . . Compass asserted only four Counterclaims and did not seek to add **any** additional parties."  *Id.* (boldface in original).  Additionally, Compass contends that because the "Counterclaims largely relate to the same facts . . . and require minimal additional discovery. . . there is at least a 'rough equivalence' between the change in scope of Plaintiff's Fourth Amended Complaint and Compass's Counterclaims, and for that reason, Compass did not need leave . . . ." *Id.*

The moderate approach appears to be the majority approach.  *See, e.g.*, *Poly-Med, Inc. v. Novus Sci. Pte Ltd.*, No. 8:15-CV-01964-JMC, 2017 WL 2874715, at *2 (D.S.C. July 6, 2017) ("Because in the Fourth Circuit, courts have routinely adopted and applied the moderate approach and the moderate approach has found favor with respected commentators, this court will adopt the moderate approach.") (cleaned up); *Activevideo Networks, Inc. v. Verizon Commc'ns, Inc.*, No. 2:10CV248, 2011 WL 13113382, at *3 (E.D. Va. Mar. 1, 2011) ("Courts within the Fourth Circuit have routinely adopted and applied the "moderate" approach.); *see also Burton v. Ghosh*, 961 F.3d

960, 968 (7th Cir. 2020) ("If every amendment, no matter how minor or substantive, allowed defendants to assert counterclaims or defenses as of right, claims that would otherwise be barred or precluded could be revived without cause. This would deprive the Court of its ability to effectively manage the litigation.") (citing *E.E.O.C. v. Morgan Stanley & Co., Inc.*, 211 F.R.D. 225, 227 (S.D.N.Y. 2002); *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1202 (11th Cir. 2011) ("[T]he filing of an amended complaint does not automatically revive all defenses or objections that the defendant may have waived in response to the initial complaint."); *KDF Forestry, Inc. v. Wells*, No. 2:23-CV-04072-BCW, 2024 WL 5446325, at *3 (W.D. Mo. Jan. 24, 2024) ("[T]he Eighth Circuit has indirectly adopted" the moderate approach.) (alteration added) (citing *Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 832 (N.D. Iowa 1997), *aff'd on other grounds*, 205 F.3d 1347 (8th Cir. 2000)); *Power Probe Grp. Inc. v. Innova Elecs. Corp.*, No. 221CV00332GMNEJY, 2023 WL 7704414, at *1 (D. Nev. Nov. 14, 2023) ("[T]he 'moderate approach' is the most commonly adopted approach by district courts in the Ninth Circuit") (alteration added) (internal citation omitted); *Danieli Corp. v. SMS Grp., Inc.*, No. 2:21-CV-1716, 2022 WL 5247424, at *3 (W.D. Pa. Aug. 18, 2022) ("[T]he moderate approach appears to be the one employed by a majority of the district courts tackling this issue and is favored by commentators as well.") (alteration added); *Raymond James & Assocs., Inc. v. 50 N. Front St. TN, LLC*, No. 18-CV-2104-JTF-TMP, 2020 WL 7332846 (W.D. Tenn. June 23, 2020) ("Courts and commentators are in agreement that the majority rule is the 'moderate' approach."), *report and recommendation adopted*, No. 218CV02104JTFTMP, 2020 WL 6694299 (W.D. Tenn. Nov. 13, 2020).

As indicated, under the "moderate approach" a party may file an "amended response," without leave of court, "only when the amended complaint changes the theory or scope of the case, and then, the breadth of the changes in the amended response must reflect the breadth of the

changes in the amended complaint." *Elite Ent., Inc.*, 227 F.R.D. at 446.  Compass claims that the addition of New Defendants in the FAC expanded the scope of the case and thus it had the right to lodge counterclaims.   ECF 234-1 at 13.  But, Compass ignores that the content of the FAC was unchanged as to Compass.  And, although the FAC added Malievsakaia and Goldsmith as parties, their conduct has been at issue since the inception of the litigation, and the allegations as to their conduct were largely unchanged.[14]

I made clear in my ruling permitting the filing of the FAC (ECF 197) that I allowed the filing of the FAC precisely because it did not alter the scope of the litigation.  In my Memorandum Opinion of July 11, 2025 (ECF 197), I pointed to an important change in circumstances:   the departure of the New Defendants from Compass.  As mentioned, the New Defendants were alleged co-founders of Compass and, when plaintiffs filed earlier versions of the suit, they held key roles with Compass.  Moreover, the earlier versions of the suit were replete with allegations concerning the conduct of both Malievskaia and Goldsmith.  Given the departure of the New Defendants from Compass, however, it was understandable that plaintiffs wanted to add them as parties.[15]

In granting leave to file the FAC, I considered that the FAC did not alter the theory or scope of the case. Significantly, the FAC did not introduce any new claims against Compass. I stated: "It is undisputed that the Proposed FAC does not materially alter the suit . . . ." ECF 197 at 35.  I also said, *id.* at 2 (alterations added): "Of import, the factual allegations in the Proposed FAC (ECF 157-1) are essentially the same as those in the [Third Amended Complaint].  And, the claims

---

[14] The New Defendants likely would have had the right to file counterclaims.  But, they did not do so.

[15] For example, if Malievskaia and Goldsmith are no longer employed by or associated with Compass, it is possible that Compass would attempt to blame any misconduct on them and disavow responsibility for any alleged unlawful conduct by them.  That was not a likely concern while Malievskaia and Goldsmith were part of Compass.

remain the same, except that they are asserted against the [New Defendants] as well as Compass." Further, I observed that plaintiffs did not add new information as to the New Defendants. To the contrary, I pointed out that Compass had "known for years that plaintiffs accused Dr. Malievskaia and Goldsmith of wrongdoing." *Id.* at 35.

Critically, the claims in the FAC were unchanged and were "based on the same conduct already alleged." *Id.* at 30. Of import, I also observed that the FAC would "not require Compass to conduct any discovery that it otherwise would not conduct." *Id.* at 36.

Compass's argument that there is a "rough equivalence" between the FAC and the filing of counterclaims by Compass is a bridge too far. *See* ECF 234-1 at 14. The FAC merely added two New Defendants whose conduct was always in issue, but whose status with Compass had changed significantly. Of import, Compass does not complain that it is disadvantaged by the addition of the two New Defendants. *Id.* at 12. If Compass wanted to lodge counterclaims, it had ample opportunity to do so well before the filing deadline.

When, as here, the substance of an amended complaint is largely unchanged, courts following the "moderate approach" have repeatedly found that filing a counterclaim requires leave of court. *See, e.g., Grain Processing Corp. v. Virgin Scent, Inc.*, No. 321CV00019RGESBJ, 2022 WL 14624960, at *5 (S.D. Iowa June 24, 2022) (concluding that defendant "was required to seek leave of the Court to assert its counterclaims [because t]he amended complaint did not add new facts as to or claims against [defendant].") (alterations added); *Ten Bridges,* 522 F. Supp. 3d at 867 (stating that because the amended complaint "made only minor amendments to its abuse of process claim . . . [defendant] was not entitled to assert its . . . counterclaim as of right.") (alterations added); *Mgmt. Registry, Inc. v. A.W. Companies, Inc.*, No. 17-5009 (JRT/KMM), 2020 WL 5813291, at *5 (D. Minn. Sept. 30, 2020) (finding that the amended complaint "did not change the

24

scope or theory of MRI's case . . . and did not create the opportunity for Defendants to introduce these counterclaims as of right."); *Concordia Pharms. Inc. SARL*, No. 618CV01658HMHJDA, 2019 WL 2502212, at *5 (D.S.C. May 17, 2019) (following minor amendments to an amended complaint, defendants were required to obtain leave of court before including "three counterclaims that were not alleged in the original Answer and that apparently bear no relation to the changes in the Amended Complaint.")

Under the circumstances, I conclude that Compass required leave of court to file the counterclaims.   In its Opposition, Compass asks, in the alternative, for leave to file the counterclaims.   ECF 234-1 at 15.   This request implicates Rules 15 and 16 of the Federal Rules of Civil Procedure, to which I turn.

### IV. Rule 15(a) and Rule 16

### A.  Rule 15(a)

Fed. R. Civ. P. 15(a)(1) provides: "A party may amend its pleading once as a matter of course no later than . . . 21 days after serving it, or . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(2) states: "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave."

Under Rule 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires."  It is the Fourth Circuit's "policy to liberally allow amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)."  *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010) (citing *Coral v. Gonse*, 330 F.2d 997, 998 (4th Cir. 1964)); *see also United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 197 (4th Cir. 2022) ("*MedCom*"); *Johnson v.*

*Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

"This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006); *see also MedCom*, 42 F.4th at 197. Therefore, "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Oroweat Foods Co.*, 785 F.2d at 509 (citing *Foman*, 371 U.S. at 182); *see also Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019); *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 293 (4th Cir. 2018); *Scott v. Family Dollar Stores*, 733 F.3d 105, 121 (4th Cir. 2013) (Wilkinson, J., dissenting); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012); *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010); *Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W.Va.*, 985 F.2d 164, 168 (4th Cir. 1993).

