**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

TERRAN BIOSCIENCES, INC., UNIVERSITY OF MARYLAND, BALTIMORE, and SCOTT THOMPSON.,

Plaintiffs,

v.

COMPASS PATHFINDER LIMITED, EKATERINA MALIEVSKAIA, M.D., and GEORGE GOLDSMITH,

Defendants.

Civil Action No. 1:22-cv-01956-ELH

**PUBLIC REDACTED VERSION**

**PLAINTIFFS' MOTION TO EXCLUDE CERTAIN OPINIONS OF DEFENDANTS' EXPERT DR. DEFOREST MCDUFF**

# TABLE OF CONTENTS


I. INTRODUCTION ..... - 1 -

II. LEGAL STANDARD ..... - 1 -

III. ARGUMENT ..... - 2 -

A. Dr. McDuff's Opening Report Regarding Compass's Counterclaims Should be Excluded ..... - 2 -

i. Dr. McDuff's Event Study Analysis Rests on Unsupported Assumptions, Cherry-Picks Data, and Ignores More Than 53% of Compass's Investors. ..... - 4 -

ii. Dr. McDuff's Tweet-Counting and Google Search Approach Render his Event Study Fundamentally Flawed and Unreliable. ..... - 6 -

iii. Dr. McDuff Places Erroneous and Unexplained Weight on "Tweets," "Likes," and "Reposts." ..... - 8 -

iv. Dr. McDuff's Google Search is Likewise Unsound and Unscientific ..... - 10 -

B. Dr. McDuff's Rebuttal Opinions Regarding Whether Patents, Patent Applications, and Scientific Materials Disclose the Trade Secrets Should be Excluded. ..... - 12 -

i. Dr. McDuff's Opinions Regarding the Scope of Patent Filings and Technical Materials is Not Based on Any Expert Analysis or Knowledge ..... - 12 -

ii. Dr. McDuff is Not Qualified to Offer an Expert Analysis Regarding Technical Patent Issues ..... - 15 -

IV. CONCLUSION ..... - 15 -

# TABLE OF AUTHORITIES

## Cases

*Brasko v. First Nat'l Bank of Pennsylvania*,
700 F. Supp. 3d 354 (D. Md. 2023) ........ 5, 15

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) ........ 6

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
752 F.3d 82 (1st Cir. 2014) ........ 6

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ........ 4, 14

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........ 11

*Hines v. Wyeth*,
2011 WL 2680842 (S.D.W.Va. July 8, 2011), *order clarified on reconsideration*,
2011 WL 2730908 (S.D.W.Va. July 13, 2011) ........ 13

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ........ 10

*In re Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502*,
892 F.3d 624 (4th Cir. 2018) ........ 5-6

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
626 F. Supp. 3d 814 (D. Md. 2022) ........ 6

*Oglesby v. Gen. Motors Corp.*,
190 F.3d 244 (4th Cir. 1999) ........ 14

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ........ 6

*Redman v. John D. Brush & Co.*,
111 F.3d 1174 (4th Cir. 1997) ........ 2

*SAS Inst., Inc. v. World Programming Ltd.*,
125 F. Supp. 3d 579 (E.D.N.C. 2015), *aff'd*, 874 F.3d 370 (4th Cir. 2017) ........ 12

*Tyger Const. Co. Inc. v. Pensacola Const. Co.*,
29 F.3d 137 (4th Cir. 1994) ........ 5

*United States v. Landersman*,
886 F.3d 393 (4th Cir. 2018) ........ 12

*In re Williams Sec. Litig.*,
558 F.3d 1130 (10th Cir. 2009) ........................................................................................6

**Other Authorities**

Rule 702 ........................................................................................................1, 4, 6, 10, 12, 15

## I. INTRODUCTION

Plaintiffs move to exclude two categories of unreliable opinions from Defendants' expert Dr. DeForest McDuff.

First, in Dr. McDuff's Opening Report regarding Compass's alleged damages, Dr. McDuff claims Plaintiffs' filing of this lawsuit caused over $4 million in damages to Compass via stock price decline—a conclusion he reaches by counting 110 "Tweets" from Twitter/X and conducting a single Google Search. Ex. 7, McDuff Opening Rep. This Tweet-counting model relies on fundamentally flawed methodologies that fail to satisfy Rule 702. It should be excluded.

