**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| TERRAN BIOSCIENCES, INC., UNIVERSITY OF MARYLAND, BALTIMORE, and SCOTT THOMPSON.,<br><br>Plaintiffs,<br>v.<br><br>COMPASS PATHFINDER LIMITED, EKATERINA MALIEVSKAIA, M.D., and GEORGE GOLDSMITH,<br><br>Defendants. | Civil Action No. 1:22-cv-01956-ELH<br><br>**PUBLIC REDACTED VERSION** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' EXPERT, DR. GARETH MACARTNEY**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 3

III. LEGAL STANDARD ..... 4

IV. ARGUMENT ..... 5

A. Dr. Macartney's Lost Investment Opinion Relies on Sufficient Facts and Data, and Each of Defendants' Criticisms Relate to Weight, Not Admissibility ..... 5

i. Defendants' "Hearsay" Objections Mischaracterize Both Dr. Macartney's Opinions and the Law ..... 6

ii. Defendants' Remaining Criticisms of the Lost Investment Model are Disputes of Fact, not Admissibility Challenges ..... 9

B. Dr. Macartney's Lost Profits Opinion Relies on Sufficient Facts and Data, and Defendants' Criticisms Again Go to Weight, Not Admissibility ..... 11

i. Defendants' "Hearsay" Objections Are Meritless ..... 12

ii. Dr. Macartney's Use of a [redacted] Success Rate is Supported By the Record ..... 13

iii. Defendants' "Speculation" Attacks on Causation in the Lost Profits Analysis Misstate the Record and Do Not Justify Exclusion ..... 14

C. Dr. Macartney's Unjust Enrichment Analysis Is Reliable ..... 16

i. Defendants' "Hearsay" Objections Are Meritless ..... 16

ii. Defendants Mischaracterize Dr. Macartney's Opinion; His Model Correctly Captures the Competitive Benefit Compass Gained From Its Misconduct ..... 16

iii. Defendants' Argument That Future Sales Cannot Support Unjust Enrichment Is Wrong Factually and Legally ..... 18

iv. Defendants' Speculation Argument Misstates the Record; Their Criticisms Raise Only Factual Disputes for the Jury ..... 20

D. Dr. Macartney's Reasonable Royalty Opinion Reflects A Proper *Georgia-Pacific* Analysis ..... 21

i. Defendants Misstate the Law and the Record; Dr. Macartney's Lump-Sum Reasonable Royalty Is Proper and Well-Supported ........ 21

ii. Dr. Macartney's Opinion That Compass Would Agree To an Exclusive License Is Supported in the Record. ........ 24

iii. Defendants' "Apportionment" Challenge Misstates His Methodology and Raises Only Weight Issues. ........ 24

iv. Defendants Misstate the Law: A Reasonable Royalty Need Not Be Tied to Sales of the Defendant's Own Product ........ 25

E. Defendants' Disclosure and Apportionment Arguments Misstate the Law and Rest on Disputed Facts, Not Methodological Error........ 26

F. Dr. Macartney's Opinions on Economic Value Are Reliable and Admissible........ 27

V. CONCLUSION ........ 30

# TABLE OF AUTHORITIES

## Cases

*AirFacts, Inc. v. de Amezaga*,
30 F.4th 359 (4th Cir. 2022) .......... 16, 19, 26

*AirFacts, Inc. v. de Amezaga*,
909 F.3d 84 (4th Cir. 2018) .......... 30

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) .......... 27

*Bresler v. Wilmington Tr. Co.*,
855 F.3d 178 (4th Cir. 2017) .......... 5, 9, 15, 16, 20, 22, 24, 25

*Bryant v. Better Bus. Bureau of Greater Md., Inc.*,
923 F. Supp. 720 (D. Md. 1996) .......... 7, 8

*Burns v. Anderson*,
123 F. App'x 543 (4th Cir. 2004) .......... 9, 23, 27

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
47 F.4th 1278 (11th Cir. 2022) .......... 7

*Cashman Dredging & Marine Contracting Co., LLC v. Belesimo*,
759 F. Supp. 3d 120 (D. Mass. 2024) .......... 27

*Championship Tournaments, LLC v. United States Youth Soccer, Ass'n*,
2022 WL 1002137 (D. Md. Apr. 4, 2022) .......... 8

*U.S. ex rel. Citylink Const., L.L.C. v. Eng'g Design Techs., Inc.*,
2005 WL 6742496 (E.D.N.C. Aug. 29, 2005) .......... 8

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025) .......... 7

*In re Ethicon Inc. Pelvic Repair Sys. Prods. Liab. Litig.*,
2017 WL 6346633 (S.D.W. Va. Dec. 12, 2017) .......... 28

*Four Seasons Software, LLC v. Icici Infotech, Inc.*,
2006 WL 3791386 (D. Conn. Dec. 22, 2006) .......... 15

*Garcia v. Giurbino*,
46 F. App'x 881 (9th Cir. 2002) .......... 7

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) .......... 21, 22, 24, 25

*Grove US LLC v. Sany America Inc.*,
2019 WL 969814 (E.D. Wis. Feb. 28, 2019) ........ 19

*Hunt Valley Baptist Church, Inc. v. Balt. Cnty., Md.*,
2018 WL 2717834 (D. Md. June 6, 2018) ........ 5

*Knight v. Boehringer Ingelheim Pharms.*,
323 F. Supp. 3d 837 (S.D.W. Va. 2018) ........ 28

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
589 F. Supp. 3d 302 (S.D.N.Y. 2022) ........ 13

*Palantir Techs. Inc. v. Abramowitz*,
2022 WL 22913842 (N.D. Cal. Nov. 3, 2022) ........ 30

*Sci. Applications Int'l Corp. v. United States*,
169 Fed. Cl. 346 (2024) ........ 27

*Starr v. VSL Pharms., Inc.*,
2025 WL 1258016 (D. Md. Apr. 30, 2025) ........ 16

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
2018 WL 2172502 (E.D. Va. May 10, 2018) ........ 19, 22, 26

*Storagecraft Tech. Corp. v. Kirby*,
744 F.3d 1183 (10th Cir. 2014) ........ 26

*Students for Fair Admissions v. U.S. Naval Acad.*,
2024 WL 4135782 (D. Md. Sept. 10, 2024) ........ 8

*TMRJ Holdings, Inc. v. Inhance Techs.*,
540 S.W.3d 202 (Tex. App. 2018) ........ 26

*Tubular Rollers v. Maximus Oilfield Prods.*,
2021 WL 5991744 (S.D. Tex. Dec. 16, 2021) ........ 7

*United States v. Brown*,
767 F.2d 1078 (4th Cir. 1985) ........ 7

*United States v. Mann*,
712 F.2d 941 (4th Cir. 1983) ........ 9

*Univ. of S. Fla., Bd. of Trs. v. United States*,
155 Fed. Cl. 639 (2021) ........ 9

*ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*,
2023 WL 3558214 (W.D.N.Y. May 19, 2023) ........ 19

*Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*,
2021 WL 3883597 (D. Md. Aug. 12, 2021) .......................................... 4, 11, 15, 20, 22, 25, 27

*VS Techs. LLC v. Twitter, Inc.*,
2011 WL 4744572 (E.D. Va. Oct. 5, 2011)....................................................................5

*Westberry v. Gislavid Gummi*,
178 F.3d 257 ...................................................................................................................11

*XpertUniverse, Inc. v. Cisco Systems, Inc.*,
2013 WL 936449 (D. Del. Mar. 11, 2013) ..................................................................22

**Statutes**

18 U.S.C. § 1836(b)(3)(B)(ii) ...........................................................................................26

Md. Code, Com. Law § 11-1203(c)........................................................................................26

**Other Authorities**

Rule 30(b)(6)..........................................................................................................................13

Rule 702 ............................................................... 1, 3, 9, 10, 11, 13, 20, 21, 22, 25, 28, 29

Rule 703 ..........................................................................................................................1, 8

Rule 803 ..............................................................................................................................8

## I. INTRODUCTION

Defendants seek to bar every one of Dr. Macartney's damages opinions not because he is unqualified or his methodologies are unreliable, but because Defendants disagree with the record evidence and factual assumptions upon which Dr. Macartney relied. Those are issues for the jury to resolve. Such disagreements do not warrant exclusion under Rule 702. Challenges to the record evidence and assumptions upon which an expert relied are classic disputes over weight—not admissibility. Defendants cannot avoid a jury's assessment of the record, under the guise of *Daubert.* At base, Defendants violated the confidentiality agreement they used to induce Dr. Scott Thompson to disclose his cutting edge work to them and then published that work in their own patent applications, unfairly destroying the value of his confidential ideas and trade secrets. As a result, Terran suffered damages, including lost investment and lost profits, as well as damages measured by unjust enrichment and a reasonable royalty. Defendants cannot avoid the consequences of their actions via *Daubert*.

