**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| TERRAN BIOSCIENCES, INC., UNIVERSITY OF MARYLAND, BALTIMORE, and SCOTT THOMPSON,<br><br>*Plaintiffs,*<br><br>v.<br><br>COMPASS PATHFINDER LIMITED, EKATERINA MALIEVSKAIA, M.D., and GEORGE GOLDSMITH,<br><br>*Defendants.* | Civil Action No. 1:22-cv-01956-ELH<br><br>**PUBLIC REDACTED VERSION** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT ON COMPASS'S COUNTERCLAIMS**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..... 1
FACTUAL BACKGROUND ..... 2
LEGAL STANDARD ..... 7
ARGUMENT ..... 8
I. DEFENDANTS' MOTION SHOULD BE DENIED IN ITS ENTIRETY ..... 8
A. Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Trade Secret Misappropriation Claims (Counts I and II) ..... 8
1. Plaintiffs Sufficiently Identified Their Trade Secrets ..... 8
2. There Are Genuine Disputes of Material Fact Concerning Whether Plaintiffs' Trade Secrets Were Generally Known ..... 13
(a) Genuine Disputes of Material Fact Exist Concerning Whether Any Prior "Discoveries" Disclose Thompson's Trade Secrets ..... 14
(b) There Are Genuine Disputes of Material Fact Concerning Whether Perez Discloses the Trade Secrets ..... 18
3. Plaintiffs Took Reasonable Measures to Ensure Secrecy ..... 20
(a) Dr. Thompson's Conversations with Fellow Academics and His Grant Applications Did Not Reveal the Trade Secrets and Were Reasonable in Context ..... 21
(b) Defendants' Caselaw is Inapposite ..... 24
4. The Trade Secrets Derive Independent Economic Value from Secrecy ..... 26
5. There Is a Genuine Dispute of Material Fact as to Whether Defendants Misappropriated Plaintiffs' Trade Secrets ..... 28
6. There Is a Genuine Dispute of Material Fact as to Plaintiffs' Damages ..... 33
(a) Defendants' Misconduct Caused Terran to Lose Investors ..... 34
(b) Plaintiffs' Reasonable Royalty Theory Is Legally Sound ..... 37
B. Defendants Fail to Challenge Plaintiffs' Remaining Claims ..... 38
II. THE COURT SHOULD GRANT SUMMARY JUDGMENT ON COMPASS'S COUNTERCLAIMS ..... 39
A. Summary Judgment Is Appropriate on Count I and Count II ..... 40
1. Counts I & II Are Barred by the Statute of Limitations ..... 40
2. Compass Cannot Establish Scienter, Fraud, or Deceit ..... 41

B. Summary Judgment Is Appropriate on Count III (Unfair Competition Against Terran) and Count IV (Tortious Interference) ........ 42

1. Counts III & IV Are Barred by *Noerr-Pennington* ........ 42

2. Count III Fails; Compass Cannot Prove Bad Faith ........ 44

3. Count IV Fails; Compass Cannot Prove Improper Conduct or Damages ........ 44

CONCLUSION ........ 45

# TABLE OF AUTHORITIES

**Page**

## Cases

*AbbVie Inc. v. Adcentrx Therapeutics Inc.*,
2025 WL 418519 (S.D. Cal. Feb. 6, 2025) .......... 26, 28

*Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*,
678 F. App'x 839 (11th Cir. 2017) .......... 20

*AirFacts, Inc. v. Amezaga*,
30 F.4th 359 (4th Cir. 2022) .......... 37

*AirFacts, Inc. v. de Amezaga*,
909 F.3d 84 (4th Cir. 2018) .......... 17, 26, 28

*Allen v. Peacock TV LLC*,
2024 WL 3597183 (D. Md. July 31, 2024) .......... 24

*Architectural Sys., Inc. v. Gilbane Bldg. Co.*,
779 F. Supp. 820 (D. Md. 1991), *aff'd*, 974 F.2d 1330 (4th Cir. 1992) .......... 41

*Arvon v. Liberty Mut. Fire Ins. Co.*,
2019 WL 4243035 (D. Md. Sept. 6, 2019) .......... 41

*AT&T Commc'ns of Cal., Inc. v. Pac. Bell*,
238 F.3d 427 (9th Cir. 2000) (unpublished) .......... 21

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
237 F.3d 394 (4th Cir. 2001) .......... 43

*Bianco v. Globus Med., Inc.*,
2014 WL 5462388 (E.D. Tex. Oct. 27, 2014),
*aff'd*, 618 F. App'x 1032 (Fed. Cir. 2015) .......... 12

*Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*,
1 F. Supp. 3d 224 (S.D.N.Y. 2014), *aff'd sub nom.*,
610 F. App'x 69 (2d Cir. 2015) .......... 13

*Bridgetree, Inc. v. Red F Mktg. LLC*,
2013 WL 443698 (W.D.N.C. Feb. 5, 2013) .......... 33

*Brightview Group, LP v. Teeters*,
2021 WL 1238501 (D. Md. 2021) .......... 22, 26, 28

*Browne v. State Farm Mut. Auto. Ins. Co.*,
258 Md. App. 452 (2023) .......... 35

*Carter Prods., Inc. v. Colgate-Palmolive Co.*,
130 F. Supp. 557 (D. Md. 1955) .......... 14, 18

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*,
53 F.4th 368 (6th Cir. 2022) .......... 13

*ClearOne Advantage, LLC v. Kersen*,
756 F. Supp. 3d 30 (D. Md. 2024) .......... 8

*Cordis Corp. v. Bos. Sci. Corp.*,
561 F.3d 1319 (Fed. Cir. 2009) .......... 22, 23, 25

*Daesang Corp. v. Rhee Bros.*,
2005 WL 1163142 (D. Md. May 13, 2005) .......... 44, 45

*Dairy, LLC v. Milk Moovement, Inc.*,
2022 WL 4387981 (E.D. Cal. Sept. 22, 2022) .......... 43

*Datascope Corp. v. Vascular Sols., Inc.*,
165 F. Supp. 2d 933 (D. Minn. 2001) .......... 43

*De Simone v. VSL Pharms., Inc.*,
352 F. Supp. 3d 471 (D. Md. 2018) .......... 20, 40

*Decision Insights, Inc. v. Sentia Grp., Inc.*,
416 F. App'x 324 (4th Cir. 2011) (per curiam) .......... 9, 13

*Ellicott Dredges, LLC v. DSC Dredge, LLC*,
280 F. Supp. 3d 724 (D. Md. 2017) .......... 42

*Est. of Adams v. Cont'l Ins. Co.*,
233 Md. App. 1 (2017) .......... 40, 41

*Fordham v. Onesoft, Corp.*,
2001 WL 641759 (E.D. Va. Jan. 24, 2001) .......... 20, 23

*Fyfe Co., LLC v. Structural Grp., Inc.*,
2016 WL 4662333 (D. Md. Sept. 7, 2016) .......... 13

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) .......... 38

*Glynn v. Impact Sci. & Tech., Inc.*,
807 F. Supp. 2d 391 (D. Md. 2011),
*aff'd sub nom.* 710 F.3d 209 (4th Cir. 2013) .......... 21

*GoSecure Inc. v. Bhandari*,
637 F. Supp. 3d 368 (E.D. Va. 2022) .......... 43

*Greenberg v. Croydon Plastics Co.*,
378 F. Supp. 806 (E.D. Pa. 1974) ..........18

*Gruppo Essenziero Italiano, S.p.A. v. Aromi D'Italia, Inc.*,
2011 WL 3207555 (D. Md. July 27, 2011) ..........44, 45

*IGEN Int'l, Inc. v. Roche Diagnostics GmbH*,
335 F.3d 303 (4th Cir. 2003) ..........42

*InfoTek Corp. v. Preston*,
626 F. Supp. 3d 885 (D. Md. 2022) ..........45

*Int'l Med. Devices v. Cornell*,
2025 WL 825211 (C.D. Cal. Mar. 14, 2025)..........26

*Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*,
521 F. App'x 453 (6th Cir. 2013) ..........21

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) ..........18, 20, 23

*Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*,
2019 WL 1756293 (W.D. Va. Apr. 19, 2019) ..........15

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
342 F.3d 714 (7th Cir. 2003) ..........18

*LSR, Inc. v. Satellite Rests. Inc. Crabcake Factory USA*,
2020 WL 4903902 (D. Md. Aug. 20, 2020) ..........42, 44

*Lundregan v. Hous. Opportunities Comm'n*,
2024 WL 1810150 (D. Md. Apr. 24, 2024)..........39

*Maryland Physician's Edge, LLC v. Behram*,
2019 WL 4573417 (D. Md. Sept. 20, 2019)..........20

*Masimo Corp. v. True Wearables Inc.*,
2021 WL 2548690 (C.D. Cal. Apr. 28, 2021),
*aff'd*, 2022 WL 205485 (Fed. Cir. Jan. 24, 2022)..........15

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991) ..........7

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
948 F. Supp. 2d 538 (D. Md. 2013) ..........43

*Microbix Biosystems, Inc. v. Biowhittaker, Inc.*,
172 F. Supp. 2d 665 (D. Md. 2000) ..........13, 25

*Mona Elec. Grp., Inc. v. Truland Serv. Corp.*,
193 F. Supp. 2d 874 (E.D. Va. 2002),
*aff'd*, 56 F. App'x 108 (4th Cir. 2003) ....................................................................33

*Padco Advisors, Inc. v. Omdahl*,
179 F. Supp. 2d 600 (D. Md. 2002) ..................................................................26, 28

*PeroxyChem LLC v. Innovative Env't Techs., Inc.*,
2015 WL 4093923 (E.D. Pa. July 7, 2015) ................................................................23

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993)....................................................................................................43

*Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*,
149 F.4th 1081 (9th Cir. 2025) ....................................................................................9

*Raybestos-Manhattan, Inc. v. Rowland*,
460 F.2d 697 (4th Cir. 1972) .....................................................................................18

*Rossignol v. Voorhaar*,
316 F.3d 516 (4th Cir. 2003) ...........................................................7, 15, 30, 32, 35

*Ruckelhaus v. Monsanto Co.*,
467 U.S. 986 (1984) ..................................................................................................24

*SkinMedica, Inc. v. Histogen Inc.*,
869 F. Supp. 2d 1176 (S.D. Cal. 2012) ........................................13, 17, 18, 19, 20

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
2018 WL 1796293 (E.D. Va. Apr. 16, 2018) ...................................... 9, 10, 12, 14

*Storagecraft Tech. Corp. v. Kirby*,
744 F.3d 1183 (10th Cir. 2014)..................................................................................37

*Synopsys, Inc v. Risk Based Sec., Inc.*,
70 F.4th 759 (4th Cir. 2023) ......................................................................................27

*TEKsystems, Inc. v. Perlson*,
2025 WL 3281196 (D. Md. Nov. 25, 2025) .................................................................7

*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*,
637 F.3d 604 (5th Cir. 2011) .....................................................................................18

*The Imaging Ctr., Inc. v. W. Maryland Health Sys., Inc.*,
2004 WL 3168776 (D. Md. Aug. 10, 2004),
*aff'd*, 158 F. App'x 413 (4th Cir. 2005) ....................................................................44

*Trandes Corp. v. Guy F. Atkinson Co.*,
996 F.2d 655 (4th Cir. 1993) ........................................................................22

*Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*,
2021 WL 3883597 (D. Md. Aug. 12, 2021) ...............................................33, 44

*Waymo LLC v. Uber Techs., Inc.*,
2017 WL 6887040 (N.D. Cal. Nov. 14, 2017) ..............................................18

*Zunum Aero, Inc. v. Boeing Co.*,
2025 WL 2364602 (9th Cir. Aug. 14, 2025) ...............................................9, 10

**Rules / Statutes**

18 U.S.C. § 1836....................................................................................37

18 U.S.C. § 1839......................................................................................8

35 U.S.C. § 122......................................................................................25

Fed. R. Civ. P. 56................................................................................1, 7

Fed. R. Evid. 803(3)...............................................................................37

Md. Code Ann., Com. Law § 11-1201.......................................................8

Md. Code Ann., Cts. & Jud. Proc. § 5-101...............................................40

Md. Code. Ann., Com. Law § 11-1203.....................................................37

**Other Authorities**

Federal Judicial Center, *Trade Secret Case Management Judicial Guide*,
2023 WL 4687411...................................................................................20

**Table of Exhibits**[1]

| No. | Description |
|---|---|
| 1 | Rebuttal Report of Dr. Roth Report, dated Sept. 19, 2025, and Ex. A thereto |
| 2 | Supplemental Rebuttal Report of Dr. Bryan L. Roth, dated Oct. 29, 2025 |
| 3 | Opening Report of Frederick Barrett, Ph.D., dated Aug. 20, 2025 |
| 4 | Bryan Roth, M.D., Ph.D. Deposition Transcript, dated Nov. 14, 2025 |
| 5 | Sandhya Deo Deposition Transcript, dated Nov. 11, 2025 |
| 6 | WO 2019/081764 to Perez (COMPASS00108321 - COMPASS00108542) |
| 7 | Opening Report of DeForest McDuff, Ph.D., dated Aug. 20, 2025, and exhibits thereto |
| 8 | McDuff Google Search (COMPASS00099905 - COMPASS00099907) |
| 9 | McDuff Twitter/X Search (COMPASS00100485 - COMPASS00100494) |
| 10 | Rebuttal Report of Gareth Macartney, Ph.D., dated Sept. 19, 2025, and exhibits thereto |
| 11 | DeForest McDuff, Ph.D. Deposition Transcript, dated Nov. 5, 2025 |
| 12 | Rebuttal Report of DeForest McDuff, Ph.D., dated Sept. 19, 2025, and exhibits thereto |
| 13 | Opening Report of Dr. Gareth Macartney, dated Aug. 20, 2025 |
| 14 | Gareth Macartney, Ph.D. Deposition Transcript, dated Nov. 19, 2025 |
| 15 | Sam Clark Deposition Transcript, dated Sept. 15, 2025 |
| 16 | Dustin Tetzl Deposition Transcript, dated Sept. 11, 2025 |
| 17 | Declaration of Sam Clark in Support of Plaintiffs' Opposition to Defendants' Summary Judgment Motion and Cross-Motion for Summary Judgment on Compass's Counterclaims, dated December 19, 2025 |

