**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| TERRAN BIOSCIENCES, INC., UNIVERSITY OF MARYLAND, BALTIMORE, and SCOTT THOMPSON,<br><br>Plaintiffs,<br><br>v.<br><br>COMPASS PATHFINDER LIMITED (an England and Wales company), EKATERINA MALIEVSKAIA, M.D., and GEORGE GOLDSMITH,<br>Defendants. | Case No. 1:22-cv-01956-ELH<br><br>[redacted] |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CERTAIN OPINIONS OF DEFENDANTS' EXPERT DR. BRYAN ROTH**

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. LEGAL STANDARDS ..... 1

III. DR. ROTH'S "GENERALLY KNOWN" AND "READILY ASCERTAINABLE" OPINIONS ARE PROPER ..... 2

A. Dr. Roth Applies The Proper Law In Opining That A Publication (Like Perez) That Discloses All Elements Of The Alleged Trade Secrets Renders Them Generally Known And Readily Ascertainable. ..... 2

B. Dr. Roth's "Generally Known" And "Readily Ascertainable" Opinion Is Focused On Perez. ..... 4

IV. THE PATENT OFFICE'S REJECTION OF DR. THOMPSON'S '950 APPLICATION IS RELEVANT AND PROPER SUPPORT FOR DR. ROTH'S OPINION THAT PEREZ RENDERS THE ALLEGED TRADE SECRETS GENERALLY KNOWN AND READILY ASCERTAINABLE ..... 6

A. Dr. Roth Opines That The '950 Application Discloses The Alleged Trade Secrets. ..... 6

B. The Patent Office's Rejection Of Dr. Thompson's '950 Application Is Relevant And Permissible, And Plaintiffs' Own Case Law Supports That. ..... 7

C. The Patent Office's Rejection Will Help The Jury, And Its Relevance Is Not Substantially Outweighed By The Risk Of Undue Confusion. ..... 9

V. DR. ROTH'S OPINION THAT ANY COMPASS CLAIM COVERING THE ALLEGED TRADE SECRETS WOULD BE OBVIOUS IN LIGHT OF PEREZ IS PERMISSIBLE AND RELEVANT TO THE LACK OF INDEPENDENT ECONOMIC VALUE ..... 11

VI. DR. ROTH'S OPINIONS REGARDING THE NECESSITY OF A LICENSE ARE PERMISSIBLE AND RELEVANT AS TO THE LACK OF INDEPENDENT ECONOMIC VALUE ..... 13

VII. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bresler v. Wilmington Tr. Co.*,
855 F.3d 178 (4th Cir. 2017) ....................2

*CardioVention, Inc. v. Medtronic, Inc.*,
483 F. Supp. 2d 830 (D. Min. 2007)....................10

*Everest Cp. Ltd. v. Everest Funds Mgmt., LLC*,
393 F.3d 755 (8th Cir. 2005) ....................10, 11

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974)....................9

*Life Spine, Inc. v. Aegis Spine, Inc.*,
8 F.4th 531 (7th Cir. 2021) ....................14

*Olaplex, Inc. v. L'Oreal USA, Inc.*,
855 Fed. Appx. 701 (Fed. Cir. 2021)....................2

*Palantir Tech. Inc. v. Abramowitz*,
No. 19-CV-06879, 2022 WL 22913842 (N.D. Cal. Nov. 3, 2022) ....................5, 6

*PBM Prods., LLC v. Mead Johnson & Co.*,
639 F.3d 111 (4th Cir. 2011) ....................9

*SkinMedica, Inc. v. Histogen Inc.*,
869 F. Supp. 2d 1176 (S.D. Cal. 2012)....................8, 9, 10

*Synopsys, Inc. v. Risk Based Security*,
70 F.4th 759 (4th Cir. 2023) ....................11, 13

*TK Elevator Corp. v. Drzewiecki*,
No. RDB-25-0744, 2025 WL 776111 (D. Md. March 11, 2025)....................2

*Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*,
859 F. Supp. 2d 771 (E.D. Va. 2012), *aff'd*, 505 Fed. Appx. 424 (4th Cir. 2013) ....................5, 6

*U.S. v. Cooper*,
482 F.3d 658 (4th Cir. 2007) ....................10

*United States v. Lentz*,
524 F.3d 501 (4th Cir. 2008) ....................10

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*United States v. Sesay*,
No. CR MJM-21-298, 2025 WL 1148476 (D. Md. Apr. 18, 2025) ....................................1

**STATUTES**

18 U.S.C. § 1839(3) ....................................................................................................11

35 U.S.C. § 282............................................................................................................15

Md. Code, Com. Law § 11 1201(e)(1).......................................................................2, 5, 11

