**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| TERRAN BIOSCIENCES, INC., *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. ELH-22-1956 |
| COMPASS PATHFINDER LIMITED, *et al.*, | * | |
| Defendants. | * | |

## MEMORANDUM OPINION

Defendants Compass Pathfinder Limited ("Compass"), Ekaterina Malievskaia, M.D., and George Goldsmith (collectively "Defendants") have filed an Opposed Motion for Sanctions for Spoliation (the "Motion"), in which they seek sanctions against Plaintiffs Terran Biosciences, Inc. ("Terran"), University of Maryland, Baltimore ("UMB"), and Scott Thompson, Ph.D. ("Dr. Thompson") for failing to preserve lab notebooks that Defendants contend contain evidence relevant to this case and Defendants' defenses. ECF No. 369. Defendants argue that the appropriate sanctions for this alleged spoliation are a curative jury instruction pinning responsibility on Plaintiffs for the loss of evidence and a preclusion order that prohibits Plaintiffs from making arguments benefiting from the loss of this evidence or introducing new evidence about the lab notebooks. The Motion is fully briefed and no hearing is necessary. Loc. R. 105.6. For the reasons explained below, Defendants' Motion is DENIED.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Dr. Thompson ran a research lab at UMB, in which he conducted experiments and allegedly developed a breakthrough treatment pertaining to the coadministration of Psilocybin and 5-HT2A antagonists. ECF No. 199 ¶¶ 1–2. Members of Dr. Thompson's lab recorded details of their research in physical lab notebooks that were stored in the lab. ECF No. 369-2 at 73:2–

74:1; 74:16–75:3; 75:17–76:9; ECF No. 369-3 at 58:14–22; ECF No. 369-4 at 171:13–23. Beginning in March 2020, the fifth floor of the Bressler Research Building, where Dr. Thompson's lab was located, underwent a major renovation. ECF No. 377-4 at 108:6–19. During the renovation, the equipment and materials in Dr. Thompson's lab were supposed to be temporarily relocated to the floor below. ECF No. 377-4 at 110:9–112:14; 113:21–114:13; 121:19–122:19. UMB completed the renovation and post-renovation cleanup in late 2022. ECF No. 369-10 at 2.[1] By that time, Dr. Thompson was no longer working at UMB, having resigned from the University on June 30, 2022. ECF No. 369-10 at 2. When Dr. Thompson resigned, his lab ceased to exist, and there is no evidence that the removed lab materials, including the lab notebooks, ever returned to the fifth floor. ECF No. 377-4 at 114:6–18. UMB has no knowledge of what happened to the lab notebooks after Dr. Thompson's departure in June 2022. ECF No. 377-4 at 118:17–119:16.

Terran filed this lawsuit on August 5, 2022. ECF No. 1. Dr. Thompson joined the case as a Plaintiff on June 2, 2023, with the filing of the Second Amended Complaint. ECF No. 48. And UMB joined the case as a Plaintiff on February 6, 2024, with the filing of the Third Amended Complaint. ECF No. 81. On July 10, 2025, Compass served on Plaintiffs a request for production of documents that sought, among other things, documents relating to Dr. Thompson's research, specifically identifying "lab notebooks" as encompassed by the request. ECF No. 369-7 at 3. Defendants deposed Dr. Thompson on September 16, 2025. ECF No. 369-4. At this deposition, Dr. Thompson testified that when he left UMB, he knew where he left the lab notebooks but that "nobody seems able to find them." ECF No. 369-4 at 170:7–11.

[1] Besides deposition transcripts, citations to the parties' filings refer to the page number provided in the CM/ECF filing header, not the PDF pagination.