Ultimately, the decision whether to grant leave to amend falls within the sound discretion of the district court. *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 553 (2010) ("By its terms, Rule 15(a) gives discretion to the district court in deciding whether to grant a motion to amend a pleading to add a party or a claim."); *see also Medigen of Ky., Inc.*, 985 F.2d at 167–68. "Put simply, an abuse of discretion is when the district judge is 'fundamentally wrong.'" *MedCom*, 42 F.4th at 198 (citing *Bluestein v. Cent. Wis. Anesthesiology, S.C.*, 769 F.3d 944, 957 (7th Cir. 2014)). But, "the trial judge 'will not be reversed simply because an appellate court disagrees.'" *MedCom*, 42 F.4th at 197 (quoting Henry J. Friendly, *Indiscretion About Discretion*, 31 Emory L. J. 747, 754 (1982)) (additional citation omitted).

As indicated, leave to amend should be denied if the amendment would be prejudicial, futile, or made in bad faith. These issues are discussed below.

A pleading is futile "'if the proposed amended [pleading] fails to satisfy the requirements of the federal rules.'" *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)) (alterations added). Put another way, "'[f]utility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards'", such as Fed. R. Civ. P. 8, Fed. R. Civ. P. 12(b)(2), and Fed. R. Civ. P. 12(b)(6). *See Davison*, 912 F.3d at 690 (quoting *Katyle*, 637 F.3d at 471).

"Traditionally," the Fourth Circuit has "held that a proposed amendment was 'futile' if it was 'clearly insufficient or frivolous on its face.'" *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021) (quoting *Oroweat Foods Co.*, 785 F.2d at 510). More recently, the Fourth Circuit has "made clear that district courts are free to deny leave to amend as futile if the complaint fails to withstand Rule 12(b)(6) scrutiny." *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d at 750; *see also Daulatzai v. Maryland*, 606 F. Supp. 3d 252, 262 (D. Md. 2022) (recognizing that the Fourth Circuit has "explicitly confirmed" that the district court has authority to deny leave to amend if the proposed amendment would not withstand a Rule 12(b)(6) challenge), *aff'd*, 97 F.4th 166 (4th Cir. 2024).

However, this requirement does not mean that "'every plaintiff seeking leave to amend their claims must demonstrate that his claims can withstand a Rule 12(b)(6) motion.'" *Those Certain Underwriters at Lloyd's, London v. Home Point Fin. Corp.,* RDB-23-405, 2025 WL 2494325, at *9 (D. Md. Aug. 29, 2025) (quoting *Bioiberica Nebraska, Inc. v. Nutramax Mfg., Inc.*, SAG-18-03133, 2019 WL 5102674, at *3 (D. Md. Oct. 10, 2019)). The court in *Bioiberica*

*Nebraska, Inc.* explained, 2019 WL 5102674, at \*3: "Such a requirement would render superfluous the Fourth Circuit's definition of a futile claim as one that is '*clearly insufficient or frivolous on its face,*' . . . and would run contrary to the Fourth Circuit's well-established 'policy to liberally allow amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)[.]'" (emphasis in original) (cleaned up).

Whether a complaint states a claim for relief, in the context of Rule 12(b)(6), is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513–14 (2002). Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . "); *Seabrook v. Driscoll*, 148 F.4th 264, 269 (4th Cir. 2025); *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025); *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021); *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). A plausible claim is more than merely conceivable or speculative. *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

But, a plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam).  However, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.  *Iqbal*, 556 U.S. at 678.  Instead, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable, and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

As noted, leave to amend should be denied if the amendment would be prejudicial to the opponent. *Oroweat Foods Co.*, 785 F.2d at 509.  Under Rule 15(a)(2), "prejudice means that the party opposing the amendment would be hindered in the preparation of its case, or would have been prevented from taking some measure in support of its position."  61A AM. JUR. 2d, Pleading § 664 (May 2025 update).  Prejudice to the opposing party is "'often . . . determined by the nature of the amendment and its timing.'"  *Adbul-Mumit*, 896 F.3d at 293 (quoting *Laber*, 438 F.3d at

427); *see also Doe v. Mercy High Sch., Inc.*, JJR-23-01184, 2024 WL 4443076, at *3 (D. Md. Oct. 8, 2024) (same).    Courts should "look to the 'particular circumstances' presented, including previous opportunities to amend and the reason for the amendment."   *Adbul-Mumit*, 896 F.3d at 293.   In general, "'[t]he further the case progressed before judgment was entered, the more likely it is that [subsequent] amendment will prejudice the defendant.'"   *Id.* (citation omitted; alterations in *Adbul-Mumit*); *see also Ramnarine v. Rainbow Child Dev. Ctr., Inc.*, RWT-17-2261, 2018 WL 2762564, at *2 (D. Md. June 8, 2018) ("The closer a case progresses toward trial, the more likely the amendment will prejudice the defendant.").

A court may find undue prejudice sufficient to justify denying leave to amend if a new claim or defense would force the non-moving party to "expend significant additional resources to conduct discovery and prepare for trial"; it would "significantly delay the resolution of the dispute"; or it would "prevent the plaintiff from bringing a timely action in another jurisdiction."   61A AM. JUR. 2d, Pleading § 664; *see also Sharkey IRO/IRA v. Franklin Res.*, 263 F.R.D. 298, 301 (D. Md. 2009) (concluding that amendment "may prejudice the non-moving party when the motion would shift the theory of the case, thereby rendering the non-moving party's prior discovery a misdirected use of resources and compelling the non-moving party to engage in costly additional discovery").   The Fourth Circuit explained in *Laber*, 438 F.3d at 427: "A common example of a prejudicial amendment is one that 'raises a new legal theory that would require the gathering and analysis of facts not already considered by the [defendant, and] is offered shortly before or during trial.'"   (Citation omitted; alteration in *Laber*).

However, "[a]n amendment is not prejudicial . . . if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred."   *Id.* (citing *Davis v. Piper Aircraft Co.*, 615 F.2d 606, 613 (4th Cir. 1980) (alteration

added), *cert. denied*, 448 U.S. 911 (1980)); *see also Ramnarine*, 2018 WL 2762564, at *2. Moreover, "the time, effort, and money . . . expended in litigating [a] case" do not constitute "substantial prejudice." *Nat'l Recovery Agency, Inc. v. AIG Domestic Claims, Inc.*, JAS-05-0033, 2006 WL 1289545, at *3 (M.D. Pa. May 9, 2006); *see also Block v. First Blood Assocs.*, 988 F.2d 344, 351 (2d Cir. 1993) (concluding that the time, effort, and money expended by the plaintiffs in litigating the case did not amount to substantial prejudice).

To be sure, "a court may consider a movant's 'undue delay' or 'dilatory motive' in deciding whether to grant leave to amend under Rule 15(a)." *Krupski*, 560 U.S. at 553 (quoting *Foman*, 371 U.S. at 182). But, "[d]elay alone is an insufficient reason to deny leave to amend." *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999); *see also MedCom*, 42 F.4th at 197 ("Delay alone is not enough to deny leave to amend, though it is often evidence that goes to prove bad faith and prejudice."); *Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987) ("Delay alone, without prejudice, does not support the denial of a motion for leave to amend."); *Davis*, 615 F.2d at 613 ("Delay alone however, without any specifically resulting prejudice, or any obvious design by dilatoriness to harass the opponent, should not suffice as reason for denial."). "Rather, the delay must be accompanied by prejudice, bad faith, or futility." *Edwards*, 178 F.3d at 242; *see also Mayfield*, 674 F.3d at 379 (stating that "a request to amend should only be denied if one of three facts is present: 'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile.'") (citation omitted); *Franks v. Ross*, 313 F.3d 184, 193 (4th Cir. 2002) ("In fact, such leave 'should be denied *only when* the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'") (citation omitted) (emphasis in *Franks*). And, "[p]rejudice is the weightiest factor, the absence thereof, 'though not alone determinative, will

normally warrant granting leave to amend.'" *Oliver v. Dep't of Pub. Safety & Corr. Servs.*, 350 F. Supp. 3d 340, 346 (D. Md. 2018) (quoting *Davis*, 615 F.2d at 613), *aff'd sub nom. Oliver v. Bartholomew*, 785 F. App'x 166 (4th Cir. 2019) (per curiam); *see V.E. v. Univ. of Maryland Baltimore Cty., Maryland*, JRR-22-02338, 2023 WL 5153650, at *2 (D. Md. Aug. 10, 2023), *aff'd*, 2024 WL 4563857 (4th Cir. Oct. 24, 2024) (per curiam).

The Fourth Circuit has said that it "cannot provide a comprehensive definition of a term like bad faith; in truth, it is a difficult term to define without retreating to circular reasoning or just listing examples." *MedCom*, 42 F.4th at 198. But, it has pointed to Black's Law Dictionary, which defines "bad faith" as "'[d]ishonesty of belief or purpose.'" *Id.* (citation omitted) (alteration in original). The Court added, *id.*: "To act with a dishonesty of purpose is to act for the wrong reasons. It may be outright lying, deceiving, playing unjustifiable hardball, slacking off, intentionally causing confusion, or stubbornly refusing to follow rules—you can imagine cases where a party just wants to cause chaos—or it might be something as mundane as noticing someone's mistake and saying nothing about it." And, "when a party withholds evidence for an extended period, it is not unreasonable for a district court to presume bad faith, at least where no satisfactory explanation is given for the delay." *Id.* at 199.