Second, in Dr. McDuff's Rebuttal Report addressing Plaintiffs' damages expert Gareth Macartney, Dr. McDuff—an economist with no patent expertise and no technical training in the subject matter at issue here—opines that various patents and scientific publications ***disclose*** Plaintiffs' alleged trade secrets. Either Dr. McDuff is offering technical opinions on patent disclosures and technical issues, which he is not qualified to do as someone with no technical training, or Dr. McDuff is offering lay observations dressed up as expert testimony—an equally invalid approach under Rule 702. Dr. McDuff's "opinions" on purported disclosures of the trade secrets should be excluded.

## II. LEGAL STANDARD

According to Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion

reflects a reliable application of the principles and methods to the facts of the case." An expert opinion is "admissible only if the expert has relied on information of a kind reasonably relied on by experts in the field." *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997).

## III. ARGUMENT

### A. Dr. McDuff's Opening Report Regarding Compass's Counterclaims Should be Excluded

Dr. McDuff's Opening Report analyzes the alleged damages attributable to Compass's Counterclaims I-IV.[1] In Counterclaims I (Fraudulent Misrepresentation) and II (Unfair Competition) against UMB and Professor Thompson, Compass alleges that Professor Thompson misrepresented the status of his research in 2019, causing damage to Compass from the allegedly lost time and energy spent negotiating the failed collaboration agreement. *See* Dkt. No. 208 ¶¶ 29-38. Compass claims in Counterclaims III (Unfair Competition) and IV (Tortious Interference) that Terran, UMB, Professor Thompson filed this lawsuit in bad faith, knowing that there were no trade secrets and no misappropriation and causing "reputational and financial harm" to Compass. *Id.* ¶¶ 39-48; Ex. 7, ¶¶ 11-12.

[redacted]

and with respect to Counterclaims III and IV, Dr. McDuff calculates $4.04 to $4.94 million in damages to Compass (measured by stock price decline) allegedly attributed to the filing of the lawsuit. Ex. 7, ¶¶ 37, 40.

---

[1] Three years into this case and well after the applicable deadline, Compass filed four new counterclaims against Plaintiffs. Dkt. No. 208. Plaintiffs maintain that Compass's counterclaims should be stricken or dismissed for the reasons described in Plaintiffs' Motion to Strike and Dismiss Compass's Counterclaims filed in August 2025. *See* Dkt. No. 229, 236, 237. That motion remains pending and therefore in accordance with the schedule at Dkt. No. 270, today Plaintiffs have also filed a Cross-Motion for Summary Judgment on Compass's counterclaims.

Dr. McDuff claims to have used a market event study of Compass's stock price between August 8-12, 2022 to analyze the alleged harm resulting from this lawsuit.[2] Dr. McDuff acknowledges the existence of various confounding factors impacting Compass's stock during his August 2022 event study window, including an article discussing the monopolistic tactics of Compass co-founders Dr. Malievskaia and Mr. Goldsmith, Compass's reporting significantly increased expenses and losses as a result of its clinical trial work, Compass's ***own*** Tweet and publicizing of the lawsuit, Compass's appointment of a new CEO, among others. Ex. 7 ¶ 18. Despite claiming that Plaintiffs' filing of the lawsuit caused over $4 million in damages via Compass's stock decline, Dr. McDuff concedes that not a single analyst report during this time even mentioned the Terran lawsuit. *Id.* ¶ 33. Instead, to segregate the supposed impact of the lawsuit on investor activity, McDuff resorted to counting a sample of social media posts—specifically just 110 Tweets and "Likes" or "Reposts" of those Tweets on Twitter/X[3]—and reviewing a single Google search. *Id.* ¶¶ 31-33. While Dr. McDuff's data purporting to show the Tweets and Google search he reviewed is entirely unreadable and undecipherable—Ex. 8 (undated and illegible Google Search for "compass pathways"); Ex. 9 (undated and illegible compilation of Twitter/X materials)—Dr. McDuff claims the following percentages of these sources mentioned the lawsuit:

- Twitter Posts: 18.5% mentioned lawsuit
- Twitter Likes: 24.3% mentioned lawsuit

[2] Although the lawsuit was filed on August 5, 2022, McDuff posits that "any market impact would not have materialized until the week of August 8, 2022," while acknowledging that "other contemporaneous events during that period may have contributed to stock price movements in both directions." Ex. 7 ¶ 18.