Lost Investment: Defendants argue that Dr. Macartney's Lost Investment model should be excluded because its "only support" is an interview with both Plaintiff Terran's CEO and Chief Business Officer. But that is both irrelevant and incorrect: First there is no basis to exclude expert testimony based on the number of percipient witnesses upon whom an expert relies. Regardless, Dr. Macartney's analysis also relies on [redacted], internal documents, sworn testimony, and technical-expert input—precisely the types of materials experts in his field routinely rely upon. Rule 703 permits reliance on such sources, and courts consistently reject attempts to exclude opinions because they incorporate executive interviews or other non-admissible evidence. Defendants and their experts allege Defendants' conduct did not cause Terran's lost investment. Terran and Dr. Macartney of course disagree. But for purposes of

*Daubert*, Defendants' claims are easily rejected; fights over which expert is more credible, or over the underlying evidence, are no basis to exclude an expert.

Lost Profits: Defendants challenge Dr. Macartney's Lost Profits analysis by disputing his assumed [redacted] regulatory-approval probability and arguing that he cannot reliably link Terran's lost investment to the future sales Terran would have achieved had its product reached the market. But Dr. Macartney's analysis relies on conservative, industry-standard benchmarks, incorporates and stress-tests multiple independent economic inputs, and is grounded in record evidence tying Terran's loss of funding to Defendants' improper use of Dr. Thompson's confidential information and resulting detrimental impact on Terran's intellectual property. Defendants' objections are factual disputes for cross-examination, not bases for exclusion.

Unjust Enrichment: Defendants argue that Dr. Macartney's Unjust Enrichment analysis is improper because it allegedly attributes all future COMP360 profits to Defendants' misconduct, fails to credit Compass's development efforts, relies on future sales of COMP360, and speculates that Terran's product would entirely displace COMP360. But Dr. Macartney's model measures only the competitive benefit Compass obtained—***after deducting Compass's own development costs***—rather than attributing all future profits to Defendants' misconduct. Unjust enrichment damages properly include head-start value, avoided costs, and the ***present value*** of future profits.

Reasonable Royalty: Defendants argue that Dr. Macartney's Reasonable Royalty analysis is unsupported because he used a lump-sum structure Compass allegedly could not afford, assumed Compass would agree to an exclusive license, failed to apportion value to the trade secrets, and tied the royalty to Terran's projected sales despite Compass not selling a product "using" the trade secrets. These arguments each rest on disputed factual premises, not methodological defects. It is typical in such analyses for defendants to assert they would not have paid a royalty sufficient to

compensate the plaintiffs. But even were that the case (an issue for jury to resolve), the law focuses on compensating the party harmed, not the willingness of the party who wrongfully caused the harm to compensate the victim. Moreover, Dr. Macartney expressly justified the ***lump-sum*** structure as economically compelled by Compass's own misconduct—which foreclosed any ***running*** royalty. Governing law squarely permits lump-sum royalties and holds that reasonable-royalty awards are not constrained by a defendant's liquidity or tied to its own product sales.

*Second,* Defendants' so-called "apportionment" argument, that Dr. Macartney supposedly failed to account for supposed prior public disclosures of the trade secrets also fails. That argument depends entirely on Defendants' ***disputed*** view of what those publications disclose—an issue addressed by Terran's technical experts—and thus challenges factual assumptions, not methodology. All of this goes (at best) to weight rather than admissibility under Rule 702.

*Finally,* Defendants close with an attack on Dr. Macartney's well-supported opinions about economic value, claiming that because Dr. Macartney did not offer a ***technical*** opinion on secrecy or public availability, his ***economic*** opinions regarding value should be excluded. Rule 702 does not require one expert to prove the entire case, nor does it authorize exclusion simply because an expert addresses only the issues within his expertise. Defendants identify no pertinent case excluding an economist from offering an opinion on economic value simply because *another* expert provides a technical opinion on secrecy. This is an improper challenge to the sufficiency of the overall record, not the reliability of Dr. Macartney's methodologies.

Because Defendants repackage fact and legal disputes as Rule 702 objections, and identify no defect in Dr. Macartney's qualifications or methodologies, the Court should deny their motion.

## II. <u>FACTUAL BACKGROUND</u>

This case concerns Defendants' misconduct in inducing Dr. Thompson—under the guise

of a signed NDA—to disclose his confidential information and research, including his discovery that [redacted] Ex. 13, Macartney Rpt. ¶¶ 6-7, 64-66. Subsequently, and without Dr. Thompson or University of Maryland, Baltimore's ("UMB") knowledge, Defendants improperly disclosed that confidential information publicly in patent applications, in an attempt to secure exclusive rights to that research and prevent others, including Plaintiffs, from securing patent protection on those same ideas. *Id*. ¶¶ 8, 67-68, 70. Defendants did so to block competitors likes Terran Biosciences, Inc. ("Terran"), which licensed Dr. Thompson's confidential information and the trade secrets from UMB, from entering the market with a psilocybin-based treatment for depression that would compete with and be superior to Compass's COMP360 psilocybin therapy. *Id*. ¶¶ 13-14, 175. Dr. Macartney evaluated four distinct measures of economic harm arising from Defendants' misconduct, described as his Lost Investment, Lost Profits, Unjust Enrichment, and Reasonable Royalty models. Ex. 13 ¶ 11-14; *see also* Ex. 111, Macartney Decl.

## III. <u>LEGAL STANDARD</u>

Under Rule of Evidence 702 and *Daubert*, a court considers five non-exhaustive factors: (1) "whether a theory or technique ... can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique has gained "general acceptance." *Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*, 2021 WL 3883597, at *5 (D. Md. Aug. 12, 2021). The "Supreme Court did not intend [a court's] gatekeeper role to supplant the adversary system or the role of the jury: vigorous

cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking . . . evidence." *Hunt Valley Baptist Church, Inc. v. Balt. Cnty., Md.*, 2018 WL 2717834, at *3 (D. Md. June 6, 2018).[1] Under *Daubert*, "questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility of the witness' assessment, not its admissibility." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017). "[T]he rejection of expert testimony is the exception rather than the rule." *VS Techs. LLC v. Twitter, Inc*., 2011 WL 4744572, at *3 (E.D. Va. Oct. 5, 2011).

## IV. ARGUMENT

### A. Dr. Macartney's Lost Investment Opinion Relies on Sufficient Facts and Data, and Each of Defendants' Criticisms Relate to Weight, Not Admissibility

Dr. Macartney's Lost Investment model assesses investment Terran lost due to Defendants' misconduct. Dr. Macartney measures the loss by analyzing Terran's [redacted] to Defendants' misappropriation and misconduct. Ex. 13 ¶¶ 11, 128-138. Terran had previously completed a [redacted] and, prior to the misappropriation becoming known, [redacted]. *Id.* ¶¶ 128. Drawing upon the foregoing evidence, Dr. Macartney explains that [redacted] when Defendants' theft of Plaintiffs' confidential information was discovered. *Id.* ¶¶ 11, 130-138. Dr. Macartney identified only [redacted] following that point, excepting [redacted] noting that [redacted] arising from Compass's conduct as the reason [redacted] *Id*. He calculated a [redacted] in [redacted] attributed to [redacted] once Defendants'

[1] Unless otherwise noted, all emphases are added and internal quotations and citations omitted.

misconduct became public.[2] *Id.* ¶¶ 133, 183.

i. <u>Defendants' "Hearsay" Objections Mischaracterize Both Dr. Macartney's Opinions and the Law</u>

Defendants first claim Dr. Macartney's Lost Investment model is based "only" on "self-serving" and "inadmissible double hearsay" from Terran executives. Defs.' Mot. to Exclude Dr. Macartney ("Mot."), ECF 302, at 3-7. Not so. First, Dr. Macartney's analysis is supported by admissible evidence that Defendants simply ignore. For example, Dr. Macartney analyzed data relating to Terran's [redacted] which shows that, immediately prior to Defendants' misconduct becoming publicly known, [redacted]. Ex. 13 ¶¶ 132-135; Ex. 14, 155:8-157:2. However, the data shows a [redacted] only after Defendants' theft became public, indicating a causal connection between [redacted] of Compass's misconduct and Terran's [redacted]. Ex. 13 ¶¶ 132-138; Ex. 14, 155:8-157:2. Defendants do not dispute that such evidence is admissible.