[1] Plaintiffs' Table of Exhibits includes exhibits cited in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Plaintiffs' Cross-Motion for Summary Judgment, Plaintiffs' Oppositions to Defendants' Motions to Exclude Certain Opinions of Plaintiffs' Experts, Dr. Gareth Macartney, Dr. Joshua Woolley, and Dr. Frederick Barrett, and Plaintiffs' Motions to Exclude Certain Opinions of Defendants' Experts Dr. Bryan Roth and Dr. DeForest McDuff.

| | |
|---|---|
| 18 | Declaration of Dr. Dustin Tetzl in Support of Plaintiffs' Opposition to Defendants' Summary Judgment Motion and Cross-Motion for Summary Judgment on Compass's Counterclaims, dated December 18, 2025 |
| 19 | Action by Unanimous Written Consent of The Board of Directors of Terran Biosciences Inc., dated Feb. 2, 2022 (TERRAN0101970 - TERRAN0101976) |
| 20 | Reply Report of Gareth Macartney, Ph.D. dated Oct. 10, 2025, and exhibits thereto |
| 21 | Supplemental Report of Gareth Macartney, Ph.D., dated Oct. 29, 2025 |
| 22 | Compass Pathways Biotechnology, US Equity Research Report, dated Jul. 31, 2025 (TERRAN0100941 - TERRAN0100955) |
| 23 | Lars Wilde Deposition Transcript, dated Aug. 15, 2025 |
| 24 | Reply Report of Joshua Woolley, MD, PhD, dated Oct. 10, 2025 |
| 25 | Corrected Reply Report of Frederick Barrett, Ph.D., dated Oct. 10, 2025 |
| 26 | Supplemental Report of Frederick Barrett, Ph.D., dated Oct. 29, 2025 |
| 27 | Opening Report of Joshua Woolley, MD, PhD, dated Aug. 20, 2025 |
| 28 | Shaun Hurley Deposition Transcript, dated Sept. 29, 2025 |
| 29 | Joshua D. Woolley, M.D., Ph.D. Deposition Transcript, dated Nov. 5, 2025 |
| 30 | Scott Thompson Deposition Transcript, dated Sept. 16, 2025 |
| 31 | Email from Jonathan Fischell to Scott Thompson, dated Jun. 23, 2018 (UMB0000080) |
| 32 | Email from Jonathan Fischell to Scott Thompson, dated Sept. 17, 2018 (UMB0000704 - UMB0000707) |
| 33 | Jonathan Fischell October/November Research Elective Final Report, dated Jan. 24, 2019 (UMB0000354 - UMB0000363) |
| 34 | Email from Jonathan Fischell to Scott Thompson, dated Feb. 26, 2019 (UMB0000069) |
| 35 | Email from Scott Thompson to Natalie Hesselgrave, dated May 15, 2019 (UMB0014172 - UMB0014173) |
| 36 | Email from Jonathan Fischell to Natalie Hesselgrave, dated Feb. 16, 2019 (UMB0000070) |
| 37 | Email from Tim Troppoli to Natalie Hesselgrave, dated Mar. 5, 2019 (UMB0010465) |
| 38 | Email from Tim Troppoli to Natalie Hesselgrave, et al., dated Apr. 4, 2019 (UMB0013105) |

| | |
|---|---|
| 39 | Email from Todd Gould to Scott Thompson, dated May 22, 2019 (THOMPSON0000538 - THOMPSON0000540) |
| 40 | Email from Scott Thompson to Manon Veraart, et al., dated May 29, 2019, and attachment (THOMPSON0000329 - THOMPSON0000333) |
| 41 | Email from Ekaterina Malievskaia to Manon Veraart, et al., dated Sept. 5, 2019 (COMPASS00043540 - COMPASS00043542) |
| 42 | George Goldsmith Deposition Transcript, dated Aug. 13, 2015 |
| 43 | Dr. Ekaterina Malievskaia Deposition Transcript, dated Aug. 13, 2025 |
| 44 | Email from Shaun Hurley to Ekaterina Malievskaia, et al., dated May 31, 2019 (COMPASS00033535 - COMPASS00033537) |
| 45 | Email from Shaun Hurley to Nate Poulsen, et al., dated Jul. 1, 2019 (COMPASS00086347 - COMPASS00086351) |
| 46 | Email from Sarah Drummond to Drummond McCulloch and Aslihan Selimbeyoglu, dated Jun. 28, 2019 (COMPASS00048644 - COMPASS00048646) |
| 47 | Remote meeting invite from Sarah Drummond to Ekaterina Malievskaia, et al., dated Jul. 1, 2019 (THOMPSON0000059) |
| 48 | Email from Todd Gould to Shaun Hurley, et al., dated Jun. 21, 2019 (THOMPSON0000157 - THOMPSON0000159) |
| 49 | Email from Shaun Hurley to Lars Wilde, et al., dated Jul. 5, 2019 (COMPASS00105736 - COMPASS00105737) |
| 50 | Email from Ekaterina Malievskaia to Shaun Hurley, et al., dated Aug. 1, 2019 (COMPASS00034422 - COMPASS00034423) |
| 51 | Email from Todd Gould to Ekaterina Malievskaia, et al., dated Jun. 13, 2019 (THOMPSON0000162 - THOMPSON0000163) |
| 52 | Research Proposal of Todd Gould and Scott Thompson (THOMPSON0000164 - THOMPSON0000165) |
| 53 | COMPASS Response to Todd Gould-Scott Thompson Proposal (THOMPSON0000160 - THOMPSON0000161) |
| 54 | Scott Thompson Deposition Transcript, dated Oct. 30, 2025 |
| 55 | Research Proposal of Todd Gould and Scott Thompson (COMPASS00086156 - COMPASS00086157) |
| 56 | Email from Natalie Hesselgrave to Jonathan Fischell, dated Mar. 14, 2019 (UMB0000074-UMB0000076) |
| 57 | Email from Scott Thompson to Shaun Hurley et al., dated Sept. 24, 2019 (COMPASS00036282 - COMPASS00036286) |
| 58 | Compass Response to Todd Gould-Scott Thompson Proposal, June 18, 2019 (COMPASS00036299) |
| 59 | Email from Tobias Whelan to Ekaterina Malievskaia, et al., dated Jun. 4, 2019 (COMPASS00036321 - COMPASS00036325) |
| 60 | Email from Anais Soula, dated Jul. 22, 2019 (COMPASS00044770) |

| | |
|---|---|
| 61 | Compass Portfolio Cross-Functional Leadership Forum, Scientific Stance Repository, First Topic: Psychoplastogens and nonhallucinogenic 'psychedelics', dated May 21, 2024 (COMPASS00076299) |
| 62 | Drummond McCulloch Undergraduate Thesis, "Can Selective 5-HT2A Agonists Help with the Treatment of Depression?" (COMPASS00086579 - COMPASS00086678) |
| 63 | U.S. Provisional App. No. 62/893,611 (TERRAN0001069 – TERRAN0001386) |
| 64 | Email from Lars Wilde to Hans Eriksson, et al., dated Aug. 30, 2019 (COMPASS00117764 - COMPASS00117769) |
| 65 | Email from Shaun Hurley to Nate Poulsen, dated Aug. 30, 2019 (COMPASS00086343 - COMPASS00086346) |
| 66 | Email from Shaun Hurley to Scott Thompson, et al., dated Nov. 20, 2019 (THOMPSON0000230) |
| 67 | Option Agreement between University of Maryland, Baltimore and Terran Biosciences, Inc., dated Dec. 22, 2020 (TERRAN0065761 - TERRAN0065771) |
| 68 | Master License Agreement between University of Maryland, Baltimore and Terran Biosciences, Inc., dated May 7, 2021 (TERRAN0065772 - TERRAN0065831) |
| 69 | Confidential Terran Bioscience Company Introduction, dated January 2021 (TERRAN0065744) |
| 70 | Confidential Terran Bioscience Company Introduction, dated March 2022 (TERRAN0065741) |
| 71 | WO 2020/212951 (COMPASS00035194 - COMPASS00035534) |
| 72 | WO 2020/212948 (COMPASS00035854 - COMPASS00036276) |
| 73 | WO 2020/212952 (COMPASS00035535 - COMPASS00035853) |
| 74 | Frederick Streeter Barrett, Ph.D. Deposition Transcript, dated Nov. 20, 2025 |
| 75 | Email from Robin Carhart-Harris to George Goldsmith, dated Sept. 9, 2016 (COMPASS00047991 - COMPASS00047994) |
| 76 | Dr. Gary Gilmour Deposition Transcript, dated Sept. 12, 2025 |
| 77 | Email from Scott Thompson to vollen@bli.uzh.ch, dated Nov. 17, 2016 (THOMPSON0015112 - THOMPSON0015114) |
| 78 | Email from Scott Thompson to fbarrett@jhu.edu, dated Nov. 20, 2017 (THOMPSON0020883) |
| 79 | Email from Scott Thompson to Frederick Barrett, dated Dec. 4, 2017 (THOMPSON0022042 - THOMPSON0022044) |
| 80 | Email from Scott Thompson to Frederick Barrett, dated Feb. 14, 2019 (THOMPSON0020969 - THOMPSON0020972) |
| 81 | Email from Frederick Barrett to Scott Thompson, dated Feb. 14, 2019 (THOMPSON0015892 - THOMPSON0015895) |

| | |
|---|---|
| 82 | Email from Scott Thompson to Frederick Barrett, dated Feb. 14, 2019 (THOMPSON0021984 - THOMPSON0021989) |
| 83 | Email from Frederick Barrett to Scott Thompson, dated Feb. 14, 2019 (THOMPSON0023417 - THOMPSON0023422) |
| 84 | Email from Scott Thompson to Frederick Barrett, dated Jan. 14, 2020 (THOMPSON0023185 - THOMPSON0023186) |
| 85 | NIH Grants Policy Statement - 2.3.11 Availability and Confidentiality of Information, revised April 2024 |
| 86 | UMB Protection of Confidential Information Policy, dated Jun. 1, 2015 |
| 87 | N. Hesselgrave et al., Poster Abstract, "Taking the fun out of psilocybin: Can psilocybin's rapid antidepressant action be preserved in the absence of hallucinations?" (COMPASS00084930) |
| 88 | N. Hesselgrave et al., Poster Presentation, "Taking the fun out of psilocybin: Can psilocybin's rapid antidepressant action be preserved in the absence of hallucinations?" (UMB0000018) |
| 89 | Email from Shaun Hurley to Manon Veraart, et al., dated Nov. 15, 2019 (COMPASS00040761 - COMPASS00040764) |
| 90 | Compass Pathways Webpage, "Why do we seek patent protection?" (TERRAN_EXP_00003839) |
| 91 | Dr. Jonathan M. Fischell Deposition Transcript, dated Sept. 30, 2025 |
| 92 | Drummond McCulloch Internship Agreement, dated Mar. 11, 2019 (COMPASS00106045 - COMPASS00106049) |
| 93 | Drummond McCulloch PhD Proposal 2019 (COMPASS00099536 - COMPASS00099544) |
| 94 | Dr. Drummond McCulloch Deposition Transcript, dated Sept. 10.2025 |
| 95 | Email from Sandhya Deo to Nate Poulsen et al., dated Aug. 29, 2019 (Cooley_Compass_0002502 - Cooley_Compass_0002504) |
| 96 | Email from Sandhya Deo to Nate Poulsen et al., dated Aug. 28, 2019 (Cooley_Compass_0000725 - Cooley_Compass_0000726) |
| 97 | Email from Shaun Hurley to Joe Sandys, et al., dated Aug. 20, 2019 (COMPASS00097897 - COMPASS00097917) |
| 98 | Email from Manon Veraart to Hans Eriksson, et al., dated Aug. 8, 2019 (COMPASS00113888 - COMPASS00113891) |
| 99 | Email from Manya Deehr to Sandhya Deo, et al, dated Aug. 29, 2019 (Cooley_Compass_0002541 - Cooley_Compass_0002543) |
| 100 | Nathan Poulsen Deposition Transcript, dated Oct. 7, 2025 |
| 101 | Jonathan Cousin, Ph.D. Deposition Transcript, dated Oct. 22, 2025 |
| 102 | Erin Foley, Ph.D. Deposition Transcript, dated Nov. 13, 2025 |

| | |
|---|---|
| 103 | Declaration of Erin M. Foley, dated Oct. 10, 2025 |
| 104 | Declaration of Sandhya Deo, dated Oct. 8, 2025 |
| 105 | Declaration of Nathan Poulsen, dated Oct. 6, 2025 |
| 106 | Email from Shaun Hurley to Compass R&D Team, dated Jul. 4, 2019 (COMPASS00045580 - COMPASS00045581) |
| 107 | Email from Todd Gould to Shaun Hurley, et al., dated Jun. 21, 2025, and attachment (COMPASS00036304 - COMPASS00036308) |
| 108 | Email from Manya Deehr to Sandhya Deo, et al., dated Aug. 29, 2019 (COMPASS00098609 - COMPASS00098612) |
| 109 | Email from Shaun Hurley to Lars Wilde, et al., dated Aug. 29, 2019 (COMPASS00086388 - COMPASS00086390) |
| 110 | Dr. Todd Denton Gould Deposition Transcript, dated Nov. 4, 2025 |
| 111 | Declaration of Gareth Macartney, Ph.D. in Support of Plaintiffs' Opposition to Defendants' Summary Judgment Motion and Crossmotion for Summary Judgment on Compass's Counterclaims, dated Dec. 16, 2025 |
| 112 | Dr. Natalie Hesselgrave Deposition Transcript, dated Sept. 10, 2025 |
| 113 | Email from Shaun Hurley to Ekaterina Malievskaia, et. al, dated Oct. 25, 2019 (COMPASS00033511 - COMPASS00033512) |
| 114 | Email from Drummond McCulloch to Anais Soula, et al., dated Aug. 8, 2019, and attachment (COMPASS00034927- COMPASS00034940) |
| 115 | Email from Ekaterina Malievskaia to Manon Veraart, et al., dated Nov. 13, 2019 (COMPASS00045682 - COMPASS00045684) |
| 116 | Email from Shaun Hurley to Scott Thompson, et al., dated Nov. 20, 2019 (COMPASS00039409) |

Pursuant to Fed. R. Civ. P. 56, Plaintiffs Terran Biosciences, Inc. ("Terran"), University of Maryland, Baltimore ("UMB") and Scott Thompson (collectively "Plaintiffs") respectfully submit this brief in support of their Opposition to Defendants' Summary Judgment Motion and Cross-Motion on Compass's Counterclaims.