UNIF. TRADE SECRETS ACT ..........................................................................................2

**RULES**

Fed. R. Evid. 105 .......................................................................................................10

Fed. R. Evid. 403 .....................................................................................................9, 10

Fed. R. Evid. 702 .........................................................................................................1

# TABLE OF EXHIBITS[1]

| Exhibit | Exhibit Description |
|---|---|
| **DEFENDANT EXHIBITS (ECF 304)** | |
| 1 | Opening Report of Frederick Barrett, Ph.D., dated Aug. 20, 2025 (highlighting added for clarity) |
| 43 | Excerpts of COMPASS00109963 – prosecution history for U.S. Patent App. No. 17/940,950 (highlighting added for clarity) |
| **PLAINTIFF EXHIBITS (ECF 325)** | |
| 2 | Supplemental Rebuttal Report of Dr. Bryan Roth, dated Oct. 29, 2025 |
| 4 | Dr. Bryan Roth Deposition Transcript, dated Nov. 14, 2025 |

[1] All exhibits identified with "D.Ex." are exhibits attached to ECF 304. All exhibits identified with "P.Ex." are exhibits attached to ECF 325.

## I. INTRODUCTION

It is axiomatic that you cannot have a protectable trade secret if the purported "secret" is in fact "generally known" or "readily ascertainable"—for example, if the information is disclosed in a published patent. Here, Plaintiffs' alleged trade secrets, as defined by Plaintiffs' own expert, are fully disclosed and claimed in a prior published patent, WO 2019/018764A1 ("Perez"). Defendants' expert, Dr. Roth, analyzes Perez and provides a detailed opinion demonstrating how, in light of Perez's disclosures and claims, Plaintiffs' alleged trade secrets are, in fact, generally known and readily ascertainable. Additionally, Dr. Roth analyzes Dr. Thompson's own patent application, details how it discloses the alleged trade secrets, and how the Patent Office's ***rejection of that application over Perez*** further supports that the purported secrets were generally known. Unable to substantively engage with or rebut those opinions, Plaintiffs have filed the present Motion to Exclude, hoping their mischaracterizations of Dr. Roth's opinions can prevent the jury from ever hearing about Perez. Plaintiffs' motion should be denied.

## II. LEGAL STANDARDS

Federal Rule of Evidence 702 allows a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise" if the proponent demonstrates that it is more likely than not that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. A district court enjoys broad latitude in determining what indicia of reliability are most relevant in a given case. *United States v. Sesay*, No. CR MJM-21-298, 2025 WL 1148476, at *8 (D. Md. Apr. 18, 2025). But "courts may not evaluate the expert witness' conclusion itself . . . only the opinion's

underlying methodology. Moreover, questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility of the witness' assessment, not its admissibility." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017).[2]

## III. DR. ROTH'S "GENERALLY KNOWN" AND "READILY ASCERTAINABLE" OPINIONS ARE PROPER

### A. Dr. Roth Applies The Proper Law In Opining That A Publication (Like Perez) That Discloses All Elements Of The Alleged Trade Secrets Renders Them Generally Known And Readily Ascertainable.

It is black letter law that a protectable trade secret cannot be "generally known to" or "readily ascertainable by proper means" by "other persons who can obtain economic value from its disclosure." Md. Code, Com. Law § 11 1201(e)(1); *see also TK Elevator Corp. v. Drzewiecki*, No. RDB-25-0744, 2025 WL 776111, at *4 (D. Md. March 11, 2025) ("The standards for misappropriation of trade secrets under MUTSA and DTSA are nearly identical."). "Information in published patents or patent applications is readily ascertainable by proper means." *Olaplex, Inc. v. L'Oreal USA, Inc.*, 855 Fed. Appx. 701, 707 (Fed. Cir. 2021); *see also* UNIF. TRADE SECRETS ACT (Nat'l Conf. of Comm'rs on Unif. State Laws), cmt. 5 ("Information is readily ascertainable if it is available in trade journals, reference books, or ***published materials***.").

Dr. Roth applies that law in evaluating whether Plaintiffs' alleged trade secrets were "generally known" or "readily ascertainable" in light of Perez. Perez is an issued patent that was published and available to the public no later than May 2, 2019. P.Ex. 2 ¶ 132. As such, it constitutes "published material" available to interested individuals before Compass allegedly misappropriated the secrets on August 29, 2019 (and, in fact, before Dr. Thompson and Compass ever spoke). D.Ex. 1 ¶ 203; *see Olaplex*, 855 Fed. Appx. at 707. In reaching his opinion that Perez rendered the alleged trade secrets generally known and readily ascertainable, Dr. Roth walks

---

[2] All citations and internal quotations omitted and all emphasis added unless otherwise indicated.

through the elements of the alleged trade secrets and identifies with specificity where those elements are found within Perez. P.Ex. 2 ¶¶ 466–73.