On September 25, 2025, the parties jointly requested Court intervention to resolve a discovery dispute concerning the missing lab notebooks. ECF No. 247. The parties' joint position statement explained that, while Defendants believed that UMB had improperly destroyed the lab notebooks, the parties had not yet held the required Local Rule 104.7 conference because UMB was actively looking for the notebooks. ECF No. 247. Defendants and UMB submitted separate position statements concerning the dispute on September 26. ECF Nos. 248, 250. UMB took the position that the dispute was premature because UMB's search for the lab notebooks was still underway, *see* ECF No. 250, whereas Defendants believed that Court intervention was appropriate because the lab notebooks were "crucial" to proving Compass's version of events and the discovery period was nearing its end, *see* ECF No. 248 at 1.

Following a hearing to address this dispute and others, the Court deferred ruling on the issue but ordered the parties to provide a status update regarding the lab notebooks by October 3. ECF No. 252. On that date, the parties jointly advised the Court that the parties had reached an agreement to conduct discovery relating to the lab notebooks and no longer required Court intervention at that time. ECF No. 257. Specifically, the parties represented to the Court that UMB had "agreed to produce its internal litigation hold correspondence and the positions of individuals who received the litigation hold." ECF No. 257 at 1. UMB had also agreed to produce a witness to testify on five topics:

> (1) When UMB first became aware that Terran intended to file this lawsuit, UMB's involvement in that effort, and UMB's knowledge of the fact that the suit involved alleged trade secrets detailed in Professor Thompson's lab notebooks; (2) The details of UMB's litigation hold; (3) What steps UMB took to identify relevant physical evidence, including the lab notebooks and when it implemented its litigation hold; (4) The timing and circumstances of the loss of the lab notebooks; and (5) When UMB first learned that the lab notebooks were missing, when it told Terran, and what steps it took next.

ECF No. 257 at 1. The letter advised that after Defendants received this discovery, they would "confer with UMB on the scope of sanctions Defendants will seek based on the loss of the lab notebooks." ECF No 257 at 1.

On October 17, 2025, UMB provided the details of its litigation hold to Defendants, including by producing its litigation hold letter and identifying the recipients of that letter. ECF No. 377-2. Defendants deposed UMB's 30(b)(6) witness on November 6, 2025. ECF No. 377 at 9. Thereafter, on March 10, 2026, counsel for Defendants emailed counsel for UMB to request a conference to discuss the "scope of sanctions Defendants will seek based on the loss of the lab notebooks." ECF No. 377 at 9–10. Defendants and UMB held a conference on March 31, 2026. ECF Nos. 380 at 8; 380-8. The parties proposed a formal briefing scheduling regarding this dispute, which the Court granted. ECF Nos. 371, 372. Defendants filed their Motion on April 9. ECF No. 369. Plaintiffs filed their Opposition on May 7. ECF No. 377. Defendants filed their Reply on May 28. ECF No. 380.

## ANALYSIS

### I. Plaintiffs' Procedural Challenges to Defendants' Motion Fail.

Plaintiffs raise two procedural challenges to Defendants' Motion. First, they argue that the Motion is untimely because Defendants filed the Motion well after the deadlines for discovery and dispositive motions. ECF No. 377 at 8–10. Plaintiffs also contend that the Motion is procedurally improper because Defendants did not follow the undersigned's protocol for resolving discovery disputes and instead filed a formal motion with Judge Hollander, the presiding judge, to circumvent the undersigned's review. ECF No. 377 at 10. Neither argument provides a basis to deny Defendants' Motion.