## B. Rule 16

Rule 16[16] governs scheduling, case management, and amendment of pleadings filed beyond the deadline set forth in a Scheduling Order. Notably, "[i]n an era of burgeoning case loads and thronged dockets, effective case management has become an essential tool for handling civil litigation." *Tower Ventures, Inc. v. City of Westfield*, 296 F.3d 43, 45 (1st Cir. 2002).

---

[16] Rule 16 was amended, effective December 1, 2025. *See* Fed. R. Civ. P. 16(b)(3)(B)(iv). But, the amendment does not affect the analysis.

Scheduling orders serve a vital role in helping courts manage their civil caseloads. *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D. Md. 1985); *see also Naughton v. Bankier*, 114 Md. App. 641, 653, 691 A.2d 712, 718 (1997) (recognizing that a scheduling order helps "to maximize judicial efficiency and minimize judicial inefficiency"). A scheduling order is an important tool in "'securing the just, speedy, and inexpensive determination of every action.'" *Miller v. Transcend Servs., Inc.*, LPA-10-362, 2013 WL 1632335, at *4 (M.D.N.C. Apr. 16, 2013) (quoting *Marcum v. Zimmer*, 163 F.R.D. 250, 253 (S.D.W. Va. 1995)). It is not a "'frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375-76 (D. Md. 1999) (quoting *Gestetner Corp.*, 108 F.R.D. at 141).

Where, as here, a party "moves to amend after the deadline established in the scheduling order for doing so, Rule 16(b)(4) becomes the starting point in the Court's analysis." *Wonasue v. Univ. of Md. Alumni Ass'n*, 295 F.R.D. 104, 106 (D. Md. 2013); *see Faulconer v. Centra Health, Inc.*, 808 F. App'x 148, 152 (4th Cir. 2020). Rule 16(b)(4) provides: "A schedule may be modified only for good cause and with the judge's consent."

Under Rule 16(b)(4), a movant must demonstrate good cause to satisfy the requirement for a modification of a scheduling order. *See Faulconer*, 808 F. App'x at 152; *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *Wonasue*, 295 F.R.D. at 106–07; *see also Cook v. Howard*, 484 F. App'x 805, 814–15 (4th Cir. 2012) (stating that Rule 15(a)(2) "applies . . . prior to the entry of a scheduling order, at which point, under Rule 16(b)(4), a party must first demonstrate 'good cause' to modify the scheduling order deadlines, before also satisfying the Rule 15(a)(2) standard for amendment"); *United States v. Hartford Accident & Indem. Co.*, JKB-14-2148, 2016 WL 386218, at *5 (D. Md. Feb. 2, 2016) ("The burden for demonstrating good cause

rests on the moving party."); *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 631 (D. Md. 2003) ("[O]nce the scheduling order's deadline for amendment of the pleadings has passed, a moving party first must satisfy the good cause standard of Rule 16(b); if the moving party satisfies Rule 16(b), the movant then must pass the tests for amendment under [Rule] 15(a).").

Nevertheless, Rule 16 "recognize[s] . . . that the parties will occasionally be unable to meet . . . deadlines [in a scheduling order] because scheduling order deadlines are established relatively early in the litigation." *O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.3d 152, 154 (1st Cir. 2004) (citation omitted). In *Nourison*, 535 F.3d at 298, the Fourth Circuit explained:

> There is tension within the Federal Rules of Civil Procedure between Rule 15(a) and Rule 16(b) . . . Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." A motion to amend should be denied only where it would be prejudicial, there has been bad faith, or the amendment would be futile. *HCMF Corp. v. Allen*, 238 F.3d 273, 276–77 (4th Cir. 2001). On the other hand, Rule 16(b) provides that "a schedule shall not be modified except upon a showing of good cause and by leave of the district judge."

Accordingly, "after the deadlines provided by a scheduling order have passed, the good cause standard" under Rule 16 "must be satisfied to justify leave to amend the pleadings." *Nourison*, 535 F.3d at 298. The "'touchstone'" of Rule 16(b)(4)'s "good cause requirement is 'diligence.'" *Faulconer*, 808 F. App'x at 152 (citation omitted). Indeed, "only diligent efforts to comply with the scheduling order can satisfy Rule 16's good cause standard." *Id.*; *see also id.* at 152 n.1 (collecting cases); *accord Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002) ("Lack of diligence and carelessness are 'hallmarks of failure to meet the good cause standard.'") (citation omitted). "Effectively, if amendment of the pleadings would satisfy Rule 16(b)(4)'s good cause standard, then it would also satisfy Rule 15(a)(2)'s freely given standard." *Varner v. South Carolina Farm Bureau Ins. Co.*, TLW-18-2098, 2020 WL 12834378, at *1 (D.S.C. Oct. 2, 2020).

In evaluating diligence, courts primarily focus on "'the timeliness of the motion to amend and the reasons for its tardy submission.'" *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 520 (D. Md. 2014) (quoting *CBX Techs., Inc. v. GCC Techs., LLC*, JKB-10-2112, 2012 WL 3038639, at *4 (D. Md. July 24, 2012) (internal quotation marks omitted)) (alteration in *Elat*). "'Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.'" *Wonasue*, 295 F.R.D. at 107 (quoting *CBX Techs., Inc.*, 2012 WL 3038639, at *4). If, for example, the "moving party knew of the underlying conduct giving rise to a claim but simply failed to raise it in an initial [pleading], then the party" has not acted diligently, and therefore "cannot establish good cause under Rule 16." *Faulconer*, 808 F. App'x at 152 (alteration added). In contrast, where "'at least some of the evidence needed for a [party] to prove his or her claim did not come to light until after the amendment deadline,' a [party] has 'good cause' for moving to amend at a later date." *Wonasue*, 295 F.R.D. at 107 (quoting *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 768–69 (D. Md. 2010)) (alterations added).

To determine whether the moving party has met his burden to show good cause, a court may consider "whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party." *Elat*, 993 F. Supp. 2d at 520. However, "'[i]f the movant has not been diligent in meeting the scheduling order's deadlines,' then other factors . . . generally will not be considered." *Faulconer*, 808 F. App'x at 152 (quoting *Kmak v. Am. Century Cos., Inc.*, 873 F.3d 1030, 1034 (8th Cir. 2017)); *see also Rassoull*, 209 F.R.D. at 374 ("'If [the moving party] was not diligent, the inquiry should end.'") (citation omitted) (alteration added); *Marcum*, 163 F.R.D. at 254 ("'[T]he focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.'") (citation omitted) (emphasis removed).

35

Notably, the Court need not address Rule 15 unless Rule 16 is satisfied. But, if the moving party demonstrates good cause pursuant to Rule 16(b)(4), the movant must then "satisfy the liberal standard of Fed. R. Civ. P. 15(a)." *Humane Soc'y of the U.S. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, DKC-13-1822, 2016 WL 3668028, at *2 (D. Md. July 11, 2016); *see Cook*, 484 F. App'x at 814–15; *Wonasue*, 295 F.R.D. at 106–07.

### C. Discussion

### 1. Rule 16

Compass asserts that it has demonstrated good cause to amend because, in light of material obtained in discovery, it was "diligent in filing its Counterclaims . . . ." ECF 234-1 at 16; *see id.* at 18. The focus here is not whether Compass obtained information in discovery that supported its counterclaims. Rather, the focus is on when Compass obtained information necessary for the pleading of the counterclaims in the first instance.

As to counterclaims I and II, asserting fraudulent misrepresentation and unfair competition, Compass alleges that Thompson and UMB "knowingly made fraudulent representations to Compass from May to November of 2019, under the guise of seeking to collaborate with Compass." ECF 208 at 25, ¶ 30. The false statements included, *inter alia*, requests for funding for "Ketanserin Research and 'unequivocally confirming' that the research had not begun." *Id.*

Compass contends that these counterclaims "arose from facts Compass first learned through discovery," *i.e.*, that "Professor Thompson did not possess the purported psilocybin trade secrets at the time he met with Compass." ECF 234-1 at 18; *see* ECF 208 at 27, 28 ¶¶ 40, 46. Moreover, Compass argues that it withdrew from its collaboration with Thompson because believed that he had already begun the research that Compass had intended to fund. ECF 234-1 at 17.

Although Compass believes its suspicions constituted an adequate basis to withdraw from the collaboration with Thompson, it suggests that it was not an adequate basis to lodge a counterclaim, because "it could not determine whether Professor Thompson was concealing the truth . . . ." *Id.* According to Compass, it was "not until discovery in this case, specifically emails produced on July 10, 2025, and July 21, 2025, that Compass learned the truth–Professor Thompson had expressly misrepresented the status of the Ketanserin Research . . . ." *Id.* at 18.