[3] Twitter (now known as X) is a social media platform where users post short messages. A "Tweet" (or "post") is a message published by a user on the platform. A "Like" is a feature allowing users to click a button "liking" the Tweet, and can be performed at any time after a Tweet is posted. A "Repost" is when an account shares the Tweet of another account and likewise can be performed at any time after the original Tweet is posted.

- Twitter Reposts: 40.5% mentioned lawsuit
- Google Search: 15.8% mentioned lawsuit
- Analyst Reports: 0% mentioned lawsuit

Ex. 7, p. 17, Table 3; *Id.* at Ex. B-3.

Dr. McDuff then adds these five different percentages together, divides them by five, and arrives at 19.8%. He then concludes, *ipse dixit*, that 19.8% of Compass's decline in stock price between August 8-12, 2022 must have been caused by Plaintiffs' alleged bad faith filing.

For the reasons described below, Dr. McDuff's analysis is not "based on sufficient facts or data," is not "the product of reliable principles and methods," and does not reflect "a reliable application of the principles and methods to the facts of the case," as required under Rule 702.

i. <u>Dr. McDuff's Event Study Analysis Rests on Unsupported Assumptions, Cherry-Picks Data, and Ignores More Than 53% of Compass's Investors.</u>

As a preliminary matter, Dr. McDuff cites no basis for the core assumption that underlies his entire analysis: that "Tweet counting" is a reliable indicator of investor decisions. Indeed, Dr. McDuff fails to cite any reliable evidence that investors make investment decisions based on informal social media posts, or that his Tweet-counting methodology is an accepted or reliable one. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 n.11 (9th Cir. 1995) ("[T]he party proffering the evidence must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific method and followed it faithfully."). Dr. McDuff simply speculates that individual investors [redacted] Ex. 7 ¶ 30.[4]

[4] In contrast, in his Rebuttal Report, Plaintiffs' expert Dr. Macartney cites various sources reflecting that social media platforms like Twitter/X are viewed in large part by individual investors as a poor method of financial information, including a citation to a study concluding that over 65% of individual investors do not rely on social media for financial information. Ex. 10, Macartney Rebuttal Rep. ¶ 76.

*Brasko v. First Nat'l Bank of Pennsylvania*, 700 F. Supp. 3d 354, 365 (D. Md. 2023) ("[A]n expert opinion that relies on 'assumptions which are speculative and are not supported by the record' is inadmissible.") (quoting *Tyger Const. Co. Inc. v. Pensacola Const. Co*., 29 F.3d 137, 142 (4th Cir. 1994)).

Nor does Dr. McDuff explain why he cherry-picked Twitter/X posts, as opposed to systematically reviewing other social media platforms for references to other Compass-related news or events besides the lawsuit. Indeed, as described below in Section III(A)(iv), in conducting his Google search, Dr. McDuff ***does*** count one Instagram post and one Facebook post he claims referenced the lawsuit. *See* Ex. 7 at Exhibit E-4 to Opening Report (summarizing Google hits, and counting a Twitter/X, Instagram, and Facebook post to conclude that 3 out of 25 of the Google "hits" for Compass referenced the lawsuit). He includes the Instagram and Facebook references to arrive at his 15.8% figure for his Google Search apportionment rate. Yet Dr. McDuff can provide no explanation whatsoever as to why he did not independently search these other social media platforms, as he did with Twitter/X.

Similarly, Dr. McDuff completely ignored institutional investors, despite conceding such investors own ***more than 53%*** of Compass's shares. Ex. 7 at 16, Table 2 (Compass's Institutional Ownership: 52.8%). Dr. McDuff did nothing to measure institutional investor sentiment or reactions to the lawsuit, and instead focuses myopically on the subset of supposed Compass investors who he assumes make and express investment decisions on Twitter/X.