Dr. Macartney also relied on the timing of Terran's [redacted] Ex. 13 ¶¶ 134-135. That data, which also is admissible, corroborates the [redacted] that came only after Compass's theft became public. *Id.* This [redacted] stands in stark contrast to the [redacted] before the theft became public. As Dr. Macartney explained, [redacted] one would reasonably expect that [redacted] that did not happen after Defendants' theft became public.

[2] Notably, Defendants do not dispute Dr. Macartney's reliance on Dr. Clark's interview for the undisputed fact that this [redacted], Ex. 13, ¶ 139; they challenge only statements about [redacted] not the [redacted]

Ex. 13, ¶¶ 86, 134-135, Ex. 14, 155:8-157:2. Defendants do not dispute this evidence is admissible.

Against this backdrop Dr. Macartney ***also*** considered the corroborating information provided in interviews with Terran's CEO Dr. Sam Clark and Chief Business Officer Dr. Dustin Tetzl, who explained to Dr. Macartney (and later confirmed under oath in their depositions) that once Defendants' misappropriation and misconduct became public, Terran's [redacted] Ex. 13, ¶¶ 85-86, 131, 135. Drs. Clark and Tetzl provided [redacted] due to Compass's misconduct and [redacted] *Id.* ¶¶ 87-89, 136-138. Dr. Macartney does not rely on his interviews with Dr. Clark and Dr. Tetzl in a vacuum, nor does he act as a mere conduit for their testimony: both Dr. Clark and Dr. Tetzl were questioned extensively about this by Compass under oath in their depositions. *See, e.gs.*, Ex. 15, Clark Tr. 20:7-12; 37:9-14, 46:19-47:3; 70:17-20; Ex. 16, Tetzl Tr. at 141:25-143:3; 150:1-11; 158:9-14; 160:7-12; 166:8-13. Drs. Clark and Tetzl will appear at trial and testify regarding their direct involvement in Terran's [redacted] *See* Ex. 17, Clark Decl.; Ex. 18, Tetzl Decl. Because such testimony corroborates additional, indisputably admissible evidence that Plaintiffs put forward, Defendants' "hearsay" cases are inapposite.[3]

---

[3] *Tubular Rollers v. Maximus Oilfield Prods.*, 2021 WL 5991744, at *1-2 (S.D. Tex. Dec. 16, 2021), and *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1323 (11th Cir. 2022), cited by Defendants (Mot. 5-6), involved experts who relied entirely on uncorroborated hearsay without any independent analysis or supporting evidence. *Garcia v. Giurbino*, 46 F. App'x 881, 882 (9th Cir. 2002), and *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1344 (Fed. Cir. 2025), also cited by Defendants, similarly excluded opinions resting ***solely*** on self-serving, uncorroborated assertions from an interested party. Here, Dr. Macartney's interviews served only as one contextual input supplementing extensive [redacted], and documentary evidence. *United States v. Brown*, 767 F.2d 1078, 1084 (4th Cir. 1985), and *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 740 (D. Md. 1996), likewise do not assist Defendants: *Brown* is a pre-*Daubert* criminal case addressing a lay declarant's double hearsay, and *Bryant* concerned whether uncorroborated hearsay could support summary judgment. Finally, *Students for Fair Admissions v. U.S. Naval Acad.*, 2024 WL 4135782, at *5 (D. Md. Sept. 10, 2024), merely reiterates that an expert may not act as a pure "conduit for testimonial hearsay." None of these decisions is instructive.

Defendants' characterization of this evidence as "double hearsay" also is inaccurate. Statements by Terran's [redacted] to Drs. Clark and Tetzl regarding [redacted] are not hearsay because they are offered to show [redacted] contemporaneous ***beliefs*** and decision making (*i.e.*, their mental state [redacted])—not the truth of the matter asserted (*i.e.*, whether there were, in fact, [redacted]). Statements reflecting [redacted] fall squarely within Rule 803(3)'s exception to the rule against hearsay, which provides that statements of a declarant's then-existing state of mind—such as intent, plan, or motive—are admissible to prove that state of mind.

In any event, Rule 703 expressly permits an expert to consider information regardless of admissibility "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." *Championship Tournaments, LLC v. United States Youth Soccer, Ass'n*, 2022 WL 1002137, at *6 (D. Md. Apr. 4, 2022). Courts have "routinely concluded that interviews with company personnel are the type of information that is normally and reasonably relied upon by [] experts." *Id.* at *6 (collecting cases); *U.S. ex rel. Citylink Const., L.L.C. v. Eng'g Design Techs., Inc.*, 2005 WL 6742496, at *8 (E.D.N.C. Aug. 29, 2005) (rejecting challenge that expert relied too heavily on "self-serving hearsay" from company personnel as "flatly contrary to the dictates of Rule 703").[4] Here, the [redacted] depends heavily on oral communications and [redacted]. Ex. 14, 175:19-176; Ex. 16, 150:1-11; Ex. 17, Clark Decl., Ex. 18, Tetzl Decl. It is thus proper for Dr. Macartney to consider information obtained from interviews of Drs. Clark and Tetzl regarding their [redacted]

[4] Tellingly, ***Defendants' own experts*** rely on interviews with party witnesses. Dr. McDuff interviewed Compass employee Shaun Hurley regarding the number of hours Compass personnel purportedly worked on their collaboration with Dr. Thompson, and Dr. Roth interviewed Compass employee Nathan Poulsen regarding the drafting of the '611 Application, in addition to interviewing Cooley attorneys Dr. Jonathan Cousin, Sandhya Deo, and Erin Foley. Ex. 7, McDuff Rpt. ¶ 39; Ex. 1, Roth Rebuttal Rpt. ¶ 214; Ex. 2, Roth Supp. Rebuttal Rpt. ¶ 220.

[redacted] particularly when those interviews corroborate other record evidence.[5]

Finally, Defendants argue that Drs. Clark and Tetzl are not credible because they have a "financial interest in this litigation." Mot. 6-7. This claim goes directly to issues of credibility for cross-examination and for the jury to assess, not *Daubert*, particularly given the various independent evidence supporting Dr. Clark and Dr. Tetzl's testimony. *See Univ. of S. Fla., Bd. of Trs. v. United States*, 155 Fed. Cl. 639, 643-44 (2021) (declining to exclude opinion despite argument that it was "based solely on…inadmissible hearsay" because such challenges go to weight, not admissibility); *United States v. Mann*, 712 F.2d 941, 942 (4th Cir. 1983) ("the credibility of the witness whose description underlies the expert's opinion may affect [] weight," not admissibility). Under Defendants' erroneous view, no expert could ever rely on facts derived from a party because such facts allegedly would be self-interested—that is not the law.

ii. Defendants' Remaining Criticisms of the Lost Investment Model are Disputes of Fact, not Admissibility Challenges

Defendants' remaining criticisms of Dr. Macartney's Lost Investment analysis—that certain contested facts in the record are "inconsistent" with his conclusions (Mot. 7-9)—are classic factual disputes that are not grounds for exclusion under Rule 702. *Bresler*, 855 F.3d at 195 (challenges to expert's factual assumptions and inputs affect weight and credibility, not admissibility); *Burns v. Anderson*, 123 F. App'x 543, 549 (4th Cir. 2004) (that an expert allegedly "failed to review certain documents which would purportedly influence" his opinion "address[es] the proper weight to afford [the expert's] testimony, not its admissibility").

First, Defendants suggest Dr. Macartney's analysis is "at odds with the chronological order

[5] Defendants nonetheless criticize Dr. Macartney for not reviewing [redacted] support of his lost investment analysis (Mot. 5), but that argument rings hollow given their own discovery record. Defendants produced no [redacted] whatsoever relating to their claim that they lost investment due to this lawsuit—despite agreeing to produce such materials to the extent they existed—even though their own expert performed a lost-investment analysis. Defendants cannot fault Dr. Macartney for purportedly lacking [redacted] when they produced none to support their own lost-investment theory.

of the pertinent events" because the '611 Application was public prior to the [redacted] after the lawsuit was filed. Mot. 7-8. These are factual disputes that Rule 702 leaves for the jury. Whether Terran should have known of the '611 Application at the time it licensed Dr. Thompson's confidential information is disputed. *See* Opp'n & Cross-Mot. for SJ ("SJ Opp") at 35 & n.19. Moreover, the relevant trigger for the lost-investment damages is not when Terran learned of the misappropriation, but when [redacted]. Ex. 14, 126:20-127:4.