## INTRODUCTION

This case concerns groundbreaking research developed by Dr. Scott Thompson and the University of Maryland, Baltimore to address treatment-resistant depression. In May 2019, Compass approached Dr. Thompson under a confidentiality agreement and induced him to disclose his new therapy. After months probing Dr. Thompson for details regarding his proprietary research, Compass secretly filed a patent application in August 2019, disclosing and claiming as their own the confidential information that Dr. Thompson had shared with them. These facts were true when Plaintiff filed this action, and they remain true (and largely undisputed) today.

Despite this, Defendants insist that their wrongdoing should never go before a jury. Rather than take a measured approach to summary judgment, Defendants move on ***every element*** of Plaintiffs' trade secret claims—and go so far as to ask the Court, with little additional explanation, to dispose of ***every one*** of Plaintiffs' nine non-trade secret claims despite the fact that these claims are independent of and require different elements from the trade secret claims, as the Court emphasized in denying Compass's prior motion to dismiss. *See* Dkt. 122 at 114-22. Defendants spend all but one paragraph of their motion attacking Plaintiffs' trade secrets claims, before summarily and incorrectly asserting that if those claims fail, so too do Plaintiffs' remaining claims. This ignores that Dr. Thompson shared and Compass misused confidential information beyond the specific "Psilocybin Trade Secrets" to which Defendants refer throughout their brief. Defendants' misuse of that information, including detailed non-public information about Dr. Thompson's past research and future proposals, forms the basis for Plaintiffs' non-trade secret claims, including for

unfair competition and breach of the confidentiality agreement that Compass induced Dr. Thompson to sign. Defendants do not dispute that this information—including discussions that Dr. Thompson had with Compass regarding it—were confidential, instead myopically focusing on Plaintiffs' trade secret claims. As such, even if some subset of that information does not qualify as trade secret, summary judgment on Plaintiffs' nine non-trade secret claims is inappropriate.

Putting aside this attempted sleight of hand, Defendants otherwise ask the Court to wade through numerous disputes of material fact, disregard the competing testimony of expert witnesses, and improperly resolve competing inferences in Defendants' favor. This is a factually intensive case that requires trial, not summary judgment. Worse, unsatisfied with simply seeking to avoid responsibility for their misconduct, Defendants seek to punish Plaintiffs for bringing this suit by asserting meritless, retaliatory counterclaims. Despite the fact that Compass's counterclaims were filed well after the Scheduling Order deadline, without leave of Court and should be dismissed, Dkt. 229, the claims all fail as a matter of law as untimely and legally unsupportable.

This Court should deny Defendants' motion for summary judgment in its entirety, and grant Plaintiffs' summary judgment on Compass's baseless untimely counterclaims.

## FACTUAL BACKGROUND

This case arose out of Defendants' scheme to defraud researchers at UMB out of confidential, valuable information that Dr. Thompson, UMB, and Terran spent years developing. That confidential information centers around a therapy for treatment-resistant depression, and involves the novel administration of a 5-HT2A antagonist followed by psilocybin to preserve psilocybin's antidepressant properties while removing its negative, hallucinogenic effects.

Defendant Compass Pathfinder Limited ("Compass") is a publicly-traded pharmaceutical company currently seeking FDA approval of its own psilocybin-based therapy for depression, COMP360. Unlike the treatment envisioned by Dr. Thompson, COMP360 is a fully-psychedelic

treatment; to safely use that treatment, patients must undergo day-long supervised sessions with physicians. Ex. 27 ¶ 75. Plaintiffs' planned competing therapy, based on sequential administration of psilocybin and a 5-HT2A antagonist, would reduce or eliminate psychedelic effects and require no such supervision—and could likely be reduced to a pill that patients could take at home. *Id.* ¶¶ 83-84. Dr. Thompson first conceived of the idea of co-administering psilocybin and ketanserin in 2016, following research that he and his lab had performed on selective serotonin reuptake inhibitors ("SSRIs"), one of the most common types of antidepressants. *See* Ex. 30, 71:19-73:6. Dr. Thompson engaged in extensive research to test and develop this idea, beginning in earnest in 2018, with the help of Jonathan Fischell, a graduate student in his lab. *See* Ex. 31; Ex. 32. At the time that Compass approached Dr. Thompson in May 2019, his lab had completed experiments on rodents using fluoxetine and ketanserin, using fluoxetine as a stand-in for psilocybin. *See* Ex. 33. These experiments supported Dr. Thompson's hypothesis that [redacted] *Id.* at -359.[2] Beginning in February 2019, another graduate student, Natalie Hesselgrave, began working with Dr. Thompson to apply these findings to studies using psilocybin with rats. *See* Ex. 34; Ex. 35. From February through May 2019, Drs. Thompson, Fischell, and Hesselgrave researched dosages and timing for psilocybin and ketanserin administration. *See* Ex. 36 (discussion of ketanserin dosage); Ex. 37 [redacted]); Ex. 38 [redacted]").

Compass approached UMB in May 2019, claiming that it was "trying to understand molecular mechanisms of psilocybin" for the treatment of depression. Ex. 39. Compass asked him

[2] Dr. Frederick Barrett, one of Plaintiffs' technical experts, will testify that these experiments laid the groundwork for the confidential research and findings that Defendants stole. *See* Ex. 3 ¶¶ 38-48.

to execute a non-disclosure agreement, which he signed and returned the next day. *See* Ex. 40.[3] Between May 31, 2019 and August 1, 2019, Dr. Thompson shared with Compass his confidential research into the sequential administration of psilocybin and a 5-HT2A antagonist to treat depression, believing that such communications were protected by the non-disclosure agreement he had signed.[4] These discussions included ranges of doses and timing for a treatment based on such sequential administration. *See* Ex. 54, 33:1-34:22 (describing sharing his discovery of [redacted]"); Ex. 30, 280:3-6, 403:15-404:15; Ex. 52 at -165 (sharing study number 10, listing multiple dosages of psilocin to be used, including 1, 3, 10, and 30 ng/ml; study number 11, which included an expected dose for ketanserin of 10 mg/kg or 1 µM "present at the time of [*i.e.*, dosing after] psilocybin or psilocin administration"). Dr. Thompson also shared a proposal for further research on psilocybin and ketanserin in mice that built on his previous research. Ex. 55. At that time, Dr. Thompson had primarily performed psilocybin studies in rats. Ex. 56. Dr. Thompson expressly told Compass that this research was a "major thrust of [his] laboratory before we spoke," Ex. 57, and he would "continue to move forward as fast as possible" to keep up with advancements in the field. Ex. 28, 222:9-224:23.

[redacted] Ex. 59.[5] [redacted]

---

[3] [redacted] *See* Ex. 41; Ex. 42, 48:12-15; Ex. 43, 203:3-7.

[4] These disclosures occurred over several months, including three calls held on May 31 (Ex. 44), July 1 (Exs. 45-49), and August 1, 2019 (Ex. 50); a proposal Dr. Thompson sent to Compass on June 13, 2019 (Ex. 51; Ex. 52); and responses to Compass's follow-up questions, which were sent on June 21, 2019 (Ex. 48; Ex. 53**)**.

[5] Throughout, emphases are added, and internal citations and quotations are omitted, unless otherwise stated.

[redacted] Ex. 59, [redacted] Ex. 58. [redacted] Ex. 60. [redacted] Ex. 23, 154:1-155:11; *see also* Ex. 61 at 3 (analyzing competitive risk of "non-hallucinogenic 'psychedelics'"). A Compass student intern who participated in calls with Dr. Thompson—Drummond McCulloch—determined that, based on a literature review in 2019, it was still unproven "that the antidepressant effects of psychedelics are through activation of the 5-HT2A receptor." Ex. 62 at -646. Defendants do not dispute that the information Dr. Thompson shared, which included but was not limited to Plaintiffs' trade secrets, fell within the bounds of the confidentiality agreement he signed.

On August 29, 2019, without telling Dr. Thompson or UMB, and in violation of the non-disclosure agreement that Dr. Thompson had signed, Compass submitted a patent application covering Dr. Thompson's research into the sequential administration of psilocybin and a 5-HT2A antagonist to treat depression, U.S. Provisional Patent Application No. 62/893,611 (the "'611" application). Ex. 63. As Dr. Barrett will testify (in testimony Defendants do not seek to exclude), that application discloses in numerous places that psilocybin's antidepressant therapeutic effects are independent of 5-HT2A receptor-mediated hallucinations, along with the idea of using a single time-sequenced, sequential administration of a 5-HT2A antagonist followed by psilocybin, each at doses relative to the other depending on the distinct pharmacokinetics of the antagonist. *See* Ex. 3 ¶¶ 205-213; *see also* Ex. 63 at -1331-32, -1370-73, -1378-84; Ex. 30, 293:4-13 [redacted]

[redacted]

Compass emails from August 29-30, 2019 lay bare Compass's motives: having learned that same day that Dr. Thompson's lab was planning a high-level presentation at an upcoming academic conference for the Society for Neuroscience ("SFN"), Compass grew concerned about "IP issues," Ex. 64, and opted to publish and patent Dr. Thompson's research for itself, Ex. 63. Compass claimed that Dr. Thompson's poster abstract for SFN was particularly surprising because it revealed "ongoing experiments" of ketanserin and psilocybin that seemed to encompass his research proposal to Compass. Ex. 28, 186:22-187:7. After filing its patent application, Compass followed up with Dr. Thompson concerning the status of the experiments that he had proposed to Compass, and received confirmation that those specific experiments had not been performed. Ex. 113; Ex. 28, 259:1-261:15. Compass cut ties with Dr. Thompson on November 20, 2019, *see* Ex. 66, after which, still unbeknownst to Dr. Thompson, Compass filed seven additional patent applications claiming priority to the '611 application. Each of these applications incorporated and described Dr. Thompson's confidential research. *See* Ex. 3 ¶¶ 214-16.

In December 2020, UMB and Terran entered into an option agreement granting Terran the exclusive option to negotiate and obtain rights to the research at issue. *See* Ex. 67. The parties ultimately entered into a Master License Agreement ("MLA") agreement in May 2021, through which UMB granted Terran an exclusive license to use and commercialize that research. Ex. 68. Terran then began planning to deploy Dr. Thompson's research in its own pharmaceutical offerings, including submitting patent applications covering the information and highlighting the development of such a drug in its fundraising efforts. *See* Ex. 69; Ex. 70.

The first of the Compass patent applications disclosing and claiming Dr. Thompson's discoveries published in October 2020. *See* Exs. 71-73. Terran discovered those applications in the spring of 2022. Ex. 15, 86:3-18; Ex. 16, 50:18-51:4. Despite Terran's previous success raising funds for its Series A, [redacted], after Compass's theft and disclosure of Dr. Thompson's research became public in August 2022. Terran [redacted] Dr. Gareth Macartney, Plaintiffs' damages expert, calculated the harm from Compass's theft and disclosure of Dr. Thompson's research by quantifying Terran's [redacted] and the unjust benefit to Compass ($254,463,245, *see id.* ¶¶ 162-69). Dr. Macartney also determined that, had Compass negotiated a license with Dr. Thompson and UMB for the information they stole and used, an appropriate reasonable royalty award would be a lump-sum payment of $117,876,681. *See id.* ¶¶ 171-82.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991); *see also Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (noting that the court "must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing" summary judgment). When the parties have filed cross-motions for summary judgment, the Court must "review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *TEKsystems, Inc. v. Perlson*, 2025 WL 3281196, at *4 (D. Md. Nov. 25, 2025).

# ARGUMENT

## I. DEFENDANTS' MOTION SHOULD BE DENIED IN ITS ENTIRETY

### A. Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Trade Secret Misappropriation Claims (Counts I and II)[6]

The Defend Trade Secrets Act ("DTSA") defines a trade secret as: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, [or] procedures" if (1) "the owner [ ] has taken reasonable steps to keep the information secret," and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by" potential competitors. 18 U.S.C. § 1839(3). Maryland's Uniform Trade Secrets Act ("MUTSA") has a "functionally identical" definition. *ClearOne Advantage, LLC v. Kersen*, 756 F. Supp. 3d 30, 41 (D. Md. 2024); *see also* Md. Code Ann., Com. Law § 11-1201(e).

Defendants seek summary judgment on ***each*** element of Plaintiffs' trade secret claims: (1) whether the trade secrets are sufficiently identified, (2) whether they were generally known, (3) whether Plaintiffs took reasonable protective measures, (4) whether Plaintiffs' trade secrets derive independent economic value, (5) whether Compass misappropriated the trade secrets, and (6) damages. Genuine issues of material fact as to each of these elements preclude summary judgment.

#### 1. Plaintiffs Sufficiently Identified Their Trade Secrets

It is well-established that "[w]here a plaintiff has identified specific information that might qualify as a trade secret, whether a trade secret exists is generally a fact-intensive question to be

[6] Defendants' brief focuses on Plaintiffs' trade secrets claims, failing entirely to explain why the arguments they raise defeat Plaintiffs' non-trade secret claims. In rebutting those trade-secret arguments, this brief refers to the trade secrets at issue as the "Psilocybin Trade Secrets." But as explained throughout, the confidential information that Dr. Thompson shared and Defendants misused encompasses far more than the specific, combination trade secrets that Defendants misappropriated. Defendants ignore this, and Plaintiffs' reference to the "Psilocybin Trade Secrets" is not an admission that Dr. Thompson's confidential research is coextensive with the trade secrets. It is not.

resolved at trial." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 2018 WL 1796293, at *10 (E.D. Va. Apr. 16, 2018); *see Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1088 (9th Cir. 2025) ("[T]he identification of a trade secret is a question of fact, and a district court may grant summary judgment only if there is no genuine dispute that a plaintiff could identify a trade secret with "sufficient particularity"); *Decision Insights, Inc. v. Sentia Grp., Inc.*, 416 F. App'x 324, 329 (4th Cir. 2011) (per curiam) (same). The key consideration is whether Plaintiffs sufficiently identify the trade secrets to allow a jury to meaningfully evaluate them. *Zunum Aero, Inc. v. Boeing Co.*, 2025 WL 2364602, at *1 (9th Cir. Aug. 14, 2025) (district court erred in holding that plaintiff had not identified trade secrets when party had provided basic explanation of each).