Plaintiffs' arguments to exclude the entirety of those opinions are as misleading as they are incorrect. For example, Plaintiffs argue that Dr. Roth fails to address "whether the trade secrets, as a unified whole, were known or readily ascertainable." ECF 322 at 4. That is demonstrably false. As explained above—and despite Plaintiffs' failure to articulate the alleged trade secrets with sufficient detail and precision[3]—Dr. Roth analyzes each component of the alleged trade secrets, articulated by Plaintiffs' expert as:

[redacted]

D.Ex. 1 ¶ 60. Dr. Roth explicitly maps how Perez disclosed both the first (P.Ex. 2 ¶ 468) and second (*Id.* ¶¶ 469, 472) portions of Plaintiffs' own definition. Plaintiffs merely disagree with Dr. Roth's conclusion based on that analysis, *i.e.*, that "Perez disclosed in full the purported trade secrets" (*Id.* ¶ 467).

Plaintiffs' next attempt is claiming that "Dr. Roth makes clear that Perez discloses only broad concepts of combining a tryptamine with a 5-HT2A antagonist." ECF 322 at 5. That is counterfactual. What Dr. Roth makes clear is that Perez includes the very details Plaintiffs allege are lacking. Using colored indications as replicated below, Dr. Roth explains how Perez specifically discloses "a combination product for the treatment and/or prevention of psychiatric and/or neurological disorders," and how "[t]he combination product comprises (i) **a compound**

[3] *See* Defendants' Motion for Summary Judgment and Memorandum in Support Thereof, ECF 304 § III.B.

which promotes neurogenesis and has hallucinogenic and/or psychedelic side effects, and (ii) **a 5-HT2A receptor antagonist** which alleviates and/or removes the hallucinogenic and/or psychedelic side effects caused by the first compound." P.Ex. 2 ¶ 468. He goes on to highlight how Perez itself states that, "[p]referably, the compound described by **formula (I)** is . . . 4-phosphoryloxy-N,N-dimethyltryptamine (**psilocybin**)," and that "**the 5-HT2A receptor antagonist is** . . . **Ketanserin**." *Id.* ¶ 468. As such, Dr. Roth's opinion makes clear that Perez discloses both psilocybin and ketanserin directly, not merely the "broad concepts of combining a tryptamine with a 5-HT2A antagonist," as Plaintiffs argue. ECF 322 at 4.

Similarly puzzling is Plaintiffs' attack that Dr. Roth "does not (and cannot) explain how [the above] amounts to disclosure of the trade secrets which require '[redacted].'" *Id.* at 6 (quoting P.Ex. 2 ¶ 60) (emphasis in original) (second alteration in original). Dr. Roth squarely addresses this entire component of the alleged trade secrets in a 1.5-page analysis, using four colors and underlining to make clear where and why Perez discloses the alleged trade secrets. P.Ex. 2 ¶ 469. Therefore, Dr. Roth's opinion that Perez renders Plaintiffs' alleged trade secrets generally known is proper: he examined each element of the purported secrets as defined by Plaintiffs' expert, and identified those same elements in Perez.

### B. Dr. Roth's "Generally Known" And "Readily Ascertainable" Opinion Is Focused On Perez.

As described above, Dr. Roth opines, based on his analysis of Perez, that the alleged trade secrets were generally known and readily ascertainable. As background for that opinion, Dr. Roth first introduces the plethora of concepts that were already known in the field—*i.e.*, knowledge one

reading Perez could access (P.Ex. 2 ¶¶ 461–65)—before explaining ***in a stand-alone section*** why Perez ***on its own*** renders the trade secrets generally known and readily ascertainable. *Id.* ¶¶ 466–73. Dr. Roth is an expert in pharmacology, psychiatry, and psychedelic drug actions; the knowledge he—as well as "other persons who can obtain economic value from its disclosure" (Md. Code, Com. Law § 11-1201(e)(1))—is relevant to the "generally known" and "readily ascertainable" inquiry. *Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 779 (E.D. Va. 2012), *aff'd*, 505 Fed. Appx. 424 (4th Cir. 2013) ("[T]he requirement that information not be generally known refers to the knowledge of *other members of the relevant industry*—the persons who can gain economic benefit from the secret, not the knowledge of the public generally." (alteration in original) (emphasis in original)). As such, it is relevant and proper for Dr. Roth to describe the state of the art as it was known by "members of the relevant industry," of which he is apart. *Id.*