**A. Timeliness**

Defendants promptly raised the issue of the missing lab notebooks after Dr. Thompson's deposition, at which he testified the lab notebooks could not be located. *See* ECF No. 247 (parties' joint dispute letter concerning the lab notebooks and identifying Defendants' four requests on September 17, 19, 21, and 22, to hold a conference with Plaintiffs on the issue); ECF No. 248 (Defendants' position statement describing dispute). And Plaintiffs do not complain of any delay between September 2025 and November 2025 when the parties jointly agreed to conduct additional discovery regarding the lab notebooks. The crux of the timeliness issue is therefore the approximately four-month period between when Defendants were in possession of all facts concerning the lost or destroyed lab notebooks (*i.e.*, the November 6, 2025, deposition of UMB's 30(b)(6) witness) and the March 10, 2026, outreach from Defendants to UMB requesting a meet and confer on the issue. Plaintiffs contend that this delay justifies denial of the Motion. ECF No. 377 at 9–10. Defendants point out that during this intervening period, the parties were briefing cross motions for summary judgment and that Plaintiffs' evolving characterizations of the alleged trade secrets precluded Defendants from determining the appropriate sanctions to seek. ECF No. 380 at 8. Moreover, Defendants argue, the alleged delay here is not so great as to warrant denial of the Motion, as other cases in this District have similarly held. ECF No. 380 at 9.

Cases addressing the timeliness of a party's spoliation motion instruct that such motions need to be filed "as soon as reasonably possible after discovery of the facts that underlie the motion . . . because resolution of spoliation motions are fact intensive" and require the Court to consider the timing of a party's duty to preserve evidence, a party's compliance with that duty, the culpability of the party responsible for the alleged spoliation, the relevance of the lost

evidence, and the prejudice to the party deprived of access to the lost evidence. *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 508 (D. Md. 2009). In particular, *Goodman* contemplates that when deciding a spoliation motion, the Court may need to order the parties to engage in additional discovery to develop the evidence relevant to the factors above. *Id.* If such discovery is necessary, it could "completely disrupt the pretrial schedule, involve significant cost, and burden the court and parties." *Id.*

There is no risk of such disruption here because the parties worked collaboratively without the need for Court intervention to conduct additional discovery regarding the missing lab notebooks. That discovery is now complete and the record regarding what happened to the lab notebooks is developed. The brief period between the deposition of UMB regarding the lab notebooks and the filing of Defendants' Motion is minimal. The Court has been aware since September 2025 that the parties were engaged in an effort to crystallize their dispute regarding the lab notebooks, and the Defendants' Motion does not seek a reopening of discovery or any other fact-finding that would disrupt the case schedule. These facts set this case apart from other cases where this Court has concluded that the moving party's spoliation motion was untimely. *See, e.g.*, *CSX Transp., Inc. v. Spiniello Glob., Inc.*, Civil Action No. JKB-19-2976, 2023 WL 5515979, at *12 (D. Md. Aug. 25, 2023) (noting that moving party waited 18 months to raise spoliation after becoming aware of issue and that it "could have been sorted out during the discovery phase," which had closed a year earlier); *Al-Sabah v. Agbodjogbe*, Civil Action No. ELH-17-730, 2019 WL 4447235, at *4 (Sept. 17, 2019) (finding motion untimely when filed 14 months after close of discovery and parties represented to the Court that discovery was complete and there were no other issues requiring Court attention); *Johnson v. Next Day Blinds Corp.*, Civil Action No. WMN-09-2069, 2012 WL 2871418, at *2–3 (D. Md. July 11, 2012) (finding

motion untimely because plaintiff waited to file "until a time when most available remedies would mandate reopening discovery and disrupting the adjudication of dispositive motions").

The facts here better align with those in *Goodman* and *Membreno v. Atlanta Restaurant Partners, LLC*, in which this Court expressly declined to find the spoliation motions untimely. In *Goodman*, as here, the moving party filed his spoliation motion after discovery and the deadline for dispositive motions, but the Court allowed the motion to proceed because there had been no ruling on the pending summary judgment motions, the moving party did not use his spoliation motion to relitigate his summary judgment arguments, and the motion for spoliation sanctions was not filed on the eve of trial. 632 F. Supp. 2d at 509. In *Membreno*, the Court identified similar reasons for not denying a plaintiff's spoliation motion, filed seven months after discovery closed and four months after the plaintiff possessed all information necessary to seek sanctions. 338 F.R.D. 66, 75–76 (D. Md. 2021) (Sullivan, J.). The Court explained that the plaintiff did not seek additional discovery, the pending summary judgment motion by defendants had not yet been ruled upon, and trial was not in the immediate future. *Id.* Those same facts ring true here. Likewise, I will not deny Defendants' Motion as untimely.