These emails, docketed at ECF 234-3, ECF 234-4, and ECF 236-5, date to 2019 and concern "the psilocybin project . . . ." ECF 234-4 at 4.  For example, an alleged UMB researcher sent an email on February 15, 2019, stating, in part:  "Scott [Thompson] wants me to work with [N]ick to continue the psilocybin project.  We were wondering how you came up with the ketanserin dose?"  ECF 234-3 at 2.  Compass posits: "In view of that information, Compass diligently filed its Counterclaim Counts I and II on July 25, 2025."  *Id.*

With respect to counterclaims I and II, Compass argues that emails obtained in discovery support the basis for its belated filing.  It states, ECF 234-1 at 18 (emphasis in original):

> It was not until discovery in this case, specifically emails produced on July 10, 2025, and July 21, 2025, that Compass learned the truth—Professor Thompson had expressly misrepresented the status of the Ketanserin Research, claiming that it had not been started, while continuing to negotiate with Compass for funding and provision of a Schedule I drug. *See, e.g.*, Ex. B (February 15, 2019, email from UMB researcher reading: "[Professor Thompson] wants me to work with nick [sic] *to continue the psilocybin project*. We were wondering how you came up with *ketanserin dose*?"); Ex. C (March 12, 2019, email from UMB researcher reading: "[t]he First group of injections will be plain ketanserin in all animals who lost SPT/SI to show that ketanserin alone doesn't cause SPT recovery. Then, probably *next Monday, I will start with Ket+Psil and Psil* alone injections."); Ex. D (April 4, 2019, email from UMB researcher to Professor Thompson reading: "We're looking to run an EEG experiment *tomorrow involving psilocybin and ketanserin*. I'm expecting to use about 500uL or so of the 1mg/mL stock Natalie had made up.").

In addition, Compass asserts that it "diligently filed Counterclaim Counts III and IV after learning for the first time in discovery that the purported psilocybin secrets were neither trade secrets nor in Professor Thompson's possession by the time he met with Compass in 2019." *Id.* at 19. Compass argues that following "multiple interrogatories that request identification of such optimal parameters . . . Plaintiffs have **still** not identified the purportedly 'optimal' parameters – because they were never in possession of such purported trade secrets." *Id.* (alterations added; citations omitted; boldface in original).

As to counterclaims III and IV, Compass maintains that Professor Thompson did not possess Psilocybin Trade Secrets. The counterclaims assert that Thompson "could not have possibly known during his discussions with Compass the '**optimal** timing, dosing and frequency,' for therapy using the sequential administration of a 5-HTZA antagonist with psilocybin." *Id.* at 22, ¶ 22 (boldface in original). This is because the research had not progressed. *Id.* at 22-24, 27, 28, ¶¶ 18-28, 39, 48. Compass asserts, *id.* at 28, ¶ 46: "Professor Thompson had not conducted any human studies on the combination . . . rodent studies would not even directly translate to human dosing, timing and frequency; and therefore . . . Professor Thompson did not know the optimal dosing, timing, and frequency for the combination."

As noted, Compass also points out that it "served multiple interrogatories that request identification of such optimal parameters," yet "Plaintiffs have *still* not identified the purportedly 'optimal' parameters – because they were never in possession of such purported trade secrets." ECF 234-1 at 19 (boldface in original). Compass claims that it "learned that Plaintiffs— nearly *four months before filing this lawsuit*—knew Professor Thompson's alleged trade secrets were not in fact secret." *Id.* (italics and boldface in original).

Further, Compass points to International Patent Application No. Wo/2019/081764 ("Perez") was filed in 2019. *Id.* It claims that Perez "disclosed the purported trade secrets that Professor Thompson alleges he later disclosed to Compass." *Id.* Compass asserts that information about plaintiffs' knowledge of the Perez filing was contained in two emails from 2022 that were produced in discovery in 2025. *Id.*; *see* ECF 234-8; ECF 234-9.

Plaintiffs maintain that "Compass's contention that it was not on notice of the factual bases for counterclaims Counts I and II until 2025 is demonstrably false." ECF 239 at 8. Plaintiffs insist that Compass is trying to "have it both ways: asserting counterclaims expressly based on its revelation **in 2019** that 'proved' the 'misrepresentations' at issue, while arguing it was not aware of the alleged misrepresentation until July 2025." *Id.* at 9 (boldface in original).

According to plaintiffs, the counterclaims contain allegations known to defendant well before July 2025, "are not based upon any new facts uncovered in discovery and could have been added earlier in this litigation." ECF 229-1 at 16. Moreover, plaintiffs argue, *id.*: "Compass has had three years to assert these claims [and] it cannot establish that it has acted with diligence in pursuing its claims to satisfy the good cause standard under Rule 16(b) and the Counterclaims should be stricken." They also posit: "Compass had detailed the exact factual basis for its allegations in numerous prior filings with this Court." *Id.* Additionally, plaintiffs argue that this has been further demonstrated in Compass's internal emails. ECF 239 at 9–11.

Similarly, plaintiffs maintain that "Compass's contention that it recently 'learned' the basis for counterclaims Counts III and IV . . . is equally baseless." *Id.* at 11 (alterations added). In this regard, they posit: "Compass has made this exact argument before in multiple filings before this Court: that Plaintiffs did not possess the trade secrets at the time Thompson met with Compass in

2019 because these trade secrets were not in fact secret." *Id.* at 8 (citing ECF 95-1 at 14 n. 1; ECF 149 8–9).

As indicated, Compass contends that its counterclaims were "not fully 'available' until 2025." ECF 234-1 at 20. However, this misstates the standard. "[T]he good cause standard is not met merely because a movant, after the deadline set by the scheduling order, obtains relevant factual details that help to flesh out a claim if the movant already had sufficient evidence to raise that claim before the deadline." *Thomason v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, No. 6:14-CV-04895-JMC, 2016 WL 11565418, at *6 (D.S.C. Dec. 21, 2016). As expressed previously, if the "moving party knew of the underlying conduct giving rise to a claim but simply failed to raise it in an initial [pleading], then the party" has not acted diligently, and therefore "cannot establish good cause under Rule 16." *Faulconer*, 808 F. App'x at 152 (alteration added).

I first consider counterclaims I and II. They do not even reference the 2019 emails produced in discovery in July 2025, on which Compass relies to justify its belated filing. Rather, the counterclaims seem to focus on the discovery of Professor Thompson's abstract for the annual meeting in 2019 of the Society for Neuroscience and the meeting itself. ECF 208 at 20–21, ¶¶ 13–16. According to Compass, on October 23, 2019, Thompson presented on his research regarding the use of ketanserin with psilocybin. ECF 208 at 21, ¶ 16. Compass alleges: "Compass was surprised to discover that the research that it had proposed sponsoring was already underway . . .", *id.* at 20, ¶ 14, and that Thompson might use the psilocybin that Compass provided "for purposes other than what Compass had intended." *Id.* at 21. Compass also asserts, *id.* at 21, ¶ 16, that Hurley met with Thompson to discuss the research. It adds, *id.*: "The discussions in person with Professor Thompson proved . . . to Compass that Professor Thompson had intentionally misrepresented the situation . . . ."

For counterclaims I and II, Compass had the information necessary to plead counterclaims I and II long before the Court's filing deadline of May 19, 2025. Compass refutes its own position by asserting: "Compass's Counterclaims arise from misrepresentations by Plaintiff Professor Scott Thompson during his discussions with Compass in 2019. . . ." ECF 234-1 at 8. Moreover, Compass's actions, as described in its Opposition, speak volumes. ECF 234-1 at 17. Compass claims it ended the relationship with Thompson based on his conduct, yet it now claims to have just discovered the conduct in issue. *Id.*

The information that Compass obtained in discovery may strengthen a contention that Compass harbored from the outset of the litigation—that Thompson had already begun ketanserin research as of 2019, despite his claims to the contrary. But, Compass did not need the emails to lodge its claim.

For example, in Compass's motion to dismiss plaintiff's Second Amended Complaint, filed on June 26, 2023 (ECF 51-1) Compass included a footnote that incorporates a 2019 letter sent by Hurley to Thompson, terminating their collaboration. *Id.* at 16 n.5; *see* ECF 45-26. Hurley wrote, ECF 45-26 at 2: "[W]e understand from your presentation at SFN that the experiments outlined in your proposal to us are already in progress. As discussed previously, we are not comfortable with supplying our product, a scheduled substance, for studies that are in-progress/completed."

As to counterclaims I and II, Compass's motion to dismiss plaintiffs' Third Amended Complaint (ECF 95-1), filed in March 2024, is also pertinent. Compass wrote, *id.* at 14 n.3 (emphasis added):

> Compass attended a presentation by Thompson at the national Society for Neuroscience conference in **2019** in Chicago. . .**There, Compass learned that Thompson had already performed the studies he was proposing to Compass.** Compass, uncomfortable with Thompson's lack of disclosure regarding the status of his research, opted not to "proceed with the collaboration."

In addition, Compass's "Motion to Require Trade Secret Identification" (ECF 149) is noteworthy.  In that motion, filed in April 2025, Compass cited Professor Thompson's abstract for his presentation in 2019 at the Society for Neuroscience. *Id.* at 9.  And, Compass argued that Thompson's "[e]xperiments with psilocybin and ketanserin [w]ere already in progress. . . ." *Id.*

Moreover, Compass's internal emails, produced in discovery, unequivocally establish that Compass "was on notice" of the factual bases "for the claims back in 2019. . . ." ECF 239 at 9; *see* ECF 237, ECF 237-1, ECF 237-2, ECF 237-3, ECF 237-4.  The emails indicate that in 2019 Compass came to the conclusion that Professor Thompson had misrepresented the status of his ketanserin research in his discussions with Compass.