This type of cherry-picking—searching one social media platform while ignoring others, yet including Instagram and Facebook hits when they appear in Google results and ignoring over 50% of investors—renders Dr. McDuff's analysis unreliable at the outset. *In re Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 634 (4th Cir. 2018) ("[C]ourts

have consistently excluded expert testimony that cherry-picks relevant data, because such an approach does not reflect scientific knowledge, is not derived by the scientific method, and is not good science.") (internal citations and quotations omitted).

ii. Dr. McDuff's Tweet-Counting and Google Search Approach Render his Event Study Fundamentally Flawed and Unreliable.

In addition to suffering from overarching flaws described above, Dr. McDuff's specific approach to his event study, including his inputs, Tweet and Google hits counting, and weighting, is flawed, unscientific, and fails Rule 702's reliability requirements.

To be reliable, an expert's event study must appropriately account for confounding or alternative factors beyond that to which the expert is attributing the alleged damage. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014) ("[W]hen conducting an event study, an expert must address confounding information that entered the market on the event date."). "An event study that fails to disaggregate the effects of confounding factors must be excluded" because it "misleadingly suggests to the jury that a sophisticated statistical analysis proves the impact of defendants' alleged [actions]" on a stock price when "the movement could very well have been caused by" other events or information released at the time. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (citing *In re Williams Sec. Litig.*, 558 F.3d 1130, 1143 (10th Cir. 2009)). *See also In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) (for event studies "the law requires the disaggregation of confounding factors"); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 626 F. Supp. 3d 814, 829 (D. Md. 2022) (*Daubert* factors include whether "the expert has adequately accounted for obvious alternative explanations").

The sole method by which Dr. McDuff attempts to disaggregate the effects of confounding factors is by counting Tweets, Likes, and Reposts, and reviewing a Google search to arrive at a 19.8% apportionment rate, as described above. But his approach is deeply unsound and unreliable for several reasons.

First, Dr. McDuff undertook ***no effort*** to determine whether the Tweets/Likes/Reposts or Google Search results he counted were even negative with respect to Compass: he simply counted and weighted equally ***any*** reference to the lawsuit, good or bad. Ex. 11, McDuff Tr. 138:16-139:2. In other words, without evaluating the content of the materials whatsoever, Dr. McDuff speculates that any reference to the lawsuit was correlated with investors therefore declining to invest in Compass or withdrawing such investments due to the lawsuit. He did not analyze whether a given Tweet, Like, Repost, or Google Search "hit" referenced both the lawsuit ***and*** other contemporaneous news regarding Compass, such as Compass's report to investors on August 4, 2022 that due to its clinical trial program, "its expenses would increase substantially" and its "expected losses 'may continue to cause [its] working capital and shareholders' equity to decrease,'" or the widely publicized article titled "A millionaire couple is threatening to create a magic mushroom monopoly" accusing Dr. Malievskaia and George Goldsmith of illegal conduct. Ex. 7 ¶ 18(b),(d). Instead, if a given source Dr. McDuff counted mentioned the lawsuit at all, he weighed it entirely as reflecting the impact of the ***lawsuit***, rather than any other factors mentioned therein.

Further exacerbating the unreliability of Dr. McDuff's approach is the fact that he only counted the "number of Likes and Reposts for each post ***as of the date of data collection***" in 2025. *Id.* ¶ 31 (emphasis added). But the timing of "Likes" and "Reposts" is not necessarily contemporaneous with the original Tweet: users can like or repost content even years after the

original Tweet, such that Dr. McDuff failed to even confirm that the activity he was measuring ***actually occurred*** during his event study window of August 8-12, 2022.

Dr. McDuff also did nothing whatsoever to determine whether his search for Tweets, Likes, or Reposts during the event window in fact included all Tweets, Likes, or Reposts regarding Compass that actually existed between August 8-12, 2022. Ex. 11, McDuff Tr. 104:3-105:5. While such tools are common, Dr. McDuff did not utilize any internet archive tools, for example, to even try to discern whether and how many Tweets mentioning Compass were deleted or removed in the several intervening years between the August 2022 event window and his 2025 analysis.