Based on the data described in Section IV.A.i *supra*, Dr. Macartney concluded that the [redacted] occurred after the misappropriation became broadly publicly known in August 2022. Ex. 14, ¶¶ 11, 131-135; Ex. 20, Macartney Reply Rpt. ¶ 9. Defendants' argue that Terran [redacted] after the '611 Application published and [redacted] the litigation was filed. Mot. 7-9. But as Dr. Macartney explained, those assertions do not actually reflect the [redacted] after Compass's misappropriation became known. Ex. 14, 165:3-15 [redacted] Ex. 13 ¶ 91 [redacted].[6]

Defendants offer no other explanation as to why [redacted] in

[6] Defendants emphasize a [redacted] following the filing of this lawsuit. Mot. 8 [redacted] But as Dr. Macartney testified, that [redacted] Ex. 14, 172:14-173:1. This [redacted] before Compass's misappropriation became public. Ex. 13 ¶¶ 11, 128, 132; Ex. 14, 165:3-15. Indeed, the [redacted] Defendants point to supports Dr. Macartney's conclusion; Defendants' alternative chronology simply presents factual disagreements that go to weight, not admissibility. *Bresler*, 855 F.3d at 195.

August 2022, after [redacted] of Defendants' misconduct. And while Defendants suggest (incorrectly) that the filing of this lawsuit was a "completely separate event from the alleged misappropriation," Mot. 9, they fail to explain why or how the manner in which [redacted] of the misconduct affects, much less invalidates, Dr. Macartney's analysis. It does not. *See* SJ Opp. at 35.

Second, Defendants quarrel with Dr. Macartney's opinion that Terran was on track [redacted] before Compass's conduct was revealed. Mot. 8-9. But Defendants' argument that Terran was only [redacted], is demonstrably incorrect. Dr. Macartney relied upon the [redacted] in addition to interviews with Drs. Clark and Tetzl corroborating [redacted]. Ex. 19, TERRAN0101970, at -971 (cited at Ex. 13 ¶82, n. 277); Ex. 20 ¶ 13. Defendants' assertion that Terran was not on track [redacted] is simply another improper attempt to turn a factual dispute into a *Daubert* issue.

Rule 702 does not authorize exclusion of an expert's testimony on the ground that the court believes one version of the facts and not the other. *See Vertellus*, 2021 WL 3883597, at *10.[7]

**B. <u>Dr. Macartney's Lost Profits Opinion Relies on Sufficient Facts and Data, and Defendants' Criticisms Again Go to Weight, Not Admissibility</u>**

Dr. Macartney's Lost Profits model uses a valuation methodology commonly used in the pharmaceutical and biotechnology sectors to quantify the harm to Terran's enterprise value caused by Defendants' misconduct. Ex. 13, ¶¶ 12, 140. This approach relies on epidemiological data to estimate the size of the relevant patient population, the expected penetration of Terran's proposed

[7] *See also Westberry v. Gislavid Gummi*, 178 F.3d 257, 261 ("the court need not determine that the expert testimony … is irrefutable or certainly correct" because "expert testimony is subject to being tested by [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.").

psilocybin-based treatment that would have used the confidential information that Defendants' stole and published, pricing assumptions, and timing of market entry. *Id.* ¶¶140-159. After estimating annual revenues and associated costs from commercializing the product that Terran would have developed using Dr. Thompson's proprietary work, he calculated the net present value of Terran's projected future profits. *Id.* Using this well-supported economic model, he determined that Terran lost [redacted] as a result of Defendants' misconduct. *Id.* ¶¶ 160.

i. Defendants' "Hearsay" Objections Are Meritless

Defendants incorporate their hearsay objection to attack the Lost Profits analysis, but as described in Section IV.A.i, that objection fails. Moreover, Dr. Macartney's lost-investment analysis relies on valuation methodologies commonly used by major investment firms to evaluate early-stage biotechnology companies, including methodologies used by Canaccord Genuity ("Canaccord"), a firm that has conducted similar analyses to value Compass. Ex. 13,¶¶ 12, 140; Ex. 20 ¶ 23 [redacted] Dr. Macartney employs a discounted cash flow ("DCF") methodology—a widely used valuation approach that estimates a company's worth by projecting its future profits and discounting those cash flows to present value. Ex. 13 ¶ 12, 157. Dr. Macartney also stress-tests his independently sourced inputs against the inputs used in Canaccord's analysis valuing Compass's future profits, in addition to Terran's own projections, to confirm that his assumptions are conservative. *See, e.g.*, Ex. 20 ¶ 29 [redacted]; ¶ 35 [redacted] Ex. 21, Macartney Supp. Rpt. ¶¶ 7-13. This type of analysis is routinely used by sophisticated investment firms and industry experts to value early-stage

biotech companies—indeed, it is the ***very approach*** Canaccord uses ***in the real world*** to evaluate COMP360 to value Compass's stock price. Ex. 13 ¶ 12, 140; Ex. 20 ¶ 23. That should end the Rule 702 inquiry. *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 331-32 (S.D.N.Y. 2022) ("expert opinion is admissible if it rests on well-established industry standards").

ii. Dr. Macartney's Use of a [redacted] Success Rate is Supported By the Record

Defendants argue that Dr. Macartney's Lost Profits analysis should be excluded because they disagree with his assumption that a Terran product based on Dr. Thompson's research would have a [redacted] chance of FDA approval. But Dr. Macartney obtained that input directly from a ***well-established industry data source***: the Biotechnology Innovation Organization's Clinical Development Success Rates Study, a peer-recognized empirical analysis of psychiatric drug clinical trial outcomes. Ex. 13 ¶ 155; Ex. 20 ¶ 29. Dr. Macartney even stress-tested the [redacted] benchmark against independent analyses used by investment firms who evaluate psychedelic drug programs, including the more aggressive projection from Canaccord, an investment bank that Defendants' Rule 30(b)(6) witness conceded provides "reputable," reliable analyses. Ex. 13 ¶ 155; Ex. 22, at -941; Ex. 23, Wilde Tr. 124:20-125:6. Again, this should end the Rule 702 inquiry.

Next, contrary to Defendants' suggestion, Dr. Macartney did not purport to offer a clinical or regulatory opinion. Rather, Dr. Macartney also relied on Terran's technical experts—along with Terran's executives, Drs. Sam Clark and Dustin Tetzl—for their explanations that Terran's planned psilocybin product does not involve hallucinations and combines two well-understood and well-tested compounds (psilocybin and a 5-HT2A antagonist), and therefore would have ***at least as high a likelihood*** of successfully progressing through clinical trials as COMP360. Ex. 13 ¶ 154; Ex. 20 ¶ 29; Ex. 24, Woolley Reply Rpt. ¶¶ 18-27. In particular, Plaintiffs' technical experts Dr. Woolley and Dr. Barrett cite empirical data supporting the plausible efficacy of Dr. Thompson's ideas and explain why Terran's product is at least as viable—if not safer—than COMP360. Ex. 3,

Barrett Rpt. ¶¶ 142, 146-167; Ex. 25, Barrett Reply Rpt. ¶¶ 206-07, 237-40; Ex. 26, Barrett Supp. Rpt. ¶¶ 29-30; Ex. 27, Woolley Rpt. ¶¶ 51, 59-86, 89-94; Ex. 24 ¶¶ 12, 15-27, 30. Moreover, despite this evidence that Terran's drug would be more effective and safer than COMP360, Dr. Macartney used the lower and more conservative [redacted] percentage of success (from Biotechnology Innovation Organization) rather than the 60% ascribed to the riskier COMP360. Defendants additionally argue that Dr. Macartney should have used a lower percentage of success for Phase III because Terran [redacted]. Mot. 11-12. Again, this attack goes directly to weight and credibility, not admissibility, and in any event critically ignores the fact that Terran [redacted] development ***due to Compass's improper actions.***

In sum, after considering technical expert input, industry data, and industry market models Dr. Macartney selected the [redacted] Phase III success probability as a conservative, reliable, and supported basis for his Lost Profits model.

iii. <u>Defendants' "Speculation" Attacks on Causation in the Lost Profits Analysis Misstate the Record and Do Not Justify Exclusion</u>

Defendants also contend that Dr. Macartney cannot reliably connect Terran's lost investment to the future sales Terran would have generated had its product reached the market. Mot. 12-13. But as Dr. Macartney testified and explained in his reports, Terran's ability to commercialize its psilocybin product depended upon [redacted] to advance the product through clinical development—a link confirmed by Terran's financial records, the documented [redacted], and sworn testimony from Dr. Clark, Terran's CEO, that Terran [redacted] and could not bring the product to market. Ex. 13 ¶¶ 133, 139; Ex. 14, 240:6-21; Ex. 15, 67:21-68:7. Dr. Macartney then applied accepted economic methods to model the expected revenue if the product advanced to commercialization. Ex. 13 ¶¶ 12, 140; Ex. 20 ¶ 23.