Here, Plaintiffs have sufficiently identified their trade secrets to allow a jury to meaningfully evaluate them and for Compass to defend against them. The Court already rejected Defendants' argument that Plaintiffs "must identify what time points, frequency, and dosing they claim to be their trade secrets" in order to have identified the trade secrets with particularity. Dkt. 161 at 22-23. Then, as now, Defendants' claim that they lack clarity on the trade secrets at issue "is clearly overstated." *Id.* at 23. Specifically, in denying Defendants' motion for "Trade Secret Identification," the Court expressly recognized that the trade secrets are a "combination" trade secret composed of Thompson's interrelated discoveries and "are relatively narrow, in that they are tied to a specific sequential therapy involving specific chemical compounds." *Id.* at 25-26. This description of the trade secrets was consistent with Plaintiffs' explanation "that they 'have not claimed time points, dosing, frequency, or other parameters as general categories of information[,]" but have instead "tethered" those "parameters . . . to the sequential administration of a 5-HT2A antagonist followed by psilocybin.'" Dkt. 161 at 20 (quoting Dkt. 153 at 9–10). As such, the Court was "amply satisfied that the TAC describes, with reasonable particularity, the

alleged trade secrets," Dkt. 161 at 22, and denied Defendants' motion, noting that the complaint referenced "the specifics of the optimal timing, frequency, and dosage for the therapy" where it discussed ranges of values for timing, dosing, and frequency disclosed in the '611 Patent Application, and that it "identif[ied] the optimal order of the therapy" by "repeatedly referenc[ing] the sequential administration of ketanserin, 'followed by psilocybin.'" *Id*. at 23-24.

Now, unable to dispute that Plaintiffs identified sequential administration and a range of values for timing, dosing and frequency, Defendants contend that Plaintiffs must provide a single numerical identification for each of the "optimal" time, order and frequency of their therapy. But this is a manufactured requirement for which Defendants cite no law. In fact, a plaintiff "need not precisely define the boundaries" of its trade secret to warrant protection, nor does it need to specifically identify every individual component of its combination trade secret to sufficiently identify the combination as a whole. *Zunum*, 2025 WL 2364602, at *1; *Steves & Sons, Inc.*, 2018 WL 1796293, at *8 (combination trade secret does not lack specificity "even if the individual components . . . are not identified with enough specificity" to constitute trade secrets individually).

This of course makes perfect sense, particularly in this context, given Plaintiffs assert interrelated, combination trade secrets where the values for dosing, timing and frequency are tethered to the sequential administration of a 5-HT2A antagonist followed by psilocybin to achieve the antidepressant effects of psilocybin without the hallucinations. The optimal dosing, timing and frequency will therefore constitute a range of values that vary relative to each other and depending on, *inter alia*, the specific form of psilocybin and 5-HT2A antagonist that is used to achieve that end result. Ex. 25 ¶¶ 23-34. Defendants' argument ignores the combination nature of Plaintiffs' trade secrets. Indeed, because Defendants' argument is based on the faulty legal premise that Plaintiffs must identify, with a singular value, each individual component of their combination

trade secret, Defendants do not dispute that the combination trade secret as a whole is sufficiently identified. This alone warrants denying summary judgment on this issue.

Moreover, Plaintiffs have still put forth enough evidence from which a reasonable jury could determine the existence of a viable trade secret. Plaintiffs have specifically identified the trade secrets as Dr. Thompson's [redacted] *See* Dkt. 199 ¶¶ 27-28; Ex. 3 ¶ 60. This specification of "[redacted]" administration and [redacted] provides specifics on the order, dosages and frequency.

Plaintiffs also have repeatedly explained that there is no single optimal dose or time interval, but rather a range of values for those parameters dependent on a variety of factors, such as the specific antagonist being used. *See* Ex. 25 ¶ 23 ("[redacted] *id.*¶ 37 [redacted]); Ex. 30, 52:15-25 (testifying that "[redacted]

Adding even further clarity, Dr. Thompson testified regarding examples of values within that range and the specifics of how to extrapolate from those values to get the entire range, all of

which he asserts were disclosed to Compass and included in the ’611 application. *See, e.g.*, *id.* 57:15-59:10 (testifying that he disclosed to Compass a range of values, which would build out from the values in human studies to [redacted]); *id.* 56:2-10 (explaining he disclosed “[redacted] *id.* 293:4-13 (explaining that he told Compass “[redacted] Ex. 25 ¶ 159 (“[redacted]

Ignoring this evidence, Defendants assert that they still do not know what the trade secrets are because the definition has changed over time. Mot. 4-8. A simple comparison between Dr. Barrett’s definition and the Court’s prior articulation of the trade secrets (Dkt. 161) belies that assertion. But more importantly, this raises a factual dispute on which a reasonable jury could agree with Plaintiffs and their expert. Dr. Barrett laid out extensively how his definition of the trade secrets is consistent with the definition in the current and previous versions of the complaint as well as Dr. Thompson’s articulation of the trade secrets. *See* Ex. 74, 101:18-20; Ex. 30, 37:14-38:13. That Plaintiffs may have minimally changed the wording of their trade secrets does not render their identification inadequate. *See Steves & Sons, Inc.*, 2018 WL 1796293, at *9 (trade secrets were adequately identified even when defendant had re-asserted trade secrets multiple times).

Defendants’ further argument that, because Plaintiffs have not conducted a human study to determine the singular optimal dose in humans, the trade secrets lack specificity is similarly without merit. Mot. 6-7. There is no requirement that a trade secret must be shown definitively to be effective in humans to warrant protection. *Cf. Bianco v. Globus Med., Inc.*, 2014 WL 5462388, at *7 (E.D. Tex. Oct. 27, 2014), *aff’d*, 618 F. App’x 1032 (Fed. Cir. 2015) (rejecting argument that

"a trade secret must be more than a mere idea").[7]

Finally, Defendants allege that the Psilocybin Trade Secrets lack specificity because Plaintiffs' experts could not answer how many trade secrets are at issue. Mot. 7-8. But, Plaintiffs are not required to parse the individual components of the trade secrets where they have asserted a ***combination trade secret*** composed of several interrelated discoveries. Ex. 29, 83:9-84:2 ("[redacted]"). It is well-established that such combination trade secrets are protectable. *See SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1196 (S.D. Cal. 2012) ("a trade secret may consist of several elements, each of which is generally known, put together in a novel and previously unknown combination"); *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 381 (6th Cir. 2022) ("Caudill's research-and-development efforts constituted a protectable combination trade secret"). Summary judgment should be denied.[8]

### 2. There Are Genuine Disputes of Material Fact Concerning Whether Plaintiffs' Trade Secrets Were Generally Known

The Fourth Circuit has "recognized that a trade secret may be composed of publicly-available information if the method by which that information is compiled is not generally known." *Decision Insights, Inc*, 416 F. App'x at 329-30 (holding that testimony that information was not

[7] Defendants' reliance upon *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 665, 674-75 (D. Md. 2000) for this premise is misplaced. The *Microbix* Court did not analyze the specificity of the trade secrets, and whether a trade secret must be tested or validated was not at issue.

[8] None of Defendants' cases compels a different result. Mot. 8. *See Fyfe Co., LLC v. Structural Grp., Inc.*, 2016 WL 4662333, at *8-9 (D. Md. Sept. 7, 2016) (concluding plaintiff had failed to identify trade secrets when plaintiff pointed to 6,000 computer files but admitted they had not reviewed contents of the files); *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 261, 263 (S.D.N.Y. 2014), *aff'd sub nom.*, 610 F. App'x 69 (2d Cir. 2015) (trade secrets had "materially" changed over course of litigation and plaintiff could not identify example that contained all elements of purported trade secret). In particular, Defendants' reliance upon *Decision Insights, Inc. v. Sentia Grp., Inc.*, is misplaced. 311 F. App'x 586, 594 (4th Cir. 2009) (unpublished). There, Plaintiff asserted a combination trade secret based on a software program ***as well as*** twelve individual portions of the software program as separate trade secrets. *Id.* at 593-94. The Fourth Circuit affirmed that Plaintiff had not sufficiently identified the twelve individual trade secrets but reversed and remanded the district court's dismissal of the combination trade secret, reasoning that the district court had not assessed "whether or not the software program, as a total compilation, could qualify as a trade secret." *Id.* at 593.

known created triable issue of fact). "Generally known" refers "to the knowledge of other members of the relevant industry–the persons who can gain economic benefit from the secret." *Steves & Sons, Inc.*, 2018 WL 1796293, at *10. This inquiry "is "heavily fact-dependent" and "boils down to assessing the ease with which a trade secret could have been independently discovered." *Id.*

Defendants contend that the Psilocybin Trade Secrets were not secret because (1) Dr. Thompson's research was allegedly "discovered" by others before his discussions with Compass and (2) a prior patent application WO 2019/081764 A1 ("Perez") disclosed his discoveries. Mot. 8-10, 17-19. But genuine issues of material fact preclude summary judgment on this basis.

#### (a) Genuine Disputes of Material Fact Exist Concerning Whether Any Prior "Discoveries" Disclose Thompson's Trade Secrets

Defendants identify three examples of others "discovering" Thompson's trade secrets before he met with Compass: (1) a 2016 Carhart-Harris publication and discussion with Compass, (2) an internal Compass proposal to study psilocybin and ketanserin, and (3) Drummond McCulloch's research. Mot. 9-10. None demonstrates the trade secrets were "generally known."

As an initial matter, Defendants' cherry-picked examples ignore the record evidence that Compass believed that Thompson's discoveries were not generally known in 2019. Defendants plainly believed the trade secrets were novel at the time they submitted the '611 application in 2019, covering the trade secrets at issue here. *See* Ex. 63; *see also Carter Prods., Inc. v. Colgate-Palmolive Co.*, 130 F. Supp. 557, 572 (D. Md. 1955) (party's argument that "information was previously known in the trade is clearly inconsistent with [party's] filing these two applications, covering the same subject matter").

The record shows that Defendants recognized the unique value that Dr. Thompson's discoveries added to the field by engaging in extensive discussions with Dr. Thompson to support his research concerning the Psilocybin Trade Secrets in 2019. *See* Ex. 59 [redacted]

[redacted] Ex. 58 [redacted] Ex. 28, 75:7-13. Defendants' contemporaneous recognition of the value that Thompson's discoveries provided to the field is sufficient to defeat summary judgment" on this element. *See Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*, 2019 WL 1756293, at *5 (W.D. Va. Apr. 19, 2019) (rejecting defendant's arguments that plaintiff's trade secrets were generally known because business negotiations indicated that defendant recognized the value of the information); *see also Rossignol*, 316 F.3d at 523 (the court "must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable" to the non-moving party).

In this context, Defendants' three examples fall well short of undisputedly indicating that the trade secrets were generally known prior to Compass's discussions with Thompson in 2019.

*First*, Defendants' citation to Robin Carhart-Harris's 2016 work concerning the "safety and efficacy of psilocybin for treatment-resistant depression" and related discussions is unavailing. Mot. 9. Defendants have adduced no evidence that these generalized discussions from Carhart-Harris's publication disclosed Thompson's trade secrets. *See Masimo Corp. v. True Wearables Inc.*, 2021 WL 2548690, at *4 (C.D. Cal. Apr. 28, 2021), *aff'd*, 2022 WL 205485 (Fed. Cir. Jan. 24, 2022) (rejecting argument that trade secrets were publicly known based upon publications in conference papers). In fact, the record is clear that, even today, many in the field, including Compass, continue to believe that the hallucinatory effects of psilocybin are critical to its therapeutic action. Ex. 43, 148:8-15 [redacted] Ex. 2 ¶ 229 [redacted]

[redacted] This is precisely the opposite of Dr. Thompson's discovery.

The only evidence Defendants cite is an email from Carhart-Harris to Compass in September 2016 proposing a study that involved administering "30mg psilocybin v 30mg psilocybin post ketanserin pre-treatment v 40mg methylphenidate" in healthy participants. Mot. 9. But this study involved healthy volunteers rather than patients suffering from depression, there is no explanation of what "pre-treatment" means in this context, and there is no indication that the goal of Carhart-Harris's study was to determine whether sequentially administering ketanserin followed by psilocybin could treat depression without hallucinations (*i.e.*, Thompson's discovery). *See* Ex. 43, 262:3-19 (admitting Malievskaia was unclear about the goals of the study); Ex. 42, 64:17-25 (testifying study only applied to healthy volunteers); Ex. 75; *see also* Ex. 3 ¶¶ 246-47 (concluding proposed study did not include the sequential administration of a 5-HT2A antagonist followed by psilocybin for the treatment of depression). Further, Defendants have provided no evidence that the study was published or even run, such that the proposal could be "generally known." *See* Ex. 43, 262:20-264:1 (Malievskaia testifying she did not know if the study was run or recall ever hearing about results); Ex. 42, 62:24-63:9 (Goldsmith, similar). Moreover, despite being aware of Carhart-Harris's proposal in 2016, Compass nevertheless determined in 2019 that [redacted] Ex. 59, [redacted] Ex. 58.

*Second*, an internal Compass email from Dr. Malievskaia suggesting a pilot study on "psilocybin and selective 5ht2a blocker (ketanserin[] where available) in depressed patients to see if the symptoms improve in the absence of psychedelic effects" also does not demonstrate that the

trade secrets were "generally known." Mot. 9-10. Malievskaia admitted that she was not proposing a study similar to Dr. Thompson's discoveries, but rather just an early stage "idea," Ex. 43, 268:13-16, and confirmed that that this "proposal" was never even run, *id.* at 272:12-21. Defendants have also not adduced undisputed evidence that this "idea" fully encompassed the trade secrets. As Dr. Barrett opines, it did not. Ex. 25 ¶ 115.

*Third*, Dr. McCulloch's literature review and proposed study similarly do not demonstrate that Thompson's discoveries were "generally known." Mot. 10. Defendants rely upon a single sentence in a 100-page literature review concerning a hypothesis that is the ***exact opposite*** of Thompson's discovery. *See* Ex. 25 ¶ 114 ("[redacted] *see also* Ex. 62 at -646. Dr. McCulloch also did not specify the order of administration of the psychedelic and ketanserin or suggest timing or dosages. *See* Ex. 76, 121:9-122:2; Ex. 62, at -646.