Plaintiffs attempt to contort Dr. Roth's opinion into something that it simply is not, mischaracterizing his discussion of what was known or available as a conclusion that the alleged trade secrets were known across "separate data sources." ECF 322 at 6 (quoting *Palantir Tech. Inc. v. Abramowitz*, No. 19-CV-06879, 2022 WL 22913842, at *4 (N.D. Cal. Nov. 3, 2022)). Again, Section XII.C.2 of Dr. Roth's report is titled "Perez Disclosed The Purported Trade Secrets In Full Before May 16, 2019," and the paragraphs thereunder explain in detail where all elements of Plaintiffs' expert's definition of the alleged trade secrets can be found within the Perez patent publication. P.Ex. 2 ¶¶ 466–73. By Plaintiffs' own standard, Dr. Roth performed "the proper analysis" in determining whether "the combination—the integrated method that Plaintiffs claim—was publicly known or readily ascertainable." ECF 322 at 4. Dr. Roth's discussion of other papers (*e.g.*, Vollenweider, Carter, Winter, Quednow, and Kometer) is relevant background

on the state of the art at the time of the alleged misappropriation (*see Trident*, 859 F. Supp. 2d at 779), not an attempt to find "isolated pieces" of the trade secrets in "the prior art" to alone prove those secrets were generally known or ascertainable. *See* ECF 322 at 4.

Dr. Roth's opinion is grounded in the entirety of Plaintiffs' alleged trade secrets being disclosed in the single publication: Perez. As such, Plaintiffs' heavy reliance on *Palantir* is wholly misplaced. The flawed methodology excluded in *Palantir* is entirely unlike Dr. Roth's analysis. The *Palantir* defendant expressly "concede[d] that [the expert] did not attempt to find 'a single prior art solution that contained every single data source purportedly encompassed by Palantir's trade secrets.'" *Id.* at *4. With that concession in hand, the court excluded the expert's opinion "that the trade secrets were known because each individual data source was known" as contravening the law, which permits "a protectable trade secret . . . even if the elements are ***individually*** in the public domain." *Id.* at *5. Here, Dr. Roth's methodology is the inverse: Dr. Roth found "a single prior art solution that contained every single [element] purportedly encompassed by [Plaintiffs'] trade secrets," and affirmatively opines that the trade secrets were known because the combination of those elements were in a single publication: Perez. *Id.* at *4.

Accordingly, Dr. Roth's opinion that the alleged trade secrets were generally known and readily ascertainable rests on a reliable analysis of the evidence and is admissible. If Plaintiffs wish to criticize Dr. Roth's explanation of the wealth of knowledge available in the field, they may do so on cross-examination.

## IV. THE PATENT OFFICE'S REJECTION OF DR. THOMPSON'S '950 APPLICATION IS RELEVANT AND PROPER SUPPORT FOR DR. ROTH'S OPINION THAT PEREZ RENDERS THE ALLEGED TRADE SECRETS GENERALLY KNOWN AND READILY ASCERTAINABLE

### A. Dr. Roth Opines That The '950 Application Discloses The Alleged Trade Secrets.

As a threshold matter, Plaintiffs wrongly accuse Dr. Roth of "fail[ing] to compare the '950

application to Dr. Barrett's articulation of the trade secrets in order to conclude that the '950 application actually discloses the trade secrets." ECF 322 at 9. In his report, Dr. Roth explicitly identified the portions of the '950 Application that disclose the alleged trade secrets, including Dr. Thompson's disclosures that discuss:

- "a method for preventing or treating a psychological disorder" "compris[ing] the step of administering a serotonin agonist in combination with a serotonin receptor 2 antagonist, where the agonist is administered separately, sequentially or simultaneously with the antagonist";
- "examples of a psychological disorder which may be treated . . . includ[ing] . . . depression";
- "the serotonin agonist [as] psilocybin or psilocin or a derivative thereof";
- "representative examples of a useful serotonin receptor 2A antagonist includ[ing] . . . ketanserin";
- the assertion that "[i]n humans, the intensity of psilocybin-induced perceptual changes is correlated with serotonin 2A receptor (5 HT2A) activation"; and
- that "psilocybin might relieve depressive symptoms through rapid activation of some other critical 5-HTRs."

P.Ex. 2 ¶ 479 (quoting D.Ex. 43, at -983, -986–87). Plaintiffs' complaint that these quotations from the '950 Application "without explanation" fail to sufficiently compare the '950 application to Plaintiffs' expert's articulation of the purported secrets (ECF 322 at 9) makes no sense. Dr. Roth identifies the disclosures above, which, "[b]ased on [his] review," show "that the '950 Application contains the alleged trade secrets as Dr. Barrett has articulated them in Paragraph 60 of his report." P.Ex. 2 ¶ 480. No further explanation would make it clearer; Dr. Barrett's articulation of the trade secrets are disclosed by Dr. Thompson's '950 Application on its face—and that makes sense, because Dr. Thompson was hoping to (but did not) get a patent on his idea.