**B. Discovery dispute procedure**

Nor will the Court put form over substance and deny Defendants' Motion merely because Defendants presented it to the Court via formal motion rather than the truncated and informal discovery dispute protocol. The Court credits Defendants' contention that the relief sought through the Motion—a jury instruction and preclusion order—relates to trial and was therefore directed to the presiding judge rather than the undersigned to whom matters of discovery are referred. I can discern no subterfuge or improper purpose on Defendants' part by directing the Motion to Judge Hollander's attention. Even if I were to find that the filing of the Motion was

procedurally improper, it would not warrant outright denial of the Motion. Procedural errors of this magnitude rarely warrant such a drastic outcome.

Plaintiffs' procedural arguments fail, and the Court now addresses the merits of Defendants' Motion.

## II. Sanctions for Spoliation Are Unwarranted.

Defendants argue that sanctions are appropriate against Plaintiffs due to their spoliation of the lab notebooks. Defendants contend that Plaintiffs were obligated to preserve the lab notebooks, which were in UMB's possession, before the notebooks went missing. The party moving for sanctions due to spoliation of evidence must establish that:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 520–21 (D. Md. 2010) (Grimm, J.), *aff'd in part, modified in part*, Civil Action No. MJG-06-2662, 2010 WL 11747756 (D. Md. Nov. 1, 2010). The Court's authority to impose sanctions upon a party for its failure to preserve evidence "arises from a court's inherent power to control the judicial process and litigation."[2] *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (D. Md. 2001). However, that authority "is limited to that necessary to redress conduct 'which abuses the judicial process.'" *Id*. (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)). The applicable burden of proof on a

[2] Federal Rule of Civil Procedure 37(e) also provides federal courts with authority to impose sanctions against a party for its spoliation of electronically stored information ("ESI"). Neither Defendants nor Plaintiffs take the position that Rule 37(e) is the source of the Court's authority here, as the lab notebooks are physical documents to which Rule 37(e) would not apply.

motion for sanctions is the "clear and convincing evidence standard." *See Modern Remodeling, Inc. v. Tripod Holdings, LLC*, Civil Action No. CCB-19-1397, 2021 WL 3852323, at *5 (D. Md. Aug. 27, 2021); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 104 (E.D. Va. 2018) ("[T]he general approach of courts in the Fourth Circuit has been to apply the clear and convincing evidence standard, especially where a relatively harsh sanction like an adverse inference is sought."); *Fahimeh Mirakhori v. Arcellx, Inc.*, Civil Action No. TDC-23-1619, 2026 WL 2030776, at *21 (D. Md. July 14, 2026) (Simms, J.) (defining clear and convincing evidence in sanctions case as "that which supports 'a firm belief or conviction, without hesitancy, as to the truth of the allegation sought to be established'" (quoting *United States v. Welsh*, 564 Fed. App'x 727, 728 (4th Cir. 2014))). The Court addresses the relevant elements of the spoliation-sanctions analysis, below.

The first element of the analysis requires Defendants to establish that Plaintiffs had an obligation to preserve the lab notebooks at the time they were lost or destroyed. The duty to preserve evidence "arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591. While "[t]he mere existence of a dispute does not necessarily mean that parties should reasonably anticipate litigation or that the duty to preserve arises," other pre-litigation occurrences may trigger the duty. *Goodman*, 632 F. Supp. 2d at 510. These occurrences include, but are not limited to, "the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue a claim. . . ." *Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 292 (D. Md. 2023) (quoting *Steves & Sons*, 327 F.R.D. at 106).