In an internal email chain beginning August 29, 2019, Hurley wrote to Malievskaia and other Compass employees. ECF 239 at 25. He stated: "I just wanted to draw your attention to a psilocybin-related poster abstract from Scott Thompson's group, which was released yesterday ahead of the Society for Neuroscience annual meeting in October (which I plan to attend)." *Id*. Noting the abstract of Thompson's presentation, Hurley wrote, *id.*: "As they would have submitted this abstract around late April [of 2019], it seems that their psilocybin programme is likely to be well under way—**should we be concerned about our collaboration with them, given that they proposed to perform the same experiments for our project?**"  (Boldface in original).  A Compass employee, Hans Eriksson responded, *id.* at 24: "You are raising an important point regarding the collaboration. Let us discuss." Alerted to this concern, the Compass team scheduled a call with Thompson to discuss the abstract. *Id.* at 22.

In an email of October 25, 2019, Hurley messaged the same group of Compass employees. ECF 239 at 27. He stated, *id.*: "I would like to share with you an update from my time at the SfN annual meeting. Earlier in the week I met with Scott Thompson and yesterday I visited the poster

from his PhD student on Psilocybin." Explaining that Thompson had shared that he had begun small scale experiments with psilocybin and ketanserin in mice, Hurley said, *id.*: "Whilst these results are encouraging, they do contradict Scott's previous reassurance to us on 24/09/19 that they were not undertaking experiments in mice."[17] Hurley then proceeds to list the statements about the experimental process that Thompson "unequivocally confirmed. . . ." *Id.* Hurley concludes the email as follows, *id.*: "I will share with you my other notes and insights from the conference upon my return to London, but for now *I thought it was important to inform you of these developments*." (Emphasis added).

Then, in an email chain beginning on November 12, 2019, Hurley wrote to the same Compass group, recapping internal meetings and recent developments. *Id.* at 31. He said, *id.*: "Despite receiving assurances from Scott Thompson that his group is not running our planned Psilocybin experiments, it became clear at SFN (from speaking to him and from seeing his PhD student's poster) that they have started to run these experiments and are continuing to do so." *Id.* Further, Hurley stated, *id.*: "We agreed that Scott has lost our trust and it is unlikely that this could be recovered by proceeding with the collaboration." Notably, Hurley stated, *id.*: "Based on the above, **I would like to recommend that we withdraw from the proposed collaboration**." (Boldface in original). He added, *id.*: "I propose that I should contact Scott to explain that as the experiments for this collaboration are ongoing, we do not believe that our support is necessary and are not comfortable with supplying the Psilocybin to him." Hurley also asked Malievskaia and Lars Wilde, another Compass employee, whether they are "happy to support this approach[.]" *Id.*

Notably, Malievskaia replied, stating, *id.* at 30: "I agree with the withdrawing form [sic] collaboration completely and not to consider other options with him." Thereafter, Hurley wrote

---

[17] Ordinarily, I would write the date as follows: 09/24/19.

to Thompson, terminating Compass's collaboration with him. ECF 45-26; *see* ECF 51 at 16 n.5; ECF 95-1 at 14 n. 1.

In an email of March 2022, Malievskaia characterized plaintiffs as "the group that filed their patents immediately after our first call and the [sic] asked us to pay for the studies that have done already." ECF 239 at 36.

Malievskaia was deposed in August 2025. She was asked about "finding out at some point that Professor Thompson was running certain studies related to psilocybin." ECF 239 at 41 (Tr. at 152-53). Malievskaia testified, ECF 239 at 41 (Tr. at 153):

> I was referring to the fact that the studies they proposed, they seem to, while they were proposing these studies, they seem to have done the [sic] some of experiments. And not only they have done these experiments, but they were submitting them for publication. And they were presenting the poster at the Society of Neuroscience while leading us to believe that they are proposing these experiments that have never been done.

Further, she stated, *id.* at 41– 42 (Tr. at 153-54) (emphasis added):

> The significance is not that they were going to be published, the significance was that they asked us for [$]450,000 of funding to support the study that they have already done. And not only that, but they also asked us to provide a GMP quality, a proprietary formulation of COMP360, which is a controlled substance, for the study that they have already done. How -- our concern was how would we, what would we support, what would we fund if the study has already been done, and how would controlled substance be used if the experiments had been done already. *In my mind, it was a fraud, both financial and fraud involving a controlled substance.*

The following colloquy is also pertinent, *id.* at 42 (Tr. at 154):

Q. And this was your view based on the statement that's mentioned in this email [of August 29, 2019] from the abstract that states, Experiments with psilocybin and ketanserin are in progress?

 A. Yes.

Malievkskaia's sworn deposition testimony reflects that in 2019—not 2025— she believed Thompson's actions constituted fraud. It is also clear from Compass's internal emails that Hurley,

Malievskaia, and other Compass personnel shared the same view and, on this basis, Compass terminated its collaboration with Thompson.  Compass's claim—that it did not come into possession of information to lodge counterclaims I and II until July of 2025—is specious.

As to counterclaims III and IV, from the outset, Compass has maintained that there were no Psilocybin Trade Secrets and that plaintiffs knew it.

Stating a viable DTSA claim requires a plaintiff plausibly to allege that it owns a trade secret. *Samuel Sherbrooke Corp., Ltd v. Mayer,* 159 F.4th 252, 254 (4th Cir. 2025).  But, long before Compass filed the counterclaims, Compass contended that plaintiffs did not possess a trade secret.

Compass's first motion to dismiss, filed in 2022 (ECF 24), is pertinent.  Compass argued there that by February 2021 the Psilocybin Trade Secrets no longer existed; UMB's patent application, containing the very same alleged trade secrets, was published to the world.  ECF 24 at 28–30; *see* ECF 95-1 at 9–10.  On this basis, Compass argued: "Terran has no standing to sue for alleged misappropriation of the Psilocybin Trade Secrets, and the DTSA and MUTSA claims should be dismissed." ECF 24 at 31.

Similarly, in Compass's "Motion to Dismiss the Second Amended Complaint" (ECF 51-1), filed in 2023, Compass claimed that by 2019 the Psilocybin Trade Secrets were disclosed.  *Id.* at 15, n. 4.  It said, *id.*: "The inescapable inference to be drawn is that, after UMB filed the patent application, the alleged Psilocybin Trade Secrets were secret no more."

Compass reiterated this contention in its third motion to dismiss (ECF 95-1), filed in March 2024.  Compass claimed: "By calling the information 'then-trade secret,' Terran acknowledged that the information lost its trade secret status when Thompson and UMB chose to include the

trade secrets in their own August 13, 2019 patent application." *Id.* at 14 n.1.  Compass advanced this same argument in its reply (ECF 105). *Id.* at 8 n.1.

Compass's "Motion to Require Trade Secret Identification" (ECF 149), filed in April 2025, is again relevant.  There, Compass argued that the Psilocybin Trade Secrets were not secret and that Compass had proof that plaintiffs had such knowledge.  *Id.* at 8–9.  Attacking plaintiffs' trade secret claim, Compass stated that, "long before the first alleged contact between Plaintiffs and Compass . . . multiple researchers ***publicized*** that the administration of 5- HT2A antagonists, including ketanserin, prior to psilocybin administration prevents the latter's hallucinogenic effects." *Id.* at 8 (boldface in original; alteration added).  Compass also emphasized that plaintiffs knew that such information had been publicized, asserting, *id.* at 9: "And Plaintiffs know that— UMB and Professor Thompson cited that 1998 publication in their own provisional patent application."[18] These contentions are all noteworthy.  They fly in the face of Compass's claim that it could not have lodged the counterclaims prior to discovery.   ECF 234-1 at 19.

With respect to counterclaims III and IV, Compass also cites Perez, filed in 2019, and points to plaintiffs' knowledge of the Perez filing, based on emails recently produced in discovery. The emails (ECF 234-8 and ECF 234-9) consist of outside parties commenting on the publication of Terran's press release concerning its acquisition of Perez. *See* Press Release, Terran Biosciences Inc., Terran Biosciences and Blumentech S.L. announce the acquisition of a patent portfolio covering the groundbreaking discoveries of prominent psychedelics researcher Dr. Jordi Riba (April 13, 2022), https://www.prnewswire.com/news-releases/terran-biosciences-and-

---

[18] In my Memorandum Opinion (ECF 161) addressing the motion (ECF 149), I said: "I decline to engage with Compass's argument that the alleged trade secrets cannot be trade secrets because the information was already publicly known or available. This is a merits argument." ECF 161 at 27 (internal citation omitted).

blumentech-sl-announce-the-acquisition-of-a-patent-portfolio-covering-the-groundbreaking-

discoveries-of-prominent-psychedelics-researcher-dr-jordi-riba-

301524938.html.[https://perma.cc/MG64-QCZ3]; *see also* ECF 234-8 at 2; ECF 234-9 at 2.