These methodological failures are not mere technical quibbles—they render Dr. McDuff's entire methodology unreliable and therefore inadmissible.

iii. Dr. McDuff Places Erroneous and Unexplained Weight on "Tweets," "Likes," and "Reposts."

In addition to the errors that plague the unreliable inputs to Dr. McDuff's event study, the approach to weighting these inputs is unscientific and skewed.

The 19.8% "apportionment" figure Dr. McDuff arrives at is ***not*** even a percentage of media mentioning the lawsuit. Instead, it is an average of five different percentages measuring completely different and cherry-picked inputs (Tweets, Likes, Reposts, a single Google Search, and Analyst Reports). There is no economic or scientific basis for why averaging these particular numbers together produces a meaningful apportionment figure for measuring investor reaction to an event. Averaging unrelated percentages from sources of vastly different reliability and investor relevance further highlights the fundamental unreliability of Dr. McDuff's methodology.

Critically, Twitter accounts for three out of the five overall inputs, or 60%, of Dr. McDuff's weighting and apportionment, with a remaining 1/5 (20%) assigned to his Google Search and

another 1/5 (20%) assigned to market analyst reports. This approach is fundamentally unsound: it places completely improper and unexplained weight on Twitter that Dr. McDuff is unable to explain. To make matters worse, within that extraordinarily high 60% weight placed on Twitter, Dr. McDuff equally weighted Tweets, Likes, and Reposts, even if the Like was to a Tweet that was ***already*** included in his analysis as a Tweet or Repost. Ex. 11, McDuff Tr. 139:18-140:23. Put another way, if a single Tweet about the lawsuit received 10 Likes and 5 Reposts, that one Tweet generates 16 data points in Dr. McDuff's analysis (1 Tweet + 10 Likes + 5 Reposts), all weighted equally, all counted as supposedly independent evidence of market concern about the lawsuit.

Dr. McDuff also did not consider the reach of any potential Tweet, Like, or Repost based on a user's followers or network. *Id.* 112:13-113:3; 114:12-13 ("I didn't perform a weighting by the number of followers"). Instead, his analysis treats every datapoint as equally salient, regardless of whether a specific user posting a Tweet had 100,000 followers or none. *Id.* 114:3-18. Dr. McDuff similarly failed to account for the fact that Twitter's algorithms promote or raise the profile of particular Tweets due to various well-known factors, including the use of hashtags or information relating to the specific user who is conducting the search.[5] *Id.* 120:9-13 (confirming he did not account for hashtags); *Id.* 128:6-129:19 (confirming his report does not discuss Twitter's algorithms, which filter and promote particular tweets). Indeed, despite conceding that the Twitter/X algorithm promotes or filters posts depending upon information from the specific user viewing the tweets, Dr. McDuff was unable to even identify which user or member of his staff conducted the Twitter/X search. *Id.* 130:13-131:7.

---

[5] A "hashtag" is a word or phrase preceded by the pound sign (#), such as #CompassPathways or #biotechstocks. On Twitter/X and other social media platforms, hashtags are used to categorize content and make posts more discoverable to users searching for topics. Twitter's algorithm gives greater visibility and reach to posts that use popular or trending hashtags, meaning that two otherwise identical posts may receive vastly different levels of exposure based solely on hashtag usage—a factor Dr. McDuff did not consider in treating all Tweets as equally salient and predictive of investor sentiment.

It is black letter law that an expert must "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). No competent economist or statistician would weigh these inputs in this conclusory and unsupported manner, and Dr. McDuff's failure to account for the various fundamental methodological flaws renders his content analysis unreliable under Rule 702.

iv. Dr. McDuff's Google Search is Likewise Unsound and Unscientific

For Google, Dr. McDuff simply searched "compass pathways," applying a date filter to reflect the event window. Ex. 7 ¶ 32; Ex. 8. Dr. McDuff claims his search yielded 25 "hits" (meaning results) that referenced Compass. While he claims he applied a date filter and "performed multiple searches" because Google's algorithm will produce different results per user (Ex. 7 at Exhibit E-4 to Opening Report), Dr. McDuff only provided Plaintiffs with a single search, which bears no date filter and is generally illegible. Ex. 8.