Far from being "speculative," forward-looking lost-profits analyses are well recognized as appropriate in early-stage business and trade-secret cases. For example, in *Four Seasons Software, LLC v. Icici Infotech, Inc.*, the court held that when a nascent business is destroyed or derailed, it may recover "the present value of a stream of expected future profits." 2006 WL 3791386, at *4 (D. Conn. Dec. 22, 2006). This is no different: Compass's misconduct halted the development of Terran's product, and Dr. Macartney modeled the profits Terran reasonably would have earned but for that interference. Ex. 13 ¶¶ 12, 139. Defendants' disagreement with that causal chain is a factual dispute for cross-examination, not a basis for exclusion. *Bresler*, 855 F.3d at 195; *Vertellus*, 2021 WL 3883597, at *10. Under Defendants' view, they were incentivized to improperly use Dr. Thompson's confidential information as early as possible so they could later argue that any resulting harm was speculative, regardless of the economic analyses applied to assess that harm.

Defendants wrongly suggest that Dr. Macartney's entire Lost Profits model rises or falls on the [redacted] FDA-success benchmark. Mot. 12. Not so. The [redacted] benchmark was just one of many independent inputs he used—alongside U.S. adult population data, population growth rate, depression prevalence among U.S. adults, percentage of adults with depression who receive treatment, percentage of patients with Treatment Resistant Depression, launch date, market penetration rate, price, and discount rate. Ex. 13 ¶¶ 140-146, 148-159; Ex. 20 ¶¶ 24-38. These multiple, independent parameters—each grounded in record evidence, industry data, and/or conservative assumptions—collectively shape the model; the FDA probability merely adjusts the expected value of the opportunity, consistent with accepted pharmaceutical-valuation methodology. Ex. 13 ¶¶ 155-156, 166; Ex. 20 ¶¶ 24-38, 29. Regardless, as discussed in Section IV.B.ii, Dr. Macartney's selection of a [redacted] success rate is grounded in the record and conservative, and not, as Defendants suggest, the model's only "limiter."

### C. **<u>Dr. Macartney's Unjust Enrichment Analysis Is Reliable</u>**

Dr. Macartney's Unjust Enrichment opinion analyzed the economic benefit Compass obtained from its theft of Plaintiffs' confidential information. Ex. 13 ¶¶ 13, 162-169. He assumed that by disclosing that confidential information in patent filings, Compass appropriated the advantages associated with ownership of the underlying technology, blocking Plaintiffs from developing such a drug. *Id*. To quantify the resulting benefit, he modeled the commercial prospects of COMP360 to determine the value that Compass received from blocking Terran's proposed competing alternative drug. *Id*. Using epidemiological data, a conservative [redacted] regulatory success probability, and discounted future profitability estimates, he calculated the net present value of the competitive and developmental advantage Compass obtained, finding that Compass gained $254,463,245 in unjust benefit. *Id.* ¶¶ 13, 162-69, 183.

None of Defendants' challenges to Dr. Macartney's Unjust Enrichment analysis identifies any defect in his methodology. Instead, Defendants dispute factual predicates, challenge inferences, and seek to reframe a standard head-start analysis as "speculative." *Id.* But again, these all are issues of weight, not admissibility. *See Bresler*, 855 F.3d at 195; *Starr v. VSL Pharms., Inc*., 2025 WL 1258016, at *11 (D. Md. Apr. 30, 2025) (disagreements about usefulness of data upon which an expert relies "do not show that his expert opinion and methodology are unreliable" and "go to weight"). Courts regularly admit unjust enrichment expert testimony in trade secret cases involving precisely the type of analysis Dr. Macartney performed. *See, e.g., AirFacts, Inc. v. de Amezaga*, 30 F.4th 359, 368 (4th Cir. 2022).

#### i. <u>Defendants' "Hearsay" Objections Are Meritless</u>

Defendants incorporate, by reference, their hearsay objection in attacking the Unjust Enrichment analysis. Mot. 13. As described in Section IV.A.i, that objection fails.

#### ii. <u>Defendants Mischaracterize Dr. Macartney's Opinion; His Model Correctly</u>

Captures the Competitive Benefit Compass Gained From Its Misconduct

Defendants' suggestion that Dr. Macartney improperly "awards all of Compass's future profits" to Terran mischaracterizes his methodology and the governing law. Mot. 14-15. Dr. Macartney isolated the incremental benefit Compass obtained by eliminating a competitive threat—exactly the type of unjust-enrichment analysis courts require. Disputes over competing evidence go to weight, not admissibility, and the record squarely refutes Defendants' assertions.

To begin, Dr. Macartney's model does not attribute all future COMP360 profits to Defendants' misconduct, but instead measures the [redacted] Ex. 14, 250:7-10. Terran's technical experts opined—based on record evidence—that Defendants' disclosure and attempt to patent the trade secrets reduced uncertainty surrounding COMP360's success, narrowed Compass's developmental pathways, and conferred meaningful competitive advantages. Ex. 3 ¶¶ 142, 146-167; Ex. 25 ¶¶ 206-07, 237-40; Ex. 27 ¶¶ 51, 59-86, 89-94; Ex. 24 ¶¶ 12, 15-27, 30. Relying on those opinions, Dr. Macartney measures only the ***present-day value*** of the competitive benefit Compass received. *See* Ex. 20 ¶ 41 ([redacted] In doing so, Dr. Macartney valued the incremental advantage Defendants' misconduct conferred, and did not attribute the entire future profits of Compass's product to the trade secrets or confidential information at issue. The criticisms levied in the case law upon which Defendants rely (Mot. 14-15) thus do not hold here. Those cases are inapposite because they concern the need to apportion the value of trade secrets ***incorporated into a defendant's product***. As Defendants repeatedly state in their motion, Compass did not incorporate the trade secrets into COMP360; instead, they disclosed and patented those trade secrets, to block a competitor from entering the market and bolster COMP360's competitiveness

in the market. Dr. Macartney appropriately calculated the value of that misconduct.

Defendants similarly argue that Dr. Macartney failed to account for Compass's own development efforts or separate its "contributions." Mot. 14. To the contrary, Dr. Macartney expressly deducted the costs and resources Compass would have expended to achieve the development and commercial milestones reflected in the model. Ex. 14, 252:4-13. Dr. Macartney's model thus measures net enrichment, not gross profits, and attributes to Compass only the portion of COMP360's expected future value gained from eliminating a rival product.

iii. Defendants' Argument That Future Sales Cannot Support Unjust Enrichment Is Wrong Factually and Legally

Defendants argue that because Compass has not yet received any benefit from sales of COMP360, it is improper for Dr. Macartney to use future sales as a basis for unjust enrichment. Mot. 15-16. That argument fails.

First, Defendants' argument raises a factual dispute regarding the nature and value of the benefit Compass received by eliminating a competitor. Dr. Macartney applied a basic competition-economics principle: a company who misappropriates a competitor's innovation to neutralize a competing product can benefit from preserving its dominant market position.[8] Ex. 13 ¶ 13 [redacted]; Ex. 14, 251:6-14; 74:8-14 . That competitive-

[8] Defendants' own damages expert agrees with this principle, acknowledging that a misappropriator can be enriched by avoiding competitive losses, including loss of market share that would result from the emergence of a superior competitor. Ex. 11, McDuff Tr: 196:4-15 ("Q. Maintaining market share or at least preventing dilution of the market share has commercial value to a company. Right? A. Yes. Q. In other words, maintaining market share generally benefits the company commercially. Right? A. Yes, in comparison to losing it."), 198:18-23 ("If you're talking about potential loss of market share from a competitor, then if that competitor weren't on the market, then all else equal, the company [already on the market] would benefit from greater market share. I agree with that proposition.").

displacement benefit—the preservation of COMP360's expected future profits—is the benefit that the model measures, using Compass's own contemporaneous valuation evidence to quantify the present-day value of the advantage Defendants obtained by blocking Terran's market entry. *See* Ex. 20 ¶ 41. A dispute over whether Defendants benefitted from blocking Terran's entry is a fact question for the jury, not a *Daubert* issue.