Moreover fundamentally, none of these three examples demonstrate that the ***combination*** of Thompson's discoveries, which comprise the Psilocybin Trade Secrets, were generally known. Defendants ignore that "a trade secret may consist of several elements, each of which is generally known, put together in a novel and previously unknown combination" that still warrants protection, as is the case here. *SkinMedica, Inc.*, 869 F. Supp. 2d at 1196. Thus, a triable issue of fact exists concerning whether the Psilocybin Trade Secrets were not generally known in the field, even if certain high-level components were generally known. *See AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 96 (4th Cir. 2018) ("Courts have long recognized that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage

and is a protectable secret"); *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 614 (5th Cir. 2011) (reversing summary judgment, concluding "it is of no moment that Tewari's alleged trade secrets are combinations of disclosed processes and technologies with other elements [ ] also known in the industry").

**(b) There Are Genuine Disputes of Material Fact Concerning Whether Perez Discloses the Trade Secrets**

Defendants next heavily rely upon the fact that Thompson's U.S. Patent App. No. 17/940,950 was rejected by the Patent and Trademark Office ("PTO") as obvious based upon the 2019 Perez Patent. Mot. 17-19. But it is well-established that "it does not follow as a matter of law that something rejected by the PTO as obvious can never be part of a protectable trade secret." *SkinMedica, Inc.*, 869 F. Supp. 2d at 1195; *see Raybestos-Manhattan, Inc. v. Rowland*, 460 F.2d 697, 700 (4th Cir. 1972) (reversing judgment in favor of defendant and finding error in district court's determination that a trade secret was not secret, because "unlike a patent, novelty and invention are not requisite for a trade secret"); *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 6887040, at *4 (N.D. Cal. Nov. 14, 2017) (denying summary judgment even where "substantial parts of asserted trade secret" were encompassed by a patent because "it remains a question of fact whether" trade secrets were generally known); *Greenberg v. Croydon Plastics Co.*, 378 F. Supp. 806, 813 & n.6 (E.D. Pa. 1974). Defendants ignore that "***[a] trade secret need not be patentable***." *Carter Prods., Inc.*, 130 F. Supp. at 578. While "the doctrine of 'prior art'. . . is of vital importance in patent cases, []it is not so significant" in a trade secret case, like here. *Id.* "***Unlike a patentable invention, a trade secret need not be novel or unobvious.***" *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 724 (7th Cir. 2003); *see Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974) ("Novelty, in the patent law sense, is not required for a trade secret.").

Viewed through the lens of trade secret law—not patent law, as Defendants misleadingly

cite throughout their motion—genuine issues of material fact clearly preclude summary judgment. Because "[a] trade secret may comprise of partly or entirely non-secret elements and still merit protection," as is the case here, the question is whether the "correct combination" of the components that comprise the trade secrets were all generally disclosed in Perez. *SkinMedica, Inc.*, 869 F. Supp. 2d at 1194. Here, Plaintiffs' technical experts specifically opined that Perez does ***not*** disclose the Psilocybin Trade Secrets, including explaining why the PTO rejection does not suggest otherwise. *See* Ex. 25 ¶¶ 91-94, 109-112, 167, 178-188; Ex. 24 ¶ 28 ("Perez does not disclose the Psilocybin Trade Secrets."); *id.* ¶¶ 34-35.

In particular, Defendants do not contest that the single dose range disclosed in Perez does not encompass the Psilocybin Trade Secrets. Mot. 18-19; *see* Ex. 74, 325:5-17 ("[redacted]). Defendants instead claim that Plaintiffs have abandoned any trade secrets based on dose ranges and claim Thompson did not share the range of dosages with Compass. Defendants are incorrect. As discussed *supra*, the Psilocybin Trade Secrets encompasses a range of dosages. *See* Ex. 74, 147:14-18, 99:17-101:20. Defendants have also not adduced evidence that would refute that Thompson disclosed a range of doses to Compass. *See* Ex. 30, 240:3-241:11 (testifying that [redacted]); *id.* 279:14-280:6 (same).

The fact that Defendants disagree with Dr. Barrett's opinions concerning the differences in Perez and the Psilocybin Trade Secrets simply means that there is a genuine dispute of fact concerning whether Perez discloses the trade secrets. Indeed, Defendants ignore that Compass conducted their own prior art search when considering Thompson's proposal in May 2019—***after*** Perez published—and concluded that Thompson's proposed experiments concerning the trade secrets were ***unique***. *See* Ex. 43, 86:4-89:11 (discussing prior art search of Thompson proposal).

This difference between Compass's pre-litigation conduct and the positions it takes here speaks volumes. A jury can rely on this stark contrast to conclude Compass' new arguments simply are not credible. *See De Simone v. VSL Pharms., Inc.*, 352 F. Supp. 3d 471, 484 (D. Md. 2018) (finding defendant's trade secret summary judgment position not credible when it was "squarely contradicted" by its arguments in the pleadings). It is for the "jury to decide the fact-intensive question of whether these patent applications, or the referenced prior art, made the [trade secrets]—all elements in combination—generally known." *SkinMedica, Inc.*, 869 F. Supp. 2d at 1195.

### 3. Plaintiffs Took Reasonable Measures to Ensure Secrecy

"Summary judgment on the 'reasonable efforts' requirement for trade secret validity will be rare except in 'extreme' cases because the analysis of what is reasonable turns on nuanced factual determinations that vary from case to case." Federal Judicial Center, *Trade Secret Case Management Judicial Guide*, 2023 WL 4687411, § 7.1. Courts in this Circuit recognize that where "[m]aterial issues of fact exist" regarding the "secrecy" of trade secrets, summary judgment is "preclude[d]." *Fordham v. Onesoft, Corp.*, 2001 WL 641759, at *4 (E.D. Va. Jan. 24, 2001). The secrecy required by this element need not be absolute but must be reasonable in context. Secrecy is not lost "if the holder of the trade secret ***reveals the trade secret to another in confidence, and under an implied obligation not to use or disclose it***." *Kewanee Oil Co.*, 416 U.S. at 475.

Trade secret defendants face a high bar in moving for summary judgment on a trade secret holder's reasonable measures to protect trade secrets. Indeed, "[t]he burden. . . is on the moving party to establish that there is no genuine dispute as to any material fact" regarding the trade secret holder's "reasonable measures to keep the [asserted trade secret] secret." *Maryland Physician's Edge, LLC v. Behram*, 2019 WL 4573417, at *7 (D. Md. Sept. 20, 2019) (denying summary judgment). Circuit courts across the country regularly reverse grants of summary judgment due to factual disputes over the reasonable measures taken by a trade secret plaintiff. *See, e.g., Advantor*

*Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 856 (11th Cir. 2017); *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, 521 F. App'x 453, 459-60 (6th Cir. 2013); *AT&T Commc'ns of Cal., Inc. v. Pac. Bell,* 238 F.3d 427, *2 (9th Cir. 2000) (unpublished).

Defendants do not dispute that Plaintiffs have produced evidence that Dr. Thompson employed measures in his laboratory to ensure the secrecy of the Psilocybin Trade Secrets. Mot. 10-16. Dr. Thompson testified that he required "[redacted] Ex. 30, 211:12-19. Rather, Defendants have invented alleged "disclosures" of the Psilocybin Trade Secrets (discussed below) based upon a standard of perfection incompatible with the law. But, "[w]hen protecting proprietary materials, the secrecy. . . need not be absolute," and "reasonable precautions" "will suffice." *Glynn v. Impact Sci. & Tech., Inc.*, 807 F. Supp. 2d 391, 435 (D. Md. 2011), *aff'd sub nom.* 710 F.3d 209 (4th Cir. 2013). None of the alleged disclosures defeat Plaintiffs' claims for protection.

**(a) Dr. Thompson's Conversations with Fellow Academics and His Grant Applications Did Not Reveal the Trade Secrets and Were Reasonable in Context**

Defendants imply that standard, academic norms of collaboration and ideation can defeat Plaintiffs' trade secret claims, arguing that it was unreasonable for Dr. Thompson to exchange high-level ideas with fellow academics, with whom he had worked before and shared a reasonable expectation of confidentiality. Mot. 10-12. Defendants are incorrect for two reasons: (1) Dr. Thompson's conversations with fellow academics did not disclose the Psilocybin Trade Secrets and (2) even if Dr. Thompson had disclosed the Psilocybin Trade Secrets (he did not), he would have done so under reasonable expectations of confidentiality in accordance with academic norms.

***First,*** Dr. Thompson's communications with Dr. Vollenweider (*id.* at 10-12) did not disclose the Psilocybin Trade Secrets. Dr. Thompson provided only a [redacted] preview of his

hypothesis with only background information and high-level theories. Ex. 77. Dr. Thompson did not disclose the sequential administration of a 5-HT2A antagonist followed by psilocybin, nor any information relating to dosages or timing. Ex. 25 ¶ 147. Similarly, Dr. Thompson did not disclose the Psilocybin Trade Secrets to Dr. Barrett in correspondence from 2017 to 2019. Mot. 10-12; *see also* Exs. 78-84. Rather, Dr. Thompson merely shared preliminary ideas about his research and never disclosed anything relating to sequential administration of psilocybin and ketanserin. Ex. 25 ¶ 148. Dr. Thompson never disclosed the particulars of the trade secrets, as is clear from the obvious lack of specificity in the purported disclosures upon which Defendants rely.

***Second***, even if Dr. Thompson did disclose the trade secrets to Drs. Vollenweider or Barrett, it would have been reasonable for someone in his position as an academic researcher to entrust certain colleagues with sensitive information to foster academic collaboration. Ex. 25 ¶ 140. A trade secret must be "secured by its owner by 'reasonable' measures, but. . . this does not mean 'the best security measures available.'" *Brightview Group, LP v. Teeters*, 2021 WL 1238501 at *7 (D. Md. 2021). Indeed, "[w]holesale disclosure of the information to third parties without proper protection may destroy a trade secret claim, ***but selective disclosures do not***." *Id.*; *see also Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993) ("A trade secret owner, however, does not abandon his secret ***by a limited public publication for a restricted purpose***."). Here, Dr. Thompson disclosed limited information to "trusted colleagues" for the restricted purpose of seeking their professional input and advice. *See* Ex. 30, 103:14-104:23.

Courts routinely acknowledge that limited disclosures to colleagues in the context of academia and research innovation do not render the information non-confidential. *See, e.g.*, *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1334 (Fed. Cir. 2009) (holding that distribution of "monographs to [inventor's] academic and research colleagues did not render the monographs

prior art" because "academic norms gave rise to an expectation that disclosures will remain confidential"); *see also PeroxyChem LLC v. Innovative Env't Techs., Inc.*, 2015 WL 4093923, at *8-11 (E.D. Pa. July 7, 2015) (denying summary judgment based on "genuine issue of material fact as to whether [inventor] had a reasonable expectation that the reviewers" of his research would keep disclosures confidential given "professional and behavioral norms of confidentiality").

Further, a confidential relationship can exist where a party is "under an implied obligation not to use or disclose" the trade secrets. *Kewanee Oil Co.*, 416 U.S. at 475. Whether such implied obligation exists is a factual determination inappropriate for summary judgment. *See Fordham* 2001 WL 641759, at *4. There exist genuine issues of material fact as to whether Dr. Thompson's conversations with fellow academics were impliedly confidential given the academic context and accompanying norms. *Cordis Corp.*, 561 F.3d at 1334; Ex. 30, 103:14-104:23; Ex. 25 ¶ 140.

*Finally*, Defendants contend that Dr. Thompson's June 4, 2019 application for NIH grant funding disclosed the trade secrets. Mot. 14. But Dr. Thompson's 2019 Grant Application did not contain the Psilocybin Trade Secrets. *See* Ex. 25 ¶ 12; Ex. 26 ¶¶ 23-25.[9] That application does not disclose the single time-sequenced, sequential administration of a 5-HT2A antagonist followed by psilocybin. The purported disclosures in the NIH Grant simply mirror the disclosures in Dr. Thompson's '090 Provisional Patent Application (Mot. n.12), which also does not disclose the Psilocybin Trade Secrets. *See* Ex. 3 ¶ 103.

Even if Dr. Thompson's grant application disclosed the Psilocybin Trade Secrets—it did not—any such disclosure would, again, be reasonable under the circumstances. NIH grant applications are not public and are maintained as confidential until the grant is awarded funding.

[9] Dr. Barrett's Reply Report (Ex. 25) addressed the rebuttal report of Compass's expert, Dr. Roth. Dr. Roth mistakenly identified the date of the NIH Grant as May 28, 2019; Dr. Barrett responded using Dr. Roth's mistaken date. This brief refers to the NIH Grant application from June 4, 2019 (Mot. 14), which Dr. Barrett addressed in his Reply Report, but with Dr. Roth's mistaken chronology. *See* Ex. 25 ¶ 12.

If—and only if—an application is funded, which did not happen in this instance, the NIH makes public the "project title, the name of the PD/PI, and the project description," Ex. 85, but not the full application in the ordinary course.

**(b) Defendants' Caselaw is Inapposite**

None of Defendants' case law merits granting summary judgment. *See, e.g.*, *Allen v. Peacock TV LLC*, 2024 WL 3597183 at *1 (D. Md. July 31, 2024) (granting defendants' ***motion to dismiss*** where *pro se* plaintiff offered only conclusory allegations of trade secret ownership and misappropriation). In *Motor City Bagels, L.L.C. v. Am. Bagel Co.*, the court granted summary judgment where plaintiffs' protective measures consisted solely of utilizing confidentiality agreements, of which plaintiffs produced only a small number. 50 F.Supp. 2d 460, 480 (D. Md. 1999).[10] Here, Plaintiffs took a number of different steps to ensure the secrecy of the trade secrets, including using confidentiality policies for students at UMB, adhering to UMB policies for safeguarding confidential information, and instructing members of Dr. Thompson's laboratory at UMB to keep information confidential. *See* Ex. 3 ¶¶ 78-87; Ex. 86; Ex. 30, 211:12-212:12. Defendants' citation to *Young Design, Inc. v. Teletronics Int'l, Inc.*, fares no better. 2001 WL 35804500 (E.D. Va. July 31, 2001). In *Young Designs*, the plaintiff gave its technology to its ***direct competitor*** without any confidentiality agreement in place. *Id.* at *2, 5-6. Dr. Thompson's conversations with academic collaborators are nothing like the *Young Design* plaintiffs' disclosure to a ***primary competitor***; if anything, *Young Designs* underscores the egregiousness of ***Compass's*** inducing Dr. Thompson to sign a mutual NDA that it never intended to abide by for its part.