### B. The Patent Office's Rejection Of Dr. Thompson's '950 Application Is Relevant And Permissible, And Plaintiffs' Own Case Law Supports That.

Having opined that Dr. Thompson's '950 Application discloses the trade secrets, Dr. Roth

explains how the Patent Office's rejection of the '950 Application as obvious in light of Perez further supports his opinion that Perez renders the purported secrets generally known. P.Ex. 2 ¶¶ 474–85. That Patent Office rejection is relevant—and damaging—to Plaintiffs' case. So Plaintiffs attempt to keep it out by arguing that "[t]he fact that the '950 application was found obvious in view of Perez and Kucuksen . . . is not dispositive of whether the trade secrets were known or readily ascertainable . . . ." ECF 322 at 6; *see also id.* at 8–9 (mischaracterizing Dr. Roth as opining "that the trade secrets at issue in this case were generally known and readily ascertainable because the '950 application was rejected by the patent office as obvious over Perez"). But Dr. Roth did not argue that the Patent Office's rejection was dispositive. Indeed, Dr. Roth frames the rejection as supporting, not defining, his opinion. P.Ex. 2 ¶ 485 ("Thus, as I have explained above and ***as is supported*** by the WIPO international search report and the Patent Office's rejection of Dr. Thompson's '950 Application, the alleged trade secrets were generally known and reasonably ascertainable—***particularly in light of the disclosures in Perez***.").

Plaintiffs' own case law makes clear that Patent Office rejections are not only relevant but "highly persuasive." *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1195 (S.D. Cal. 2012). In *SkinMedica*, the defendant argued that "the PTO's rejection of several similar patent applications as obvious in view of the prior art means the Hair Growth was generally known." *Id.* at 1195. While the *SkinMedica* court found that the "patent rejections based on prior art [were] not necessarily determinative of the fact that the claimed trade secret was generally known," it acknowledged that the rejections "may be highly persuasive," concluding that "it remains for the jury to decide the fact-intensive question of whether [the] patent applications, or the referenced prior art" rendered the secrets generally known. *Id.* at 1195. Nowhere in *SkinMedica* does the court suggest that it is improper for an expert to present testimony regarding the Patent Office's

obviousness rejection for an application the expert asserts as encompassing alleged trade secrets. In fact, the court's statement that the rejections are "highly persuasive" and are for the jury to decide demonstrates such evidence should not be excluded. *Id.* at 1195. The rest of Plaintiffs' cited cases merely stand for the proposition that patent and trade secret law have different standards. *See* ECF 322 at 7–9; *see also id.* at 7 (quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974) noting that "[n]ovelty, in the patent law sense, is not required for a trade secret" but omitting from the same paragraph "[h]owever, some novelty will be required if merely because that which does not possess novelty is usually known"). Neither the Defendants nor Dr. Roth are arguing otherwise. But that is not a reason to exclude ***any*** reference to the PTO's decision.

Dr. Roth did not apply patent law—novelty, invention, or obviousness—to determinatively opine that Plaintiffs' purported secrets were generally known and ascertainable. Instead, Dr. Roth discusses the Patent Office's obviousness rejection as relevant, corroborative evidence of his independent analysis and resulting opinion that Perez renders the purported secrets generally known. That is proper, and his testimony will be helpful for the jury's consideration of the issue.

### C. The Patent Office's Rejection Will Help The Jury, And Its Relevance Is Not Substantially Outweighed By The Risk Of Undue Confusion.

Because Plaintiffs are unable to seriously contest the relevance and permissible use of Patent Office obviousness rejections, Plaintiffs take a shot at exclusion under Federal Rule of Evidence 403. Rule 403 states:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

"Where the evidence is probative, 'the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *PBM Prods., LLC v. Mead*

*Johnson & Co.*, 639 F.3d 111, 124–25 (4th Cir. 2011) (quoting *United States v. Lentz*, 524 F.3d 501, 525 (4th Cir. 2008)) (collecting cases); *see also U.S. v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007) ("Rule 403 exclusion should be invoked rarely, because the general policy of the Federal Rules is that all relevant material should be laid before the jury." (cleaned up)).

Here, Plaintiffs have failed to demonstrate any risk of confusion (there is none), let alone risk that would substantially outweigh the probative value offered by the Patent Office's rejection. First, neither party is arguing that the Patent Office's rejection is determinative in assessing whether Plaintiffs' purported secrets are generally known or readily ascertainable. Second, Dr. Roth performed and will testify about his own independent analysis of how Perez fully discloses the alleged trade secrets—far different than the "rubber stamp[]" analysis Plaintiffs argue Dr. Roth offers. ECF 322 at 7. Finally, even if there was risk of unfair confusion (again, there is none), that risk could not rise to a level so substantial that it would require exclusion. At the most, any potential confusion could easily be guarded against with a limiting instruction—*e.g.*, that the jury may consider the Patent Office's rejection as evidence but that the rejection is not dispositive (Fed. R. Evid. 105), just as Plaintiffs' case law supports. *SkinMedica*, at 1195.