The parties dispute two issues: (1) when Plaintiffs' duty to preserve the lab notebooks arose and (2) when the lab notebooks were lost or destroyed. Defendants argue that the duty to preserve arose in April 2022, months before litigation began and before the time when Plaintiffs contend the lab notebooks went missing. ECF No. 369 at 13. Plaintiffs argue that there was no duty to preserve in April 2022, and that the lab notebooks were most likely lost in July 2022 before there was any duty to preserve. *See* ECF No. 377 at 12–13.

**A. When the duty to preserve arose**

There is no dispute that Terran filed this lawsuit on August 5, 2022, notified UMB of the filing on August 8, and that approximately one week later, on August 16, UMB issued its litigation hold. *See* ECF Nos. 377 at 12; 369-9. At the time, UMB was not a party to this lawsuit. UMB did not enter the case as a Plaintiff until the filing of the Third Amended Complaint on February 6, 2024. ECF No. 81. But as the cases cited above instruct, the duty to preserve evidence may arise earlier than the actual filing of a lawsuit. In particular, a plaintiff's duty to preserve evidence may arise before the start of litigation when the plaintiff "deci[des] to pursue a claim." *Steves & Sons*, 327 F.R.D. at 106; *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 466, 466 n.27 (S.D.N.Y. 2010) (noting that a plaintiff's duty to preserve evidence may be triggered earlier because, as the prosecuting party, the plaintiff "control[s] the timing of litigation").

Defendants lean heavily into the argument that all Plaintiffs—Terran, UMB, and Dr. Thompson—reasonably anticipated litigation in April 2022, months before this lawsuit was filed, thus triggering the duty to preserve. Defendants point the Court to Plaintiffs' own allegation in the Second, Third, and Fourth Amended Complaints, which states that "Plaintiffs first suspected Defendants' disclosure of, and misuse of, the Psilocybin Trade Secrets in approximately April

2022, in the course of reviewing Compass's published patent application filings." *See* ECF No. 369 at 9, 12; ECF No. 48 ¶ 49 (Second Amended Complaint); ECF No. 81 ¶ 50 (Third Amended Complaint); and ECF No. 199 ¶ 52 (Fourth Amended Complaint). Defendants also direct the Court to Plaintiffs' privilege log, which indicates that Plaintiffs communicated with outside counsel regarding legal advice pertaining to "litigation, IP advice, and licensing advice." ECF No. 369-8 at 3; ECF No. 369 at 12.

Plaintiffs counter that in April 2022, UMB was not a party to this lawsuit and did not anticipate that it would later join the case. ECF No. 377 at 13–15. And while Terran may have suspected misappropriation of trade secrets in April 2022, Plaintiffs contend that UMB did not, and that Terran's knowledge cannot be imputed to UMB. ECF No. 377 at 13–15, n.7. Moreover, Plaintiffs assert that their communications with counsel around April 2022 were related to an amendment to the Master License Agreement between Terran and UMB rather than to litigation against Defendants. ECF No. 377 at 15.

Defendants have not established by clear and convincing evidence that Plaintiffs reasonably anticipated litigation against Defendants as early as April 2022.[3] Even assuming that Plaintiffs first suspected misuse of the trade secrets in April 2022, the mere suspicion of certain facts giving rise to a dispute demonstrates only that there was the "possibility of litigation," not that Plaintiffs should have reasonably anticipated litigation at that time.[4] *See Modern*

[3] Defendants' evidence would also fail to meet the less stringent preponderance of the evidence standard, if such standard applied here.

[4] UMB urges the Court to conclude that the allegation in the Complaint that *Plaintiffs* first suspected Defendants' misuse of the trade secrets relates only to Terran's knowledge. *See* ECF No. 377 at 13. But despite multiple revisions to the Complaint, including grammatical and substantive changes across many paragraphs, the paragraph alleging when Plaintiffs first suspected the misuse of the trade secrets has remained substantively the same. While UMB was not a party to the lawsuit when this allegation first surfaced in the Second Amended Complaint, UMB was a named plaintiff in the Third and Fourth Amended Complaints and the allegation was unchanged.