Compass did not require discovery from plaintiffs to uncover the press release disseminated by Terran in April 2022. *See* ECF 234-8 at 2; *see* Terran, Press Release, *supra*. Compass does not identify any other information produced in discovery that amounts to information previously unavailable to or unknown to Compass. ECF 234-1 at 19.

Courts in this District and elsewhere have repeatedly concluded that information uncovered in discovery does not excuse a lack of diligence when the movant previously had enough facts to plead a claim. That is precisely the situation here as to all four counterclaims.

The case of *G. W. Aru, LLC v. W. R. Grace & Co.-Conn.,* 344 F.R.D. 446 (D. Md. 2023), is informative. There, Judge Bredar denied a motion to amend based on the absence of good cause. He found that new information obtained in discovery did not excuse a lack of diligence in the face of longstanding knowledge of a claim. *Id.* at 450.

In particular, a few months before the close of discovery, the plaintiffs moved to amend to add a claim of tortious interference, "largely based on materials obtained during discovery, including communications that Defendant made with customers." *Id.* at 449. The plaintiffs argued that they were "adding their new cause of action at th[at] time because they only learned of the facts needed to bring the claim during discovery." *Id.* (alteration added). According to the plaintiffs, "'almost all of the evidence . . . to prove the[] new claim for unfair competition did not surface until well after the. . . deadline to move for amendment of pleadings.'" *Id.* at 450 (alteration added).

Judge Bredar recognized that "a wealth of newly alleged facts", not previously accessible to the plaintiffs, emerged in discovery. *Id.* But, he said, *id.*: "Plaintiffs' problem is—while they now have many more facts to support a common law unfair competition claim—they already had enough facts to plausibly allege such a claim when they filed their First Amended Complaint." *Id.* As Judge Bredar put it, "the question is not whether Plaintiffs now have *more* evidence on which to ground a new claim than they had before, but whether they had *enough* evidence to make out that claim before the amendment deadline expired." *Id.* at 451 (emphasis in original).

The case of *Crouch v. City of Hyattsville, Md.,* DKC-09-2544, 2012 WL 718849 (D. Md. Mar. 5, 2012), also provides guidance. There, shortly after discovery closed, the plaintiff attempted to amend his complaint to add two claims. *Id.* at 3. Despite contending that the core operative facts remained the same, the plaintiff asked the court to grant leave to amend because "he learned of facts supporting these claims for the first time during the course of discovery." *Id.* at *2. Observing that the plaintiff had repeatedly raised similar arguments in the case, before bringing them as claims, Judge Chasanow found "the fact that Plaintiff may not have had sufficient evidence to prove a . . . claim before the deadline for the amendment of pleadings had no bearing on his ability to plead a . . . claim in a timely manner." *Id.* at *3 (alterations added). She also said, *id.*: "This is true especially given that he was apparently aware of a potential . . . claim 'since the inception of this case.' There is simply no showing of good cause here to permit Plaintiff to amend his pleadings to add a . . . claim." *Id.* (alterations added) (citations omitted).

Judge Gallagher declined to find good cause to amend in *Brightview Grp., LP v. Teeters*, SAG-19-2774, 2020 WL 4019172 (D. Md. July 16, 2020). There, following multiple modifications of the scheduling order, both during discovery and after the deadline for amendment of pleadings, Brightview, the plaintiff, moved to amend its complaint to add a new claim of

"Tortious Interference with Business Relations". *Id.* at *3. Judge Gallagher determined that the plaintiff had not moved diligently because it "had notice of most [of] the facts underlying its tortious interference claim at the time it filed its Amended Complaint *as of right"* and before the deadline for amendments. *Id.* at *5 (alteration added) (emphasis in original). She stated, *id.* at *6: "[I]t is apparent to the Court, as discussed above, that the vast majority, if not all, of the factual allegations contained in the [proposed amended complaint] could have been alleged months in advance of the amendment deadline in the Scheduling Order."

According to the court, Brightview's claims of recent factual discoveries were "beside the point." *Id.* Judge Gallagher reasoned: "None of these 'new' discoveries changes the fact that, since the Court first issued its Scheduling Order, Brightview had notice of sufficient facts to plead its request for attorneys' fees, and its tortious interference claim. . . ." *Id.* Finding a lack of good cause, Judge Gallagher ruled that the "time for amending the complaint in the instant case, in which discovery is all but complete, has passed." *Id.* at *7.

In *Washington D.C. Cement Masons Welfare Fund v. Rapid Response Constr., Inc*., AW-04-1090, 2005 WL 8174766 (D. Md. May 20, 2005), a defendant moved to add a counterclaim following the close of discovery, "on the basis of Defendant's belief that Plaintiffs 'willfully and intentionally interfered with Defendant's contracts with the general contractor.'" *Id.* at *1. When defendant answered the complaint, "'Defendant suspected that Plaintiffs had somehow obstructed Defendant's ability to perform and be paid under its contract with the general contractor.'" *Id*. According to the defendant, "this suspicion was proven correct during the course of discovery." *Id.* The court said: "Although Defendant asserts that the counterclaim arose from 'information disclosed during a deposition during discovery,' Defendant's own statements belie this claim." *Id.* at *2. The court noted that defendant "provides this Court with no reason as to why it did not, at

that time [of its suspicion] or sometime soon thereafter, also assert a counterclaim based on these suspicions." *Id.* (alterations added).  Therefore, the court found: "Defendant was not diligent in pressing its counterclaim at first opportunity. . . ." *Id.*

The case of *Fid. & Guar. Life Ins. Co. v. United Advisory Grp., Inc.,* WDQ-13-0040, 2016 WL 158512 (D. Md. Jan. 12, 2016), is also pertinent.  Fidelity, the plaintiff, sought to add a claim immediately after the close of discovery. *Id.* at *2.  It argued "that good cause exist[ed] to amend the Scheduling Order because the proposed amendment [was] based on facts obtained in discovery after the deadline for amending the pleadings under the Scheduling Order had passed . . . ." *Id.* at *4 (alterations added).  Judge Quarles wrote that Fidelity made "contradictory assertions regarding the novelty of the information." *Id.* at *5.  He noted that Fidelity posited that "all of the Defendants were already on notice from the original Complaint and the Amended Complaint that Plaintiff was asserting facts which could support [its claim]." *Id.* (alterations added).  However, Fidelity "simultaneously argue[d]  that it did not have knowledge of these facts until the close of discovery and therefore could not have filed its motion earlier." *Id.* Judge Quarles stated, *id.*: "It is hard to imagine a clearer example of the phrase, 'having your cake and eating it, too.'" Examining Fidelity's earlier motions, he found: "It is evident from Fidelity's own arguments that it had knowledge sufficient to state a claim . . . when it filed its initial claim, or, in the alternative, when it filed its Amended Complaint." *Id.* at *6 (alterations added).  The court concluded: "Fidelity's specious claim that the delayed discovery in the case created good cause to delay its filing is insufficient to overcome the Rule 16(b)(4) burden here." *Id.*

Many other cases reach similar conclusions.  *See*, *e.g.*, *Rockwell Mining, LLC v. Pocahontas Land LLC,* 749 F. Supp. 3d 660, 669 (S.D.W. Va. 2024) (stating that defendant "knew of the underlying conduct on which it bases the proposed . . . claim when the case began, [and]

cannot establish good cause for its motion.") (alteration added); *N. Ave. Cap., LLC v. Ranger Sci. LLC*, No. 2:22-CV-00168, 2023 WL 122404, at *2 (S.D.W. Va. Jan. 6, 2023) ("The record indicates that [defendant] gave [plaintiff] every reason to bring a breach of contract claim against it; however, [plaintiff] chose not to seek leave to do so until after the deadline for amendment had expired.") (alterations added); *see also Ackerman v. Graziano*, No. 2:19-CV-1811-RMG, 2022 WL 1638770, at *2 (D.S.C. May 24, 2022) (stating that plaintiff "'knew of the underlying conduct giving rise to his . . . claim [since the beginning of this case] but simply failed to timely raise it.'") (first alteration added); *Humane Soc'y of the United States v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, DKC 13-1822*, 2016 WL 3668028, at *5 (D. Md. July 11, 2016) ("[T]he underlying facts were long known to Plaintiffs, and Plaintiffs could have included . . . claims . . .when they commenced this action, and certainly before the expiration of the scheduling order deadline.") (alterations added); *Wonasue v. Univ. of Maryland Alumni Ass'n*, 295 F.R.D. 104, 109 (D. Md. 2013) ("Although these facts might bolster plaintiff's case, they. . . are not 'needed' for her to prove her claim.") (cleaned up); *Pure Fishing, Inc. v. Normark Corp.*, 2012 WL 3062683, *7 (D.S.C. July 26, 2012) (finding lack of good cause when a party seeking to amend relies on information obtained during discovery that is "not significantly different from [the] information previously available") (alteration added); *CBX Techs., Inc. v. GCC Techs., LLC*, JKB-10-2112, 2012 WL 3038639, at *4 (D. Md. July 24, 2012) (stating that plaintiff "has not offered any facts that would support an amended complaint and that were not discoverable by [plaintiff] through proper diligence prior to the deadline of the original scheduling order for filing a motion for leave to amend the complaint.") (alterations added).