Moreover, Dr. McDuff was not looking at Google News or a similar aggregator, and as a result pulled in and counted hits from sources like Reddit, Instagram, Facebook, and YouTube, all of which are open-source social media platforms for anyone to post content, as opposed to investment or financial news sources. Ex. 7 at Exhibit E-4 to Opening Report (summarizing Google hits). Again, Dr. McDuff provides no support for his assumption that these sources are reliable indicators of investor sentiment. He similarly provides no explanation for his decision to disregard 6 of his Google search hits to arrive at his Google apportionment figure. He simply says that he decided 6 search results "related to employment or advertising something extraneous." *Id.* ¶ 32.

Dr. McDuff claims that 3 of the 25 hits related to the lawsuit, such that he claims that 15.8% of Google searches yielded lawsuit-related results. But perhaps most telling of Dr. McDuff's arbitrary and fundamentally unreliable approach is the fact that 1 of those 3 hits mentioning the lawsuit is from Twitter/X, which Dr. McDuff ***already*** purported to count and include in the Twitter/Likes/Reports percentages input into his overall "apportionment" percentage. *Id.*

**Exhibit E-4**
Google Hits from 8/8/22-8/12/22 for "Compass Pathways"

| Website | Topic |
|---|---|
| Glassdoor | Employment |
| Instagram | Lawsuit |
| Facebook | Lawsuit |
| X | Lawsuit |
| Taylor & Francis | Psychedelic Research |
| PharmExec | New CEO |
| LinkedIn | Employment |
| Blossom Analysis | Psychedelic Research |
| SpringerLink | Psychedelic Research |
| NIH | Psychedelic Research |
| Taylor & Francis | Psychedelic Research |
| Handelsblatt | Psychedelic Research |
| Psychedelic Health | Psychedelic Research |
| Reddit | Stock price |
| European Pharmaceutical Review | Sector-wide news |
| ADLIB Recruitment | Employment |
| Instagram | Psychedelic Research |
| The Org | Employment |
| Choice Stock Korea | Stock price |
| The Org | Employment |
| PsyPolitics | IPO |
| YouTube | Sector-wide news |
| MarketBeat | Sector-wide news |
| Facebook | Psychedelic Research |
| QResear.ch | Employment |

Ex. 7 at Exhibit E-4 to Opening Report.

In sum, Dr. McDuff's damages opinion is based on speculative assumptions, a flawed an unreliable methodology, and is rife with errors and unexplained logical leaps between the so-called data he analyzed and his ultimate opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). The Court should preclude Dr. McDuff from offering his damages opinion.

**B. Dr. McDuff's Rebuttal Opinions Regarding Whether Patents, Patent Applications, and Scientific Materials Disclose the Trade Secrets Should be Excluded.**

In addition to serving as Compass's counterclaim damages expert, Dr. McDuff submitted a Rebuttal Report addressing the opinions of Plaintiffs' damages expert Dr. Gareth Macartney. Ex. 10. Among the opinions he offers in his attempt to rebut Dr. Macartney, Dr. McDuff opines that Plaintiffs' alleged trade secrets were in fact disclosed in specific patent and other scientific materials, including the Perez patent,[6] Dr. Thompson's '090 patent application, Dr. Thompson's PCT application claiming priority to the '090 application, Dr. Hesselgrave's August 2019 abstract, Dr. Hesselgrave's October 2019 SfN poster, and Dr. Hesselgrave's April 13, 2021 PNAS paper.