Second, Defendants' legal premise is wrong: unjust enrichment is not limited to realized profits from a commercialized product. Courts repeatedly hold that unjust enrichment may include avoided development costs, head-start value, and future competitive benefits derived from misappropriation, even if the defendant has not yet sold a product. *See, e.g.*, *AirFacts*, 30 F.4th at 368 (in trade-secrets cases, the court "can't condition [damages] awards on a defendant putting a trade secret to commercial use"); *Steves & Sons, Inc. v. JELD-WEN, Inc*., 2018 WL 2172502, at *6-9 (E.D. Va. May 10, 2018) (approving reasonable-royalty and unjust-enrichment measures reflecting avoided costs and future benefits, not just past use).[9]

In sum, Defendants' premise—that it received no benefit because COMP360 has not yet generated sales—is contradicted by Compass's own expert, the record evidence, and governing law. *See* Ex. 23, Wilde Tr. 154:1-155:11 [redacted] Ex. 28, Hurley Tr. 75:7-13 [redacted]

[9] Defendants' attempt to distinguish *Grove* and *ValveTech* mischaracterizes both decisions and misunderstands unjust enrichment under the DTSA and MUTSA. Mot. 16. Neither case holds—and no authority supports—that unjust-enrichment damages must be limited to historical "actual profits" and may never include forward-looking benefits or avoided costs. In *Grove US LLC v. Sany America Inc.*, 2019 WL 969814, at *3-4 (E.D. Wis. Feb. 28, 2019), the court approved measuring unjust enrichment based on the value of the opportunity obtained at the time of misappropriation and declined to confine damages to realized profits. *ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*, 2023 WL 3558214, at *7 (W.D.N.Y. May 19, 2023), excluded an expert whose model was untethered to the facts, not because unjust enrichment cannot include forward-looking benefits, and reaffirmed that such damages may reflect the present value of benefits already conferred. Dr. Macartney's analysis follows that framework by quantifying the present value of the competitive advantage Compass obtained by blocking a superior rival product.

[redacted] Disagreements with the factual assumptions underlying an expert's model go to weight, not admissibility. *See VSL Pharms.*, 2025 WL 1258016, at *11; *Bresler*, 855 F.3d at 195. Whether Compass benefitted from misappropriating the trade secrets and preventing Terran's market entry is a factual question for the jury.

iv. <u>Defendants' Speculation Argument Misstates the Record; Their Criticisms Raise Only Factual Disputes for the Jury</u>

The remainder of Defendants' unjust enrichment challenge is factual, not methodological. Defendants' criticism that Dr. Macartney's unjust-enrichment model supposedly assumes Terran's product would "completely force COMP360 out of the market" rests on a gross mischaracterization of his testimony, opinion, and the record. Mot. 16-17. Dr. Macartney assumed no such thing. When asked in deposition whether "[redacted]" Dr. Macartney made clear that [redacted] Ex. 14, 248:5-249:17. As explained above, Dr. Macartney is stating and relying upon a basic competition-economics principle: a defendant who misappropriates a competitor's innovation to neutralize a competing product can be unjustly enriched by the value of preserving its dominant market position. Ex. 13 ¶ 13; Ex. 14, 251:6-14, 74:8-14. Whether and to what extent Terran's product would have eroded COMP360's market position is a battle of the experts for the jury to evaluate—not a basis to exclude a reliable economic model under Rule 702. *See Bresler*, 855 F.3d at 195; *Vertellus*, 2021 WL 3883597, at *10.

Because Defendants' objections attack factual assumptions, credibility determinations, and competing inferences—rather than any methodological flaw—they go to weight, not admissibility under Rule 702. Dr. Macartney's analysis applies reliable economic principles grounded in the

record, and Defendants' motion to exclude his Unjust Enrichment opinion should be denied.

### D. Dr. Macartney's Reasonable Royalty Opinion Reflects A Proper *Georgia-Pacific* Analysis

Dr. Macartney's fourth damages analysis is a Reasonable Royalty analysis. Using the well-recognized factors laid out in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), Dr. Macartney estimated the lump-sum royalty that Defendants and Dr. Thompson and UMB would have negotiated had Compass sought an exclusive and perpetual right to use the trade secrets at the time of Defendants' misappropriation. Ex. 13 ¶¶ 14, 178, 181. His analysis considered factors such as the competitive significance of the trade secrets, the purposes Compass used them towards, the scope of the license that would be required for such purposes, Terran's projected future profits, the value of avoided development and regulatory risk, comparable licensing terms, and the economic consequences of Defendants' disclosure of the information in patent filings. *Id.* ¶¶ 14, 171-181. Synthesizing these factors, he calculated a lump-sum reasonable royalty of $117,876,681. *Id.* ¶¶ 14, 181, 183. Defendants' challenges to Dr. Macartney's reasonable-royalty opinion raise only legal misstatements and factual disagreements that go to weight, not admissibility.

#### i. Defendants Misstate the Law and the Record; Dr. Macartney's Lump-Sum Reasonable Royalty Is Proper and Well-Supported

Defendants argue that Dr. Macartney does not explain why a lump-sum payment is appropriate and that his calculation is "inconsistent with the facts of the case" [redacted] 17-19. Neither argument provides a basis for exclusion under Rule 702.

First, Defendants contend there is no basis for a lump-sum royalty, but that is incorrect. This royalty structure flows directly from the economic reality Defendants created. *See* Ex. 13 ¶¶ 14, 178; Ex. 20 ¶ 55; Ex. 14, 275:19-277:3. Because Defendants' conduct eliminated the very

pathway through which a running royalty could have accrued, a lump-sum royalty is the economically appropriate structure and directly reflects the value Defendants attributed to the trade secrets. Ex. 14, 276:1-19 [redacted] Ex. 13, ¶ 175. Courts routinely hold that lump-sum royalties are appropriate where the parties' competitive relationship or the nature of the misappropriation makes running royalties infeasible. *See, e.g.*, *Steves & Sons*, 2018 WL 2172502, at *10 (lump-sum royalty was appropriate where the "competitive relationship indicates that a lump-sum payment is a possible outcome of their hypothetical negotiations"). Nothing in the law requires a running royalty, and courts regularly accept lump-sum structures where they best capture the value of the rights the defendant assumed.

Second, Defendants argue that the royalty is untethered from the facts of the case because [redacted] But a reasonable royalty is not constrained by an infringer's liquidity. *Georgia-Pacific*, 318 F. Supp. at 1120-21 (focus is on value of the right to the infringer). Were that the case, a defendant could never be held fully accountable for misappropriating information before it fully realized the value of the misappropriation or despite the harm it caused. Here, the strategic value Compass obtained—[redacted]—drives the royalty amount. *See* Ex. 13 ¶ 175 ([redacted]). Defendants' disagreement with Dr. Macartney's valuation is a factual dispute for cross-examination, not a Rule 702 issue. *See Bresler*, 855 F.3d at 195; *see Vertellus*, 2021 WL 3883597, at *10.

Third, Defendants' reliance on the *Daubert* ruling in *XpertUniverse, Inc. v. Cisco Systems, Inc.*, 2013 WL 936449 (D. Del. Mar. 11, 2013), a patent-infringement case, is misplaced. Mot. 18-

19. There, the magnitude or structure of the proposed royalty was not the problem, as the expert's number lacked any reliable evidentiary foundation or logical link to the record. *Id.* at *3-4. Here, Dr. Macartney's analysis is firmly grounded in record evidence of Dr. Thompson's ideas' value to Compass: the substantial competitive advantage Defendants obtained by using the trade secrets and confidential information to eliminate a superior rival product and foreclose any opportunity for a running royalty. Ex. 13 ¶ 175; *see also* SJ Opp. at 26-27. Far from arbitrary, Dr. Macartney's royalty is the product of a conventional hypothetical-negotiation analysis applied to the evidence.

Finally, Defendants argue that the lump-sum structure is flawed because it differs from the most comparable license, the UMB–Terran MLA.[10] But the MLA is a benchmark, not a template. And as explained above, the facts here justify a different structure than the one that UMB and Terran entered into when both parties envisioned a collaborative relationship and ongoing sales. *See* Ex. 13 ¶ 177 ([redacted] Ex. 20 ¶ 58. Under the MLA, [redacted]. Ex. 14, 275:22-277:3. By contrast, Defendants here [redacted] *Id.* 275:22-277:3. In the hypothetical negotiation, Compass would be purchasing an exclusive license that extinguished UMB's ability to commercialize the technology or earn future royalties—an exchange that warrants an upfront

[10] Defendants' argument that Dr. Macartney should have given greater weight to the Terran–Blumentech license, Mot. 19, goes to weight, not admissibility. *Burns*, 123 F. App'x at 549 (failure to review certain documents affects credibility, not admissibility). Defendants' own expert agrees that the UMB–Terran agreement—not the Terran–Blumentech license—is the most comparable benchmark. *See* Ex. 12, McDuff Rebuttal Rep. ¶130.

lump-sum payment where UMB is forgoing the rights and value embodied in the MLA. Ex. 20 ¶ 58; Ex. 14, 275:22-277:3. Dr. Macartney clearly considered the MLA terms and explained why he adapted them to the factual circumstances. Moreover, the degree of reliance an expert places on a comparable license and the extent to which he adjusts its terms to reflect the economic realities are classic weight, not admissibility, issues. *See* Bresler, 855 F.3d at 195.

ii. <u>Dr. Macartney's Opinion That Compass Would Agree To an Exclusive License Is Supported in the Record.</u>

Defendants next assert that Dr. Macartney does not justify why Compass would seek and agree to an exclusive license. Mot. 19-20. But, as detailed in Section IV.D.i, the structure and scope of the hypothetical license flows directly from the way Compass used the misappropriated information and the economic reality Compass created. *See* Ex. 13 ¶¶ 14, 178; Ex. 20 ¶¶ 55-56; Ex. 14, 275:22-277:3. Compass rushed to patent Dr. Thompson's ideas, in an attempt to secure exclusive rights to their use. To rightfully do that, Compass would have had to negotiate an exclusive license to the trade secrets, as Dr. Macartney explains. Ex. 20 ¶ 56. An exclusive license in these circumstances is therefore not "counterfactual." Mot. 20.