Defendants also rely on *Microbix Biosystems* to imply that Plaintiffs' participation in

[10] Defendants rely on a quotation from *Motor City* that internally quotes *Ruckelhaus v. Monsanto Co.*, 467 U.S. 986 (1984). But *Rucklehaus* concerned whether trade secrets give rise to property rights that are compensable under the Takings Clause. 467 U.S. at 1002. The Court did not analyze any disclosure of any trade secrets nor did it provide any analysis or guidance on what amounts to disclosure. The quotation from *Rucklehaus* is *dicta.*

academic publications, conferences, and applications for funding were unreasonable disclosures of the trade secrets. 172 F. Supp. 2d at 674. The key issue in that case was whether a document containing publicly-disclosed information could nonetheless be a protectable trade secret. *Id.* That is simply not the case here, where Plaintiffs' trade secrets were not publicly disclosed at any point prior to Compass's theft. As explained *supra* pp. 23-24, Plaintiffs' grant applications do not disclose the trade secrets. Neither did Dr. Hesselgrave's October 2019 conference abstract or her poster displayed at SFN. *See* Ex. 3 ¶¶ 97-101; Ex. 25 ¶ 122; Ex. 87; Ex. 88.[11]

Finally, Defendants' reliance on the out-of-circuit *Stutz Motor Car of Am v. Reebok Int'l* decision is similarly unavailing. 909 F. Supp 1353 (C.D. Cal. 1995). Defendants suggest that because Dr. Thompson filed a patent application on August 13, 2019, which Defendants contend include the trade secrets, "Dr. Thompson's 'discoveries' cannot qualify as trade secrets." Mot. 16. But in *Stutz*, the trade secret holder disclosed the alleged trade secrets to the defendants in May; a patent containing the trade secrets ***issued*** in September that same year. 909 F. Supp at 1360. Thus, just four months after disclosure, the trade secrets were ***published*** in ***an issued patent***. That is not the case here, where Dr. Thompson filed a ***provisional patent application*** which was not publicly available. *See* 35 U.S.C. § 122(b)(2)(A) ("An application shall not be published if that application is ... a provisional application."). In any event, that patent application did not disclose the full scope of the Psilocybin Trade Secrets, as it does not disclose the time-sequenced administration of ketanserin followed by psilocybin, nor does it disclose the specific details of that sequential administration. *See* Ex. 3 ¶ 103; Ex. 25 ¶ 123; Ex. 74, 229:6-230:5.

[11] Even if Dr. Hesselgrave's presentation disclosed the trade secrets (it did not), there is a genuine dispute of material fact with regard to whether any potential disclosure by Dr. Hesselgrave occurred with a reasonable expectation of confidentiality. *See* Ex. 30, 211:12-213:22 (Dr. Thompson testifying [redacted]; Ex. 25 ¶ 140 (opining on academic norms). Courts acknowledge that presentation of research in academic conferences may be presumably confidential, including crediting expert testimony regarding such norms. *See Cordis Corp.*, 561 F.3d at 1334 (recognizing "the importance of preserv[ing] the incentive for inventors to participate in academic presentations or discussions" and noting "that professional norms may support expectations of confidentiality").

#### 4. The Trade Secrets Derive Independent Economic Value from Secrecy

Defendants next argue that, even if Plaintiffs' trade secrets were secret at the time of Defendants' misappropriation, Plaintiffs cannot prove that the information derived independent economic value "from their secrecy." Mot. 19. Defendants do not and cannot dispute that Plaintiffs have submitted evidence that the trade secrets were valuable; they instead demand that such evidence expressly tie that value to the information's secrecy. But this conflates an ***element*** of Plaintiffs' claim—that the trade secrets derived independent economic value from their secrecy—with the ***evidence*** that might support that element. This overly demanding standard is unsupported by the case law.[12] Courts have found this element satisfied where a plaintiff presents evidence that the trade secrets would be valuable to a competitor. *See, e.g.*, *Padco Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 610 (D. Md. 2002) (at summary judgment, finding "independent economic value" element met where trade secrets "would be valuable to competitors"); *AirFacts*, 909 F.3d at 97 (affirming judgment following bench trial, finding that flowcharts satisfied "independent economic value" element because those charts "would be useful to any AirFacts competitor"); *Brightview*, 2021 WL 1238501, at *6 (granting summary judgment *for plaintiff* where there was no dispute that the trade secrets "could be valuable if acquired by a competitor"). This makes sense: if a competitor would benefit from the use of plaintiff's trade secrets, a plaintiff derives economic, competitive value from keeping those trade secrets secret.

Here, a fact finder could conclude that the trade secrets would be valuable to a competitor. [redacted]. Ex. 59 [redacted]

[12] Courts recognize that "the standard to show that trade secrets derive economic value is not a high standard." *AbbVie Inc. v. Adcentrx Therapeutics Inc.*, 2025 WL 418519, at *11 (S.D. Cal. Feb. 6, 2025); *see also Int'l Med. Devices v. Cornell*, 2025 WL 825211, at *3 (C.D. Cal. Mar. 14, 2025) (noting same, and that "information can have independent economic value even if there is no actual product on the market utilizing the information").

[redacted] *see also supra* pp. 4-5; Ex. 89 at -763 [redacted] Compass rushed to patent the trade secrets, *see, e.g.*, Ex. 64, over fears Dr. Thompson would share his research at an academic conference—where he had a reasonable expectation of confidentiality, *supra* pp. 21-24. This confirms that Compass's valuation of the trade secrets was directly tied to their secrecy and the potential to exclude use by competitors. *See also* Ex. 90 (Compass: "Without IP, there would be little incentive to take the risk to fund the [R&D] of new products.").

Defendants' citations to Dr. Tetzl's deposition (Mot. 20) are a misdirect. As is clear from those excerpts, Defendants repeatedly asked questions that called for legal analysis. When Defendants asked Dr. Tetzl ***factual*** questions about why Plaintiffs' trade secrets were valuable, he answered. *See* Ex. 16, 72:24-74:20 ("[redacted]

There is thus ample record evidence that Plaintiffs' trade secrets would be valuable to Terran's competitors, such that they derived independent economic value from their secrecy. Defendants cite no case holding that such evidence is insufficient to survive summary judgment on this element. And in the one case Defendants do cite, the plaintiff's evidence fell well short of what Plaintiffs offer here. *See Synopsys, Inc v. Risk Based Sec., Inc.*, 70 F.4th 759, 771-73 (4th Cir. 2023). In *Synopsys*, the plaintiff "failed to come forward with evidence establishing the trade secrets had 'value'," period, and relied upon the defendant company's purchase price without providing any evidence or method of "determining which of the now-asserted trade secrets, if any, contributed to [defendant's] valuation." *Id.* at 771-73. Here, the record demonstrates that a competitor of Terran's (Compass) believed the trade secrets were valuable and could be patented,

and that the trade secrets would provide benefits relative to other competitors. This is sufficient. *See Padco*, 179 F. Supp. 2d at 610; *AirFacts*, 909 F.3d at 97; *Brightview*, 2021 WL 1238501, at *6; *see also AbbVie*, 2025 WL 418519, at *11 (allegations that pharmaceutical trade secrets would serve a growing and competitive market sufficiently alleged independent economic value).

For these reasons, as well as those outlined in Plaintiffs' concurrently filed opposition to Defendants' motion to exclude Drs. Barrett and Woolley's testimony, summary judgment on this element of Plaintiffs' claims is inappropriate.

**5. There Is a Genuine Dispute of Material Fact as to Whether Defendants Misappropriated Plaintiffs' Trade Secrets**

Defendants do not dispute that the '611 application discloses the information that Plaintiffs claim as trade secrets. Nor could they. Paragraphs [0004] and [0005] of the '611 application explain the potential therapeutic uses of psychedelics to treat depression and the "need to minimize the negative side effects that can be associated with a traumatic psychedelic experience." Ex. 63 at -1331-32. Together, paragraphs [0007], [0008], [0009], [0010], and [0014] disclose Dr. Thompson's [redacted] *See id.* at -1332-33; *supra* p. 6. These disclosures are repeated in paragraphs [0172]-[0176] and in the claims. *See id.* at -1370-73, -1378-84; *see also* Ex. 30, 293:4-13.

Thus, rather than contest that the '611 application discloses Dr. Thompson's confidential information, Defendants argue that they are entitled to summary judgment because the information in the '611 was "independently derived" from the work of a student intern at Compass, Drummond McCulloch. Mot. 23. According to Defendants, any overlap between what was included in the

’611 application and what was disclosed to Compass is merely a “coincidence of timing.” *Id.* at 25. But there is sufficient record evidence for a jury to conclude otherwise. Defendants’ defense rests on two disputed factual assertions: that (1) Dr. Thompson did not share the dosing and timing information in the ’611 application with Compass, and, (2) even if he did, that information was not used to draft the ’611 application (*id.* at 21-25). There is a genuine dispute as to both claims.

***First***, there is substantial evidence in the record that Dr. Thompson provided Compass with the confidential information disclosed in the ’611 application, including details about optimal doses and timing for the sequential administration of a 5-HT2AR antagonist followed by psilocybin. Indeed, Dr. Thompson testified at length to that fact. Ex. 54, 33:3-34:22; *see also* Ex. 30, 279:14-280:6, 327:6-25. Dr. Thompson disclosed the full scope of the Psilocybin Trade Secrets to Compass over the course of several months. *See supra* n.3. Dr. Thompson’s June 13 proposal alone included proposed doses for the sequential administration of psilocin and ketanserin. *See supra* pp. 4-5; Ex. 52 at -165; Ex. 30, 259:4-260:6. And Compass’s follow-up questions reflect that Compass began soliciting details on how to evaluate the efficacy of the trade secrets well before the ’611 application was submitted. *See* Ex. 58 [redacted]

Defendants claim that, at the time he met with Compass, Dr. Thompson had not completed any experiments specifically using ketanserin and psilocybin. Mot. 24-25. This is a red herring: Whether Dr. Thompson had ***completed*** experiments using ketanserin and psilocybin at the time of these calls says nothing about whether he shared his plans and proposals regarding optimal dosage and timing with Compass prior to completing those experiments.[13] As explained above, he did.

[13] Dr. Jonathan Fischell, one of Plaintiffs’ fact witnesses, and Dr. Barrett, one of Plaintiffs’ technical experts, have both explained how one could identify effective doses and timing parameters for a combination therapy without conducting experiments. *See* Ex. 91, 130:20-133:21; Ex. 25 ¶¶ 24, 96-97, 225.

Defendants point to no evidence contradicting this.[14]

***Second***, there is substantial evidence from which a jury could reasonably infer that Compass used the information Dr. Thompson provided to Compass to draft the '611 application. Defendants have stipulated that Dr. McCulloch is the only inventor who contributed to the subject matter in the '611 application that Plaintiffs contend are their trade secrets. Dkt. 295 ¶ 1. But the materials to which Defendants point as the basis for the '611 and '110 applications—Dr. McCulloch's PhD proposal documents—were indisputably created ***after*** Dr. McCulloch was exposed to Dr. Thompson's confidential information, including the Psilocybin Trade Secrets. Dr. McCulloch, a student intern fresh from his undergraduate education, had been at Compass for only a month before being asked to join calls between Compass and Dr. Thompson. Ex. 92 (specifying June 24, 2019 start date); Ex. 46. Then, just a month later, he allegedly "independently" developed the PhD materials used to draft the '611 and '110 applications. Ex. 114. Defendants do not and cannot put forth evidence that these PhD materials were created without the influence of the Psilocybin Trade Secrets. A reasonable jury could easily reject Defendants' independent development defense on this evidence, and find that the information Dr. McCulloch provided in the '611 application, and which overlaps with the trade secrets, was obtained from Dr. Thompson.

Moreover, there is no dispute that the invention disclosed in the '611 application is broader than what was disclosed in Dr. McCulloch's PhD materials. *See generally* Ex. 93. Indeed, Dr. McCulloch himself testified that his proposal sought to ***preserve*** the "mystical" (*i.e.*, hallucinogenic) experience of using psilocybin, Ex. 94, 106:4-8, and that the specific doses and

---

[14] Defendants have suggested (Mot. 24 n.15) that, because certain details are not found in internal Compass notes from Compass's calls with Dr. Thompson, those details were not discussed. Defendants are welcome to ask a jury to draw that inference—but on summary judgment, inferences are drawn in the ***non-movant's*** favor. *Rossignol*, 316 F.3d at 523. Moreover, Dr. Shaun Hurley, the individual who prepared those notes and Compass's corporate designee on communications between Dr. Thompson and Compass, testified that his call notes were not comprehensive and that he had no independent recollection of what was communicated to Compass during those calls. *See* Ex. 28, 42:7-43:5, 48:6-49:19, 53:7-12, 146:10-16, 149:3-9, 180:11-181:6.

timing in the ’611 application are not in his proposal, *see id.* at 264:12-265:1, 271:12-272:11 [redacted]

Because Defendants cannot argue that the doses and timing in the ’611 application came from Dr. McCulloch’s materials, they instead argue that the information “all came from the ’110 application.” Mot. 23.[15] But Defendants’ motion begs the question of why and how those specific timing and dose ranges were included in the ’110 application in the first place. The information in the ’110 application cannot be separated from the information contained in the ’611 application because the two applications began as one with both allegedly based on the same information—Dr. McCulloch’s PhD materials. Ex. 95. Ultimately, Mr. Poulsen decided to separate the one application into two—with the ’110 being filed late on August 28 and the ’611 being filed on August 29, 2019—but they were prepared at the same time, by the same people. Ex. 96. By then, numerous Compass employees had access to Dr. Thompson’s confidential information, including the trade secrets. Mr. Poulsen, Dr. Malievskaia, Dr. Goldsmith, Dr. McCulloch, Dr. Hurley, and others were included on calls and emails with Dr. Thompson and received documents from him including, among other things, his research proposal. *See* Exs. 46-49, 51-53. Individuals at Cooley LLP, Compass’s outside counsel responsible for drafting the ’110 and ’611 applications, also had access to Dr. Thompson’s confidential information, including at least his research proposal, *see* Ex. 97, and were also on calls with individuals at Compass that had access to the same material, *see* Ex. 98. Mr. Poulsen and those at Cooley with access to Dr. Thompson’s research were indisputably involved in the preparation of the ’611 and ’110 applications. *See* Ex. 95; Ex. 99.