Plaintiffs attempt to support their argument by relying on *CardioVention, Inc.* and *Everest Capital Ltd.* That reliance is misplaced. In *CardioVention*, the plaintiff sought to rely on an "interim USPTO decision" regarding defendant's patent application to support its misappropriation claims. *CardioVention, Inc. v. Medtronic, Inc.*, 483 F. Supp. 2d 830, 842–43 (D. Min. 2007). The court excluded that evidence because the decision was not even final and risked the jury thinking the defendant acted improperly in trying to obtain broad patent protection. *Id.* Similarly, the *Everest* appellate court affirmed a trial court's discretionary exclusion of a Trademark Office suspension notice that "had little probative value because it stated a ***tentative***

***opinion***, not an administrative finding of fact based upon an adequate record." *Everest Cp. Ltd. v. Everest Funds Mgmt., LLC*, 393 F.3d 755, 764 (8th Cir. 2005). Here, the Patent Office's obviousness rejection of the '950 Application is a final determination and does not involve statements, positions, or argument from the instant litigation, nor any comparable issues.

Because Plaintiffs fail to demonstrate any risk of unfair confusion, let alone risk that substantially outweighs the probative value of the Patent Office's obviousness rejection, that evidence and Dr. Roth's related opinions should not be excluded.

## V. DR. ROTH'S OPINION THAT ANY COMPASS CLAIM COVERING THE ALLEGED TRADE SECRETS WOULD BE OBVIOUS IN LIGHT OF PEREZ IS PERMISSIBLE AND RELEVANT TO THE LACK OF INDEPENDENT ECONOMIC VALUE

For information to be a trade secret, it must "[d]erive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Md. Code, Com. Law § 11-1201(e)(1); 18 U.S.C. § 1839(3). That inquiry may be informed by assessing whether a competitor could obtain value by accessing the alleged trade secret information (where the information's owner has otherwise derived value from exclusive access to it). *See Synopsys, Inc. v. Risk Based Security*, 70 F.4th 759, at 771 (4th Cir. 2023) (independent economic value "requires proof not just of value, but of value specifically tied to secrecy," and "[t]he economic value of that property right lies in the ***competitive advantage*** over others that [the plaintiff] enjoys by virtue of its exclusive access to the data, and ***disclosure or use by others of the data would destroy that competitive edge***." (alteration in original)).

Dr. Roth analyzes independent economic value in accordance with that framework. P.Ex. 2 § XIV.C. For example, Dr. Roth evaluates whether Compass would gain value, or a competitive advantage, from the alleged misappropriation—*i.e.*, from the accused disclosures in the '611

Application. *See id* §§ XIV.C.3–4. His conclusion is that the ’611 disclosures provide no such value. Dr. Roth explains that, for example, Compass cancelled the ’611 Application claims and, in fact, “has not pursued any claims related to the coadministration of a 5-HT2A antagonist and psilocybin” at all. P.Ex. 2 ¶ 606. Therefore, he opines, the accused disclosures held no value because no relevant claims materialized from the ’611 Application. Dr. Roth further explains that [redacted]” *Id.* ¶ 607. Thus, Dr. Roth addresses that the ’611 Application (and therefore any purported secret therein) would have no competitive advantage or value to Compass since it did not result in issued claims, nor could it in light of Perez. *Id.* ¶ 608.

Plaintiffs take issue with Dr. Roth’s opinion that “[t]o the extent any potential claims relating to maintaining antidepressant effects with a combination of 5-HT2A antagonist and psilocybin were recited in the ’611, the Patent Office would likely have rejected them as obvious over Perez just as they had with Thompson’s ’950 Application.” ECF 322 at 11 (quoting P.Ex. 2 ¶ 608). In particular, Plaintiffs complain that “Dr. Roth never set out the law for obviousness, nor did he conduct the analysis required by that law, which requires comparing the claims of the ’611 application to the disclosures in Perez.” ECF 322 at 11–12. But that ignores the opinion actually offered, which is directed to “any potential claims” relating to the trade secrets. In other words, in view of Perez’s broad disclosures and the amorphous articulation of the alleged trade secrets, ***any*** potential claim based on the ’611 Application disclosures that ***also*** encompassed the alleged trade secrets, would likely be found obvious. P.Ex. 2 ¶ 608. Dr. Roth not only supported that opinion with the testimony of Compass’s outside patent counsel (*id.* ¶ 606), he also analyzed it in parallel with his analysis of Dr. Thompson’s ’950 Application. *Id* (citing *id.* ¶¶ 612–21). For example, he

opined that the ’950 Application disclosed the trade secrets and explained that, under the Patent Office’s application of the obviousness standard, the claims were rejected over Perez. *Id.* ¶¶ 612–21. Applying that logic, the obviousness analysis of the Patent Office, and his experience in the field, Dr. Roth determined that any claim similarly encompassing the alleged trade secrets based on the ’611 Application disclosures would likely face the same result. *Id.* ¶ 608