*Remodeling, Inc.*, 2021 WL 3852323, at *6 (distinguishing between the possibility of litigation and the reasonable anticipation of such litigation and noting only the latter creates a duty to preserve). The Complaint does not allege that Plaintiffs understood in April that Compass had misappropriated their trade secrets, nor does it allege that Plaintiffs made known their suspicions of misappropriation to Compass. On the contrary, the allegation that Plaintiffs "*first suspected* misuse" in April suggests that this was their initial reaction to information contained in Compass's patent filings—a far cry from an affirmative decision to sue, or even a direct threat of litigation from Terran to Compass that would have triggered a duty to preserve. *See Goodman*, 632 F. Supp. 2d at 511 (finding letter "openly threaten[ed] litigation" in that author noted consults with attorneys and stated that if he was "forced to litigate," he could receive damages in excess of amount presently in dispute, thus placing recipient on notice and triggering duty to preserve); *Steves & Sons*, 327 F.R.D. 96 at 106 (finding Plaintiff's consultant had a duty to preserve evidence following his email to Plaintiff warning of potential impending trade secret litigation by Defendant given that consultant had previously testified in an unrelated trade secret misappropriation case brought by Defendant).

Even considering Plaintiffs' allegation that they first suspected misuse of the trade secrets in April, together with the privilege log entries from that time, Defendants fail to satisfy the clear and convincing evidentiary standard. The privilege log entries are ambiguous. At most, they establish that Plaintiffs communicated with private, outside attorneys regarding licensing and

---

This consistency across the pleadings supports the conclusion that all three Plaintiffs shared the initial suspicion of Compass's misuse of trade secrets in April 2022. Had there been any distinction between the parties in this regard, Plaintiffs could have alleged that fact. Even so, under the circumstances presented here, the suspicion in April 2022 that Compass misused the trade secrets did not trigger a duty to preserve relevant evidence.

intellectual property issues and "litigation" of an unspecified nature. That the subject emails covered multiple topics other than litigation tends to support the conclusion that litigation (of whatever nature) was not the parties' sole, or even primary, concern at that time.

Nor have Defendants set forth any clear and convincing evidence establishing at what time *after* April 2022 but *before* August 5, 2022, Plaintiffs, including then non-party UMB, may have reasonably anticipated litigation sufficient to trigger a duty to preserve. The sole evidence in this regard is the First Amendment to a Master License Agreement between Terran and UMB, executed in June 2022, which granted Terran the right to prosecute any action regarding misappropriation of UMB's confidential information, or inventions. ECF No. 377-6 at 6. The agreement required Terran to consider the views of UMB and any effects on the public interest before making any decision regarding whether to sue. ECF No. 377-6 at 6. This agreement certainly suggests that before filing suit Terran should have at least consulted with UMB, but the agreement itself does not establish whether, in fact, Terran sought UMB's input, and if it did, when.[5]

Accordingly, Defendants have failed to establish by clear and convincing evidence that Plaintiffs should have reasonably anticipated litigation in April 2022, thus triggering their duty to preserve evidence at that time. Rather, the evidence submitted supports the Court's findings that Terran commenced litigation on August 5, 2022, triggering its own duty to preserve relevant evidence, and UMB's duty to preserve arose at the latest on August 8, 2022, with UMB's receipt

[5] Defendants point out that UMB has not alleged that Terran breached the First Amendment to the Master License Agreement and that, therefore, the Court may presume that Terran abided by the Agreement's terms and consulted with UMB at some point before it filed the lawsuit. ECF No. 380 at 13. While that could be true, it is also possible that Terran did not seek UMB's input but that failure did not give rise to a breach of the agreement, or if it did, UMB declined to take action against its licensee. The Court can only speculate and that speculation is not enough to warrant spoliation sanctions.

of correspondence from Terran advising UMB of the lawsuit and seeking preservation of relevant evidence. Having determined when the duty to preserve arose, the Court now considers when UMB lost the notebooks, as the timing of when the evidence was lost in relation to when the duty to preserve arose, is essential to the spoliation analysis.