What Judge Bredar said in *Cunney v. Patrick Commc'ns LLC*, JKB-13-2519, 2015 WL 6783010, at *5 (D. Md. Nov. 6, 2015), is apt here, albeit in regard to defendant rather than

plaintiffs: "Plaintiff's amended FAC presents his case in brighter color and sharper focus. The problem is that well over two years have elapsed since the commencement of this suit."  The court added that although the facts flushed out plaintiff's claims, there was no new information, "despite Plaintiff's conclusory assertion in his Motion that 'additional facts relevant to the issues in the case became apparent' during discovery. . . ." *Id.* at *5.  As such, the court concluded that the plaintiff failed to show good cause for the delay in seeking to amend the complaint. *Id.*

Simply put, a movant does not establish good cause merely because discovery strengthens or supports an existing contention.  *See Trustmark Inc. Co. v. Gen. & Cologne Life Reinsurance Co. of Am.,* 424 F.3d 542, 553 (7th Cir. 2005) (rejecting assertion of good cause when movant merely "contend[ed] that it did not confirm its suspicions of . . . the facts supporting its equitable estoppel claim—until . . . the depositions . . . were completed") (alterations added).  In other words, good cause is not established when a party "could have included these allegations at the outset of this case." *Buie v. Charter Commc'ns*, No. 617CV03007DCCJDA, 2018 WL 11357530, at *3 (D.S.C. Dec. 14, 2018).  Information found in the discovery process that "appears to merely slightly strengthen what was already a pretty strong inference" does not constitute an excuse for lack of diligence. *Id.*

Here, suit was filed in 2022. Well before the deadline for the amendment of pleadings, Compass has had information resembling what it claims it learned for the first time in discovery. *See* ECF 149 at 8–9.  Compass obtained information that might provide more detail for the claims it could have lodged earlier.  But, discovery that merely adds detail to existing information does not constitute good cause. *See Thomason,* 2016 WL 11565418, at *7 ("Plaintiff has failed to show that the changes incorporated into his proposed complaint are, in fact, based on evidence obtained during deposition testimony and that this evidence did not merely aid Plaintiff in fleshing out

claims and allegations that could have been raised prior to the deadline."); *see also Morrissey v. ASD Shared Servs., LLC*, 626 F. App'x 946, 954 (11th Cir. 2015) ("The fact that [plaintiff] learned of facts relevant to [belatedly raised] claims later in discovery does not show that they could not have been raised earlier.") (alterations added); *Hutton v. Hydra-Tech, Inc.*, No. 1:14CV888, 2017 WL 2462646 (M.D.N.C. June 6, 2017) (finding no good cause to add a claim when enough facts existed to form the basis of a claim previously, even if "'more varied and more detailed facts'" are available later.), *report and recommendation adopted sub nom.*, No. 1:14CV888, 2017 WL 2790526 (M.D.N.C. June 27, 2017).   As such, Compass was not diligent in lodging its counterclaims.

As noted, the "'touchstone'" of Rule 16(b)(4)'s "good cause requirement is 'diligence.'" *Faulconer*, 808 Fed. App'x at 152. And, inquiries as to diligence focus on "'the timeliness of the motion to amend and the reasons for its tardy submission.'" *Elat*, 993 F. Supp. 2d at 520.  In my view, Compass has not shown the diligence required by Rule 16, so as to warrant leave to add the counterclaims.

Among other things, the FAC did not alter the allegations in the suit as to Compass.  Rather, two individuals whose conduct has been at issue since the inception of the case were added as defendants because of their departure from the corporate defendant.  There is nothing in the substance of the FAC as to Compass that opened any door so as to justify the belated filing of counterclaims, for which Compass long had ample notice.

It is worth noting that a bevy of new defense counsel entered the case for Compass in April of 2025.  *See*, *e.g.*, ECF 132; ECF 133; ECF 134; ECF 141; ECF 142, ECF 155.[19]  The filing of the counterclaims may have been the brainchild of new counsel.  But, in the context of this case, a

---

[19] Local counsel did not change.

change in counsel does not justify the belated filing of the counterclaims. Compass offers no viable explanation as to why the discovery was needed to assert the claims . *See Matter of Under the Bridge Watersports, LLC*, GLR-20-1111, 2022 WL 1027778, at *5 (D. Md. Apr. 6, 2022) (finding no good cause when the movant lacked an explanation as to why the asserted facts found were needed to assert claims); *KVC Waffles Ltd. v. New Carbon Co., LLC,* GLR-20-195, 2021 WL 2476459, at *3 (D. Md. June 17, 2021) (denying counterclaims due to lack of good cause as defendant "does not provide an explanation in its Motion regarding how [the new information] supports its counterclaims or why [the new information] was 'needed' for its counterclaims to move forward.") (alteration added).

## B. Rule 15 (a)

Assuming, *arguendo*, that Compass has satisfied Rule 16(b)(4), the Court must next consider Rule 15(a). As previously stated, the Fourth Circuit has interpreted Rule 15(a) to provide that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Oroweat Foods Co.*, 785 F.2d at 509.

Plaintiffs argue that Compass's introduction of the "four new theories of liability *after* substantial completion of initial document production[] is not only unduly prejudicial- it is indicative of an effort to delay the case, as it would necessarily prolong discovery." ECF 229-1 at 7. They point out that "the parties have diligently been engaged in discovery and Compass's new Counterclaims will expand the scope of discovery and alter the nature of the litigation." *Id.* at 17. Plaintiffs add that the counterclaims "would require . . . substantial new discovery by Plaintiffs to Compass to defend against these claims. . . ." *Id*., n. 4. This would include discovery on "purported reliance upon the alleged misrepresentations . . . discovery on the economic relationships and

contracts. . . as well as discovery on what actually caused any business interruptions or harm to whatever Compass contracts and economics relationships are at issue for that claim." *Id.*

Compass counters that it "satisfies the more lenient requirements of Rule15(a)(2), as its Counterclaims are timely and will not cause prejudice to Plaintiffs." ECF 234-1 at 15–16. Compass also insists that there would be no need for further discovery, as it has already produced the information that it believes plaintiffs would need. *Id.* at 23. In any event, Compass maintains that additional discovery would not cause prejudice, because any prejudice could be ameliorated "by providing Plaintiffs an opportunity to conduct additional discovery limited on the new claims." *Id.* Compass also argues that the discovery plaintiffs would need will not "impact the case schedule." *Id.*[20]

In their Reply (ECF 239), plaintiffs posit that allowing Compass's claims at this juncture "will significantly undermine Plaintiff's ability to litigate their own case while defending against these new claims." *Id.* at 13. In their view, the counterclaims will require an investigation into the alleged harm to Compass's business and share price and further discovery. *Id.*; *see* ECF 208 at 26, 27, 28, ¶¶ 37, 41, 46, 47. Plaintiffs cite the need for investigation into "alternative causes of Compass's so-called business damages including, for example, discovery regarding Compass's 'investor communications and disclosures, and discovery regarding Compass's clinical trials and product development. . . ." ECF 239 at 13.[21]

---

[20]  The deadline for the parties to complete all remaining discovery was November 20, 2025. ECF 270 at 1. This matter was fully briefed as of September 12, 2025. *See* ECF 239.

[21]  Plaintiffs also suggest that Compass is hypocritical, asserting: "Compass does not even attempt to square its previous position [in opposition to the FAC] that minimal changes in the FAC. . . would be prejudicial, but Plaintiffs will suffer no prejudice with the addition of four new counterclaims. . . ." ECF 239 at 12.

It is true that, in its opposition to the FAC, Compass argued that further delay "is not only untenable and inefficient, but it is prejudicial to Compass. This case has already been pending for

There is a critical distinction between plaintiffs' earlier motions to amend, which I granted, and defendant's effort to add the counterclaims.  As I said earlier, the FAC added two New Defendants who were previously affiliated with Compass when suit was initially filed, and whose conduct has always been central to the litigation. The amendment of the suit did "not require Compass to conduct any discovery that it otherwise would not conduct." ECF 197 at 36.  The same cannot be said with regard to the counterclaims.

This case is also in a very different posture.  ECF 1.  Defendants have filed a voluminous summary judgment motion (ECF 304), with more than 110 exhibits.  Compass has also filed challenges to expert opinions.  ECF 315, ECF 316. Plaintiffs' summary judgment motion is due on December 19, 2025.[22]  To allow these counterclaims to proceed would dramatically expand the case, upend the schedule, and impact the Court's ability to proceed in a case that was almost three years old when the counterclaims were filed.

The Fourth Circuit's ruling in *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423 (4th Cir. 2011), is instructive.  There, shortly before trial, the defendant asserted six counterclaims, without seeking leave of court.  *Id.* at 439.  The district court subsequently denied the defendant's motion "for leave to file its counterclaim. . . finding that it was prejudicial and

---

over two and a half years." ECF 160 at 9. Compass stressed, *id.* at 7: "Discovery in this case is already underway." Compass also claimed that it "is entitled to resolution of the allegations against it in a timely manner, without last-minute and unjustified upheaval of the schedule that will draw the case out for an unknown amount of time." *Id.* at 9. The FAC, Compass argued, "would render that schedule essentially impossible." *Id* at 8.  Similarly, in its opposition to the Third Amended Complaint, filed in 2024, Compass complained, ECF 68 at 18: "Plaintiffs' undue delay in filing their motion has already caused, and will continue to cause, prejudice to Compass." *Id.* at 18.