Either Dr. McDuff is providing a lay opinion under the cloak of expert testimony or he is providing a technical opinion on the patents and related scientific materials that he is unqualified to give—either is improper and warrants exclusion.

i. <u>Dr. McDuff's Opinions Regarding the Scope of Patent Filings and Technical Materials is Not Based on Any Expert Analysis or Knowledge</u>

To be admissible, "the proffered expert opinion must be based on scientific, technical, or other specialized *knowledge* […]." *United States v. Landersman*, 886 F.3d 393, 412 (4th Cir. 2018)(emphasis original) (internal citations and quotations omitted). Rule 702 does not permit an expert to testify in a manner that simply restates or summarizes evidence under the guise of expert testimony without some connection to the expert's proffered expertise. *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 587 (E.D.N.C. 2015), *aff'd*, 874 F.3d 370 (4th Cir. 2017). Put another way, the law does not allow a party to use the imprimatur of an expert to inject non-

[6] As described in the parties' summary judgment briefing, the "Perez patent" is an international patent application titled "Combination Product for the Treatment of Neurological and/or Psychiatric Disorders."

expert testimony, such as about the so-called plain meaning of words, into trial. *Hines v. Wyeth*, 2011 WL 2680842, at *7 (S.D.W.Va. July 8, 2011), *order clarified on reconsideration*, 2011 WL 2730908 (S.D.W.Va. July 13, 2011) (excluding expert testimony on the basis that "it will provide little assistance to the jury and is thus irrelevant under Daubert" where the expert's "opinions are based on her own reading of defendants' internal documents" and "the jury is more than capable of reading … the documents on its own.").

Dr. McDuff confirmed he is indeed offering his own opinion as to whether patent filings and scientific literature disclose Plaintiffs' trade secrets. Ex. 11, McDuff Tr. 163:7-164:15 ("I am saying clearly certain aspects of the trade secrets that are relevant to Dr. Macartney's analysis have been disclosed in these documents"); *Id.* 167:12-18 (confirming that his conclusion regarding the '090 patent application is based on "both" his own assessment and Defendants' technical expert's). But when pressed for the basis of those opinions, Dr. McDuff revealed that his conclusion was not based on any expert analysis or methodology and instead was based on him simply reading the words in the patent documents. *Id.* 181:21-183:9.

For example, Dr. McDuff claims that the Perez patent disclosed Plaintiffs trade secrets because the USPTO denied Dr. Thompson's '950 patent application.[7] But when asked the basis for his analysis that allowed him to supposedly arrive at the conclusion that the USPTO's decision equates to the Perez patent having disclosed the trade secrets, Dr. McDuff testified: "***I don't know that I would call it analysis.*** It's based on looking at [the USPTO decision] and assessing it. I don't think it's that complicated. ***I'm just looking at the patent application –or looking at the USPTO***

[7] *See* Ex. 12, McDuff Rebuttal Rep. ¶ 68 ("I further note that the USPTO denied Dr. Thompson's '950 patent application for a method of treating depression with the sequential administration of an antagonist (later specified to be ketanserin) and an agonist (psilocybin) because it was, based on Perez, 'prima facie obvious to a person of ordinary skill in the art, at the time the claimed invention was made, to have administered psilocybin about 60 minutes after administering ketanserin in the method of treating major depression, psychotic depression, or postpartum depression.'").

***indication and drawing a conclusion …. I wouldn't call it analysis because it's not complicated. I'm just looking at the document and saying what the document says.***" *Id.* 180:16-182:4 (emphasis added).

Dr. McDuff further claims that "the Perez application states: 'the compound and the 5-HT2A receptor antagonist can be administered together or separately. The neurogenic compound can be administered to an individual who is already taking a 5-HT2A receptor antagonist.'" Ex. 12 ¶ 68. Yet when asked for the basis for his understanding including what a "neurogenic compound" is, Dr. McDuff responded: "I don't know. ***Just plain meaning and understanding of the words***." Ex. 11, McDuff Tr. 179:3-17 (emphasis added).

Similarly, when asked to explain the basis of his opinion that Dr. Thompson's provisional '090 patent application disclosed Plaintiffs' trade secrets, Dr. McDuff confirmed he arrived at his conclusion simply by "comparing the words that Plaintiffs use […] to describe the trade secrets and the words in the patent." *Id.* 166:3-170:24.