Defendants' assertion that Compass would not have bargained for exclusivity is a factual dispute and ignores the core assumption of the *Georgia-Pacific* framework of a hypothetical negotiation between parties willing to license and obtain licensing rights. 318 F. Supp. at 1121 (reasonable-royalty analysis requires consideration of "[w]hat a ***willing licensor and a willing licensee*** would have agreed upon in a suppositious negotiation"). Dr. Macartney opined that [redacted] *See* Ex. 13 ¶ 14, 178; Ex. 20 ¶ 55-56; Ex. 14, 275:22-277:3.

iii. <u>Defendants' "Apportionment" Challenge Misstates His Methodology and Raises Only Weight Issues.</u>

Defendants further argue that Dr. Macartney failed to "apportion" the reasonable royalty

to the value of the asserted trade secrets and confidential information because [redacted]. Mot. 20-21. That argument mischaracterizes both what Dr. Macartney did and what Rule 702 requires. To begin, as explained above in Section IV.D.i, Dr. Macartney treated the MLA as a ***benchmark***, not a template. He appropriately departed from its terms to reflect the economic reality Defendants created—namely, that Compass effectively granted itself an exclusive worldwide license through its misappropriation and public disclosure of the trade secrets. *See* Ex. 20 ¶ 58-59; Ex. 14, 275:19-277:3. Dr. Macartney separately analyzed the value of the trade secrets to Compass, explaining that Compass would gain both (1) the right to commercialize a highly innovative non-hallucinogenic antidepressant therapy, and (2) the strategic ability to shield COMP360 from a potentially superior competitor. *See* Ex. 13 ¶ 175; Ex. 20 ¶ 58. Defendants' suggestion that Dr. Macartney needed to painstakingly [redacted] He did not. Moreover, whether the MLA conveys [redacted], and the extent to which [redacted], are factual and technical disputes between the parties, not methodological defects. *See Bresler*, 855 F.3d at 195; *Vertellus*, 2021 WL 3883597, at *10.

iv. <u>Defendants Misstate the Law: A Reasonable Royalty Need Not Be Tied to Sales of the Defendant's Own Product</u>

Defendants' contention that Dr. Macartney's reasonable-royalty analysis is flawed because Compass "did not use" the misappropriated information in a product rests on a fundamental misunderstanding of governing law and disputed facts. Mot. 21-22. To begin, Dr. Macartney *did* consider "the extent to which [Compass] has made use of the invention" as required by *Georgia-Pacific*. 318 F. Supp. at 1120. He explains why Compass's use was the equivalent of granting itself

an exclusive license. *See supra* IV.D.i-ii; Ex. 13 ¶ 14, 178; Ex. 20 ¶ 55-56; Ex. 14, 275:22-277:3. Moreover, Defendants' assertion that only "commercial" uses of a trade secret can support a royalty award is squarely foreclosed by governing law. Reasonable royalty damages may be awarded to compensate for a defendant's "unauthorized ***disclosure*** or use of the trade secret." 18 U.S.C. § 1836(b)(3)(B)(ii); *see also* Md. Code, Com. Law § 11-1203(c). Consistent with that plain language, the Fourth Circuit held in *AirFacts*, that "[b]ecause the Act [MUTSA] expressly permits royalty damages for mere disclosure, we can't condition such awards on a defendant putting a trade secret to commercial use." 30 F.4th at 368; *see also* SJ Opp. at 37-38.[11]

### E. Defendants' Disclosure and Apportionment Arguments Misstate the Law and Rest on Disputed Facts, Not Methodological Error

Defendants extraordinarily argue that ***all*** of Dr. Macartney's damages opinions should be excluded because he allegedly did not consider disclosures of the trade secrets unrelated to Compass's misconduct, and thus did not "apportion" harm based on those disclosures. Mot. 22-24. This argument, again, simply repackages material factual disputes as *Daubert* issues.

First, this argument rests entirely on Defendants' assertion that various publications (including the Perez patent) disclose the trade secrets. Mot. 22-23. This is a strawperson argument, directed at a "head start" damages theory that Dr. Macartney does not offer. Compass did not merely secure a "head start." By publishing Dr. Thompson's ideas in a patent application, Compass ([redacted]) extinguished Terran's ability to secure its own rights to that information. Ex. 13 ¶¶ 11, 14, 132-135, 181; Ex. 20, ¶¶ 9, 55-56; Ex. 14, 126:16-127:4, 275:22-277:3. Even assuming, *arguendo*, to the extent the two alleged "disclosures" Defendants

[11] A reasonable royalty measures the value of the trade secret to the defendant ***at the time of misappropriation***—regardless of whether the defendant later commercializes it. *See Steves & Sons*, 2018 WL 2172502, at *9; *Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1186-1189 (10th Cir. 2014) (explaining that commercial use is not required); *TMRJ Holdings, Inc. v. Inhance Techs.*, 540 S.W.3d 202, 210 (Tex. App. 2018) (reasonable royalty may be based on the value of the trade secrets at the time of misappropriation, even if defendant's contemplated use never materializes).

highlight—the ’722 application, followed by Hesselgrave 2021—disclosed some portion of Dr. Thompson’s ideas, they did so ***after*** Compass had already acted to thwart Terran’s ability to protect its rights through the ’722 application, and after the harm to Terran was done. The timeframe that Dr. Macartney assumed for that harm appropriately reflected the nature of Compass’s misconduct. *See* Ex. 13, ¶ 178; Ex. 20 ¶ 58; Ex. 14, 275:22-277:3.

Moreover, whether the Vollenweider 1998, Carter 2005, and Quednow 2012 publications or the Perez patent do in fact disclose the trade secrets is sharply disputed by Terran’s technical experts, who opine and testify in detail that these alleged disclosures do *not* contain the trade secrets. *See* Ex. 3 ¶¶ 107-34; Ex. 25 ¶¶ 79-117; Ex. 24 ¶ 28; *see also* Pls.’ Opp. to Mot. to Exclude Woolley & Barrett at 12-14. Defendants’ factual disagreement with Terran’s technical experts is not a basis for exclusion of Dr. Macartney’s testimony. *See Burns*, 123 F. App’x at 549; *Vertellus*, 2021 WL 3883597, at *10. Defendants’ criticism also misunderstands the role of a damages expert. Dr. Macartney was asked to assume that Dr. Thompson’s ideas were in fact secret, and he relied on Terran’s technical experts for that determination (a subject outside an economist’s expertise). Ex. 13 ¶ 9; Ex. 20 ¶ 4-5. This is exactly what Rules 702 and 703 allow and what courts expect. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014) (“Experts routinely rely on other experts”); *Sci. Applications Int’l Corp. v. United States*, 169 Fed. Cl. 346, 364 (2024) (similar); *Cashman Dredging & Marine Contracting Co., LLC v. Belesimo*, 759 F. Supp. 3d 120, 162-63 (D. Mass. 2024) (damages expert may assume existence of trade secrets and rely on liability experts). Defendants’ quarrel with that reliance is a factual dispute—not a methodological defect. Dr. Macartney properly relied on Terran’s technical experts, and had no obligation to “apportion” damages based on purported disclosures that those experts conclude did *not* occur.

### F. <u>Dr. Macartney’s Opinions on Economic Value Are Reliable and Admissible</u>

Finally, Defendants contend that Dr. Macartney’s damages opinions are unreliable because

he did not independently assess the scientific or clinical value of the asserted trade secrets—including that derived from their secrecy—and because he did not apportion value among the trade secrets. Mot. 24-30. Neither argument identifies a flaw in methodology under Rule 702.