Critically, none of Compass’s witnesses—including the primary drafter of the applications, Sandhya Deo, and the only relevant inventor, Dr. McCulloch—have been able to identify, if not

---

[15] The ’110 application discloses a combination therapy using benzodiazepines, rather than 5-HT2A antagonists, which is why Plaintiffs do not allege that this earlier application contains their confidential information. Mot. 23.

from Dr. Thompson, the source of the information in the ’611 and ’110 applications that is not contained in Dr. McCulloch’s PhD proposal materials and that overlaps with the trade secrets. *See* Ex. 100, 244:4-246:22, 264:14-270:12; Ex. 76, 78:22-87:17; Ex. 101, 84:16-90:7; Ex. 5, 69:10-70:14, 73:6-16, 78:14-79:13; Ex. 102, 54:6-57:11, 62:9-16; *see also* Exs. 103-105 (Decls. of Dr. Foley, Dr. Deo, and Mr. Poulsen). [redacted]. *See* Ex. 5, 20:13-21:11; Ex. 100, 53:18-56:20, 311:14-312:4. [redacted] Ex. 98. [redacted] Ex. 107 [redacted] Ex. 108.[16]

Again, at this stage, “competing, rational inferences” are to resolved “in the light most favorable to the party opposing” summary judgment. *Rossignol*, 316 F.3d at 523. From all of these facts, a jury could reasonably (and easily) find that the information that Dr. Thompson disclosed to Compass between May 31 and August 1, 2019 formed the basis for the disclosures at issue in the ’611 patent application, and thus reject Defendants’ narrative of “independent development.”

---

16 [redacted]

Defendants' cited cases are inapposite. In *Vertellus*, the defendant independently developed the alleged trade secret ***before even the plaintiff in that case had developed them***. *Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*, 2021 WL 3883597, at *24 (D. Md. Aug. 12, 2021). No such evidence exists here, as Compass has been unable to identify any internal documentation containing the specific information disclosed in the '611 application. And in *Mona Electronic*, the plaintiff "ha[d] not provided any evidence to support its claim of misappropriation," and instead asked the Court to find that a former employee of the plaintiff "must have used secret information" in his new employment. *Mona Elec. Grp., Inc. v. Truland Serv. Corp.*, 193 F. Supp. 2d 874, 877 (E.D. Va. 2002), *aff'd*, 56 F. App'x 108 (4th Cir. 2003). There is no dispute that the '611 application discloses information that Plaintiffs claim as trade secret. And there is more than sufficient direct and circumstantial evidence from which a jury could find that Compass employees received that information from Dr. Thompson and then disclosed it in the '611 application. *See, e.g.*, *Bridgetree, Inc. v. Red F Mktg. LLC*, 2013 WL 443698, at *8 (W.D.N.C. Feb. 5, 2013) (collecting cases holding that misappropriation can be proven by circumstantial evidence).[17]

**6. There Is a Genuine Dispute of Material Fact as to Plaintiffs' Damages**

Defendants next assert that Plaintiffs cannot prove damages. Mot. 27-30. As a threshold matter, Defendants do not address Plaintiffs' requests for equitable relief. *See* Dkt. 199 at 42-43. Even if the Court grants summary judgment as to Plaintiffs' damages claims, there is no dispute that Plaintiffs can continue to pursue those equitable remedies, should any aspect of their claims proceed. As to damages, Defendants rely upon cherry-picked evidence with which they take issue, ignore indisputably admissible evidence, and mischaracterize the law. But as explained below,

---

[17] Defendants' remaining case law, *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, did not involve a claim for theft and misuse of confidential information. 823 F. Supp. 2d 334, 352 (D. Md. 2011).

Plaintiffs' lost investment and reasonable royalty damages[18] are well-grounded in the facts.

**(a) Defendants' Misconduct Caused Terran to Lose Investors**

To measure the harm that Defendants' disclosure of Dr. Thompson's confidential information caused to Terran's fundraising efforts, Plaintiffs' damages expert, Dr. Gareth Macartney, analyzed [redacted] to isolate the effect of Defendants' theft and disclosure on those fundraising efforts. *See generally* Ex. 13 ¶¶ 128-38. [redacted] *Id.* ¶ 11. [redacted] *See id.* ¶¶ 133-38. As Dr. Macartney notes, and as Terran executives Dr. Sam Clark and Dustin Tetzl have testified, [redacted] *See id.* ¶¶ 86-89, 136-38; Ex. 15, 20:3-21:20, 45:25-47:4, 67:21-69:2; Ex. 16, 150:1-10; Exs. 17 & 18. Comparing [redacted] Dr. Macartney [redacted]. *See* Ex. 13 ¶ 133.

Defendants raise just two attacks on these damages, arguing that (1) Terran's filing of this lawsuit was a "superseding" cause of its lost investment (Mot. 27-28); and (2) certain evidence Plaintiffs rely upon [redacted] is inadmissible (*id.* 28-29). Defendants are wrong.

***First***, Plaintiffs have ***never*** "admit[ted] that Defendants' conduct was not the cause of" the

---

[18] Defendants focus on just two of Plaintiffs' damages theories—Plaintiffs' lost investment theory (*see* Mot. 27-29) and Plaintiffs' reasonable royalty theory (see *id.* 29-30). Even if the Court finds that there are no genuine disputes as to these theories, Defendants have not moved for summary judgment as to Plaintiffs' remaining theories.

harm at issue. Mot. 28. Plaintiffs directly tie their lost investment damages to Defendants' misconduct, identifying [redacted] Defendants do not dispute [redacted] Terran's decision to file this suit.[19] Defendants thus once again try to flip the standard for summary judgment on its head, asking the Court to resolve competing inferences in their favor. Defendants will be free at trial to ask a jury to do that; but at this stage, "any competing, rational inferences" are to be interpreted "in the light most favorable" to Plaintiffs. *Rossignol*, 316 F.3d at 523. Moreover, Defendants identify no evidence that the filing of this lawsuit, rather than the underlying Compass misconduct revealed by that lawsuit, [redacted] Even if [redacted] does not sever the causal link between Defendants' misconduct and Plaintiffs' harm. *Cf. Browne v. State Farm Mut. Auto. Ins. Co.*, 258 Md. App. 452, 485 (2023) (in tort law, supervening cause must be "an unusual or extraordinary act that could not have been anticipated by the original tortfeasors").

Defendants' cited case law (applying North Carolina law) is inapposite. In *RLM Commc'ns, Inc. v. Tuschen*, the plaintiff alleged that the defendants' misappropriation would cause plaintiff to lose out on a future contract. 66 F. Supp. 3d 681, 698 (E.D.N.C. 2014). That court found that the plaintiff ***had already*** been disqualified as a bidder for reasons unrelated to the defendant's misconduct. *Id.* And in *360 Mortg. Grp., LLC v. Home Point Fin. Corp.*, the defendant offered nothing more than speculation between the timing of an event (an employee's resignation

---

[19] Defendants' cursory argument in a footnote that "[redacted] Mot. 29 n.18, cites no evidence even suggesting [redacted]

[20] Defendants suggest that [redacted] Mot. 27-28. But Dr. Clark testified as [redacted], *see* Ex. 15, 83:18-88:6, a fact which does not negate [redacted]

from plaintiff's company) that was completely ***unrelated*** to the alleged misappropriation and the alleged harm. *See* 740 F. App'x 263, 268 (4th Cir. 2018). Plaintiffs have shown far more.

***Second***, Plaintiffs' lost investment theory is supported by admissible evidence—including evidence which Defendants' motion does not challenge, such as [redacted] *See* Ex. 13 ¶¶ 85, 131-35. Defendants do not dispute that such evidence is admissible. Indeed, they affirmatively rely upon that evidence to argue that Terran's filing of this suit was a "superseding cause" of damages (it is not).

Defendants' complaint is that Dr. Macartney ***additionally*** relied upon facts provided to him by two of Plaintiffs' fact witnesses—Drs. Clark and Tetzl—to conclude [redacted] (not, as Defendants surmise, the filing of this lawsuit). *See* Ex. 13 ¶¶ 135-38. As Drs. Clark and Tetzl explained, once Compass's theft became public, [redacted]. *See id.*; Ex. 15, 20:3-21:20, 45:25-47:4, 67:21-69:2; Ex. 16, 150:1-10; Exs. 17 & 18.[21]

Defendants generally protest that such facts are "double hearsay." But Dr. Macartney can appropriately rely upon evidence that would not be independently admissible. *See* Macartney Opp. 6-9. Moreover, this evidence is not "double hearsay." Drs. Clark and Tetzl will be witnesses at trial, and will testify as to their personal involvement in [redacted] Defendants have deposed both of them; both

[21] This testimony also directly undercuts any suggestion that the filing of the lawsuit, rather than the revelation of Defendants' misconduct, caused [redacted]. It is equally likely, if not more likely, [redacted]

offered testimony consistent with Dr. Macartney's report and their concurrently filed declarations. *See* Ex. 15, 20:3-21:20, 45:25-47:4, 67:21-69:2; Ex. 16, 150:1-10; Exs. 17 & 18. Moreover, statements from [redacted] are not hearsay, as they are not being offered for the truth of the matter of asserted (*i.e.*, [redacted] but rather as evidence of [redacted] Statements about those [redacted] would also fall within Federal Rule of Evidence 803(3)'s exception to the hearsay rule. *See* Fed. R. Evid. 803(3). For these reasons, summary judgment as to Plaintiffs' lost investment theory is improper.

**(b) Plaintiffs' Reasonable Royalty Theory Is Legally Sound**

Plaintiffs also seek damages based on a reasonable royalty analysis, to estimate the lump-sum royalty that Defendants would have negotiated had Compass sought an exclusive, perpetual, and unlimited right to use the trade secrets at the time of Defendants' misappropriation. *See* Ex. 13 ¶¶ 14, 170-82. Defendants argue "there is no allegation that Compass is using any trade secret in any product." Mot. 30. But there is no requirement that a defendant "use a trade secret in a product" for a reasonable royalty to be appropriate. Reasonable royalty damages can be assessed "in lieu of damages measured by any other methods" to compensate for "unauthorized ***disclosure*** or use of the trade secret." 18 U.S.C. § 1836(b)(3)(B)(ii); *see also* Md. Code. Ann., Com. Law § 11-1203(c). Here, Defendants both "used" Plaintiffs' trade secrets and "disclosed" them. *See supra* pp. 28-33. Defendants' suggestion that only "commercial" uses of a trade secret give rise to a reasonable royalty award is expressly contrary to the cases they cite, both of which *rejected* their argument. *See AirFacts, Inc. v. Amezaga*, 30 F.4th 359, 367 (4th Cir. 2022) ("'commercial use' is not a threshold requirement to obtaining reasonable royalty damages under Maryland law"); *Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1185 (10th Cir. 2014) ("[N]othing in the state's trade secret statute categorically restricts the availability of 'reasonable royalty' damages to cases

in which the misappropriator *used* a trade secret commercially rather than *disclosed*[.]").

Moreover, Plaintiffs' reasonable royalty theory expressly accounts for the specific "nature of [Defendants'] use" and disclosure of the trade secrets (Mot. 30), including "any evidence probative of the value of that use." *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Compass incorporated the trade secrets into a patent application, for the purposes of disclosing and claiming exclusive rights to that information, to stifle competition for its COMP360 product. Dr. Macartney considered these uses, at least in determining the appropriate scope of the hypothetical license. *See* Ex. 13 ¶ 14; Ex. 20 ¶ 55 [redacted]; Macartney Opp. 21-26. Plaintiffs' reasonable royalty theory thus appropriately accounts for the value of Compass's "use."

**B. Defendants Fail to Challenge Plaintiffs' Remaining Claims**

Despite having moved for summary judgment on every element of Plaintiffs' trade secret claims, Defendants want more. By way of three sentences in their motion, Defendants assert that "***all*** of Plaintiffs' claims fail if the purported trade secrets were not protectable and/or were not misappropriated." Mot. 26. The sole reason Defendants give is that Plaintiffs' remaining nine counts reference the "Psilocybin Trade Secrets." *Id.* at 26-27. Defendants' approach to these claims is reminiscent of their (unsuccessful) attempt to dismiss Plaintiffs' "duplicative contract- and fraud-type claims" prior to discovery. *See* Dkt. 93 at 1. As the Court explained in denying that request, those claims are decided under different legal standards, implicate different legal duties, and entitle Plaintiffs to different kinds of relief. *See* Dkt. 122 at 114-22.

As just one example, Plaintiffs' unfair competition claim (Count III) alleges that Compass initiated discussions with Dr. Thompson and UMB in bad faith, for the purposes of extracting confidential information concerning Dr. Thompson's research. Dkt. 199 ¶ 89. Whether that

confidential information qualifies as a trade secret is not dispositive of that claim, and Defendants do not argue otherwise. Indeed, if Defendants did not believe that Dr. Thompson's work was novel at the time of their interactions (they did), that ***strengthens*** Plaintiffs' unfair competition and misrepresentation claims, as it would confirm that Compass had no intention of pursuing a collaboration with Dr. Thompson when it approached him. Defendants similarly do not dispute that the information Dr. Thompson shared with Compass was confidential under the non-disclosure agreement Compass asked him to sign, or that Compass's misuse of that information violated that agreement. Even if Defendants demonstrate that Plaintiffs did not take reasonable measures to protect the Psilocybin Trade Secrets or that those trade secrets do not "derive independent economic value" from secrecy, such specific legal shortcomings on the trade secret claims do not render the broader information Dr. Thompson shared with Compass non-confidential under the terms of the non-disclosure agreement he signed. Defendants completely ignore this.

As such, Defendants do not even try to explain why victory on any particular element of Plaintiffs' trade secret claims would negate Plaintiffs' ability to carry their burden of proof on any other element of any other claim—let alone on ***each*** remaining claim. Defendants have thus failed to meet their "initial burden of demonstrating that there exists no genuine dispute of material fact" with respect to any element of Plaintiffs' remaining claims. *Lundregan v. Hous. Opportunities Comm'n*, 2024 WL 1810150, at *4 (D. Md. Apr. 24, 2024). Summary judgment is inappropriate.

## II. THE COURT SHOULD GRANT SUMMARY JUDGMENT ON COMPASS'S COUNTERCLAIMS

Compass asserts four counterclaims, alleging fraudulent misrepresentation, unfair competition and tortious interference theories. *See* Dkt. 208. All four fail as a matter of law. Compass's fraudulent misrepresentation and unfair competition counterclaims (Counts I & II against UMB and Thompson) are barred by Maryland's three-year statute of limitations.