In the remainder of Section III of their brief, Plaintiffs take issue with various statements Dr. Roth made during his deposition regarding the process by which patent applications are written, arguing that “Dr. Roth is not and does not purport to be an expert in patent drafting and prosecution practice.” ECF 322 at 12. As a preliminary matter, it is not clear what opinion(s) Plaintiffs attempt to exclude. In any event, as his report lays out, Dr. Roth has extensive experience related specifically to psychedelic drug actions, including being “a named inventor on more than 40 patents or patent applications.” P.Ex. 2 ¶ 20; *see also* P.Ex. 4 at 272:16–274:7. As such, his testimony—elucidated by Plaintiffs’ counsel’s questions—draw from appropriate experience.

## VI. DR. ROTH’S OPINIONS REGARDING THE NECESSITY OF A LICENSE ARE PERMISSIBLE AND RELEVANT AS TO THE LACK OF INDEPENDENT ECONOMIC VALUE

Plaintiffs ask the Court to exclude Dr. Roth’s opinions regarding Perez, arguing that the need for a license is irrelevant to assessing independent economic value. ECF 322 at 14. That is incorrect. As discussed above, determining whether information “[d]erives independent economic value” may be informed by evaluating whether a competitor could obtain value by accessing that information (where the information’s owner has otherwise derived value from exclusive access to it). *See Synopsys*, 70 F.4th at 771–72. In assessing that value, it is relevant to determine whether someone in possession of the information—here, the alleged trade secrets—could freely use it commercially. Dr. Roth opined on this issue. In particular, he opined that: (1) Dr. Thompson’s ’950 Application disclosed the alleged trade secrets; and (2) based on his own analysis and as

supported by the Patent Office's rejection of the '950 Application over Perez, one would require a license to Perez to practice the alleged trade secrets. *See* Section IV.A above; P.Ex. 2 ¶ 630. He then opined that, because a license would be required, one would not be free to commercially practice the secrets, thereby eliminating the alleged trade secrets' independent economic value. *Id.* ¶ 630; *see also id.* ¶ 627.

Plaintiffs attempt to support their argument by relying on *Life Spine, Inc. v. Aegis Spine, Inc.* for the proposition that a party can maintain trade secret protection on aspects of a product that are undisclosed in a patent. 8 F.4th 531, 540–41 (7th Cir. 2021); ECF 322 at 10. That is inapposite. The issue is not whether Plaintiffs could have a product that embodies the alleged trade secrets asserted here, plus some other trade secrets. They have no product, and Dr. Roth does not opine on the limitations of what else such a product could include. Instead, Dr. Roth analyzed the alleged trade secrets in light of Perez, and found that any commercial use of those ideas would require a license, and further that Perez as a whole discloses the entirety of the alleged trade secrets. *See* §§ XII.C.2; XIV.C.4; XIV.C.6; XIV.C.7.

Separately, Plaintiffs repeat their mischaracterizations of Dr. Roth's Perez opinions, arguing that "Dr. Roth asserts that anyone attempting to use the trade secrets would need a license to Perez because 'Perez broadly covers ***the co-administration*** of a 5-HT2A antagonist and a psychedelic.'" ECF 322 at 15 (quoting partially P.Ex. 2 ¶ 623) (emphasis in original). What Plaintiffs conveniently omit from their quotation of Paragraph 623 is the remainder of the disclosures from Perez, which—as Dr. Roth opines—demonstrate that the alleged trade secrets were generally known and fully disclosed in Perez. Paragraph 623 reads in full:

> It is my opinion that [a therapeutic that combined ketanserin with psilocybin] would practice the same invention claimed in Perez. Perez broadly covers the co-administration of a 5-HT2A antagonist and a psychedelic. Perez explains that its "combination product"

> can refer to, among other things, "two or more separate products packaged in a single package or as a unit and comprised of drug and device products, device and biological product, or biological and drug products." Perez contemplates that, in some embodiments, "the compound described by formula (I) [e.g. psilocybin] and the 5-HT2A receptor antagonist are physically separated. Perez specifically references ketanserin as an example of a 5-HT2A antagonist.