### B. When the lab notebooks went missing

After engaging in discovery to determine the lab notebooks' whereabouts, neither Plaintiffs nor Defendants can state with any precision when the lab notebooks were lost or destroyed. The evidence shows that the last time the lab notebooks were observed was in June 2022. *See* ECF No. 369-4 at 171:13–16. There is no concrete evidence regarding what happened to the notebooks after that time. Plaintiffs contend that the lab notebooks were "most likely … lost in July 2022." ECF No. 377 at 12. Plaintiffs point to an October 1, 2025, email from UMB's counsel, which concludes that the lab notebooks were inadvertently lost or misplaced during the renovations and ensuing cleanup of the fifth floor of the research building. ECF No. 377 at 12; ECF No. 369-10. The email also notes that the renovations "began in early 2021 and continued well into 2022 beyond Dr. Thompson's resignation from UMB on June 30, 2022." ECF No. 369-10 at 2.

This evidence does not support the firm conclusion that the date of loss or destruction of the lab notebooks was in July 2022, versus a later point, like August or thereafter. Plaintiffs' chosen timing is convenient because it would mean that the lab notebooks were lost before the Plaintiffs' duty to preserve arose. But another plausible and equally speculative interpretation of the same October 1 email is that the lab notebooks may have been lost sometime after August 5, 2022, when this lawsuit commenced. The record is unclear. At bottom, the only conclusions that the Court can draw from the evidence presented are: (1) the lab notebooks went missing

sometime *after* June 2022, when Dr. Thompson last saw them; (2) the lab notebooks were declared lost on October 1, 2025, when UMB advised Defendants of the results of their investigation into the whereabouts of the lab notebooks; and (3) the lab notebooks were in UMB's possession when they were lost or destroyed.

### C. Defendants have not carried their evidentiary burden at step one

As noted above, I cannot conclude that Plaintiffs' duty to preserve the lab notebooks arose in April 2022. The evidence only establishes that the duty arose on August 5, 2022, at the earliest. Because the lab notebooks were lost at some point after June 2022, it is entirely possible that the lab notebooks were destroyed in the intervening month before there was a duty to preserve. Given that Defendants have not carried their evidentiary burden at the first step in the analysis, the Court need not proceed to step two to determine whether UMB had a culpable state of mind. Doing so would require the Court to stack all its findings upon a hypothetical—a "what if" scenario that presumes Plaintiffs lost or destroyed the lab notebooks after August 5, 2022. Such a conditional analysis could not serve as the basis for the award of any sanctions. *See In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 518–19 (S.D.W. Va. 2014) (finding that documents that were lost or discarded before the duty to preserve arose "do not support a finding of spoliation" and terminating the analysis as to those materials); *United States v. Maxxam, Inc.*, No. C-06-07497CWJCS, 2009 WL 817264, at *13–14 (N.D. Cal. Mar. 27, 2009) (denying motion for spoliation sanctions because a nonmovant "cannot be held liable for evidence that was destroyed or lost before they had an obligation to preserve it" and the movant failed to "satisf[y] their burden of establishing that evidence was destroyed or lost after the duty to preserve it arose"); *see also* Fed. R. Civ. P. 37(e) advisory committee's note to the

2015 amendment ("Rule 37(e) … does not attempt to create a new duty to preserve. The rule does not apply when information is lost before a duty to preserve arises.").

## CONCLUSION

Accordingly, the Court DENIES Defendants' Opposed Motion for Spoliation Sanctions. A separate Order follows.

Date: August 13, 2026

/s/
Chelsea J. Crawford
United States Magistrate Judge