Compass's earlier positions are at odds with its stance here.  But, I did not credit those contentions.  Nor are Compass's earlier contentions a basis on which to rule in favor of plaintiffs.

[22] As of 5:00 p.m. on December 19, 2025, plaintiffs' motion has not yet been filed.

unduly delayed in bad faith." *Id.*  On appeal, the Fourth Circuit concluded that under Rule 15 (a) "the district court's finding of prejudice was not an abuse of discretion." *Id.* at 440.  Citing *Laber*, 438 F.3d 427, the Fourth Circuit agreed with the district court that the addition of six new counterclaims would prejudice the plaintiff and might entail the need for further discovery. *Id.*

The defendant claimed it did not seek to file the counterclaim until it "'received NNHC's financial records in late December 2008, and had them interpreted by an expert, [because] VCV lacked sufficient legal foundation to file the counterclaim.'" *Id.*  The Fourth Circuit stated, *id*: "This explanation rings hollow because none of the counts in the counterclaim relied primarily on allegations regarding NNHC's financial records."  The same rationale applies here.

The Fourth Circuit cited *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 940–41 (4th Cir.1995).  *See Newport News*, 650 F.3d at 440.  In *Lone Star*, under Rule 15, a district court denied a counterclaim filed during the final stages of discovery.  The *Newport News* Court said, 650 F.3d at 440–41 (alteration in original):

> We have upheld a district court's denial of leave to file a counterclaim in substantially similar circumstances. In *Lone Star Steakhouse,* the defendant in a trademark infringement suit sought leave, in the last days of discovery, to add a counterclaim alleging that the plaintiff had committed fraud. *See* 43 F.3d at 940–41. The defendant based its claim on information that, according to the district court, it possessed approximately three months before requesting leave to file the counterclaim. The district court refused to "inject the defense of fraud," because it "considered the motion unduly delayed and reasoned that the amendment would have seriously prejudiced Plaintiffs and placed them at risk of further infringement because the amendment would have delayed the resolution of the case." *Id.* at 940. In affirming the decision of the district court, we found that the record did not support the defendant's contention that it delayed its counterclaim because it needed to conduct further investigation. *Id.*
>
> We also held that the amendment "would have substantially prejudiced Plaintiffs and would have significantly changed the nature of the litigation" because "[i]nserting the defense of fraud in the case on the last day of discovery would have raised new issues, which were not involved in the case during the discovery and were not the subject of Plaintiff's discovery and trial preparation."

Compass seeks to distinguish *Lone Star*, claiming that Compass "confirmed the bases for its Counterclaims only upon receiving discovery in July 2025, as described above." ECF 234-1 at 24. But, as previously discussed in regard to Rule 16, this argument is fallacious. Compass also attempts to distinguish *Newport News,* 650 F.3d at 440, by highlighting that in that case "a party sought leave to file a counterclaim less than one month before . . . trial." ECF 234-1 at 23. But, that is not a distinction of any significance here, with dispositive motions now pending.

"[W]here a new claim untimely pled is sought to be added near or at the close of discovery, the prejudice to the defendant is to[o] great to permit it." *McKinney v. UPS Freight*, No. CV 7:08-2264-HMH-BHH, 2009 WL 10710976, at *3 (D.S.C. Sept. 3, 2009) (alterations added) (denying a claim added close to the end of discovery because the defendant would be left "with no discovery whatsoever on that claim or will be forced to seek an extension of time").

*JPS Elastrometrics Corp. v. Jones Day*, No. CV 6:11-2960-TMC, 2013 WL 12158591 (D.S.C. Mar. 12, 2013), is instructive. There, the plaintiff moved to add a new claim during discovery. *Id.* at *1. The court found that the plaintiff was not diligent because the facts it claimed were revealed in discovery and justified good cause were already known to the plaintiff prior to the amendment deadline. *Id*. at *2. Additionally, the *JPS* Court found that a new claim would be prejudicial to the defendant, stating, *id.* (alterations added): "Although time remains in the discovery process and the case has not yet been set for trial, this case is now fifteen months old, and, over those fifteen months, [defendant] has expended significant resources in a discovery effort based solely on the [previous claim]." The court added: "While the amendment does not allege new facts, it does change the scope and direction of the case.[]" *Id.* (alterations added). Given the current stage of the litigation, the court found that the discovery that would be necessary would be prejudicial. *Id.*.

In *Jeffries v. Prince George's Cnty.,* AAQ-22-526, 2025 WL 590433 (D. Md. Feb. 24, 2025), the plaintiff did not file her motion "to add a new claim until September 5, 2024—well past the April 24, 2024, deadline for amended pleadings." *Id.* at *6, *aff'd*, 25-1456, 2025 WL 2694382 (4th Cir. Sept. 22, 2025). Reviewing plaintiff's previous filings, the court found that "the record establishes her knowledge [of the claim's underlying facts] by at least the Summer of 2022." *Id.* The court also said, *id.*: "Further, although Plaintiff stated during the hearing that no additional discovery would be required, her Motion states otherwise." Observing that "the parties were close to the end of discovery and summary judgment briefing was imminent," the court denied plaintiff leave to amend as it would "would result in additional discovery and, thus, prejudice" to the defendant. *Id.* at *6.

Numerous cases reach similar conclusions. *See*, *e.g.*, *Moke Am. LLC v. Am. Custom Golf Cars, Inc.,* No. 3:20CV400 (DJN), 2021 WL 11276921, at *2 (E.D. Va. Nov. 15, 2021) (denying leave to amend because "the facts underlying [defendant's] new counterclaims are not new and could have been alleged long ago" and defendant moved "far too late in the discovery process and too close to the deadline for motions for summary judgment."); *4D-Enters., LLC v. Aalto Hyperbaric Oxygen, Inc.*, No. 119CV01504AJTIDD, 2020 WL 13200228, at *2 (E.D. Va. July 10, 2020) (concluding that the newly added counterclaim, premised on a new theory of liability, was untimely and prejudicial because it "raises a range of factual and legal issues not within the scope of [defendant's] other claims, which had, to date, framed the scope of discovery) (alteration added); *Three Rivers Landing of Gulfport, LP v. Three Rivers Landing, LLC*, No. 7:11-CV-00025, 2013 WL 791313 at *3 (W.D. Va. Mar. 4, 2013) (denying leave to amend to add counterclaims during discovery because "new claims . . . almost certainly would require new and additional avenues of discovery to be explored and would likely prevent the case from moving forward and

being resolved in a timely fashion."); *Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.,* No. 2:08-CV-00810, 2010 WL 4117050, at *3 (S.D.W. Va. Oct. 19, 2010) (stating that "adding two new and substantially different causes of action when discovery is almost complete will also prejudice [the plaintiff.]") (alteration added); *Robinson v. Harvey,* 2007 WL 5029289, at *9 (M.D.N.C. June 21, 2007) ("Allowing plaintiff to amend her Complaint to raise additional claims that would potentially require further discovery would substantially delay disposition of this case and otherwise prejudice Defendant."), *aff'd,* 254 F. App'x 250 (4th Cir. 2007).

The Scheduling Order set a deadline of May 19, 2025, for amendment of pleadings. ECF 146. Compass filed the counterclaims on July 25, 2025. ECF 234-1 at 15. It blames plaintiffs for the need to add belated counterclaims, but the facts unequivocally establish that the assertion is pretextual. For one thing, apart from adding as defendants two individuals whose conduct has been central to the litigation, because of a change in their employment status, the suit made no changes to the claims. Moreover, Compass has long had sufficient knowledge to assert the claims embodied in the counterclaims. They significantly broaden the scope of the litigation. To properly defend against the proposed counterclaims, additional discovery would be required, which will certainly impact the current schedule in a case filed more than three years ago, with dispositive motions already pending.

## V. Conclusion

To allow Compass to add counterclaims at this late stage in the litigation would unduly delay the case, burden the court, and prejudice the plaintiffs.[23] As the Second Circuit has said, at

---

[23] Plaintiffs also argued that the counterclaims I and II should be dismissed due to the statute of limitations, and that counterclaims III and IV are subject to dismissal under *Noerr-Pennington* doctrine. *See* ECF 229-1 at 18–22. However, in view of my ruling, I need not address these contentions.

"a late stage of the litigation. . . a new counterclaim that raises issues beyond the scope of the new claims made in the most recent amended complaint will usually cause escalating prejudice to the counterdefendant and undue expansion of litigation that the court is charged with managing . . . ." *GEOMC*, 918 F.3d at 100.

For the reasons stated, I shall grant plaintiffs' Motion.  An Order follows, consistent with this Memorandum Opinion.


Date:  December 19, 2025                                        _____/s/_____
                                                                Ellen Lipton Hollander
                                                                United States District Judge

61