Dr. McDuff's confession that he simply read words and assumed their meaning without any scientific or technical analysis disqualifies him from offering these opinions on complex pharmaceutical trade secrets. This type of "I know it when I see it" testimony, devoid of any actual reliable or testable analysis or application of specialized knowledge, is inadmissible lay testimony that would be highly misleading to the jury. *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (an expert's "inferences must be derived using scientific or other valid methods.") (citing *Daubert* 509 U.S. at 592-93 ). Dr. McDuff's *ipse dixit* opinions regarding these technical issues should be excluded.

ii. Dr. McDuff is Not Qualified to Offer an Expert Analysis Regarding Technical Patent Issues

If, rather than simply reading words on a page and providing lay opinions, Dr. McDuff is purporting to offer an expert analysis of what is described at a technical level in these materials, Dr. McDuff lacks any qualification to do so: he is an economist, not a scientist, and lacks any hard sciences training. Ex. 11, McDuff Tr. 48:24-49:9 (admitting that with respect to "the hard sciences" or "some relevant technological field related to this case," he does not "have expertise in those areas"); *Id.* 172:6-10 ("I'm not a scientist in the hard sciences"); *Id.* 180:6-15 (confirming he is not an expert in biochemistry or any hard sciences "related to technology in this case"). Indeed, Dr. McDuff could not identify a single patent he has reviewed involving psilocybin or 5-HT2A antagonists outside this case, *id.* 170:6-24, and despite opining as to what the Perez patent says, Dr. McDuff admitted he does not even know what DMT—the subject matter of that patent—is, asking counsel during his deposition "What is DMT?" *Id.* 175:20-176:11.

To be qualified to testify on a subject, Rule 702 requires that an expert be qualified "by knowledge, skill, experience, training, or education" to testify about the subject matter. Dr. McDuff lacks any such expertise in the technical areas at which his opinions regarding the patent materials are directed. For this additional reason the Court should exercise its gatekeeping function to preclude Dr. McDuff from opining that Plaintiffs' alleged trade secrets were in fact disclosed in specific patent and other scientific materials. *Brasko*, 700 F. at 368 (collecting cases and excluding testimony on topics for which expert lacked requisite expertise).

## IV. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion to Exclude Dr. McDuff's opinions.

Dated: December 19, 2025

/s/ *Steven C. Cherny*
Steven C. Cherny (*pro hac vice*)
Matthew A. Traupman (*pro hac vice*)
Nicola R. Felice (*pro hac vice*)
Abigail M. Graegin (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
stevencherny@quinnemanuel.com
matthewtraupman@quinnemanuel.com
nicolafelice@quinnemanuel.com
abbygraegin@quinnemanuel.com

Patrick D. Curran (*pro hac vice*)
Kathleen Marini (*pro hac vice*)
Ryan P. Gorman (*pro hac vice*)
Alexandra O. Schelle (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, Massachusetts 02199
Telephone: (617) 712-7100
patrickcurran@quinnemanuel.com
kathleenmarini@quinnemanuel.com
ryangorman@quinnemanuel.com
alexandraschelle@quinnemanuel.com

Robert S. Brennen (Fed. Bar No. 04499)
Megan J. McGinnis (Fed. Bar No. 12810)
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
T/F: (410) 385-3727
rbrennen@milesstockbridge.com
mmcginnis@milesstockbridge.com

Ramsay M. Whitworth (Fed. Bar #26251)
Email: rwhitworth@silvermanthompson.com
Andrew M. Harvey (Fed. Bar #21925)
Email: aharvey@silvermanthompson.com
SILVERMAN, THOMPSON, SLUTKIN & WHITE
400 East Pratt Street, Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432

*Attorneys for Plaintiffs Terran Biosciences, Inc. and Professor Scott Thompson*

/s/ *Steven E. Tiller*
Steven E. Tiller (Bar #11085)
WHITEFORD, TAYLOR & PRESTON LLP
7 Saint Paul Street, Suite 1500
Baltimore, MD 21202
Telephone: (410) 347-9425
Facsimile: (410) 223-4325
stiller@whitefordlaw.com

*Attorney for Plaintiff University of Maryland, Baltimore*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 19th day of December 2025, a copy of Plaintiffs' Motion was served via CM/ECF on all counsel of record.

/s/ *Ryan Gorman*