First, Dr. Macartney is not required to himself determine the technical value of trade secrets derived from being secret. Different experts may opine on different aspects of Plaintiffs' claims and Dr. Macartney need not individually address every component of a complex claim. *See In re Ethicon Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, 2017 WL 6346633, at *3 (S.D.W. Va. Dec. 12, 2017) ("A single expert need not provide all the pieces of the puzzle for their testimony to be useful to the jury."); *Knight v. Boehringer Ingelheim Pharms.*, 323 F. Supp. 3d 837, 847-48 (S.D.W. Va. 2018) (rejecting exclusion where plaintiff used "multiple experts to assemble the logical links needed" for the claim). Here, Plaintiffs' technical expert, Dr. Barrett, explained at length why the trade secrets were not generally known, were not readily ascertainable, and derive significant technical and clinical value from their secrecy. Ex. 3 ¶ 135, 167, 176; Ex. 25 ¶ 176.[12]

Second, Dr. Macartney, an economist, is permitted—indeed expected—to rely on technical experts and fact witnesses for assumptions outside his discipline. *See supra* IV.E. Consistent with that framework, and as explained above, Dr. Macartney expressly stated that he was asked to assume that the trade secrets meet the legal requirements of a trade secret, including secrecy, and that he relied upon Terran's technical experts' determination that the trade secrets were not publicly disclosed. *See* Ex. 13 ¶ 9; Ex. 20 ¶ 4-5. Dr. Macartney was not thus required to independently analyze the scientific basis for secrecy or to quantify monetary value arising from secrecy itself.[13] Dr. Macartney cabined his analysis of the value of the trade secrets to areas of his

[12] Defendants' disagreement with Dr. Barrett's analysis goes to weight, not admissibility, and those arguments are rebutted in detail in Pls.' Opp. to Mot. to Exclude Drs. Barrett and Woolley ("Woolley & Barrett Opp."). *See* Woolley & Barrett Opp., at 11-15; *see also Vertellus*, 2021 WL 3883597, at *10.

[13] Defendants' argument would preclude an expert in economics from leveraging their expertise to discuss the

expertise, analyzing the market landscape and explaining, based on that understanding of the market, why a product embodying the trade secrets would have substantial economic value. *See* Ex. 13 ¶¶ 92-108; Ex. 14 65:20-66:6 [redacted]

Defendants also seek to exclude Dr. Macartney's opinions on the basis that he did not "isolate the[] value of Dr. Thompson's idea from the information that was generally known or readily ascertainable," including "public disclosures" and the Perez Patent. Mot. 27. But as discussed at length in Plaintiffs' Opposition to Motion to Exclude Drs. Barrett and Woolley, the premise behind this argument is wrong. *See* Woolley & Barrett Opp. at 11-12. Plaintiffs' technical experts extensively analyzed the Perez Patent and the publications Defendants highlight, and concluded that none of these sources disclose the trade secrets. *See* Ex. 3, ¶¶ 107,121, 129-134; Ex. 25 ¶¶ 89-99; Ex. 24, ¶¶ 28, 32, 34.[14] Dr. Macartney explicitly adopted and incorporated these technical conclusions because they fall outside his area of expertise. *See* Ex. 20 ¶¶ 4-5, 18-19, 44. That is proper under Rule 702, and commonplace. *See supra* IV.E.

Finally, Defendants suggest that Dr. Macartney failed to apportion value across and between individual trade secrets. Mot. 29. But Dr. Macartney expressly adopted the definition of the trade secrets outlined in Plaintiffs' Fourth Amended Complaint, which identifies the trade secrets as a unified ***combination*** of Dr. Thompson's interrelated discoveries. *See* Ex. 13 ¶ 6.

---

economic value of a trade secret unless that expert ***also*** offered expert testimony concerning the secrecy of those trade secrets, which will likely necessarily depend upon technical understandings of the relevant technology. Such a requirement would both (1) overly restrict the testimony that economics experts could provide and (2) invite those experts to offer testimony outside their field of expertise. Defendants do not cite a single case endorsing their position.

[14] Moreover, Drs. Barrett and Woolley expressly opined on the benefits the trade secrets over other antidepressants on the market. Ex. 3 ¶¶ 142, 146-167; Ex. 25 ¶¶ 206-07, 237-40; Ex. 26 ¶¶ 29-30; Ex. 27 ¶¶ 51, 59-86, 89-94; Ex. 24 ¶¶ 12, 15-27, 30.

Defendants nevertheless erect a strawperson, artificially dividing that definition into two separate "pieces of information" that they claim Dr. Macartney needed to evaluate separately. Mot. 29. But the record confirms that Plaintiffs assert a combination trade secret composed of Thompson's interrelated discoveries—not discrete, freestanding facts. Plaintiffs' technical experts have consistently treated the trade secrets as a unified concept. *See* Ex. 25 ¶ 37; Ex. 29, Woolley Tr. at 83:23-84:2. Defendants' effort to divide this unified combination into separate elements, and then fault Plaintiffs for not valuing these contrived subparts, is impermissible and contrary to the record.

The proper inquiry is not whether Dr. Macartney can enumerate individual technical pieces of a trade secret, but whether he reliably analyzed the economic value of the trade-secret combination he set out to evaluate.[15] Courts have long recognized that a trade secret may lie in the combination of several components that, even if individually known, collectively provide a unique competitive advantage. *See, e.g.*, *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 96 (4th Cir. 2018). Indeed, courts have excluded experts for adopting the piecemeal methodology Defendants urge Dr. Macartney should have adopted here. *See, e.g.*, *Palantir Techs. Inc. v. Abramowitz*, 2022 WL 22913842, at *4 (N.D. Cal. Nov. 3, 2022) (excluding technical expert who argued combination trade secret was generally known solely by pointing to constituent parts). Dr. Macartney's decision to assess the value of the trade secrets as a unitary invention, consistent with their technical characterization and Plaintiffs' definition of those secrets, is proper.

## V. <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiffs respectfully request that Defendants' motion to exclude Dr. Macartney's opinions in their entirety be denied.

---

[15] Defendants' reliance on *Synopsys* is misplaced. Mot. 29, 30. In *Synopsys*, the plaintiffs asserted 150 to 160 separate trade secrets, then later narrowed to 75, raising concerns about whether the expert had properly accounted for a voluminous set of independent secrets. 70 F.4th 759, 769-770 (4th Cir. 2023). Here, by contrast, Plaintiffs assert a single combination trade secret, and Dr. Macartney's analysis properly treated it as such.

Dated: December 19, 2025

*<u>/s/ Steven C. Cherney</u>*
Steven C. Cherny (*pro hac vice*)
Matthew A. Traupman (*pro hac vice*)
Nicola R. Felice (*pro hac vice*)
Abigail M. Graegin (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
stevencherny@quinnemanuel.com
matthewtraupman@quinnemanuel.com
nicolafelice@quinnemanuel.com
abbygraegin@quinnemanuel.com

Patrick D. Curran (*pro hac vice*)
Kathleen Marini (*pro hac vice*)
Ryan P. Gorman (*pro hac vice*)
Alexandra O. Schelle (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, Massachusetts 02199
Telephone: (617) 712-7100
patrickcurran@quinnemanuel.com
kathleenmarini@quinnemanuel.com
ryangorman@quinnemanuel.com
alexandraschelle@quinnemanuel.com

Robert S. Brennen (Fed. Bar No. 04499)
Megan J. McGinnis (Fed. Bar No. 12810)
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
T/F: (410) 385-3727
rbrennen@milesstockbridge.com
mmcginnis@milesstockbridge.com

Ramsay M. Whitworth (Fed. Bar #26251)
Email: rwhitworth@silvermanthompson.com
Andrew M. Harvey (Fed. Bar #21925)
Email: aharvey@silvermanthompson.com
SILVERMAN, THOMPSON, SLUTKIN & WHITE
400 East Pratt Street, Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432

*Attorneys for Plaintiffs Terran Biosciences, Inc. and Professor Scott Thompson*

*<u>/s/ Steven E. Tiller</u>*
Steven E. Tiller (Bar #11085)
WHITEFORD, TAYLOR & PRESTON LLP
7 Saint Paul Street, Suite 1500
Baltimore, MD 21202
Telephone: (410) 347-9425
Facsimile: (410) 223-4325
stiller@whitefordlaw.com

*Attorney for Plaintiff University of Maryland, Baltimore*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 19th day of December 2025, a copy of Plaintiffs' Opposition to Defendants' Motion to Exclude Certain Opinions of Plaintiffs' Expert Dr. Gareth Macartney was served via CM/ECF on all counsel of record.

/s/ *Ryan P. Gorman*
Ryan P. Gorman