Compass's unfair competition and tortious interference counterclaims, based on the unsupported claim that Plaintiffs brought this litigation in bad faith (Counts III & IV), are barred by the *Noerr-Pennington* Doctrine. These legal issues, among others, entitle Plaintiffs to summary judgment.

### A. Summary Judgment Is Appropriate on Count I and Count II

#### 1. Counts I & II Are Barred by the Statute of Limitations

Fraudulent misrepresentation and unfair competition are both subject to a three-year statute of limitations in Maryland. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101. Yet Compass filed these claims in 2025, ***six years after*** Compass was aware of the facts it relies on for these claims. That is not permitted in Maryland; a cause of action accrues when a party knows or should have known of the potential claim. *See Est. of Adams v. Cont'l Ins. Co.*, 233 Md. App. 1, 25 (2017).

Compass's own allegations establish that its claims accrued in 2019. Compass says Thompson and UMB made fraudulent representations "from May to November of 2019." Dkt. 208 ¶ 30. Critically, Compass alleges that it discovered the supposed fraud ***in 2019***—claiming that its October 23, 2019 discussion with Dr. Thompson "proved to Compass that Professor Thompson had intentionally misrepresented the situation." Dkt. 208 ¶ 16. This is fatal to these claims. Filing fraud claims in 2025, six years after supposedly discovering the fraud in 2025, is untimely. *See De Simone*, 352 F. Supp. 3d at 490 (granting summary judgment).

The undisputed record confirms Compass was on inquiry notice of these claims in 2019:

- **August 2019:** An internal Compass email dated August 29, 2019 reviewed Dr. Thompson's poster abstract for the SFN meeting. Quoting the abstract's statement that "[e]xperiments with psilocybin and ketanserin are in progress," Compass concluded: "it seems that their psilocybin programme is likely to be well under way." Ex. 65. Dr. Shaun Hurley testified that Dr. Thompson's SFN poster revealed "ongoing experiments" of ketanserin and psilocybin that seemed to be encompassed by his proposal to Compass. Ex. 28, 186:14-16, 186:24-187:1. Dr. Ekaterina Malievskaia testified that Compass believed at the time—in August 2019—that Dr. Thompson was committing a "fraud," both financially and to obtain psilocybin. Ex. 43, 153:18-154:15.

- **<u>September 2019</u>:** Dr. Malievskaia confirmed that Compass had reason at this time to "investigate[] further" to confirm whether there was fraud, testifying that Compass believed Dr. Thompson's actions to be "straightforward … extortion." *Id*. at 155:1-13, 182:15-183:3.

- **<u>October 2019</u>:** An internal Compass email dated October 25, 2019 stated that Dr. Thompson's poster at the SFN meeting included psilocybin results in mice, which "contradict [Thompson's] previous reassurance to us on 24/09/19 that they were not undertaking experiments in mice." Ex. 113. Dr. Hurley testified that in October 2019 Compass came to the "final confirmation" that it could not move forward with the collaboration based in part on "loss of trust" from September 2019. Ex. 28, 259:16-260:5.

- **<u>November 2019</u>:** An internal Compass email dated November 12, 2019 stated that "[d]espite receiving assurances from Scott Thompson that his group is not running our planned Psilocybin experiments, it became clear at SFN (from speaking to him and from seeing his PhD student's poster) that they have started to run these experiments." Ex. 115. On November 20, 2019, Compass informed Dr. Thompson that it would not proceed because "following our meeting at SFN last month" Compass "understand[s]. . . that the experiments outlined in your proposal to us are already in progress." Ex. 116.

The law is clear: a claimant is on notice "when the claimant in fact knew or reasonably should have known of the wrong" and when knowledge would have prompted a reasonable person to investigate, the limitations period is triggered. *Est. of Adams*, 233 Md. App. at 25. Counts I and II are time-barred and summary judgment should be granted.

**2. Compass Cannot Establish Scienter, Fraud, or Deceit**

Even if Counts I and II were timely (they are not), they still fail because Compass cannot show, among other things, that Dr. Thompson or UMB acted with the requisite intent for those claims. To prevail on a claim of fraudulent misrepresentation (Count I), Compass must establish by clear and convincing evidence that Dr. Thompson or UMB made a misrepresentation of material fact, which they knew was false, "for the purpose of defrauding" or deceiving Compass. *See Arvon v. Liberty Mut. Fire Ins. Co.*, 2019 WL 4243035, at *4 (D. Md. Sept. 6, 2019); *Architectural Sys., Inc. v. Gilbane Bldg. Co.*, 779 F. Supp. 820, 823 (D. Md. 1991), *aff'd*, 974 F.2d 1330 (4th Cir. 1992) (granting summary judgment where "[t]he evidence presented in this case does not show the necessary level of scienter"). To prevail on a claim of unfair competition (Count

II), Compass must establish that Dr. Thompson's or UMB's conduct was deceitful or fraudulent. *See LSR, Inc. v. Satellite Rests. Inc. Crabcake Factory USA*, 2020 WL 4903902, at *6 (D. Md. Aug. 20, 2020) ("[U]nfair competition is 'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort.'"); *Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724, 732-33 (D. Md. 2017) (granting summary where party failed to show deceitful or fraudulent conduct).

The record evidence, and Compass's admissions, prove that Dr. Thompson and UMB did not make deceitful statements or engage in fraudulent conduct. Rather, both Dr. Thompson and Compass's witnesses agree that Dr. Thompson informed Compass that although he already had administered psilocybin in mice, he had not yet begun any experiments using ketanserin ***and*** psilocybin. Ex. 28, 224:18-23; 237:24-238:10; Ex. 109; Ex. 54, 56:8-57:20, 58:11-59:6. That work did not begin until early 2020. *See, e.g.*, Ex. 30, 61:18-62:4, 285:16-24; Ex. 54, 58:11-59:6; Ex. 110, 162:8-17. No reasonable jury could find that Dr. Thompson or UMB made fraudulent misrepresentations or engaged in unfair competition.

### B. Summary Judgment Is Appropriate on Count III (Unfair Competition Against Terran) and Count IV (Tortious Interference)

#### 1. Counts III & IV Are Barred by *Noerr-Pennington*

Compass's counterclaims for unfair competition (Count III) and tortious interference (Count IV)—which allege that this litigation is a sham brought in bad faith—are barred as a matter of law by the *Noerr-Pennington* Doctrine, which "grants First Amendment immunity to those who engage in petitioning activity"—including the pursuit of litigation. *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003) (noting that doctrine applies to business torts, including unfair competition and tortious interference claims). The application of the doctrine is a question of law. *Id.* While it is subject to a narrow "sham litigation" exception, that

requires showing that the litigation was (1) objectively baseless and (2) subjectively filed in bad faith. *Id.* at 312. A suit is "objectively baseless" if "no reasonable litigant could realistically expect success on the merits." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). This is a high bar: "[i]f an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*." *Id*. Only where litigation is objectively meritless can a court examine the litigant's subjective motivation. *Id.*

Here Compass cannot establish the first prong: Compass cannot say "no reasonable litigant" could find an objective basis where a motion to dismiss has already been denied. Dkt. 122. This forecloses any argument that the lawsuit is "objectively baseless." *See Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 557 (D. Md. 2013); *Balt. Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 400 (4th Cir. 2001) (*Noerr-Pennington* immunity applied even where case was eventually dismissed, because at the outset, "an objective litigant could reasonably expect to have success on the merits"); *Dairy, LLC v. Milk Moovement, Inc.*, 2022 WL 4387981, at *2-3 (E.D. Cal. Sept. 22, 2022).

As to the second prong, Compass has adduced no evidence that Plaintiffs instituted this case in bad faith. Specifically, as discussed *supra* in Section I, Compass cannot credibly claim that there is no basis for Plaintiffs to assert that they were in possession of trade secrets at the time of Dr. Thompson's discussions with Compass in 2019. *See* Dkt. 208 ¶¶ 40, 46. Thus, Plaintiffs are entitled to *Noerr-Pennington* immunity and summary judgment on Counts III and IV. *See GoSecure Inc. v. Bhandari*, 637 F. Supp. 3d 368, 380 (E.D. Va. 2022) (granting summary judgment where action was "neither objectively frivolous nor brought in bad faith"); *Datascope Corp. v. Vascular Sols., Inc.*, 165 F. Supp. 2d 933, 937 (D. Minn. 2001) (insufficient evidence of bad faith).

**2. Count III Fails; Compass Cannot Prove Bad Faith**

Even absent *Noerr-Pennington* immunity, Count III fails because Compass has not adduced sufficient evidence to create a genuine dispute of material fact that this litigation was brought in bad faith. *See LSR, Inc.*, 2020 WL 4903902, at *6. Summary judgment is warranted where "the record does not contain evidence of fraud, deceit, trickery or unfair methods[.]" *Imaging Ctr., Inc. v. W. Md. Health Sys., Inc.*, 2004 WL 3168776, at *4 (D. Md. Aug. 10, 2004), *aff'd*, 158 F. App'x 413 (4th Cir. 2005). As the Court's motion to dismiss ruling notes, Plaintiffs instituted this action with far more than the "some evidence" needed to show good faith. *See Vertellus Holdings LLC*, 2021 WL 3883597, at *28 (no bad faith where plaintiff "put forth at least 'some evidence' in support of its claims"). Discovery has confirmed that. *See supra* pp. 8-38.

**3. Count IV Fails; Compass Cannot Prove Improper Conduct or Damages**

Tortious interference requires proof of "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss without right or justifiable cause on the part of the defendants (constituting malice); and (4) resulting in actual damage and loss." *Gruppo Essenziero Italiano, S.p.A. v. Aromi D'Italia, Inc.*, 2011 WL 3207555, at *8 (D. Md. July 27, 2011). "[T]ortious or deliberate intent to harm a plaintiff's business relationship is not alone sufficient. There must also be proof that the defendant's conduct in interfering with contract or business relations was accomplished through improper means." *Id.*; *see also Imaging Ctr.*, 2004 WL 3168776, at *4 (same). Improper conduct may include instituting groundless civil suits in bad faith, *Daesang Corp. v. Rhee Bros.*, 2005 WL 1163142, at *13 (D. Md. May 13, 2005), the only basis Compass alleges here.

Count IV alleges Plaintiffs filed this suit to cause "Compass's shareholders and investors [to end] their business relationships with Compass." Dkt. 208 ¶ 47. But Compass has no evidence

to support that claim. Courts "routinely reject[] tortious interference and unfair competition claims based on good faith efforts to enforce intellectual property rights." *Daesang*, 2005 WL 1163142, at *13; *see also InfoTek Corp. v. Preston*, 626 F. Supp. 3d 885, 896 (D. Md. 2022) (plaintiff cannot prove tortious interference where it "has not established that [defendant's] specific purpose was to interfere with [plaintiff's] prospective business relationships"). Compass also failed to adduce any evidence that its relationships with investors or shareholders were damaged by this lawsuit. That is fatal to this claim. *See, e.g.*, *Gruppo Essenziero*, 2011 WL 3207555, at *9.

The independent economic analysis in this case affirmatively demonstrates that Compass's stock price fluctuations were unrelated to this litigation. Compass's stock experienced significant price volatility since its September 2020 IPO, which is typical of young public companies. Ex. 10 ¶¶ 15-16. Notably, ***zero*** analyst reports during the relevant August 2022 period mentioned this lawsuit—strongly suggesting the litigation did not materially affect institutional investor decisions. *Id.* ¶ 69. The stock's decline tracked broader market movements, as both the NASDAQ and biotechnology sector indices experienced temporary corrections before reverting. *Id.* ¶¶ 45-48. Compass has no evidence that any investor or shareholder terminated or changed their relationship with Compass due to this suit. Without that, Compass cannot sustain its tortious interference claim. *See Gruppo Essenziero*, 2011 WL 3207555, at *9.

Finally, UMB was not a party to the lawsuit at the time of its initial filing and during the period of Compass's claimed damages. Compass's Counts III and IV should be dismissed against UMB for that additional reason alone.

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that the Court grant summary judgment in their favor on Counts I, II, III, and IV of Compass's Counterclaims, and further request that Defendants' motion for summary judgment be denied in its entirety.

Dated: December 19, 2025

*/s/ Steven C. Cherny*
Steven C. Cherny (*pro hac vice*)
Matthew A. Traupman (*pro hac vice*)
Nicola R. Felice (*pro hac vice*)
Abigail M. Graegin (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
stevencherny@quinnemanuel.com
matthewtraupman@quinnemanuel.com
nicolafelice@quinnemanuel.com
abbygraegin@quinnemanuel.com

*/s/ Patrick D. Curran*
Patrick D. Curran (*pro hac vice*)
Kathleen Marini (*pro hac vice*)
Ryan P. Gorman (*pro hac vice*)
Alexandra O. Schelle (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, Massachusetts 02199
Telephone: (617) 712-7100
patrickcurran@quinnemanuel.com
kathleenmarini@quinnemanuel.com
ryangorman@quinnemanuel.com
alexandraschelle@quinnemanuel.com

Robert S. Brennen (Fed. Bar No. 04499)
Megan J. McGinnis (Fed. Bar No. 12810)
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
T/F: (410) 385-3727
rbrennen@milesstockbridge.com
mmcginnis@milesstockbridge.com

Ramsay M. Whitworth (Fed. Bar #26251)
Email: rwhitworth@silvermanthompson.com
Andrew M. Harvey (Fed. Bar #21925)
Email: aharvey@silvermanthompson.com
SILVERMAN, THOMPSON, SLUTKIN & WHITE
400 East Pratt Street, Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432

*Attorneys for Plaintiffs Terran Biosciences, Inc. and Professor Scott Thompson*

*/s/ Steven E. Tiller*
Steven E. Tiller (Bar #11085)
WHITEFORD, TAYLOR & PRESTON LLP
7 Saint Paul Street, Suite 1500
Baltimore, MD 21202
Telephone: (410) 347-9425
Facsimile: (410) 223-4325
stiller@whitefordlaw.com

*Attorney for Plaintiff*
*University of Maryland, Baltimore*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 19th day of December 2025, a copy of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and Cross-Motion for Summary Judgment on Compass's Counterclaims was served via email on all counsel of record.

/s/ *Ryan P. Gorman*
Ryan P. Gorman