P.Ex. 2 ¶ 623. And in the very next paragraph, Dr. Roth opines that "[i]n particular, claim 1 of Perez (reproduced below) would cover a combination product that utilizes ketanserin and psilocybin." *Id.* ¶ 624.

Finally, failing on the substance, Plaintiffs attack Dr. Roth's opinion, arguing "[h]e has no training or experience that qualifies him to opine on patent licensing or the factors that inform whether a company requires a license to a patent." ECF 322 at 14. That misses the mark. Dr. Roth is qualified to provide his opinion that the language in Perez's claim covers the alleged trade secrets. Because practice of the trade secrets are claimed by an issued patent—which Plaintiffs do not dispute is enforceable (*see also* 35 U.S.C. § 282 ("[a] patent shall be presumed valid"))—Dr. Roth is more than qualified to opine that a license is required. Dr. Roth is not offering opinions regarding what licensing terms parties would agree on, or what factors parties would consider in a licensing negotiation. Instead, his opinion is technical: because Perez's claim covers the alleged trade secret, the ability to practice what is claimed requires a license. Accordingly, Dr. Roth's opinion that the trade secrets are without independent economic value due to the need for a license from Perez is proper.

## VII. CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' Motion to Exclude.

Dated: January 21, 2026

John M. Desmarais (admitted *pro hac vice*)
Steven M. Balcof (admitted *pro hac vice*)
Joze Welsh (admitted *pro hac vice*)
Asim Zaidi (admitted *pro hac vice*)
Gillian Moore (admitted *pro hac vice*)
Davis A. Gonsalves-DeDobbelaere (admitted *pro hac vice*)
Peter Kotecki (admitted *pro hac vice*)
Allan E. Carlsen (admitted *pro hac vice*)
DESMARAIS LLP
230 Park Ave., 26th Fl. New York, NY 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401
JDesmarais@desmaraisllp.com
SBalcof@desmaraisllp.com
JWelsh@desmaraisllp.com
AZaidi@desmaraisllp.com
GMoore@desmaraisllp.com
DGgonsalves-dedobbelaere@desmaraisllp.com
PKotecki@desmaraisllp.com
ACarlsen@desmaraisllp.com

*/s/ Jean E. Lewis*
Jean E. Lewis (Bar No.  27562)
Justin A. Redd (Bar No. 18614)
KRAMON & GRAHAM, P.A.
750 East Pratt Street, Suite 1100
Baltimore, MD 21202
Telephone: (410) 752-6030
Facsimile: (410) 539-1269
jlewis@kg-law.com
jredd@kg-law.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I, Jean E. Lewis, hereby certify that on January 21, 2026, a true and correct copy of the foregoing was served by email on all counsel of record for Plaintiffs at their following addresses:

Ramsay M. Whitworth (Fed. Bar #26251)
Andrew M. Harvey (Fed. Bar #21925)
SILVERMAN, THOMPSON, SLUTKIN & WHITE
400 East Pratt Street, Suite 900
Baltimore, Maryland 21202
Telephone: (410) 385-2225
rwhitworth@silvermanthompson.com
aharvey@silvermanthompson.com

Steven C. Cherny (admitted *pro hac vice*)
Matthew A. Traupman (admitted *pro hac vice*)
Nicola R. Felice (admitted *pro hac vice*)
Abigail M. Graegin (admitted *pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
stevencherny@quinnemanuel.com
matthewtraupman@quinnemanuel.com
nicolafelice@quinnemanuel.com
abbygraegin@quinnemanuel.com

Patrick D. Curran (admitted *pro hac vice*)
Kathleen Marini (admitted *pro hac vice*)
Ryan P. Gorman (admitted *pro hac vice*)
Alexandra O. Schelle (admitted *pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, Massachusetts 02199
Telephone: (617) 712-7100
patrickcurran@quinnemanuel.com
kathleenmarini@quinnemanuel.com
ryangorman@quinnemanuel.com
alexandraschelle@quinnemanuel.com

*Attorneys for Plaintiffs Terran Biosciences, Inc. and Professor Scott Thompson*

Robert S. Brennen (Fed. Bar No. 04499)
Megan J. McGinnis (Fed. Bar No. 12810)
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
Telephone: (410) 385-3727
rbrennen@milesstockbridge.com
mmcginnis@milesstockbridge.com

*Attorneys for Plaintiffs Terran Biosciences, Inc. and Professor Scott Thompson*

Steven E. Tiller (Bar #11085)
Whiteford, Taylor & Preston LLP
7 Saint Paul Street, Suite 1500
Baltimore, MD 21202
Telephone: (410) 347-9425
stiller@whitefordlaw.com

*Attorneys for Plaintiff University of Maryland, Baltimore*

*/s/ Jean E. Lewis*
Jean E. Lewis